IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEMORYLINK CORP., a Wisconsin Corporation, | ) ) ) | **FILED: JUNE 9, 2008** **08CV3301** |
| Plaintiff, | ) ) | **JUDGE HIBBLER** Case No.: **MAGISTRATE JUDGE NOLAN** |
| v. | ) ) | **AEE** |
| MOTOROLA, INC., a Delaware corporation, | ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendant. | ) | |

**COMPLAINT FOR INVENTORSHIP CORRECTION
AND FOR PATENT INFRINGEMENT**

Plaintiff MEMORYLINK CORP. by its attorneys, McDONALD HOPKINS LLC, as and

its complaint against Defendant MOTOROLA, INC., for correction of inventorship, patent

infringement and other relief states as follows:

1.      Defendant Motorola, through a scheme of lies, broken promises of a future

working relationship, and outright deceit, stole from Memorylink pioneering technology that

allows the wireless transmission of real-time video (the "Invention"), including video

transmission in Motorola's own cellular telephones, and other valuable intellectual property

rights.  The Invention was created solely by Memorylink shareholders Peter Strandwitz's and

Robert Kniskern's ideas and development of original technology.   Motorola's actions left

Memorylink with nothing but empty promises, missed opportunities, unforeseen significant costs

including developing a radio to work with various applications for the Invention and its

applications.  Memorylink, therefore, brings this complaint to reclaim its intellectual property

rights by correcting the named inventorship on two issued U.S. Patents on the Invention, and to

recover damages for Motorola's patent infringement, fraud, breach of contract as well as other common law claims.

## Parties

2.      Plaintiff Memorylink Corp. ("Memorylink") is a Wisconsin citizen and a Wisconsin corporation with its principal place of business situated at 36 Jewelers Park Drive, Suite 200, Neenah, Wisconsin 54956.

3.      Upon information and belief, Defendant Motorola, Inc. is an Illinois citizen and a Delaware corporation with its principal place of business situated at 1303 East Algonguin Road, Schaumburg, Illinois 60196.

4.      In 1998  Motorola had 29.4 Billion dollars in revenues.  From 1997 through 2000 Motorola has been in the top ten of all patent recipients and filers in the United States Patent and Trademark Office ("USPTO"), averaging approximately 1300 plus issued patents per year.  In 1998, Motorola also employed approximately several hundred patent department professionals in-house focusing on patent prosecution amongst other things.

## Memorylink Patented Technology and the Patents-in-Suit

5.      The patents-in-suit for correction of named inventors under 35 U.S.C. § 256 are: U.S. Patent No. 6,522,352 (the "Known Patent"), entitled "Self-contained Wireless Camera Invention, Wireless Camera System and Method", which issued February 18, 2003 (Exhibit 1); and U.S. Patent No. 6,573,938 (the "Secret Patent"), entitled "Self-contained camera Invention and method for capturing and communicating images via a modem", which issued on June 3, 2003 (Exhibit 2).

6.      The patent-in-suit for infringement is:  the Known Patent entitled "Self-contained Wireless Camera Invention, Wireless Camera System and Method".

7.    Memorylink owns all right, title and interest in and to the Known Patent and has standing to sue for infringement of the Known Patent.

## Jurisdiction and Venue

8.    The Court has exclusive subject matter jurisdiction over this correction of named inventors and patent infringement action pursuant to 35 U.S.C. § 256 and §§ 271 and 281, and has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  To the extent that diversity does not exist, the Court has jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the correction of named inventors and patent infringement claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.    Motorola is subject to personal jurisdiction in this judicial district because it has its corporate headquarters and has transacted business and committed acts of infringement in this district at least by making, using, offering to sell, and selling infringing products through retailer locations located in this district and through websites that are designed to reach and are, in fact, used by customers in this district, and Motorola has committed one or more of the acts complained of herein within this district.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because, upon information and belief, Motorola resides in this judicial district, and § 1391(b)(2) because the events giving rise to Memorylink's claims of correction of named inventors and patent infringement against Motorola occurred in this district.  Venue also is proper pursuant to 28 U.S.C. § 1400(b) because Motorola resides and has committed, and continues to commit, acts of infringement in this judicial district.

## Common Factual Allegations

### Conception of Memorylink's Invention

11.     In 1996 and 1997, as a result of very early Internet experiences, including the playing of a text based multi-player Internet game, Peter Strandwitz, the founder of Memorylink, began to think about the future of video transmission over networks and the dramatic effect it could have on communication between people.

12.     In late 1997, Strandwitz contacted the Advanced Radio Lab of Motorola to discuss securing a 5GHz radio for transmission of the images captured and compressed by the Invention and to discuss a possible relationship with Motorola concerning the Invention.

13.     Strandwitz also believed that combining Motorola's economic strength and market power and the groundbreaking technology of the Invention could result in a valuable business partnership for both sides.

14.     Following Strandwitz's initial contact with Motorola, Plexus Corp., Strandwitz's employer at the time, and Motorola signed a non-disclosure agreement.

15.     On November 12, 1997, Strandwitz, in order to further develop features of his Invention and pursuant to a signed non-disclosure agreement, discussed the Invention with Robert J. Kniskern, President of Adaptive Micro-Ware.

16.     Over the course of November and December 1997, Strandwitz met with Motorola's Advanced Radio Lab personnel and discussed the Invention at length as well as a potential demonstration of an application utilizing the Invention.

17.     Motorola agreed to provide a radio circuit board with a standard Ethernet connection for use in the proposed demonstration.

**The First Memorandum of Understanding**

18.     In January 1998, Motorola, Plexus and Interactive Broadcasting Limited, a company with which Strandwitz had been consulting, executed a Memorandum of Understanding (the "First MOU").  A true and accurate copy of the First MOU is attached hereto as Exhibit 3.

19.     The First MOU provided, *inter alia,* that "Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology."

**The Initial Invention Demonstration For Motorola**

20.     On January 20, 1998, Kniskern and Strandwitz successfully demonstrated an application of the Invention to Motorola at its Schaumburg, Illinois offices.

21.     The demonstrated application consisted of a camera, the technology related to the Invention, and a standard Motorola radio circuit board with an Ethernet connection that were wired together and integrated into this application of the Invention.  These items were then placed in a child's Tasmanian Devil lunchbox for the demonstration (the "Lunchbox Demonstration").

22.     The camera in the lunchbox was able to wirelessly transmit real time video that was displayed on both a television set and a computer.

23.     Motorola was positively blown away by the demonstration and the breakthrough in wireless transmission of real-time video.

**Memorylink Is Incorporated**

24.     Memorylink was incorporated on January 28, 1998.  Strandwitz was named CEO and, later, Kniskern was named as a Director and became an employee.

25.     Subsequent to Memorylink's incorporation, Plexus, Interactive Broadcasting Limited, and Adaptive Micro-Ware, the companies Strandwitz and Kniskern had worked with relating to the Invention and its applications, assigned any and all of their respective rights, title and interest with respect to the technology and applications relating to the Invention to Memorylink.

26.     Also subsequent to incorporation, Plexus and Interactive Broadcasting Limited assigned the First MOU to Memorylink.

**Kniskern Authors the Invention Patent Overview**

27.     On February 15, 1998, Kniskern, without any assistance or input from Motorola finished preparing a document covering aspects of the Invention entitled "Wireless Multimedia Core Technology Overview for Patent Review" for Memorylink.  A true and accurate copy of this document is attached hereto as Exhibit 4.  This was prepared in anticipation of filing one or more patent applications covering various embodiments of the Invention.

28.     On February 16, 1998, at the request of Motorola's Jan Wyckoff and Tom Waltz, Strandwitz and Kniskern sent the "Wireless Multimedia Core Technology Overview for Patent Review" to Wyckoff and Waltz.

**Motorola Requests Additional Demonstrations of the Invention**

29.     After the Lunchbox Demonstration and during subsequent discussions, Motorola requested that Strandwitz and Kniskern perform another application demonstration of the Invention, but this time using Sharp brand camcorders.  In connection with that request, Motorola provided another radio board.

30.     At Motorola's request, Kniskern and Strandwitz made another successful application demonstration of the Invention on February 25, 1998 using two modified Sharp

brand video camcorders to allow each camera to wirelessly transmit the video to the other what each was viewing in real time, even from adjacent rooms (the "Sharp Demonstration").

31.    Memorylink accomplished this by removing the videotape cassettes from the camcorders and replacing them with circuit boards which incorporated technology related to the Invention that enabled the Motorola radio to wirelessly transmit real time video.

32.    Motorola was again astonished with the success of this application of the Invention.

33.    Relying on the First MOU, mutual understandings and the non-disclosure agreements in place between the parties, Strandwitz and Kniskern, at Motorola's request, agreed to leave the two modified Sharp video camcorders incorporating the Invention with Motorola.

34.    Upon information and belief, Motorola subsequently demonstrated these modified Sharp video camcorders incorporating the Invention at a Motorola technology forum without Memorylink's knowledge or acquiescence.

35.    After February 25, 1998, Motorola made a request to Strandwitz and Kniskern that Memorylink repeat the demonstration previously made with the Sharp video camcorders using Sony brand video camcorders incorporating the Invention.

36.    Motorola stated that it wanted Sony brand camcorders used in order to be able to approach Sony with the Invention, and using Sharp brand camcorders would potentially offend Sony.

37.    Motorola promised Memorylink, through its statements to Strandwitz and Kniskern, that any demonstration to Sony would be done with Memorylink's approval and with Memorylink in attendance.

38.     Memorylink agreed to do the demonstration and began working on the application project.

**Motorola Begins Its Scheme To Steal The Invention**

39.     Subsequent to the successful Lunchbox and Sharp Demonstrations, Motorola represented to Strandwitz and Kniskern it had a large in-house patent department and an expertise in the filing and prosecution of patent applications and suggested that Motorola prepare and file any patent applications on the Invention.

40.     Strandwitz and Kniskern had little experience in the filing and prosecution of patent applications.

41.     In 1998, Motorola received 1,406 issued utility patents according to USPTO records, which was up 33 percent from 1997 totals and which placed them fourth amongst all organizations.

42.     Motorola, by having only its own patent attorneys preparing and controlling the documents in the filing and prosecution of the patent application before the USPTO provided itself the opportunity to, and did, defraud and steal Memorylink's rights in the Invention.

43.     Based on Motorola's statements about its large in-house patent department and its expertise in preparing, filing and prosecuting patent applications, and based on the terms of the First MOU, Strandwitz agreed to have Motorola file any patent applications for the Invention.

**The Patent Filings Begin**

44.     On April 13, 1998, Hugh C. Dunlop, Motorola Senior Patent Manager, sent a letter to Strandwitz regarding patents.  A true and accurate copy of this letter without exhibits is attached hereto as Exhibit 5 (the "April 13 Dunlop Letter").

45.    A stated purpose of the April 13 Dunlop Letter was to identify a basis for filing patent applications as a result of "the design effort between Motorola and Memorylink or its associated companies."

46.    In the April 13 Dunlop Letter, Dunlop stated that, premised upon his understanding from Gary Schulz and Jan Wyckoff, Schulz and Wyckoff along with Strandwitz and Kniskern were co-inventors of the Invention, as well as any related technologies.

47.    In fact, as of the date of the April 13 Dunlop Letter, neither Schulz nor Wyckoff had contributed or done anything towards the conception of the Invention.

48.    Despite Memorylink's reliance on Motorola's patent attorneys and the fact that Motorola's patent attorneys were preparing all of the documents related to the patent filing and that Strandwitz and Kniskern subsequently appointed Motorola's in-house patent attorneys as their attorneys to prosecute the Known Patent Application, no one from Motorola at any time advised Strandwitz and Kniskern as to the legal standard of who qualifies as an inventor or what effect an assignment to Motorola would have on Memorylink's rights under any patent that might issue.

49.    During face-to-face meetings with Motorola engineers and management prior to signing any formal documents related to the Known Patent application, Motorola affirmatively represented to Memorylink, through Strandwitz, that Motorola's employees needed to be on the patent application as co-inventors.

50.    Motorola's statement that Motorola's employees needed to be on the patent application as co-inventors was false and Motorola knew such statement was false when made.

51.    Motorola's false statement that Motorola's employees needed to be on the patent application as co-inventors was made for the purpose of inducing Memorylink to believing that

Motorola's employees needed to be named as co-inventors on the patent applications as well as for the purpose of Motorola gaining rights to the Invention.

52.    Memorylink relied upon Motorola's statement that its employees needed to be on the patent application as co-inventors.

53.    Given, among other circumstances, Motorola's false statements that their employees needed to be on the patent, Strandwitz's inexperience in the preparation and filing of patent applications and what constitutes being an inventor, the terms of the First MOU, the April 13 Dunlop Letter, and the fact that Motorola's in-house patent counsel was handling the filing of the patent on the Invention, Memorylink, through Strandwitz, believed that Motorola personnel needed to be placed on any patent applications as co-inventors in order for Motorola and Memorylink to jointly work together on uses and applications of the Invention.

54.    Thus Strandwitz did not object to including Motorola's employees Schulz and Wyckoff as co-inventors because he reasonably relied on Motorola's misstatements and reasonably relied on Motorola's experienced in-house patent attorneys to properly define who is and who is not an inventor under the patent laws.

55.    Kniskern similarly deferred to Motorola's decision and professed expertise in filing patent applications and to Strandwitz.

56.    The April 13 Dunlop Letter also attached Kniskern's "Wireless Multimedia Core Technology Overview for Patent Review" document created by Kniskern for Memorylink and submitted to Motorola as the only relevant exhibit to the proposed Joint Patent filing Agreement.

57.    The description of the Invention, as set forth in the "Wireless Multimedia Core Technology Overview for Patent Review," was based wholly on the draft document disclosures created by Kniskern for Memorylink and submitted to Motorola.

58.     However, Dunlop stated that the description included in the April 13 Dunlop Letter deleted the references in Figure 1 and pages 17 to 20 of Kniskern's draft document because "these are areas where Motorola has prior involvement, and we [Motorola] are not able to enter into any agreement which might result in joint ownership of intellectual property in these areas."

59.     Figure 1 and pages 17 to 20 of Kniskern's draft discussed radio technology.

60.     Thus the resulting patent contains no independent or dependent claims related to any novelty in Motorola's radio technology.

61.     The April 13 Dunlop Letter also attached a proposed Joint Patent Filing Agreement drafted by Motorola that referenced Kniskern's documents regarding the Invention (the "Proposed Joint Patent Filing Agreement").   A true and accurate copy of a Proposed Joint Patent Filing Agreement is attached hereto as Exhibit 6, which is believed to be a version sent to Memorylink in October of 1998.

62.     On April 21, 1998, Motorola and Memorylink met to discuss the patent filing on the Invention.

63.     On that same date Dunlop prepared and witnessed, and Strandwitz, Kniskern, Schulz and Wyckoff signed, a Motorola invention disclosure form listing Strandwitz and Kniskern of Memorylink and Schulz and Wyckoff of Motorola as inventors.  A true and accurate copy of the April 21, 1998 invention disclosure form is attached hereto as Exhibit 7.

64.     For the same reasons that they did object to the suggestions in the April 13 Dunlop Letter, Memorylink, through Strandwitz and Kniskern did not object to the contents of the disclosure form.

65.    On or about May 6, 1998, Kniskern and Strandwitz had a meeting with IDEO Corporation, a product development consulting company, and engaged IDEO Corporation to prepare a marketing report for Memorylink of potential applications of the Invention.

66.    Prior to June 11, 1998, Motorola made false statements and/or omissions of material fact concerning the explanation of inventorship, the Assignment and the legal effects of joint ownership of the patent right. If an explanation of inventorship, assignment and joint ownership was made to Strandwitz and Kniskern, they would not have assigned any of their rights in the Invention to Motorola and they would have objected to the addition of Motorola's employees being added as co-inventors on the patent application.

67.    The foregoing representations by Motorola were false and Motorola knew such statements and omissions were false when made.

68.    The foregoing false statements and omissions by Motorola were made for the purpose of inducing Strandwitz and Kniskern to execute the assignment.

69.    On June 11th and 12th, 1998, premised upon Motorola's false representation, Kniskern and Strandwitz, respectively, signed an assignment, prepared by Motorola, assigning their rights in the Invention and any resulting patent(s) from the patent application being prepared and prosecuted by Motorola's in-house patent attorneys to Motorola and Memorylink (the "Assignment").  A true and correct copy of the Assignment is attached hereto as Exhibit 8.

70.    The Assignment was signed before the claims in the planned patent application were finalized and before Strandwitz and Kniskern ever saw a complete draft of the patent application.

71.    Despite Memorylink's reliance on Motorola's patent attorneys and the fact that Motorola's patent attorneys were preparing all of the documents related to the patent filing,

prepared the Assignment, and that Strandwitz and Kniskern subsequently appointed Motorola's in-house patent attorneys as their attorneys to prosecute the Known Patent application, no one from Motorola at any time advised Strandwitz and Kniskern as to the legal significance of their signatures on the Assignment – namely that they were giving away a significant portion of their patent rights to Motorola for free without any need for Motorola to account for future profits it made from any issued patent on the Invention and giving Motorola the free ability to grant licenses under any resulting patent on its own terms without any input from or remuneration to Memorylink.

72.    Strandwitz and Kniskern executed the Assignment solely due to Motorola's misrepresentations that Motorola's employees had to be included on the patent and they had to execute the assignment in order to file the patent application and to work jointly together on applications of the Invention.

73.    There was no consideration for the Assignment.

74.    On June 17, 1998, Kniskern, Strandwitz and Tom Freeburg of Motorola met with IDEO Corporation regarding preliminary findings of potential applications of the Memorylink Invention.

**Motorola Files An Application For The Known Patent**

75.    On June 22, 1998, Motorola's in-house patent attorneys finished their preparation of the patent application and filed it with the United States Patent Office as U.S. Patent Application Serial No. 09/102,457 titled, "Self Contained Wireless Camera Invention, Wireless Camera System and Method", which eventually issued as the Known Patent.  A true and accurate copy of this patent application is attached hereto as Exhibit 9.

76.    The Known Patent application named Peter Strandwitz, Robert J. Kniskern, Gary Schulz, and Jan-Michael Wyckoff as the "inventors".

77.    Unbeknownst to Memorylink, Motorola also prepared, and Motorola's patent counsel affirmed, an assignment recordation sheet that, despite the unambiguous terms of the Assignment, reflected that Motorola was the sole assignee of the patent.  Memorylink did not discover this fact until 2008.  A true and accurate copy of this recordation sheet is attached hereto as Exhibit 10.

78.    The Known Patent application and the claimed Invention in the issued Known Patent are derived solely from information, concepts and designs created solely by Strandwitz and Kniskern

79.    The "Wireless Multimedia Core Technology Overview for Patent Review" was prepared wholly and solely by Kniskern for Memorylink and from information, concepts and designs created solely by Strandwitz and Kniskern.

**Motorola's Scheme Continues As It Surreptitiously Files a Second Patent Application**

80.    A mere two days following the filing of the Known Patent application, without informing Memorylink and without Memorylink's knowledge or agreement, Motorola, through its in-house patent department, filed a separate U.S. Patent Application Serial No. 09/103,408 titled, "Self-Contained Camera Invention and Method for Capturing and Communicating Images via a Modem" that matured into the "Secret Patent".  A true and accurate copy of the Secret Patent application is attached hereto as Exhibit 11.

81.    Motorola prepared the Secret Patent application and knowingly and intentionally excluded mention of Strandwitz and Kniskern, naming only Gary Schulz and Jan-Michael Wyckoff as the purported "inventors".

82.     Motorola also prepared an additional assignment knowingly and intentionally listing only Schulz and Wyckoff as inventors of the Secret Patent. The assignment purported to assign their patent rights solely to Motorola.

83.     Motorola knew that the application for the Secret Patent would be unpublished, meaning that it was not publicly available, until after the Secret Patent issued, thus making it less likely that Memorylink would discover the Secret Patent or Motorola's overall scheme to steal Memorylink's technology and intellectual property rights.

84.     The Secret Patent and its application depicts two video camcorders bearing unmistakable similarities to the modified Sharp and Sony (see paragraph 86 –89 below) camcorders conceived of, built, and developed by Memorylink and previously used in the Demonstrations.

85.     Memorylink did not learn of the Secret Patent until November 29, 2007.

**The Sony Camcorder Demonstration**

86.     In May 1998, pursuant to Motorola's previous request, Kniskern and Strandwitz repeated the successful demonstration of an application of the Invention using two Sony video camcorders.

87.     Similar to the prior demonstrations, and for similar reasons, Memorylink agreed to Motorola's request to leave the Sony demonstration units incorporating the Invention with Motorola.

88.     In late June 1998, without Memorylink's prior knowledge or attendance, and, upon information and belief, without a signed non-disclosure agreement, Motorola continued its scheme to steal Memorylink's technology by demonstrating the Sony camcorder application of the Invention to Sony Corporation using the Sony video camcorder provided by Memorylink,

and, upon information and belief, representing to Sony that the technology of the Invention was solely owned by Motorola.

89.　　Subsequently, Wyckoff admitted to Strandwitz that the demonstration to Sony took place without Memorylink and that Memorylink was not mentioned to Sony in the meeting or that Memorylink was the source of the modified camcorders and the underlying technology therein.

90.　　On July 10, 1998, IDEO Corporation provided to Memorylink a marketing report of potential applications of the Memorylink Invention.　Among a plethora of applications of wireless video, this marketing report set forth a hand-held, wireless video communicator bearing a striking resemblance to today's cellular telephone.

91.　　Subsequent to July 10, 1998, Memorylink provided to Motorola IDEO Corporation's marketing report of these potential applications for the Memorylink Invention.

92.　　In September 1998, nearly one year after Motorola and Memorylink began their discussions relating to Motorola providing a radio circuit board to use in connection with the Invention, Motorola disbanded its Advanced Radio Lab.

93.　　On October 21, 1998, Strandwitz sent a letter to Freeburg of Motorola regarding the disbanding of Motorola's Advanced Radio Lab and identifying items of Motorola's radio technology that Memorylink desired to license in connection with Memorylink's continuing work on applications of the Invention.

94.　　Motorola ignored Memorylink's request for a license.

95.　　Memorylink therefore began spending its own time and money developing its own 5GHz radio chipset to provide a radio frequency carrier signal for use with the Invention.

**Motorola Continues The Charade Of Partnering With Memorylink**

96.    On October 30, 1998, Dunlop sent a letter to Strandwitz stating that he could not locate a signed copy of the proposed Joint Patent Filing Agreement and requested that Strandwitz "re-execute" it.  A true and correct copy of this letter without exhibits is attached hereto as Exhibit 12.

97.    On or before December 2, 1999, Schulz, indicating Motorola's continued interest in working with Memorylink, sent an email to Strandwitz requesting that Memorylink prepare another demonstration of an application of the Invention using a remote controlled vehicle with wireless streaming video.

98.    Subsequently, believing that Motorola was still interested in partnering with Memorylink based on similar statements of continued interest from Motorola's engineers, Strandwitz and Jon A. Huard, Memorylink's Executive Vice President, successfully demonstrated the remote-controlled vehicle application of the Invention to Motorola.

99.    Over the next few months from the end of 1999 to early 2000, believing Motorola's continuing statements and indications of interest, and believing Motorola was acting in good faith, at Motorola's request Memorylink made various presentations to internal Motorola groups, demonstrations at Motorola symposia, and prepared documents describing potential uses of the Invention technology with Motorola devices and concepts.

100.    In early 2000, Motorola re-established and/or re-formed the Advanced Radio Lab under the name of the Broadband Wireless Technology Center to develop Motorola's "Canopy" product (the "Canopy Lab").

101.    Subsequent to the formation of the Canopy Lab, Memorylink demonstrated its progress, including Memorylink's proprietary 5 GHz radio technologies incorporated into state of the art Application Specific Integrated Chips ("ASIC") to Motorola.

102.    Motorola was impressed with these accomplishments made by Memorylink on the radio ASIC that were shown to Motorola during meetings in Neenah, Wisconsin.  Motorola was provided with detailed specifications, circuit diagrams and, upon information and belief, Memorylink's 5 GHz radio ASIC units to evaluate.

103.    Again Memorylink, trusting Motorola, and having a non-disclosure agreement in place, felt secure in supplying this detailed information and samples of its radio ASIC to Motorola for further study and evaluation. .

104.    On March 22, 2001, without informing Memorylink, Motorola announced a product concept referred to as the "Motorola Other Eyes miniaturized camera," which, according to Motorola, included "video and sounds to enhance communication through messages and conversations.  Wherever you are, your family can literally share a day in your life, seeing the things you do via the Motorola Other Eyes miniaturized camera."

105.    On August 27, 2001, at Motorola's request, Memorylink and Motorola executed two more Memoranda of Understanding that were drafted by Motorola each of which provided, *inter alia,* that "Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology."

106.    One MOU related to evaluating joint product/business opportunities relative to Memorylink's unique video compression of the Invention.  A true and correct copy of this MOU is attached hereto as Exhibit 13.

107.    The other MOU related to combining Memorylink's 5 GHz gallium arsenide radio chipset with Motorola's discrete radio.  A true and correct copy of this MOU is attached hereto as Exhibit 14.

108.    On the basis of the August 27, 2001 two Memoranda of Understanding and further discussions between the parties, Memorylink ceased further development of its radio and radio chipset to avoid duplication of efforts with Motorola.

109.    Throughout 2002, at Motorola's request, Memorylink attended various tradeshows as well as Motorola's Homeland Security Technology Summit to demonstrate various applications of the Invention.

110.    On June 10, 2002, Kniskern sent a letter to Tony Kobrinetz and Tom Freeburg of Motorola regarding a proposed effort to combine Memorylink's wireless video technology Invention and Motorola's radio technology to create a product development platform from which specific products could be developed. This was called the MotoLink circuit board. A true and correct copy of this letter is attached hereto as Exhibit 15.

111.    Memorylink had the MotoLink circuit board built with an application of the Invention and certain elements of the Canopy radio integrated onto the circuit board and then submitted the circuit board to Motorola for its review.

**Motorola Prosecutes The Known and Secret Patents Without Input From Memorylink**

112.    On April 1, 2002, the USPTO issued an Office Action on the Secret Patent application.

113.    On June 19, 2002, USPTO issued an Office Action on the Known Patent application.

114.    On July 1, 2002, without notifying Memorylink, Motorola, through its in-house patent counsel, responded to the Office Action on the Secret Patent application.

115.    On July 9, 2002, without notifying Memorylink, Motorola, through another one of its in-house patent counsel, responded to the Office Action on the Known Patent application.

**Motorola Continues to Mislead Memorylink**

116.    On December 17, 2002, Strandwitz sent a letter to Tony Kobrinetz of Motorola, again seeking the definitive agreements promised in the various MOUs.

117.    Rather than follow through on those promises at this time, Motorola proposed, and on or about January 24, 2003, Memorylink and Motorola executed, a fourth Memorandum of Understanding, which related to joint development of a Motorola multi-band radio utilizing Memorylink's previously developed proprietary radio chipset technology, which incorporated advanced ASIC technology versus Motorola's discrete component technology.   A true and correct copy of the fourth MOU is attached hereto as Exhibit 16.

**Motorola States that Memorylink has Full Rights to the Known Patent and Its Divisional**

118.    On January 27, 2003, Memorylink filed a divisional patent application, U.S. Patent Application Serial No. 10/351,906 (the '906 Application), from the Known Patent application.

119.    As required by the Patent laws, the '906 Application listed all of the inventors listed on the "parent" patent namely, Strandwitz, Kniskern, Schulz and Wyckoff.

120.    On January 29, 2003, Memorylink's patent counsel, Jon O. Nelson of Banner & Witcoff, had a telephone conversation with Brian Mancini, Motorola's patent counsel in which Mancini stated that Motorola declined to participate in the filing of the '906 Application, and that

Memorylink could have exclusive ownership of the Known Patent, if and when it issued, as well as any divisional patent applications.

121.    On January 29, 2003, Mr. Nelson sent a letter to Mr. Mancini confirming the conversation and requesting to further discuss the logistics of transferring ownership regarding the Known Patent and any divisional patent applications.  A true and correct copy of this letter is attached hereto as Exhibit 17.

122.    Motorola did not respond to this letter.

123.    The Known Patent issued on February 18, 2003.

**Motorola Finally Pulls the Plug**

124.    Still relying on Motorola's promises of its intent to partner with Memorylink, believing that Motorola was acting in good faith, and unaware of the Secret Patent, in April 2003, Memorylink prepared and circulated to Motorola a draft Strategic Alliance Agreement.

125.    On April 30, 2003, Memorylink met with Motorola to discuss the draft Strategic Alliance Agreement.   Rather than move forward on the agreement, Motorola informed Memorylink that Motorola was no longer interested in pursuing Memorylink's wireless video applications of the Invention and was ceasing work on the MotoLink board and the joint development radio effort utilizing Memorylink's advanced radio elements.

126.    On May 30, 2003, Strandwitz sent a letter to Tony Kobrinetz of Motorola, seeking a definitive agreement as contemplated by the MOUs and reiterating Memorylink's desire to license Motorola's radio technology for its Invention applications.

127.    On June 3, 2003, the Secret Patent issued.

128.    On July 29, 2003, Jon Nelson sent a second letter to Brian Mancini regarding Motorola's previously expressed willingness to transfer the full ownership of the Known Patent

and its divisional patent application to Memorylink, along with an assignment document for each.  A true and correct copy of this letter is attached hereto as <u>Exhibit 18</u>.

129.    On August 1, 2003, Brian Mancini responded in a letter stating that Motorola was not willing to relinquish its patent rights in the Known Patent or any divisional patent applications.  A true and correct copy of this letter is attached hereto as <u>Exhibit 19</u>.

130.    On September 18, 2003, Jon Nelson sent a letter to Brian Mancini requesting a copy of "the signed documentation relating to the" Known Patent.

131.    On November 5, 2003, Brian Mancini sent a facsimile to Jon Nelson stating that a signed copy of documentation relating to the Known Patent, including a signed copy of the Proposed Joint Patent Filing Agreement, could not be found. A true and accurate copy of the facsimile is attached hereto as <u>Exhibit 20</u>.

132.    On December 20, 2005, Jon Huard and Jon Nelson met with Timothy M. Kowalski, Motorola's Intellectual Property Counsel, and Peter Jorgensen of Motorola regarding the Known Patent.

133.    In that meeting, Kowalski admitted that the Known Patent covers wireless video transmission in the cellular telephone industry and that Motorola was interested in control of the Known Patent and any divisional patent applications.

134.    Kowalski did not mention the Secret Patent.

135.    In that meeting, Huard expressed a desire for definitive agreements between the parties to enforce the Known Patent and a desire to move forward in a business relationship with Motorola.

136.     On February 8, 2006, Huard followed up his comments at the meeting with a written proposal to Kowalski presenting several strategic options to move forward in a business relationship with Motorola.

137.     In March 2006, Huard held a telephone conference with Kowalski and Jorgensen to further discuss the Known Patent and the related strategic business options.

138.     In that telephone conference, Motorola stated that they believed that the Known Patent was very valuable but that Motorola was primarily interested in the patent for defensive purposes and cross-licensing opportunities.

139.     Motorola still did not reveal the existence of the Secret Patent.

140.     On January 18, 2007, Huard had another telephone conversation with Kowalski regarding the Known Patent.

141.     In this telephone conference, Kowalski again stated that the Known Patent was applicable to its wireless video transmission in the cellular telephone industry.

142.     Throughout the remainder of 2006 and into 2007 Memorylink continued to engage Motorola in discussions seeking the definitive agreements promised in the four previous MOUs, a definitive agreement regarding ownership and enforcement of the Known Patent, and future plans for both companies moving forward.

143.     On October 16, 2007, Memorylink sent a Letter of Intent to Motorola proposing a joint patent enforcement agreement.  A true and correct copy of this letter is attached hereto as Exhibit 21.

144.     Motorola responded to this proposed joint patent enforcement by demanding that Motorola have a royalty-free license to the Known Patent; that Motorola have the right to issue royalty-free licenses to its customers; that the Known Patent would be subject to "pick

agreements" with Motorola's competitors under which a competitor could choose to have a royalty-free license to the patent; and that Motorola exercise veto control over any licensing deals.

145.    Motorola's demands on the joint patent enforcement agreement made it clear to Memorylink that Motorola had no intention to follow through or honor any of its prior mutual understandings, agreements and promises made in the four MOUs to reach definitive agreements with Memorylink and to jointly exploit the Invention together as partners.

146.    On October 25, 2007, Memorylink filed a continuation patent application, U.S. Patent Application Serial No. 11/977,687 (the '687 Application), from the Known Patent application.

147.    As required by the Patent laws, the '687 Application listed all of the inventors listed on the "parent" patent namely, Strandwitz, Kniskern, Schulz and Wyckoff.

148.    In November 2007, as part of an external investigation as to the relationship with Motorola, Memorylink discovered that Gary Schulz and Jan-Michael Wyckoff were not proper inventors on the Known Patent under the patent law.

149.    In November 2007, as part of an external investigation as to the relationship with Motorola, Memorylink first discovered the existence of the Secret Patent.

150.    In December 2007, as part of the external investigation as to the relationship with Motorola, Memorylink learned that Motorola's Other Eyes miniaturized camera product concept incorporated an application of the Invention and other proprietary Memorylink technology.

151.    In 2008 after discovering the problem with the inventorship on the Known Patent and then discovering the Secret Patent and Motorola's Other Eyes miniaturized camera product

concept, Memorylink made attempts to reach a fair resolution with Motorola concerning the Known Patent and its divisional patent applications, as well as the Secret Patent, with no success.

### COUNT I
### CORRECTION OF INVENTORSHIP OF THE '352 PATENT (the "Known Patent") UNDER 35 U.S.C. §256

152.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 152.

153.    Strandwitz and Kniskern are the only inventors of the claims of the Known Patent.

154.    Gary Schulz and Jan-Michael Wyckoff of Motorola did not conceive of any invention defined in the claims of the Known Patent and, therefore, are not inventors of the Known Patent.

155.    The improper naming of Gary Schulz and Jan-Michael Wyckoff as inventors of the Known Patent occurred without any deceptive intent on behalf of the actual inventors Peter Strandwitz and Robert J. Kniskern.

156.    Because Gary Schulz and Jan-Michael Wyckoff of Motorola were identified as inventors of the Known Patent, Motorola has exploited the Known Patent and has profited and will continue to exploit the Known Patent and profit unless this Court issues an Order directing the Commissioner of Patents to correct the inventorship of the Known Patent under 35 U.S.C. §256.

### COUNT II
### INVALIDATION OF THE ASSIGNMENT OF THE '352 PATENT (the "Known Patent")

157.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 157.

158.    The Assignment of the Known Patent was executed under conditions of fraud and deception.

159.    Motorola intentionally deceived Peter Strandwitz and Robert J. Kniskern into believing that Gary Schulz and Jan-Michael Wyckoff were inventors of the Known Patent and needed to be on the Patent for various other reasons unrelated to actual inventorship.

160.    Motorola intentionally deceived Strandwitz and Kniskern by failing to explain the legal standard of who qualifies as an inventor.

161.    Based on the belief that Gary Schulz and Jan-Michael Wyckoff were inventors of the Known Patent and were required to be on the patent for other reasons, Peter Strandwitz and Robert Kniskern executed the Assignment of the Known Patent.

162.    Motorola intentionally deceived Strandwitz and Kniskern by failing to explain the legal consequences of Strandwitz and Kniskern jointly assigning the Known Patent Application to Motorola and Memorylink.

163.    Given Motorola's deception, Peter Strandwitz's and Robert Kniskern's execution of the Assignment of the Known Patent was not voluntary.

164.    But for Motorola's false statements and omissions of material fact to Strandwitz and Kniskern concerning the inventorship, the Assignment and the joint ownership of patent rights, Strandwitz and Kniskern would not have executed the Assignment.

165.    Therefore, the Assignment of the Known Patent should be invalidated.

## COUNT III
## DECLARATORY JUDGMENT THAT THE ASSIGNMENT IS VOID *AB INITIO*

166.    Memorylink realleges Paragraphs 1 through 151 and 158 through 165 of this Complaint as and for this paragraph 166.

167.    The nature of this count is for declaratory relief pursuant to 28 U.S.C. §2201, for the purpose of determining a question in actual controversy between the parties concerned as to the validity of the Assignment.

168.    An actual controversy exists as to whether the Assignment is valid or is void *ab initio* for lack of consideration.

169.    Motorola, by, among other things, its actions, has indicated that it believes that the Assignment is valid and binding.

170.    Memorylink believes that the Assignment is invalid for lack of consideration, as Motorola gave nothing of value in return for Strandwitz and Kniskern executing the Assignment in favor of Motorola.

171.    A declaration as to the foregoing is necessary so that the parties can determine whether the Assignment is valid and whether Motorola may rely on the Assignment to (a) grant licenses under the Known Patent without Memorylink's knowledge and to Memorylink's detriment, and (b) defend against this action.

172.    If the Assignment is invalid, then Motorola had no right to grant licenses under the Known Patent and should be forced to account and disgorge to Memorylink all monies received as a result of the invalid Assignment.

173.    If the Assignment is void *ab initio*, then any Motorola licenses to third parties would also be null and void.

## <u>COUNT IV</u>
## <u>INFRINGEMENT OF THE '352 PATENT (the "Known Patent")</u>

174.    Memorylink realleges Paragraphs 1 through 151 and 158 through 165 of this Complaint as and for this paragraph 174.

175.    Motorola has been and is now directly infringing, contributorily infringing, and inducing infringement by making, using, importing, offering for sale, or selling wireless cameras and wireless camera systems that infringe one or more claims of the Known Patent in violation of 35 U.S.C. § 271 within this judicial district and elsewhere in the United States.

176.    Such infringement includes, but is not limited to Motorola's RAZR line of cellular phones and other cellular phones containing the Invention.

177.    Motorola has profited and will continue to profit by its infringing activities.

178.    Motorola has knowingly infringed the Known Patent and Motorola's infringement has been willful and deliberate.

179.    Memorylink has been damaged by Motorola's infringing activities and will continue to be irreparably injured unless this Court enjoins these infringing activities.

**COUNT V**
**CORRECTION OF INVENTORSHIP OF THE '938 PATENT (the "Secret Patent")**
**UNDER 35 U.S.C. § 256**

180.    Memorylink realleges Paragraphs 1 through 151 and 158 through 165 of this Complaint as and for this paragraph 180.

181.    The subject matter of the Secret Patent was derived solely from Memorylink's confidential information received by Motorola under various Non-Disclosure Agreements.

182.    The Secret Patent fails to identify Strandwitz and Kniskern as inventors when there is clear and convincing evidence that Strandwitz and Kniskern are the only inventors of the Secret Patent.

183.    Gary Schulz and Jan-Michael Wyckoff of Motorola did not conceive of any invention defined by the claims of the Secret '938 Patent and, therefore, are not inventors of the Secret '938 Patent.

184.    The naming of Gary Schulz and Jan-Michael Wyckoff of Motorola as inventors of the Secret Patent was done without any deceptive intent on behalf of the actual inventors, Strandwitz and Kniskern.

185.    Because Strandwitz and Kniskern are identified as inventors of the Secret Patent, Motorola has profited and will continue to profit unless this Court issues an Order directing the Commissioner of Patents to correct the inventorship of the Secret Patent.

### COUNT VI
### BREACH OF NON-DISCLOSURE AGREEMENTS

186.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 186.

187.    Memorylink had various non-disclosure agreements with Motorola, and is the successor in interest to the non-disclosure agreements between Motorola and others that helped develop applications of the Invention, including Plexus, Interactive Broadcasting, and Adaptive Micro-Ware.

188.    Motorola beached the various non-disclosure agreements by using and disclosing Plexus' and Memorylink's confidential and proprietary information to third parties without permission or authorization.

189.    Motorola's breach of the non-disclosure agreements has damaged and continues to damage Memorylink.

190.    Motorola has profited from its breach of these non-disclosure agreements and will continue to profit unless enjoined by this Court.

191.    Memorylink has a clearly ascertained right in the protection of confidential information disclosed to Motorola under the various non-disclosure agreements that is in need of protection.

192.    Memorylink's rights are in need of protection as Motorola has, despite the existence of the various non-disclosure agreements, shared Memorylink's confidential information with third parties and used Memorylink's confidential information in Motorola products and product concepts.

193.    If an injunction is not granted, Memorylink will suffer irreparable harm, as, among other things, Motorola's transgressions are ongoing and continuing.

194.    Memorylink has no adequate remedy at law.

195.    Memorylink is likely to succeed on the merits of its claim.

196.    The balance of hardships favors Memorylink.

## COUNT VII
## BREACH OF FIDUCIARY DUTY

197.    Memorylink realleges paragraphs 1 through 151 of this Complaint as and for this paragraph 197.

198.    Due to its size, power, patent expertise, and the fact that it undertook to prepare, file all formal papers and prosecute the Known Patent on Memorylink's behalf through its in-house patent attorneys, Motorola entered into a fiduciary relationship with Memorylink.

199.    Despite this relationship, Motorola breached its fiduciary duties to Memorylink by, for example, exploiting Memorylink's confidential information for its own purposes, failing to explain the legal standard of who qualifies as an inventor, incorrectly identifying inventorship of the Known Patent, failing to explain the legal effects of jointly assigning the Known Patent Application to Motorola and Memorylink, filing the Secret Patent without Memorylink's knowledge, and profiting from Memorylink's technology.

200.    Motorola knew that Memorylink was acting without knowledge of Motorola's breach of fiduciary duties with respect to Memorylink.

201.    Memorylink has been damaged by Motorola's breaches of its fiduciary duties and will continue to be damaged unless enjoined by the Court.

202.    Memorylink has a clearly ascertained right in the protection of Memorylink's confidential and proprietary information disclosed to Motorola, Memorylink's ownership of the Invention, and Memorylink's ownership of the intellectual property related to the Invention.

203.    Memorylink's rights are in need of protection as Motorola has, despite the existence of various non-disclosure agreements, the MOUs, and its fiduciary duties, shared Memorylink's confidential information with third-parties, used Memorylink's confidential information in Motorola products and product concepts, licensed the Invention to other third parties through pick license agreements and outright stolen Memorylink's ownership rights in the Invention and the related intellectual property.

204.    If an injunction is not granted, Memorylink will suffer irreparable harm, as, among other things, Motorola's transgressions are ongoing and continuing and its third party license agreements will continue to erode the value of the intellectual property.

205.    Memorylink has no adequate remedy at law.

206.    Memorylink is likely to succeed on the merits of its claim.

207.    The balance of hardships favors Memorylink.

**COUNT VIII**
**COMMON LAW FRAUD**

208.    Memorylink realleges paragraphs 1 through 151 and 158 through 165 of this Complaint as and for this paragraph 208.

209.    Defendant Motorola made false statements and omissions of material fact to Memorylink with the intent to deceive Memorylink.

210.    Motorola made false statements and omissions to induce Memorylink to lose rights in and grant rights to the Invention to Motorola.

211.    Motorola intentionally deceived Strandwitz and Kniskern by failing to explain the legal standard of who qualifies as an inventor.

212.    Motorola intentionally deceived Strandwitz and Kniskern into believing that Gary Schulz and Jan-Michael Wyckoff needed to be on the Patent for various other reasons unrelated to actual inventorship.

213.    Motorola intentionally deceived Strandwitz and Kniskern by failing to explain the legal consequences of Strandwitz and Kniskern jointly assigning the Known Patent to Motorola and Memorylink.

214.    Motorola also made false statements and omissions with the intent to induce Memorylink to create technology that Motorola would subsequently steal.

215.    Memorylink reasonably relied on Motorola's false statements and omissions to Memorylink's detriment.

216.     Memorylink has been and continues to be damaged by its reliance on Motorola's false statements and omissions.

217.    But for Motorola's false statements and omissions of material facts to Strandwitz and Kniskern concerning inventorship, the Assignment, and the joint ownership of patent rights, Strandwitz and Kniskern would not have allowed Motorola's employees to be named as co-inventors on the patent application, executed the Assignment and would not have continued to freely share the technology it created.

## COUNT IX
## PROMISSORY FRAUD

218.    Memorylink realleges paragraphs 1 through 151 and 158 through 165 and 209 through 217 of this Complaint as and for this paragraph 218.

219.    Defendant Motorola made false promises of future actions to Memorylink including, but not limited to, promises of entering into definitive agreements, with the intent to deceive Memorylink  into continuing to share information with Motorola and to allow Motorola to use the Invention for demonstrations with its potential customers and promises of letting Memorylink use its 5 GHz radio technology with its Invention if it discontinued its ASIC development of its own 5 GHz radio.

220.    Motorola made such false promises to induce Memorylink to lose rights in and grant rights to the Invention to Motorola.

221.    Motorola also made false promises with the intent to induce Memorylink to create technology that Motorola would subsequently steal.

222.    Motorola further made false promises with the intent to induce Memorylink to abandon its state-of-the-art ASIC 5 GHz radio technology at a great cost to Memorylink and replace it with Motorola's radio.

223.    Memorylink reasonably relied on Motorola's false promises.

224.     Memorylink has been and continues to be, damaged by its reliance on Motorola's false promises.

225.    Motorola's promises of future conduct were part of an overall scheme to defraud Memorylink.

226.   But for Motorola's false promises, Memorylink would not have provided information on the various uses and applications of its Invention and abandoned its costly ASIC radio development required to work in tandem with any uses or applications of the Invention.

**COUNT X – In the Alternative**
**NEGLIGENT MISREPRESENTATION**

227.    Memorylink realleges paragraphs 1 through 48, 50 through 65 and 69 through 151 of this Complaint as and for this paragraph 227.

228.   During face-to-face meetings with Motorola engineers and management prior to signing any formal documents related to the Known Patent application, Motorola affirmatively represented to Memorylink, through Strandwitz, that Motorola's employees needed to be on the patent application as co-inventors.

229.   Prior to June 11, 1998 Motorola represented to Strandwitz and Kniskern that in order for parties to continue to work jointly together to further develop applications for the Invention when one party, such as Motorola prepares and files the patent application, the other parties, [Strandwitz and Kniskern] would have to assign their rights in the Invention to Motorola and Memorylink.

230.   Motorola's statements were  false statements of a material facts.

231.   Motorola was careless and/or negligent in ascertaining the truth of each of such statements.

232.   The foregoing false statements were made for the purpose of inducing Memorylink to allow Motorola employees to be named on the patent application as co-inventors and to cause Strandwitz and Kniskern to execute the Assignment.

233.   Motorola was in the business of providing information in connection with these false statements.

234.    It was the duty to Motorola to communicate accurate information to Memorylink.

235.    Memorylink relied on Motorola's false statements.

236.    But for Motorola's false statements, neither Strandwitz nor Kniskern would have allowed Motorola's employees to be named as co-inventors on the patent application or assigned the Invention to Motorola and Memorylink would not have abandoned its almost completed advanced ASIC radio design required to transmit and receive the streaming video signals from the Invention.

237.    Memorylink has been, and will continue to be, damaged by Motorola's actions.

## COUNT XI
## CONVERSION

238.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 238.

239.    Memorylink has an exclusive right to the Invention and the confidential and proprietary information related thereto.

240.    Memorylink has the sole right to intellectual property related to the Invention, including the Known Patent and the Secret Patent.

241.    Motorola wrongfully gained rights to, has interfered with, and continues to interfere with Memorylink's use and benefit of Memorylink's intellectual property, including the Known Patent and the Secret Patent.

242.    Motorola has interfered and continues to with Memorylink's use of Memorylink's confidential and proprietary information by using and exploiting Memorylink's confidential and proprietary information and intellectual property, including the Known Patent and the Secret Patent.

243.    Motorola has profited and continues to profit by Motorola's use and exploitation of Memorylink's confidential and proprietary information intellectual property, including the Known Patent and the Secret Patent.

244.    Memorylink has been and will continue to be damaged by Motorola's conversion of Memorylink's confidential and proprietary information and Memorylink's intellectual property.

## COUNT XII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

245.    Memorylink realleges paragraphs 1 through 151 of this Complaint as and for this paragraph 245.

246.    Memorylink's exclusive rights to the Invention had a high probability of future economic benefit to Memorylink by entering into valid business relationships such as by licensing the Invention to third parties.

247.    Motorola had knowledge of the existence of the relationship between Memorylink and third parties related to the Invention.

248.    Motorola intentionally and unjustifiably disrupted Memorylink's relationship by exploiting Memorylink's confidential and proprietary information, fraudulently inducing Memorylink to assign rights in the Known Patent, filing the Secret Patent based solely on Memorylink's technology, and entering into Memoranda of Understanding.

249.    Memorylink's relationship with third parties was disrupted and continues to be disrupted due to Motorola's actions.

250.    Memorylink has been, and continues to be, damaged by Motorola's actions.

251.    Motorola's conduct is the proximate cause of Memorylink's damage.

**COUNT XIII**
**CORRECTION OF INVENTORSHIP OF U.S. PATENT APPLICATION NO. 10/351,906**

252.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 252.

253.    Peter Strandwitz and Robert J. Kniskern are the only inventors of the '906 Application.

254.    Gary Schulz and Jan-Michael Wyckoff of Motorola did not conceive of any invention defined in the claims of the '906 Application and, therefore, are not inventors of the '906 Application.

255.    The improper naming of Gary Schulz and Jan-Michael Wyckoff as inventors of the '906 Application occurred without any deceptive intent on behalf of the actual inventors Peter Strandwitz and Robert J. Kniskern.

256.    Indeed, the only reason Gary Schulz and Jan-Michael Wyckoff are named as inventors on the '906 Application is because they are named investors on the parent patent to the '906 application.

257.    Because Gary Schulz and Jan-Michael Wyckoff of Motorola were identified as inventors of the '906 Application, Motorola will exploit the '906 Application and will continue to exploit the '906 Application and profit unless this Court issues an Order directing the Commissioner of Patents to correct the inventorship of the '906 Applications under 35 U.S.C. §256.

**COUNT XIV**
**CORRECTION OF INVENTORSHIP OF U.S. PATENT APPLICATION NO. 11/977,687**

258.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 258.

259.    Peter Strandwitz and Robert J. Kniskern are the only inventors of the '687 Application.

260.    Gary Schulz and Jan-Michael Wyckoff of Motorola did not conceive of any invention defined in the claims of the '687 Application and, therefore, are not inventors of the '687 Application.

261.    The improper naming of Gary Schulz and Jan-Michael Wyckoff as inventors of the '687 Application occurred without any deceptive intent on behalf of the actual inventors Peter Strandwitz and Robert J. Kniskern.

262.    Indeed, the only reason Gary Schulz and Jan-Michael Wyckoff are named as inventors is because they are named investors on the parent patent to the '687 application.

263.    Because Gary Schulz and Jan-Michael Wyckoff of Motorola were identified as inventors of the '687 Application, Motorola will exploit the '687 Application and will continue to exploit the '687 Application and profit unless this Court issues an Order directing the Commissioner of Patents to correct the inventorship of the '687 Applications under 35 U.S.C. §256.

## COUNT XV
## UNJUST ENRICHMENT

264.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 264.

265.    Memorylink has unilaterally spent at least $15 million developing its intellectual property and confidential and proprietary information and related technology and made its intellectual property and confidential and proprietary information available to Motorola.

266.    Motorola has been unjustly enriched by stealing from Memorylink, Memorylink's intellectual property and confidential and proprietary information and using the stolen property and information to its monetary benefit, all to the exclusion of Memorylink.

267.    The circumstances under which Motorola came into possession of Memorylink's intellectual property and confidential and proprietary information by fraud and through converting and exploiting Memorylink's confidential information, proprietary information, technology, and intellectual property, including the Secret Patent and the Known Patent, such as by engaging in "pick" agreements, (allowing Motorola to obtain royalty-free licenses to other technology) and license make it unjust for Motorola to retain the benefits it has received without paying Memorylink.

268.    As a direct and proximate result of this unjust enrichment, Memorylink has been damaged and will continue to be damaged.

## COUNT XVII
## CONVERSION (In the Alternative)

269.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 280.

270.    In the event that the Court finds Motorola's conduct before the USPTO was inequitable, then, alternatively, Memorylink brings this claim for conversion of the Invention.

271.    Memorylink had an exclusive right to the Invention.

272.    Memorylink had the sole right to intellectual property related to the Invention, including the Known Patent and the Secret Patent.

273.    Motorola wrongfully gained rights to, and interfered with Memorylink's use and benefit of Memorylink's intellectual property, including the Known Patent and the Secret Patent.

274.    If the Known Patent and/or the Secret Patent are found unenforceable, such a finding is due solely to Motorola's actions.

275.    If the Known Patent and/or the Secret Patent are found unenforceable, Memorylink will have been damaged by Motorola's conversion of Memorylink's intellectual property in Memorylink being unable to license the Invention in numerous applications in many industries.

## COUNT XVIII
## COMMON LAW FRAUD (In the alternative)

276.    Memorylink realleges paragraphs 1 through 151 of this Complaint as and for this paragraph 287.

277.    In the event that the Court finds Motorola's conduct before the USPTO was inequitable, then, alternatively, Memorylink brings this claim for fraud.

278.    Defendant Motorola made false statements and omissions of material fact to Memorylink with the intent to deceive Memorylink.

279.    Motorola made false statements and omissions to induce Memorylink to assign the Known Patent to Motorola also by failing to explain the legal standard of who qualifies as an inventor.

280.    Motorola made false statements and omissions to induce Memorylink to lose rights in the Invention and grant rights in the Invention to Motorola by stating that Motorola employees had to be inventors on the patent if the parties had a joint patent agreement and worked together.

281.    Motorola made false statements and omissions to induce Memorylink to assign the Known Patent to Motorola also by failing to explain the legal consequences of Strandwitz and Kniskern jointly assigning the Known Patent to Motorola and Memorylink

282.    Motorola made false statements and omissions to induce Memorylink to assign the Known Patent to Motorola by omitting to tell Memorylink what the standard of inventorship was to be included as a co-inventor on a patent application.

283.    Motorola made false statements and omissions to gain rights in the Secret Patent.

284.    Motorola also made false statements and omissions with the intent to induce Memorylink to create technology that Motorola would subsequently steal.

285.    Memorylink reasonably relied on Motorola's false statements and omissions to Memorylink's detriment.

286.    But for Motorola's false statements and omissions of material fact concerning inventorship, the Assignment and the legal effects of joint ownership of the patent right, Memorylink would not have assigned its Invention to Motorola and would have objected to the addition of Motorola's employees as co-inventors on the patent application.

287.    If the Known Patent and/or the Secret Patent are found unenforceable, such a finding is due solely to Motorola's improper actions.

288.    If the Known Patent and/or the Secret Patent are found unenforceable, Memorylink will have been damaged by Motorola's conversion of Memorylink's intellectual property in Memorylink being unable to license the Invention in numerous applications in many industries.

## COUNT XIX
## CONVERSION (In the Alternative)

289.    Memorylink realleges Paragraphs 1 through 151 of this Complaint as and for this paragraph 300.

290.     In the event that the Court finds that one or both of the Known Patent and the Secret Patent are invalid for any reason, then, alternatively, Memorylink brings this claim for conversion of the Invention.

291.     Memorylink had an exclusive right to the Invention.

292.     Memorylink had the sole right to intellectual property related to the Invention, including the Known Patent and the Secret Patent.

293.     Motorola wrongfully gained rights to, and interfered with Memorylink's use and benefit of Memorylink's intellectual property, including the Known Patent and the Secret Patent.

294.     If the Known Patent and/or the Secret Patent are found invalid, such a finding is due solely to Motorola's actions.

295.     If the Known Patent and/or the Secret Patent are found invalid, Memorylink will have been damaged by Motorola's conversion of Memorylink's intellectual property in Memorylink being unable to license the Invention in numerous applications in many industries.

**COUNT XX**
**COMMON LAW FRAUD (In the alternative)**

296.     Memorylink realleges paragraphs 1 through 151 of this Complaint as and for this paragraph 307.

297.     In the event that the Court finds that one or both of the Known Patent and the Secret Patent are invalid for any reason, then, alternatively, Memorylink brings this claim for fraud.

298.     Defendant Motorola made false statements and omissions of material fact to Memorylink with the intent to deceive Memorylink by stating that Motorola employees had to be placed on the patent application if Memorylink and Motorola were going to jointly work together and that Memorylink had to assign an interest in the patent to Motorola when Motorola made no

contribution to the invention and by Motorola's omissions in telling Memorylink what constituted an inventor on a patent application.

299.　Motorola made false statements and omissions to induce Memorylink to lose rights in the Invention and grant rights in the Invention to Motorola by omission in telling Memorylink that Motorola's employees were inventors on the patent and by having Memorylink inventors sign an assignment to Motorola when there is no basis for such an assignment.

300.　Motorola made false statements and omissions to induce Memorylink to assign the Known Patent to Motorola by stating that Memorylink inventors must assign their interest to Memorylink even though Motorola knew its employees were not true inventors.

301.　Motorola made false statements and omissions to induce Memorylink to assign the Known Patent to Motorola also by failing to explain the consequences of Strandwitz and Kniskern jointly assigning the Known Patent to Motorola and Memorylink

302.　Motorola made false statements and omissions to gain rights in the Secret Patent by omitting to tell Memorylink that it was filing the secret patent on an invention that belonged solely to Memorylink.

303.　Motorola also made false statements and omissions with the intent to induce Memorylink to create technology that Motorola would subsequently steal by telling Memorylink that it would enter into definitive agreements outlined in four separate MOUs over a period of several years covering individual technology developments of Memorylink useful in its cellular phone business and Canopy product line and also leading Memorylink on that its would partner with them on Homeland security applications and other applications that it issued news releases stating that the patented Invention of Memorylink would be used in Motorola's Canopy product

line as well as stating that Motorola would share its 5 GHz radio technology with Memorylink to use in connection with uses and applications of its Invention.

304. Memorylink reasonably relied on Motorola's false statements and omissions to Memorylink's detriment.

305. But for Motorola's false statements Memorylink would not have shared any of its uses and applications of its Invention, nor would it have provided Motorola demonstration units that it showed customers or shared it latest ASIC radio technology with Motorola who was behind Memorylink with its discrete component technology for radio.

306. If the Known Patent and/or the Secret Patent are found invalid, such a finding is due solely to Motorola's actions.

307. If the Known Patent and/or the Secret Patent are found invalid, Memorylink will have been damaged by Motorola's conversion of Memorylink's intellectual property in Memorylink being unable to license the Invention in numerous applications in many industries.

## **PRAYER FOR RELIEF**

WHEREFORE, Memorylink asks this Court to enter judgment in its favor against Motorola Inc., granting the following relief:

A. Enter judgment that the true and correct inventors of the '352 are Peter Strandwitz and Robert J. Kniskern;

B. Issue an Order directing the Commissioner of Patents to correct the inventorship under 35 U.S.C. §256 of the '352 Patent, the '906 Application, and the '687 Application that (i) Gary Schulz and Jan-Michael Wyckoff are not inventors of the '352 Patent, the '906 Application, and the '687 Application (ii) Peter Strandwitz and Robert J. Kniskern are the only inventors of the '352 Patent, the '906 Application, and the '687 Application and (iii) Gary

Schulz and Jan-Michael Wyckoff were named as inventors without any deceptive intent on behalf of Peter Strandwitz and Robert J. Kniskern;

C.     Issue an order rescinding the Assignment of rights, title, and interest in and to the '352 Patent;

D.     Issue an Order directing the Commissioner of Patents to correct the inventorship under 35 U.S.C. §256 of the Secret '938 Patent that (i) Gary Schulz and Jan-Michael Wyckoff are not inventors of the '938 Patent, (ii) Peter Strandwitz and Robert J. Kniskern are the only inventors of the '938 Patent, and (iii) Gary Schulz and Jan-Michael Wyckoff were named as inventors without any deceptive intent on behalf of Peter Strandwitz and Robert J. Kniskern

E.     Enter judgment that Motorola has directly and contributorily infringed the claims of the '352 Patent;

F.     Preliminarily and permanently enjoin Motorola, Motorola's officers, directors, managers, employees, affiliates, agents, representatives, corporate parents and those in privity with Motorola from further infringement of the '352 Patent;

G.     Order an accounting of Motorola's profits arising out of Motorola's infringing activities and award Memorylink those profits;

H.     Award Memorylink all of its damages caused by Motorola's acts of infringement of the '352 Patent together with interest and costs as provided for under 35 U.S.C. §284;

I.     Enter judgment that Motorola's infringement is willful and increase the damages to three times the amount found or accessed pursuant to 35 U.S.C. § 284;

J.     Enter judgment that this case is exceptional and award Memorylink its' attorneys' fees in this action pursuant to 35 U.S.C. § 285;

K.     Declare that the Assignment is void *ab initio* for lack of consideration;

L.      Enter judgment that the Assignment is void for fraud;

M.      Enter judgment that Motorola breached the various non-disclosure agreements with Memorylink and award damages in an amount to be determined at trial;

N.      Enter judgment that Motorola breached its fiduciary duties to Memorylink and that Memorylink has been damaged as a result of Motorola's acts and award damages in an amount to be determined at trial;

O.      Enter judgment that Motorola committed common law fraud against Memorylink and that Memorylink has been damaged as a result of Motorola's fraudulent acts and award damages in an amount to be determined at trial;

P.      Enter judgment that Motorola made negligent misrepresentations to Memorylink and award damages in an amount to be determined at trial;

Q.      Enter judgment that Motorola converted Memorylink's intellectual property and award damages in an amount to be determined at trial;

R.      Enter judgment that Motorola tortiously interfered with Memorylink's prospective economic advantage and award damages in an amount to be determined at trial;

S.      Enter judgment that Motorola has been unjustly enriched as a result of Motorola's theft and fraudulent conversion of Memorylink's technology and award damages in an amount to be determined at trial;

T.      Enter judgment that Motorola's in-house patent law department has committed acts that breached their duty through intentional acts or omissions to prosecuted the patent properly with respect to Memorylink and award damages in an amount to be determined at trial; and

U.     Award Memorylink such other and further relief that this Court deems just and proper.


## JURY DEMAND

Memorylink Corp. demands a trial by jury on all issues presented in this complaint.


                                    Respectfully submitted,
                                    MEMORYLINK CORP.


Dated: June 9, 2008                 By: /s/Michael J. Femal
                                        One of Its Attorneys
                                    Michael J. Femal  (#0792012)
                                    Richard Kessler  (#6183140)
                                    Peter Berk  (#6242515)
                                    McDonald Hopkins LLC
                                    640 N. LaSalle Street
                                    Suite 590
                                    Chicago, IL 60610
                                    312.280.0111 (phone)
                                    312.280.8232 (Fax)
                                    mfemal@mcdonaldhopkins.com
                                    rkessler@mcdonaldhopkins.com
                                    pberk@mcdonaldhopkins.com

US006522352B1

(12) **United States Patent**
Strandwitz et al.

(10) Patent No.: **US 6,522,352 B1**
(45) Date of Patent: **Feb. 18, 2003**

(54) **SELF-CONTAINED WIRELESS CAMERA DEVICE, WIRELESS CAMERA SYSTEM AND METHOD**

(75) Inventors: **Peter Strandwitz**, Appleton, WI (US);
**Robert Kniskern**, Fort Wayne, IN (US); **Gary D. Schulz**, Cary, IL (US);
**Jan-Michael Wyckoff**, Schaumburg, IL (US)

(73) Assignee: **Motorola, Inc.**, Schaumburg, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/102,457**

(22) Filed: **Jun. 22, 1998**

(51) Int. Cl.$^7$ .................................... H04N 5/232

(52) U.S. Cl. ............................... 348/211.2; 348/211.4;
348/333.01; 455/556

(58) Field of Search .................................. 348/207, 211,
348/212, 213, 231, 234, 232, 233, 222,
384, 552, 207.99, 207.1, 207.11, 211.99,
211.1, 211.2, 211.3, 211.4, 211.5, 211.6,
333.01, 333.02, 333.12; 455/556, 557; H04N 5/225

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,097,893 A * 6/1978 Camras ........................ 348/158

4,791,680 A * 12/1988 Yokoe et al. ................. 358/1.9
5,760,824 A * 6/1998 Hicks, III .................. 348/14.02
6,327,001 B1 * 12/2001 Yamagishi .................. 348/158
6,330,028 B1 * 12/2001 Oie et al. ................... 348/220

* cited by examiner

*Primary Examiner*—Tuan Ho
(74) *Attorney, Agent, or Firm*—Hugh C. Dunlop; Brian M. Mancini

(57)     **ABSTRACT**

A self-contained wireless camera (10) and a wireless camera system (25) having such a device and a base station (20). Video processing (e.g. video compression) circuitry (200, 210) of the camera device receives video signals from a camera (130) and provides processed video signals. These are transmitted over a shared radio channel. A radio receiver (101) receives processed (e.g. compressed) video signals from the base station or another camera device. Images from the camera or the base station are displayed in a selected manner on a display or monitor (140). The base station device (20) receives processed (e.g. compressed) video signals, stores them and retransmits them. A command signal is received by the radio receiver to modify operation in such a manner as to control bandwidth usage. Wireless camera devices can adjust their operation to accommodate other wireless camera devices. Different transport protocol modules 230 and 240 can be selected according to the application that the user selects for operation.

26 Claims, 8 Drawing Sheets





EXHIBIT

1



*FIG. 1*



FIG. 2



*FIG. 3*

FIG. 4



*FIG. 5*



FIG. 6



*FIG. 7*

| | | EXAMPLE 1 | EXAMPLE 2 | EXAMPLE 3 |
|---|---|---|---|---|
| IMAGE PARAMETERS | FRAME SIZE | 512 x 512 | 512 x 512 | 512 x 512 |
| | FRAME RESOLUTION | 270 x 352 | 270 x 352 | 480 x 352 |
| | FRAME RATE | 15/SEC | 30/SEC | X |
| | COMPRESSION TYPE | JPEG | WAVELET #1 | MPEG |
| | COMPRESSION RATIO | 50% | 30% | X |
| | AUTO MODE | NO | NO | YES |
| AUDIO PARAMETERS | NUMBER OF CHANNELS | 1 | 1 | 2 |
| | SAMPLING RATE | 64KBS | 64KBS | 64KBS |
| | COMPRESSION TYPE | NONE | NONE | MPEG |
| | COMPRESSION RATIO | 0 | 0 | X |
| | AUTO MODE | NO | NO | YES |
| CONTROL | LOCAL | YES | YES | NO |
| | REMOTE | NO | NO | YES |
| | ON DEMAND | NO | NO | YES |
| TRANSPORT PARAMETERS | REAL TIME(NO ERROR CORRECTION) | YES | NO | X |
| | VERIFIED(WITH ERROR CORRECTION) | NO | YES | X |
| | VARIABLE | NO | NO | X |
| | AUTO MODE | NO | NO | YES |
| | % BANDWIDTH UTILIZATION | 0%   30% | 50% | 75%   100% |

X = DON'T CARE AUTO WILL ADJUST

FIG. 8

US 6,522,352 B1

1

# SELF-CONTAINED WIRELESS CAMERA DEVICE, WIRELESS CAMERA SYSTEM AND METHOD

## FIELD OF THE INVENTION

This invention relates to wireless camera devices, including but not limited to video camera devices and still image devices, and it relates to a wireless camera system comprising a self contained wireless camera device in combination with a base station device. It also relates to an architecture for provision of peripheral devices in such a system.

## BACKGROUND OF THE INVENTION

Simple master-slave portable wireless video recording devices have been proposed in the past, designed to produce video and associated signals and transmit these wirelessly to a recording station. U.S. Pat. No. 4,097,893 describes one such analog device, in which start and stop (i.e. pause) operation of the recording station is controlled from the camera station. Communication of images from the camera station to the recording station is over a VHF or UHF radio channel

The establishment by the Federal Communications Commission of a nonrestrictive usage frequency band in the 5 GHz range, with channel bandwidth capability for high throughput multimedia data transmission creates a new opportunity for wireless consumer devices having broader bandwidth capability than has heretofore been possible. The ability to efficiently use these frequencies requires greater attention to be given to bandwidth management.

Functionality of previously proposed wireless camera devices has been fairly limited and such devices have so far found little or no acceptance in the consumer marketplace. There is believed to be a demand for a compact, highly functional, broadband wireless camera device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic view of a simple point to point multimedia device network in accordance with the invention.

FIG. 2 is a block diagram illustrating the elements of a wireless camera device according to the preferred embodiment of the invention, with optional additional elements for purposes of description of a wireless gateway.

FIG. 3 illustrates a comparison between the protocol structure of a device according to the preferred embodiment of the invention and a standard protocol structure.

FIG. 4 illustrates a wireless camera system according to a preferred embodiment of the invention.

FIG. 5 is a time diagram illustrating video frame transmission for the purposes of explanation of re-transmission.

FIG. 6 is a system similar to that of FIG. 4 but with additional wireless camera devices.

FIG. 7 illustrates a system similar to that of FIG. 6, in the context of a security system.

FIG. 8 is a table illustrating examples of selection of different combinations of parameters for the purposes of bandwidth control.

## DETAILED DESCRIPTION OF THE DRAWINGS

Referring to FIG. 1, a basic configuration of a system 25 according to a preferred embodiment of the present invention is shown, comprising a camera device 10 and a base

2

station 20, which is illustrated in a basic form as being a radio base station with a monitor, but can be a mere storage and replay device without a monitor or can be a gateway device.

A first stage in defining the potential for a high quality video/audio-based product, such as that of FIG. 1, lies in creation of a basic set of enabling technologies. These technologies are predicated on the concept that a dedicated set of data transfer and control protocols can enhance the overall performance and cost profiles of any end product schemes utilizing the approach. The following proposed hardware architecture and communications protocol is intended to provide this low cost/high performance solution. The dedicated purpose wireless protocol layering model described provides operating advantages via a tightly coupled integration of communication protocols, which are targeted to provide an optimum solution to the very specific application of transferring optimized blocks of audio/video information in a high frequency digital state. The architecture is consequently less costly based on this narrower set of protocol requirements and the tighter integration of the layers. Because the communication protocol processing is highly integrated, it reduces the general protocol service access requirements needed in more generally applied interchangeable protocol modules. It has a focused set of requirements and can thus be implemented at a very high level of integration, such as a single chip Application Specific Integrated Circuit (ASIC), which reduces the cost of many components while providing the speed needed for some of the higher data rates.

An architecture for a wireless device is illustrated in FIG. 2. The device comprises a full duplex RF transceiver 100 connected to a processor 110, which in turn is connected to a manual input 120 (such as a keypad or control panel), a camera 130 (which has still image and video capability but more generally is any image capture device), a video monitor 140, a speaker 150, and a microphone 160. The transceiver 100 comprises a receiver 101 and a transmitter 102.

A network gateway 170, with protocol translator 175, is also shown in phantom outline. This network gateway is optional in a self-contained wireless camera device and is illustrated here for purposes of later explanation and description of a base station.

The processor 110 can be a microprocessor or digital signal processor or can take the form of an ASIC (with or without an integrated microprocessor). The exact implementation is not important. The processor 110 comprises a video encoding/decoding module 200 (having video compression circuitry 201 and decompression circuitry 202) coupled at an input and an output of the processor to the camera 130 and the video monitor 140 respectively; a still image encoding/ decoding module 210 (having video compression circuitry 211 and decompression circuitry 212) also coupled at an input and an output of the processor to the camera 130 and the video monitor 140. It also comprises audio encoding/ decoding module 220 coupled at an input of the processor 110 to the microphone 160 and at an output of the processor to the speaker 150.

Within the processor 110 there is also a communications controller 190 coupled to the RF transceiver 100. Coupled between the video encoding/decoding module 200 and the communications controller 190 are a real time video transport protocol module 230 and a verified video transport protocol module 240. Coupled between the still image encoding/decoding module 210 and the communications controller 190 are a still image transport protocol module

US 6,522,352 B1

3

250. Coupled between the audio encoding/decoding module 220 and the communications controller 190 is an audio transport protocol module 260. Selection logic 290 is provided, coupled by control connections (shown in dotted outline) to the various modules 200–260. The selection logic 290 is coupled to the communications controller 190 and to a control data generating module 280, which is coupled to the manual input 120.

In the preferred embodiment, still image encoding/ decoding module 210 performs discrete cosine transform or block oriented image compression, such as JPEG (Joint Photographers Expert Group) compression and video encoding/decoding module 200 performs full frame compression, such as wavelet or MPEG (Motion Picture Expert Group) compression. Other types of compression can be used in the modules.

In operation, images are captured by the camera 130 and encoded in either video encoding/decoding module 200 or still image encoding/decoding module 210. They are passed to the respective transport protocol module 230, 240 or 250 and passed to the communications controller 190 for transmission by the RF transceiver 100 over a wideband radio channel. At the same time they can be displayed on video monitor 140. Images are received by the RF transceiver 100 and passed by the communications controller 190 to a selected one of the protocol modules 230, 240 and 260 and from there to the corresponding video encoding/decoding module 200 or still image encoding/decoding module 210 for decoding and for display on the video monitor 140.

Audio signals are received by the microphone 160, encoded in encoding/decoding module 220 and passed to the communications controller 190 via audio transport protocol module 260, for transmission (with accompanying video signals if selected). Audio signals are received by the transceiver 100 (e.g. with accompanying video signals) and are passed by audio transport protocol module 260 to audio encoding/decoding module 220, where they are decoded and output from the speaker 150.

Different transport protocol modules such as modules 230 and 240 are selected according to the application that the user selects for operation. Thus, real time video transport protocol module 230 is selected for real time video and minimizes delay of transmission and delay variation to avoid "jitter", while verified video transport protocol module 240 performs error correction or selected retransmission to provide error-reduced transmission at the expense of delay in transmission. The selection of the transport modules 230–260 and the encoding/decoding modules 200–220 is performed by selection logic 290.

There are two principal processes by which selection logic selects the desired transport modules and the encoding/ decoding modules. The first method is by manual selection via the manual input 120 and the second method is by receipt of commands from the RF transceiver 100.

To manually select a transport module and corresponding encoding/decoding module, the user selects an application using the manual input 120. For example, the user can select real time video mode, or verified video mode, or sill image mode and control data generating module 280 generates corresponding control data for selection logic 290 to select the corresponding transport protocol module 230, 240 or 250 and its corresponding encoding/decoding module 200 or 210.

To remotely select a transport module and corresponding encoding/decoding module, control data is received via radio transceiver 100 and passed to selection logic 290 via

4

communications controller 190. As before, the selection logic selects the corresponding transport protocol module 230, 240 or 250 and its corresponding encoding/decoding module 200 or 210.

Under control of the manual input 120, control data generating module 280 can generate control data for transmission via the communications controller 190 through the RF transceiver 100 to another camera device or to a base station over the wideband radio channel. If sent to another camera device, the control data is received by corresponding selection logic in the remote camera device. When control data generating module 280 generates control data for transmission to a remote camera device, it can simultaneously cause a selection by selection logic 290 of corresponding encoding/decoding and transmission modules in the device 100.

Control signals or commands that can be generated by control data generating module 280 fall into three categories: video control commands, video quality control commands and bandwidth control commands. Video control commands include pause, replay, rewind and fast-forward. They also include sets of commands that cause selection of automatic mode vs. manual mode. Video quality control commands include frame size, frame resolution, frame rate, compression type and compression ratio. Bandwidth control commands define percentage of allocation of bandwidth for a given camera or from one camera to another, expressed as a bandwidth allocation value or a proportion of available bandwidth for as the number of camera devices permitted in a band.

Video encoding/decoding module 200 and real time video transport protocol module 230 can together be viewed as first video processing and video reconstruction circuitry that provide to the transceiver 100 selectively processed first video signals processed according to a selected protocol scheme and provide reconstructed second video signals to the monitor 140. Similarly, video encoding/decoding module 200 and verified video transport protocol module 240 can together be viewed as second video processing and video reconstruction circuitry that provide to the transceiver 100 selectively processed first video signals processed according to a different selected protocol scheme and provide reconstructed second video signals to the monitor 140. Similarly, reliable still image encoding/decoding module 210 and reliable still image transport protocol module 250 can together be viewed as third video processing and video reconstruction circuitry.

Each selected protocol scheme has at least one of a selectable transport protocol, a selectable image coding (compression/decompression) protocol, a selectable audio protocol scheme and a selectable control protocol. Selection of different protocols gives rise to different bandwidth usages and allows more optimized or balanced usage of available bandwidth.

The architecture described and illustrated integrates the various communication protocol layers into a common processing block between the physical layer and the application layer. This architecture decouples the communication protocol layers from the RF transceiver functional block. It also decouples the communication protocol layers from the multimedia I/O which represents the application layer. The architecture is based upon a presumed system in which a variety of transmission and reception devices are operating.

Encoding/decoding algorithms and transport protocols are configured and optimized based on the multimedia data type and the user's preferences. These various data paths con-

US 6,522,352 B1

5

verge upon the more common networking, bandwidth allocation, and RF medium access protocols.

FIG. 2 shows that there are differences in transport protocol for real time video and verified video. Real time video, and real time audio are isochronous. This means that these transport protocols must balance the reliable transfer concerns with the timing required for proper presentation at the receiving end. For verified video or audio, the intended immediate destination for the multimedia data is not real time presentation, but rather storage. It is referred to as "verified" since higher levels of reliable transfer (e.g. higher error correction and/or retransmission) can be used without high bandwidth usage.

The protocol layer stack model to be used in the proposed architecture is compared to the International Telecommunication Union (ITU) standard network protocol layer model in FIG. 3.

On the left hand side of the figure, the standard ITU protocol layer model is illustrated, comprising a physical layer 300 and a data layer link layer 301 having a link level reliability sub-layer 302 and a media access control sub-layer 303. Above the data link layer is a network layer 304 and above the network layer 304 are a session layer 306, a presentation layer 307 and an application layer 308. To the right of this standard model is illustrated, for purposes of comparison, the protocol layer stack model for a camera device according to the preferred embodiment of the invention. This model comprises an RF modem 350, a layer 361 which integrates encoding/decoding, encryption, transport protocol, network protocol, bandwidth allocation, and media access control. The encoding/decoding and encryption is an application specific presentation layer. The transport protocol is an application specific reliability protocol. Above these integrated protocol layers is the application 362.

The RF modem 350 is implemented in the full duplex RF transceiver 100 of FIG. 2. The integrated protocol layers 361 are implemented in the processor 110 of FIG. 2 and the application layer 362 is implemented in the form of the camera 130, the video monitor 140, the speaker 150, the microphone 160, and the network gateways 170 of FIG. 2. In the preferred embodiment, the integrated protocol layers 361 are admitted on a logic board and a radio control board, in which processes of the protocol below the dotted line of FIG. 3 are implemented on the radio control board and processes above the dotted line are implemented on a logic board. In effect, this has the result that the encoding/ decoding modules 200, 210 and 220 and the transport protocol modules 230, 240, 250 and 260 are all implemented on the logic board and the communications controller 190 is implemented on a separate communications control board. The selection logic 290 and the control data generating module 280 are implemented on the logic board. These details are, of course, not critical and greater integration can be achieved with all the elements of the integrated critical layers being implemented in a single, highly integrated module.

The advantages of a proprietary multimedia communications protocol stack over the ITU standard for this architecture is optimum use of bandwidth, cost, performance, and the flexibility to tailor the protocols for the various multimedia transmissions.

The ITU standard seeks to define each layer independently and to define a set of protocol access points between each layer. The strict interpretation of this model results in creating a set of interchangable protocol building blocks that provide a very general solution to digital communications networking. Each general purpose protocol building block tends to be a costly, yet reasonable solution for a broad range of networking challenges. This architecture is critical for heterogeneous, standardized networks that are built from commercially available, interoperable components. Conversely, the dedicated purpose architecture now described builds a homogeneous RF wireless network with a uniquely qualified set of components.

The architecture described focuses upon providing optimum solutions for a particular family of wireless devices. It provides transmission reliability at the link layer and not on an end-to-end regime. (An end-to-end reliability is not needed since there is no multiple-hop routing in the common uses of the wireless network.) If an application is developed which needed end-to-end reliability within the wireless network, layers can be added between the application layer 362 and the integrated protocol processing block 361. For the current applications, the transmission reliability is specific tailored to the needs of the user, the multi-media data type being transferred, and the RF environment.

The architecture described operates in a somewhat closed homogeneous RF wireless network. The limited set of components that operate within the network only need to be interoperable with each other. The closed nature of a network allows value added features to be included, with a controlled, limited impact upon existing device interoperability. The ability to include such value added features, allows the wireless product developer to differentiate this product from the others in the market using other network approaches.

The closed aspect of this architecture does not, however, limit interoperability with other, more general purpose networks. Network gateways 170 bridge the wireless network with other standard networks. FIG. 4 illustrates the use of a gateway to interconnect the proposed wireless network to standard networks.

The presence or absence of network gateways 170 in a particular device depends on the function of that device. For example, a self contained wireless video or still camera need not have network gateways 170, while a dedicated base station preferably has network gateways 170 but does not have the camera 130, video monitor 140, speaker 150 or microphone 160. Accordingly, the particular application layer devices that are included in any particular product will depend on the intended function of the camera device product.

Referring to FIG. 4, the wireless camera device of FIG. 1 is shown communicating over a wideband radio channel 400 to a wireless multi-media gateway 401 and a wireless disk drive 402 and a wireless monitor 403, as well as other miscellaneous devices which will not be described in detail, but may include a lap-top computer 404, a remote control device 405 and a printer 406. Each of the devices 100 and 401 thru 406 has an architecture as described with reference to FIG. 2 and FIG. 3. The gateway 401 communicates with a multi-media personal computer 410 having a monitor 411 and audio speakers 412 and it communicates with a public or private network 420.

The wireless multimedia gateway depicted in FIG. 4 provides protocol translation to convert the wireless protocol to the standard public network protocol or the standard PC interface protocol. The gateway converts the focused, optimized protocol used on the wireless network to general purpose protocol, such as Internet protocol (IP) used in the open system networks. In essence the gateway provides the wireless network devices with points of interoperability to

US 6,522,352 B1

7

outside systems. The provision of the gateway **401** has a number of advantages, including the ability to network multiple camera devices and operate them under remote control.

This invention, in its preferred embodiment, also provides flexibility of bandwidth usage for video quality and transmission reliability tradeoffs. Bandwidth can be traded for video quality and transmission reliability based on the needs of a given application.

The approach described is inherently bandwidth sensitive. The estimated peak bandwidth limit is at least 10 Mbps. This rate is sufficient to support various combinations and quality levels of the transmission of video, still images, audio, data, graphics and text. A goal is to provide a bandwidth usage strategy that will accommodate the maximum number of devices in a wireless network with highest possible transmission reliability and the level of video quality necessary for a given application.

Video quality and reliability are singled out for discussion over other multimedia types because of the large demand placed on bandwidth by video transmission and the bandwidth tradeoffs that are possible with video. Video quality is represented as resolution of each video frame, the rate at which the video frames are updated and compression rate of the transmitted video.

The resolution of still images that make up the video are only limited by the image sensor of the camera. Given a high end image sensor, video resolution can be supported in a range from HDTV (high definition television) or high resolution computer monitor quality to very small thumbnail images. The lower the video resolution the more grainy the video image appears. Higher video resolution will require commensurate higher bandwidth usage for transmission. Selection of video resolution is based on the application demands and/or the user's preferences.

Video frame rate is the speed that still image frames are presented upon the monitor of the base station **20** or the monitor **140** of the camera device to produce the illusion of full motion video. The described technology can support video frame rates ranging from National Television Standards Committee's (NTSC) standard of 60 interlaced fields per second through stop action video used for video conferencing to single frame still images. Slower than the above noted video frame rates can introduce an unintended effect of jerkiness in the motion of high speed "action" video sequences. Faster video frame rate signals will require higher bandwidth usage for transmission. Selection of video frame rate is, again, based on the application demands and/or the user's preferences.

Video compression rate is an indication of the amount by which the video data has been reduced using various compression techniques. For instance, broadcast quality, uncompressed digital video requires a bandwidth of 150 Megabits per second (Mbps). Given 10 Mbps limit of the RF subsystem, uncompressed digital video transmission is not practical. Current standard video compression algorithms, including MPEG, wavelet, or H.320, will compress video to within these speed limitations. Any video compression will cause some loss of the video data, but the amount of loss can be limited based on the video compression rate. Lower rates of video compression provide higher perceived image quality and use more bandwidth. The compression ratio/bandwidth tradeoff is dependent upon the application. A baby monitor, for instance, could operate with a high video compression rate and use less bandwidth because of the lower demands for image quality.

8

As with video quality, the unique timing requirements of video directly relate to reliability. As discussed earlier, there is a different set of concerns with the transmission of real time video versus verified video. As previously noted, real time video is a video stream that is played back, to the user's perception, immediately upon reception. Verified video, or non-real time video, is not intended to be played back immediately, but rather is stored for later viewing.

The transmission of real-time video must be isochronous to prevent buffer over flow or underflow in the receiving end. In other words a steady flow of video data must be received such that it can be displayed without either running out of or being overrun by video data. Non-real time video is not sensitive to this problem, unless the transmitting end is in danger of overrunning its buffers between the image acquisition and transmission phases.

The transmission of real time video and non-real time video presents a tradeoff in reliability. The reliable transmission of video data that results in later video delivery for a real time application serves no purpose. Specifically, video that is not received within the presentation time will cause a frame skip. In the event that a frame is to be presented but has not been completely received, a buffer underflow condition occurs which results in a frame skip. Transmission of non-real time video is not constrained by the timing of immediate playback. As a result more reliable transmission methods can be used to create a non-real time yet verified video transmission, thus the term "verified video".

Re-transmission can be used to provide some limited measure of reliability for real time video transmission. A goal of this method is to provide time for transmission retries prior to presentation time. The method tends to balance the amount of reliability and allocation, with bandwidth or larger receive buffer sizes and increased video latency. FIG. 5 presents a simplified example of video frame transmission timing which illustrates some of the parameters for the retransmission method. In practice the technique may be complicated by such issues as the MPEG video compression scheme, which does not always transmit full video frames.

As FIG. 5 shows, a burst of video frame data at bandwidths higher than the constant video rate will provide time for transmission retries prior to the next video frame burst. Beginning at time t the image capture device (e.g. camera **130**) has captured a complete video frame N. Starting at this time it is the function of the transport protocol layer to deliver this frame reliably to the corresponding transport protocol layer at the receiving end.

Time t+1 (which occurs following a guard band following preceding activity on the channel), the transmitter transmits the video frame N in a data burst, completed at the time t+2. Starting at time t+2, there is a period extending to time t+3 during which the transport protocol layer module of the receiving device (specifically verified video transport protocol module **240** of FIG. 2) receives the video frame N data burst, performs error correction using any embedded error correction code in the data burst and determines whether the data burst is received correctly. If it is not received correctly, the verified video transport protocol module of the receiver sends a negative acknowledgment message to the verified video transport protocol layer module of the transmitter and there is an opportunity for the transmitter to perform a re-try, retransmitting video frame N data burst. At time t+4 illustrated by the dotted line in FIG. 5, there is a deadline for receiving video frame N. If the receiver does not successfully receive video frame N before this deadline, the video frame is dropped.

US 6,522,352 B1

9                                                                10

The receiver has a timer (not shown in FIG. 2) which commences timing at time t+2 (or can commence timing at t+1), as measured at the receiving end, and if the receiver transport layer protocol cannot determine before time t+4 that frame N has successfully been received, it drops the frame and awaits the next video frame data burst N+1. This data burst is transmitted by the transmitting device at time t+5, ending at time t+6. The receiver (assuming it has successfully received video frame N data burst) waits until time t+7 before presenting video frame N on the receiver monitor. By delaying until time t+7, the receiver has the time from t+4 until t+7 as its minimum received video processing time. If the receiver fails to receive video frame N data burst, it can simply present the preceding video frame. The overall latency in the system is from time t to time t+7. Every frame will be delayed by the receiver until time t+7 (regardless of whether the frame was received before time (t+4), with the result that jitter at the receiver monitor is avoided.

Using this technique, average video bandwidth increases based on the average number of retries. The video burst rate of bandwidth that is needed to support this method depends upon the amount of time left for retries, which in turn dictates the reliability of the transmission.

Time for transmission retries can also be increased by providing more buffer space for in transit video data. Increased buffering will increase the video latency which, as shown in the FIG. 5, is the time between capturing and presenting the video. The amount of acceptable video latency will be dependent upon the application. For example, long video latencies in a two-way interactive video application can be awkward and distracting to the users.

Real time audio is also isochronous and as such shares these same issues. However, due to lower bandwidth requirements for audio, this issue is not as costly to solve in terms of bandwidth, processing power, and end-to-end latency.

In case of audio/video program transmissions, the audio and video presentations are synchronized.

The method of access control to the RF media is not critical. Methods that can be employed include Frequency Division Multiplex (FDM) techniques or Time Division Multiplex (TDM) techniques or in some advanced cases Code Division Multiplex (CDM) techniques. Methods may also include fixed allocation of bandwidth or dynamic allocation of bandwidth based on need.

It is not critical whether a decentralized type of media access control is used in, or a direct central control of allocation by a gateway is used. For instance, decentralized control has the advantage of allowing any combination of wireless devices to interact, without the added expense of a central control unit. A decentralized control approach also minimizes the risk of single point failure.

The wireless transmission technology in the lightly regulated environment of the 5.2 GHz band is very flexible. The flexibility of this technology can be taken advantage of to develop a whole family of products, each with its own characteristic use of the technology. Those products share many common attributes. For example, if they are to interoperate at the local area level, each must: support a subset of the various multimedia transport protocols; provide the RF and antenna control sections; and share a networking and RF media access control algorithm.

One of the primary issues of a network protocol in a wireless network is to allocate bandwidth and time slots to the members of the network. This issue favors a tight integration of network and media access control layer. For

the purpose of explanation of bandwidth allocation and control, FIG. 6 is presented, illustrating a network such as that of FIG. 4 with the addition of second and third wireless camera devices 600 and 601.

In the complex network, of FIG. 6, a "smart" control of bandwidth based on the user's intentions is provided. Under this scenario, the user may have multiple low resolution video inputs. In the event that the user wishes to focus in detail on the output of a single video source, e.g. wireless camera device 600, commands to increase frame rate or resolution may be sent to the camera device 600 (or other input device). At the same time, commands are sent to the other video image capture devices 100 and 601 to reduce their frame rates or resolution in an effort to balance the bandwidth usage.

The capability described enables the organization of a number of "local" RF clusters of devices into logically accessible "higher level" groups that shield the user from the specific internal system details of that organization, and still permit an authorized remote user to modify the operation of any particular device.

One simple application example that could use this approach would be a campus security system illustrated in FIG. 7 that has a considerable number of wireless devices providing audio and visual surveillance. These devices could be arranged in groups 700 and 701 at various physical locations, (for instance at doors and windows of the buildings in the complex). These "local" RF clusters of devices could be interconnected by standardized Local Area Networks (LAN's) 710 to provide access to the devices from display equipment located anywhere on the LAN (e.g. security monitoring stations 715 and 720 via wireless gateways 716 and 721).

This approach to organizing the access to the devices provides a very powerful logical mapping or switching capability. For instance, the media information from a group of cameras located on the rear of the first building could be accessed as a single file of media data that contains multiple timestamped views and is logically labeled as "Building One—Rear Loading Dock". In addition, the users operating the display equipment could change various operating parameters of the surveillance equipment for maximum flexibility.

FIG. 8 illustrates examples of various parameters that can be adjusted to control bandwidth utilization between multiple devices operating on a common bandwidth. The various rows in the table of FIG. 8 are different parameters that can be adjusted or selected and the different columns show various examples of how these parameters give rise to different bandwidth utilization estimates.

The adjustable parameters fall into four broad categories: image parameters, audio parameters, control parameters and transport parameters. Selectable image parameters include frame size, frame resolution, frame rate, compression type, compression rate, compression ratio and auto mode. Selectable audio parameters include number of audio channels, sampling rate, compression type, compression ratio and auto mode. Control parameters include local operation, remote operation and on-demand mode. Transport parameters include real time (i.e. no error correction) verified (i.e. with error correction), variable and auto mode.

In examples 1 and 2 of FIG. 8 the frame size is 512×512 and the frame resolution is 270×352. In the first example the frame rate is 15 frames per second, the compression type is JPEG, the compression ratio is 50% and auto mode is off. In the second example, the frame rate is 30 frames per second,

US 6,522,352 B1

11

the compression type is wavelet #1, the compression ratio is 30% and the auto mode is off. For examples 1 and 2 the audio parameters are the same and the control parameters are the same. In example 1 error correction is used while in example 2 error correction is not used. As a result of these alternative selections of parameters, example 2 gives rise to higher bandwidth utilization than example 1. In the table the estimated bandwidth utilization of example 2 is 50%, while the estimated bandwidth utilization for example 1 is only 30%.

From this, it can readily be seen that two cameras can simultaneously be operated using the high frame rate and high level of verification of example 2, but if a third camera device is to enter the same bandwidth, it would be preferable (indeed necessary) for all three cameras to revert to the combination of parameters illustrated in example 1. The switching from the set of parameters of example 2 to the set of parameters of example 1 takes place in response to each camera that is operating according to the parameters of example 2 receiving a control command requiring those cameras to degrade to a lower bandwidth utilization. The control command can come from a central controller such as the security monitoring station 715 of FIG. 7 or can come from the third camera (e.g. camera device 601 of FIG. 6) making a request to enter the shared bandwidth. The latter scenario provides an ad hoc network in which all users would voluntarily degrade as the network became more congested. In such an arrangement it is preferable to provide a minimum level of service (e.g. that of example 1) beyond which a given device would not degrade further. Upon reaching this minimum level of service, all devices being requested to degrade respond with a negative acknowledgment, in effect telling the requesting device that no further bandwidth is available.

The third example of FIG. 8 has the same frame size as the first two examples, but has a higher frame resolution of 480×352 pixels and uses MPEG compression. Two audio channels are provided, using MPEG audio compression, and remote and on demand control is enabled. In this example, a single wireless camera device will use 75% of the available bandwidth. Clearly when a single camera device operates using these parameters, that one device is able to enter the channel (unless that other device can enter at a bandwidth utilization even lower than the bandwidth utilization of example 1).

In the scenario of FIG. 7, in the event that a user monitoring the surveillance area from one of the security monitoring stations 715 and 721 wishes to examine with greater scrutiny a particular camera, a command can be sent to one of the cameras (e.g. camera device 601 of FIG. 6) instructing that camera to increase its resolution as shown in example 3 of FIG. 8 and to change its compression type, while at the same time frames are sent to other camera devices (e.g. devices 10 and 600) instructing those camera devices to degrade completely, either by ceasing transmission or by reducing their frame rates to a very low level.

In the preferred embodiment, selection logic 290 of FIG. 2 comprises a pre-programmed table of different levels of service in which different combinations of parameters of FIG. 8 are pre-programmed. In this manner, a user can select, through manual input 120, a particular package of parameters to support a particular desired application. Examples of packages of desired parameters could include still images, scenic video, motion video, security surveillance, etc. According to the selected application, the optimum package of parameters is selected.

Referring one again to FIG. 6, the provision of gateway 401 makes the home wireless network a conduit for audio/

12

video recording and playback, video on demand from an outside network, and wireless network browsing (as well as other functions) simultaneously.

In a multi-user, multi-function environment, shared components such as monitors or disk drives 402 must be addressable and may also must provide a form of dedicated access to prevent users from corrupting each other's data.

The system is easy for the consumer to use and reconfigure. The initial products should be capable of detecting the components in the system configuration and acting accordingly. Adding a new component to the system should not pose a technical challenge to the user.

Privacy and security algorithms are included that allow a home's wireless components to interact without concern that components outside the home network can gain access or provide interference. These algorithms provide authentication and encryption. As new components that are added to the network, each is easily synchronized with the unique security "keying" that provides secure access.

Some of the main product configurations for video and/or audio delivery are: point to point video; multi-point video; full duplex video; and point-to-point, multi-point, full duplex audio.

The point to point video category encompasses the set of applications where there is a need to transmit video from an origination site to a reception site. Multi-point video encompasses the set of applications where there is a need to transmit video to or from an origination site to multiple reception sites. Full duplex video includes the set of applications where there is a need to transmit and/or receive video from two or more origination and/or reception sites.

The same options exist for audio configurations to be added to most of the video configurations.

The range of these potential configurations are illustrated by FIG. 6. Many of the potential product embodiments described based upon the core technology require connection with outside, standard networks such as the Internet. In this case, a device class for providing data translation support also present an opportunity for provision of dedicated purpose, integrated application modules. Termed "wireless gateway" for this discussion, this class of devices share some common characteristics.

Various models and options of wireless gateways may be provided. All wireless gateway models capability of receiving and transmitting at bandwidth levels that are necessary to transfer the various multimedia data types, remote control, or transport protocol signaling. Wireless gateways must be capable of supporting the features of the other devices in the premise's wireless network, as well as the user's external connection requirements. Each user will have a different set of expectations for connection to the outside world and potential hardwired networks within the household that the gateway must support.

A high end model wireless gateway could provide expansion slots for various Network Interface Cards (NIC). The fully equipped gateway may support cable modems, satellite antenna connections, and telephone lines, to the external world as well as internal hardwired networks such as Ethernet.

The wireless multimedia gateway contains the capability of high bandwidth receive and transmit. For instance, it can receive verified video and still images for storage. It may transmit video either real time to the monitor or verified video and still images for transfer to the PC or the network, or it may transmit and receive at much lower rates for remote control and transport protocol signaling.

US 6,522,352 B1

13

The gateway may also provide direct access to non-wireless shared resources, such as disk drives and printers. The gateway provides the ability to receive remote control from either a directly connected PC, an incoming telephone call, or a wireless remote control device. Remote control commands from a PC or the external network may be routed to other hardwired wireless devices.

Various models of wireless video image acquisition devices such as cameras may be provided. All camera models can use high bandwidth for transmission of real time video data and each can use low bandwidth to transmit and receive for remote control and transport protocol signaling. Higher end camera models may provide more flexibility and capabilities in terms of video rates, image resolution and video compression rates. They may also support synchronized audio and video. Inexpensive camera applications, such as an infant monitor, can have lower target bandwidth usage by taking advantage of low resolution image sensor, fixed transmitted resolutions, slow, fixed rate video framing, and high video compression ratios.

The wireless monitor supported by this modular system could also impose a wide range of demands. In one embodiment it could be a high bandwidth receive device and low bandwidth transmit device. It may receive real time audio/video only for immediate playback or still images for display. It in turn may transmit and receive at much lower rates for remote control and transport protocol signaling. Other various models of wireless video monitors may also be provided, each with its own minimum and maximum demands. For instance, some monitor models may use high bandwidth for reception of video stream data or high resolution still images. Higher end monitor models will likely provide more capabilities in terms resolution and compatibility with the higher end cameras.

Monitor 403 is able to receive real time video whether it is received from a camera or a storage device. Added options may include provision of a port for a photo printer that prints the currently displayed still image or video frame. Among the advanced features of a wireless monitor there may be an option to split the screen for inputs from various sources or display on screen information in the form of overlays or digital effects. This option is also highly dependent upon how the bandwidth is shared between various components.

The storage peripheral 402 denoted as "wireless disk drive," has the capability of high bandwidth data receive and transmit. It receives verified audio/video and still images for storage. It is also capable of receiving real time audio/video for applications that both record and play back simultaneously. An optional feature is transmission of audio/video data in either real time mode to the monitor or verified audio/video and still images for storage to the gateway. As with other network devices, the drive transmits and receives at much lower rates for remote control and transport protocol signaling. This device provides storage that can be archived and is easily expandable. (One configuration option may support a removable hard disk type device to provide such capability. For instance, one and two gigabyte removable disks are available on the market today that provide sufficient storage for log video streams and a multitude of still images. Even a 100 Megabyte removable disk would be useful for fairly extended video streams.)

More than one type of wireless video disk drive may be provided. All wireless disk drive models bear the capability of both receive and transmit using variable bandwidths needed to transfer the various multimedia data types, remote control, or transport protocol signaling. The higher end

14

wireless disk drive models provide more capabilities in terms of storage and multiple user support features.

In summary, the system described optimizes the relatively unregulated characteristics of the new frequency allocation to provide extremely high quality transmission in a small, low cost and power efficient end product package, enabling the creation of a revolutionary class of video-enabled, personal communication devices.

The various arrangements described above and illustrated in the figures are given by way of example only and modifications of detail can be made by one of ordinary skill in the art without departing from the spirit an scope of the invention.

We claim:

1. A self-contained wireless camera device for communication with a base station device from which compressed video signals from the base station are transmitted to the wireless camera device, the wireless camera device comprising:

    a camera;

    video compression circuitry coupled to the camera, receiving video signals from the camera and providing selectively compressed video signals from the camera, compressed according to a selected protocol scheme;

    selection logic coupled to the video compression circuitry to control selection of a protocol scheme;

    a radio transmitter coupled to the video compression circuitry for transmission of the compressed video signals from the camera;

    control circuitry, generating control commands, the control circuitry being coupled to the radio transmitter whereby the radio transmitter transmits the control commands to the base station device for control of transmission of compressed video signals from the base station;

    a radio receiver for receipt of the compressed video signals from the base station;

    video decompression circuitry coupled to the radio receiver, receiving the compressed video signals from the base station and providing decompressed video signals; and

    a display selectively coupled to the camera and the video decompression circuitry, selectively displaying images from the camera and images represented by the decompressed video signals.

2. The wireless camera device of claim 1, wherein the control commands include: a video replay command; a rewind command; and a fast forward command.

3. The wireless camera device of claim 1, wherein the control commands include a video quality command.

4. The wireless camera device of claim 1, wherein the control commands include a bandwidth control command.

5. A wireless camera system comprising:

    a self-contained wireless camera device comprising:

        a camera;

        video compression circuitry coupled to the camera, receiving video signals from the camera and providing compressed video signals from the camera;

        a radio transmitter coupled to the video compression circuitry for transmission of the compressed video signals from the camera;

        control command generation circuitry, coupled to the radio transmitter, generating control commands to be sent to a base station device for control of transmission of compressed video signals from the base station;

US 6,522,352 B1

15

a radio receiver for receipt of compressed video signals from the base station;

video decompression circuitry coupled to the radio receiver, receiving the compressed video signals from the base station and providing decompressed video signals; and

a display selectively coupled to the camera and the video decompression circuitry, selectively displaying images from the camera and images represented by the decompressed video signals

and a base station device comprising:

a radio receiver receiving the compressed video signals from the camera;

a storage device for storing signals derived from the compressed video signals from the camera;

a transmitter coupled to the storage device for retransmitting the compressed video signals from the camera as compressed second video signals; and

control command signal receive circuitry responsive to the control commands from the camera device to control retrieval of the signals derived from the compressed video signals stored in the storage device and retransmission of the compressed second video signals.

6. The wireless camera system of claim 5 wherein the control commands include: a video replay command; a rewind command; and a fast forward command.

7. The wireless camera system of claim 5, wherein the base station device has transport circuitry operable to deliver video signals derived from the compressed video signals from the camera as internet protocol packets at an output port.

8. A wireless camera system comprising:

a first wireless camera device comprising:

a camera;

video compression circuitry coupled to the camera, receiving video signals from the camera and providing compressed video signals from the camera;

a radio transmitter coupled to the video compression circuitry for transmission of the compressed video signals from the camera;

a radio receiver for receipt of command signals, wherein the video compression circuitry is responsive to receipt of a first control command by the radio receiver to modify operation of the video compression circuitry;

and a base station device comprising:

a user selection input;

control circuitry coupled to the user selection input, the control circuitry for receiving a second control command from the user selection input seeking service for a second wireless camera device; and

a transmitter, coupled to the control circuitry, for transmitting to the first wireless camera device the first control command, thereby causing the first wireless camera device to adjust its operation to accommodate the second wireless camera device.

9. The system of claim 8, wherein the base station device comprises a radio receiver and the control circuitry is coupled to the radio receiver to receive the second control command from the second wireless camera device.

10. The system of claim 8 wherein the first wireless camera device and the second wireless camera device share use of a common radio channel.

11. The system of claim 8, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to modify operation of

16

the video compression circuitry to decrease bandwidth of the compressed first video signals.

12. The system of claim 11, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to decrease frame rate.

13. The system of claim 11, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to decrease resolution.

14. A method of operation of a self-contained wireless camera device comprising:

receiving video signals from a camera;

selecting a compression protocol scheme;

providing compressed first video signals processed according to the selected compression protocol scheme;

transmitting the compressed first video signals over a shared radio channel;

generating control commands and transmitting the control commands to a base station device for control of transmission of compressed second video signals;

receiving compressed second video signals from the shared radio channel and providing decompressed video signals; and

selectively displaying images from the camera and images represented by the decompressed video signals.

15. The method of claim 14, wherein the control commands include: a video replay command; a rewind command; and a fast forward command.

16. The method of claim 14, wherein the control commands include a video quality command.

17. The method of claim 14, wherein the control commands include a bandwidth control command.

18. A method of operation of a wireless camera system having a self-contained wireless camera device and a base station device, the method comprising, at the wireless camera device:

receiving video signals from a camera and providing compressed first video signals;

transmitting the compressed first video signals over a shared radio channel;

generating control commands and sending the control commands to the base station device;

receiving compressed second video signals at a radio receiver;

decompressing the compressed second video signals and providing decompressed second video signals; and

selectively displaying images from the camera and images represented by the decompressed second video signals

and at the base station device:

receiving the compressed first video signals from the radio channel;

receiving the control commands;

controlling retrieval of signals derived from the compressed first video signals in response to the control commands;

storing signals derived from the compressed first video signals; and

retransmitting the compressed first video signals as compressed second video signals.

19. The method of claim 18, wherein the control commands include: a video replay command; a rewind command; and a fast forward command.

US 6,522,352 B1

17                                                     18

**20.** The method of claim **18,** further comprising delivering video signals derived from the compressed video signals from the camera as internet protocol packets at an output port.

**21.** A method of operation of a wireless camera system having a first wireless camera device and a base station device, comprising, at the first wireless camera device:

processing video signals from a camera to provide compressed first video signals;

transmitting the compressed first video signals;

receiving control commands;

modifying the processing of the video signals in response to a first control command received,

and at the base station device:

receiving a second control command, in response to a user selection input, seeking service for a second wireless camera device; and

transmitting to the first wireless camera device the first control command, thereby causing the first wireless camera device to adjust its operation to accommodate the second wireless camera device.

**22.** A method of claim **21,** wherein receiving includes receipt of the second control command from the second wireless camera device.

**23.** A method of claim **21,** wherein the first wireless camera device and the second wireless camera device share use of a common radio channel.

**24.** The method of claim **21,** wherein the first wireless camera device is responsive to receipt of the first control command to decrease bandwidth of the compressed first video signals.

**25.** The method of claim **21,** wherein the first wireless camera device is responsive to receipt of the first control command to decrease frame rate.

**26.** The method of claim **21,** wherein the first wireless camera device is responsive to receipt of the first control command to decrease resolution.

*    *    *    *    *

US006573938B1

(12) **United States Patent**
Schulz et al.

(10) Patent No.: **US 6,573,938 B1**
(45) Date of Patent: **Jun. 3, 2003**

(54) **SELF-CONTAINED CAMERA DEVICE AND METHOD FOR CAPTURING AND COMMUNICATING IMAGES VIA A MODEM**

(75) Inventors: **Gary Schulz**, Cary, IL (US); **Jan-Michael Wyckoff**, Schaumburg, IL (US)

(73) Assignee: **Motorola Inc.**, Schaumburg, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/103,408**

(22) Filed: **Jun. 24, 1998**

(51) Int. Cl.[7] ............................................. H04N 5/225
(52) U.S. Cl. ..................................... 348/373; 348/231.9
(58) Field of Search ...................... 358/906; 348/231.7, 348/373, 14.02, 231.8, 231.9; H04N 5/225

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,034,804 A  *  7/1991  Sasaki et al. ............... 348/232

| | | | | |
|---|---|---|---|---|
| 5,264,935 A | * | 11/1993 | Nakajima | 358/906 |
| 5,561,458 A | * | 10/1996 | Cronin et al. | 348/231.7 |
| 5,790,193 A | * | 8/1998 | Ohmori | 348/233 |
| 5,893,037 A | * | 4/1999 | Reele et al. | 348/14.02 |
| 6,104,430 A | * | 8/2000 | Fukuoka | 358/906 |
| 6,278,481 B1 | * | 8/2001 | Schmidt | 348/233 |

* cited by examiner

*Primary Examiner*—Wendy R. Garber
*Assistant Examiner*—Jason Whipkey
(74) *Attorney, Agent, or Firm*—Randall S. Vaas; Lawrence J. Chapa

(57)        **ABSTRACT**

A self-contained camera device (10) and method for capturing and communicating images via a modem (13). The self-contained camera device (10) comprises an image capturing device (15) and a chassis (11) for receiving a storage module or a modem (13). A removable modem (13) is mountable on the chassis (11) and couplable to the image capturing device (15). The removable modem (13) is replaceable with the storage module.

**14 Claims, 5 Drawing Sheets**



**EXHIBIT**
**2**





*FIG. 1*



*FIG.2*

Case 1:08-cv-03301     Document 1-3     Filed 06/09/2008     Page 4 of 9





*FIG.3*



*FIG. 4*



*FIG.5*

US 6,573,938 B1

1

# SELF-CONTAINED CAMERA DEVICE AND METHOD FOR CAPTURING AND COMMUNICATING IMAGES VIA A MODEM

## FIELD OF THE INVENTION

The present invention relates to a self-contained camera device and method for capturing and communicating images via a modem.

## BACKGROUND OF THE INVENTION

Currently, self-contained camera devices use external cabled connections to interconnect portable video cameras to radio frequency transmitters (typically analog video transmissions). These devices require dedicated redundant hardware to perform a dedicated function. A common application for such devices is for use in electronic news gathering activity and sports events.

Another application for a similar concept is in wireless in-home video distribution. In this application, a wireless video transmitter is cabled to a device such as a video cassette recorder (VCR), which enables the user to remotely view content without necessitating wiring a household. This application, however, requires a user to connect separate video and audio cables, as well as a power cable, to the host device resulting in a system that requires several pieces of equipment.

Thus, a need exists for a method and apparatus that provides an additional interface to the outside world without losing the functionality of a host device and provides for a way to achieve network connectivity for a consumer without the consumer having to purchase redundant hardware.

## BRIEF DESCRIPTION OF THE DRAWINGS

A preferred embodiment of the present invention is now described, by way of example only, with reference to the accompanying drawings in which:

FIG. 1 is an isometric view of the preferred embodiment of the present invention;

FIG. 2 is a block diagram of a modem located on a host device according to the present invention;

FIG. 3 is an isometric view of a first alternative embodiment of the present invention;

FIG. 4 is an isometric view of a second alternative embodiment of the present invention; and

FIG. 5 is a block diagram of a destination device according to the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention allows for efficient re-use of any magnetically recordable media (e.g., consumer video or digital still camera equipment) by providing a means for additional external interfaces to networks, closed circuit televisions, monitoring, surveillance, commercial video market, etc. The present invention enables such an additional external interface to the outside world without losing the functionality of a host device (i.e., the magnetically recordable media).

The present invention provides for a generic interface that is applied to either digital or analog formats for both video and audio transmission. The present invention consists of the electronics necessary to interface the existing magnetic media electronics device with the outside world via a

2

transport, wireless or wireline. The present invention allows the user of any magnetically recordable media to directly interface with the multimedia network by inserting a module or device in the form of a video or audio cassette and utilizing existing magnetic transducers to couple baseband modulation information to the transport.

Moreover, the present invention provides for a way to achieve network connectivity for the consumer without the consumer having to purchase redundant hardware. Thus, a person needs only one device with accessories to perform a multitude of functions. For example, a user of a camcorder is allowed to re-use the major components of the camera subsystem by removal of the cassette tape and the insertion of a modem.

The present invention utilizes a self-contained camera device which comprises an image capturing device and a chassis. The chassis receives a storage module (e.g., a tape cartridge) or a modem (wired or wireless). A removable modem is mountable on the chassis and couplable to the image capturing device. The removable modem is either a wireless radio frequency (RF) modem with a radio network interface and antenna or a wireline modem with a wireline network interface. Coupling the removable modem to the chassis allows the image capturing device to transmit images via the radio or wireline network interface. The removable modem is replaceable with a storage module. Preferably, the removable modem has an identical form factor as the storage module, including an identical input-output interface.

The removable modem utilizes existing hardware on the host device and provides an additional interface to the outside world in place of the functionality of the cassette tape transport mechanism. The removable modem takes on the mechanical configuration of a video, audio, digital audio tape (DAT) or similar cassette, and uses the existing consumer electronic tape drive as a docking station for a peripheral, e.g., 5 GHz wireless radio, infra-red or wireline modem with various interfaces, e.g., 10 base T or 1394. The installation of such a peripheral can be made connectorless since it utilizes the existing magnetic record heads of the host device.

As shown in FIG. 1, in the preferred embodiment of the present invention, the self-contained camera device 10 is a camcorder (i.e., host device) and the chassis 11 has a cavity 12 for receiving the storage module (not shown) or the removable modem 13. The cavity 12 is also adapted to receive a magnetic tape.

The cavity 12 includes a magnetic head 14 coupled to the image capturing device 15 of the host device 10. The magnetic head 14 couples a video signal, which originates from the host device 10, by picking up magnetic signals and duplicating the magnetic signals on the modem 13.

As shown in FIG. 2, the modem 13 consists of several components: a magnetic transducer 20, a demodulator 21, a format conversion block 22, a logic and control application specific integrated circuit (ASIC) 23, a radio or wireline network interface 24 (and an antenna 25, if utilizing the radio network interface). The magnetic transducer 20 is selectively and/or removably couplable to a magnetic head 14 within the cavity 12. A coil 26 is placed in the magnetic transducer 20 which picks up the magnetic signals generated by the magnetic head 14. The magnetic transducer 20 establishes connectivity with the host device 10 when the magnetic transducer 20 comes in contact with or comes within close proximity to the magnetic head 14 of the host device 10. After the magnetic transducer 20 picks up the magnetic signals from the magnetic head 14 of the host device 10, the magnetic signals need to be demodulated.

US 6,573,938 B1

3

The demodulator 21 is coupled to the magnetic transducer 20. The demodulator 21 demodulates the magnetic signals picked up by the magnetic transducer 20 and converts them into baseband video signals. The demodulator 21 provides the baseband video signals to the format conversion block 22.

The format conversion block 22 is coupled to the demodulator 21. The format conversion block 22 is specific to the type of host electronic device 10 that the modem 13, or any other magnetic media housing, is plugged/inserted into. The format conversion block 22 presents the demodulated video baseband information in a baseband format ready for digitization by the video encoder/compression engine which is part of a very large scale integration (VLSI) ASIC.

The logic and control ASIC 23 is coupled to the format conversion block 22 and receives the baseband format from the format conversion block 22. After format conversion, the digital video and audio are packetized by the logic and control ASIC 23 and presented to the radio or wireline network interface 24, i.e., 5 GHz radio. The logic and control ASIC 23 controls the rate of modulation to the radio or wireline network interface 24. For example, the logic and control ASIC 23 instructs the radio or wireline network interface 24 when to transmit and receive signals, queries the radio or wireline network interface 24 whether it received a packet, whether the packet contained errors, whether there was a collision, or whether the logic and control ASIC 23 needs to request that the packet is re-sent. Thus, the logic and control ASIC 23 helps manage the radio or wireline network interface 24 and data framing.

If transferring files over the Internet, an internet protocol (IP), a host device IP address and a destination device IP address are embedded or downloaded in the logic and control ASIC 23. Embedding or downloading such information enables the logic and control ASIC 23 to know how to format the files and where to send the information over the Internet.

The radio or wireline network interface 24 is coupled to the logic and control ASIC 23. The radio or wireline network interface 24 is either a point-to-point stand alone system or part of a multimedia network. When the radio network interface 24 is utilized, the radio network interface 24 transmits the digital signal to a destination device via the antenna 25. When a wireline network interface 24 is utilized, the wireline network interface 24 transmits the digital signal to the destination device via an infra-red or wireline interface (e.g., 10 base T).

FIG. 3 illustrates an isometric view of a first alternative embodiment of the present invention. As shown, the chassis 11 of the host device 10 is adapted to receive a storage module (e.g., a semiconductor memory), a modem, or any other network interface. The chassis 11 comprises a set of electric contacts 30 for selectively connecting to the semiconductor memory, the modem or any other network interface.

As shown in FIG. 4, a second alternative embodiment of the present invention is applicable as a radio or wireline network interface for digital still cameras 40. The components of the modem 41 in the second alternative embodiment are the same as in the preferred embodiment. The modem 41 is embedded in a module that also contains a mini flash storage interface. The modem 41 takes the place of the functionality of the storage module 42 and is inserted into the cavity 43 of the digital still camera 40. Embedding the modem 41 in a module that also contains a mini flash storage

4

interface allows the present invention to take advantage of the mini flash storage interface standard which is available across numerous vendor platforms.

A third alternative embodiment (not shown) replaces the entire tape drive transport module with a modem. All video cameras use a multi-lead interface from the tape drive transport module back to the electronics of the self-contained camera. The present invention allows the tape drive transport interface to interface with the modem. The user can remove the tape drive transport module from the host device and insert a modem in its place. The modem has the same size, shape and form factor as the tape drive transport module and connects itself to the self-contained camera device via the multi-lead interface. Thus, the user can interchange the tape drive transport module with the modem depending on his need.

At this point, capturing and communicating images at the self-contained camera device has been described. The remaining description focuses on receiving the images transmitted from the self-contained camera device at a destination device (e.g., a personal computer).

As shown in FIG. 5, the destination device 50 has common circuitry as the modem 13 located on the host device 10. Embedded in or mountable on the destination device 50 are the following components: a radio or wireline network interface 51, a logic and control ASIC 52, a format conversion block 53, an interface port (e.g., a network interface card) 54, a multimedia card 55, an integrated drive electronics (IDE) or small computer system interface (SCSI) 56, and a hard drive 57. The radio or wireline network 51 is in communication with the modem 13 via an antenna 58 or a wireline. The logic and control ASIC 52 is coupled to the radio or wireline network interface 51. The format conversion block 53 is coupled to the logic and control ASIC 52. The interface port 54 is coupled to the format conversion block 53 via a 1394, a 10 base T (e.g., Ethernet) or a high speed serial bus 59. The multimedia card 55 is coupled to the interface port 54 via a system bus, e.g., protocol control information (PCI) 60. The IDE or SCSI 56 and a super video graphics array (SVGA) monitor (not shown) are coupled to the multimedia card 55. The hard drive 57 is coupled to the IDE or SCSI 56.

In operation, using a radio network interface 51 and an antenna 58, the RF signals are picked up by the antenna 58 on the destination device 50 and are fed to a radio (e.g., 5 GHz radio). The radio network interface 51 down-converts the RF signals into baseband signals. The baseband signals are then fed into the logic and control ASIC 52. The logic and control ASIC 52 is able to read the data that comes over the baseband signals and strips out the data from the baseband signals to create raw data which is fed into the format conversion block 53. The format conversion block 53 converts the raw data into one of several standard data formats (e.g., 10 base T, 1394, high speed serial, etc.). The data flows from the format conversion block 53 to an interface port (e.g., network interface card) on the destination device 50. The data is then ported into a system bus 60 and into a multimedia card 55 by using the appropriate software application. The data is now able to be viewed on a computer monitor (e.g., a SVGA monitor) or stored on the system hard drive 57, or other media storage device (e.g., floppy disk, tape drive, etc.), that enables the user to view, manipulate and store the video data. It is important to note that the wireline network interface essentially operates in the same manner as the radio network interface. The wireline network interface, however, has a wired or infra-red connection to the destination device as opposed to a radio.

US 6,573,938 B1

5

While the invention has been described in conjunction with a specific embodiment thereof, additional advantages and modifications will readily occur to those skilled in the art. The invention, in its broader aspects, is therefore not limited to the specific details, representative apparatus and illustrative examples shown and described. For example, the present invention is also applicable to other forms of consumer imaging devices. The modem disclosed herein could take the form of a data storage card, personal computer memory card international association (PCMCIA) card or disk drive. The electrical and mechanical interfaces could be configured to be compatible with any of these standards. Various alterations, modifications and variations will be apparent to those skilled in the art in light of the foregoing description. Thus, it should be understood that the invention is not limited by the foregoing description, but embraces all such alterations, modifications and variations in accordance with the spirit and scope of the appended claims.

We claim:

1. A self-contained camera device for capturing and communicating images via a modem comprising:

an image capturing device;

a chassis for receiving a storage module or a modem; and

a removable modem, mountable on the chassis and couplable to the image capturing device, wherein the modem is replaceable with the storage module; and

wherein the self-contained camera device is a camcorder, which further comprises a removable tape drive transport module.

2. The self-contained camera device according to claim 1 wherein the wireless communication device is a wireless radio frequency modem.

3. The self-contained camera device according to claim 1 wherein the modem is a wireline modem.

4. A self-contained camera device for capturing and communicating images via a modem comprising:

an image capturing device;

a chassis for receiving a storage module or a modem; and

a removable modem, mountable on the chassis and couplable to the image capturing device, wherein the modem is replaceable with the storage module; and

wherein the chassis has a cavity for receiving the storage module or the modem, where the cavity is adapted to receive a magnetic tape.

5. The self-contained camera device according to claim 4 wherein the cavity includes a magnetic head coupled to the image capturing device and the removable modem comprises a magnetic transducer removably coupled to the magnetic head.

6. A self-contained camera device for capturing and communicating images via a modem comprising:

an image capturing device;

a chassis for receiving a storage module or a modem; and

a removable modem, mountable on the chassis and couplable to the image capturing device, wherein the modem is replaceable with the storage module;

wherein the chassis has a cavity for receiving the storage module or the modem; and

6

wherein the removable modem comprises

a magnetic transducer selectively couplable with a magnetic head within the cavity,

a demodulator coupled to the magnetic transducer,

a format conversion block coupled to the demodulator,

a logic and control application specific integrated circuit coupled to the format conversion block, and

a network interface coupled to the logic and control application specific integrated circuit.

7. The self-contained camera device according to claim 6 wherein the network interface is a radio network interface, and further comprising an antenna coupled to the radio network interface.

8. The self-contained camera device according to claim 6 wherein the network interface is a wireline network interface.

9. A housing for capturing and communicating images on a self-contained camera device via a modem comprising:

a magnetic transducer for picking up a magnetic signal generated by a magnetic head of a host device;

a demodulator for demodulating the magnetic signal picked up by the magnetic transducer to produce a video baseband signal;

a format conversion block for formatting the video baseband signal;

a logic and control application specific integrated circuit for packetizing the video baseband signal; and

a network interface for communicating the video baseband signal to a destination device.

10. The housing according to claim 9 wherein the housing has a same shape and size as a magnetic cassette tape.

11. The housing according to claim 9 wherein the magnetic transducer comes in contact with the magnetic head of the host device to establish connectivity.

12. The housing according to claim 9 wherein the magnetic transducer is within close proximity to the magnetic head of the host device to establish connectivity.

13. A self-contained camera kit of parts comprising:

a housing having image capturing capabilities and a chassis;

a removable tape drive transport module; and

a removable modem, wherein the removable tape drive transport module and the removable modem are alternatively mountable on the chassis.

14. A method of capturing and communicating images on a self-contained camera device via a modem comprising:

entering a record mode;

activating a magnetic head of a host device;

utilizing a magnetic transducer to pick up a magnetic signal generated by the magnetic head of the host device;

demodulating the magnetic signal picked up by the magnetic transducer to produce a video baseband signal;

formatting and packetizing the video baseband signal; and

communicating the video baseband signal through a network interface.

*    *    *    *    *

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU") is entered into between Motorola, Inc., through its Multimedia Group, Plexus Corp., and Interactive Broadcasting, and sets forth the current intention of the parties relative to the development of a preliminary specification for a a wireless device and compatible base station in the 5 GHz spectrum for use with home computers that will enable video, audio and control information (hereinafter the Device). The parties intend to continue the development of a preliminary specification for the Device and to continue discussions about the role each of them would have in the development of the Device if it is mutually decided to proceed with the project.

1. The parties agree to cooperate in the completion of a preliminary specification for the Device in a timely manner. A preliminary specification will describe the desired functional capabilities of the Device and, at a high level, the various subsystems involved and the interfaces between the various subsystems.

2. Work will also begin on a comprehensive business plan for the Device, including how best to market the product. However, this activity will be conducted in such a manner as to avoid unnecessary delays in completing the conceptual specification.

3. Each party will be responsible for paying its own costs associated with the above activities, as well as all such activities conducted to date. However, this MOU does not obligate any of the parties to provide funding for the development of the Device. Such funding, if a party elects to participate in it, will be the subject of other written agreements to be entered into apart from this MOU.

4. If the parties mutually decide to proceed with the development of the Device, the parties will negotiate, in good faith, terms and conditions of one or more definitive agreements that set forth the parties' respective rights with respect to the manufacturing and distribution of the Device and its various subsystems and/or components. The current intention of the parties in this regard is as follows:

    a) Interactive Broadcasting would get some rights pertaining to web servers for certain applications.

    b) Plexus or a Plexus subsidiary would get some rights pertaining to the manufacture of the Device and/or certain subsystems or components of the Device.

    c) Motorola would get rights pertaining to the manufacture of the radio subsystem for the Device, and some rights pertaining to the manufacture and distribution of the Device.

    d) Nothing would limit Motorola's right to manufacture and distribute for other purposes or to other persons the same 5GHz radio subsystem used in the Device which is the subject of this MOU.

EXHIBIT

3

5. Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology. Without limiting the foregoing, Motorola will retain all rights to the 5GHz radio subsystems that it is currently developing or may hereafter develop and which may become part of a preliminary specification and/or which may become part of the Device. The preliminary specification will be owned jointly by the parties. Nothing contained in this MOU shall be deemed to grant any party, by implication or otherwise, any license under any patents or patent applications of any of the other parties.

6. Disclosure of confidential information in connection with this MOU and the development of a definitive agreement will be governed by the terms of the existing Nondisclosure Agreements between the parties. All information relating to this MOU, including the existence and terms of this MOU, are considered confidential information. None of the parties shall issue any statement or press release regarding this MOU, or the subject matter thereof, without the express written permission of all the other parties.

7. Each of the parties will act as, and will be, independent contractors in all aspects of this MOU. No party will act or have authority to act as an agent for any other party for any purpose. Nothing in this MOU will be interpreted to constitute or create a joint venture, partnership, teaming arrangement or other formal business entity or fiduciary relationship between the parties hereto. Unless otherwise expressly and mutually agreed in writing, the prospective relationship contemplated in this MOU shall not be an exclusive agreement. Each party reserves the right to enter into other cooperative relationships with other third parties.

8. This MOU sets forth the current intent of the parties with respect to the business activities described herein, but in no way gives rise to any legal obligations except obligations under paragraphs 3, 5 and 6. The obligation of the parties to consummate the transactions contemplated hereby is subject to negotiation and execution of a definitive agreement in form and substance satisfactory to both parties.

9. This MOU shall be governed by and interpreted in accordance with the domestic laws of the State of Illinois.

10. Neither this MOU nor any of the obligations or rights of the parties may be assigned, pledged or transferred by either party without the prior written consent of the other party.

11. Any party may cease its development activities under this MOU at any time for any reason if it so chooses, without liability to any of the other parties.

This MOU is effective as of the latest of the dates set forth below.

Motorola Inc., Multimedia Group

By: _Thom A Freeburg_

Title: _VP & OFFICER TECHNICAL STAFF_

Date: _1/12/98_

Plexus Corp.

By: _Peter Strandun_

Title: _#13# CEO_

Date: _1/13/97_

Interactive Broadcasting

By: _____

Title: ____DIRECTOR_____

Date: _____15ᵗʰ Jan 1998____

Confidential



### ADAPTIVE MICRO•WARE, Inc.
*Technology Development*

# DRAFT DOCUMENT

# Wireless Multimedia Core Technology Overview

# For Patent Review

# Prepared For

# MemoryLink Corp.

Document Number:  D-980273-0001

Revised: February 15, 1998

Copy Number: _2_



EXHIBIT
4

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

# TABLE OF CONTENTS

Section ................................................................................................ Page

Executive Summary .......................................................................... 1

Definitions .......................................................................................... 2

   Multimedia ..................................................................................... 2

   Wireless Multimedia Device (WMD) ............................................ 2

   Wireless Multimedia Gateway (WMG) ........................................ 2

Core Technology Concept Specification ........................................... 2

Proposed Architecture Technical Description .................................. 3

   Protocol Layer Model ................................................................... 5

   Open Systems Interoperability .................................................... 7

   Architecture Development Evolution ........................................... 9

Developmental Issues ...................................................................... 9

   Bandwidth Tradeoffs .................................................................. 10

   Common Architecture Features ................................................. 14

   System Configuration and Transport Protocol Issues ............... 15

Product Configurations .................................................................... 17

General Product Characteristics ..................................................... 19

   External Network Support ........................................................... 19

   Camera Subsystem .................................................................... 20

   Monitor Subsystem .................................................................... 20

   Diskdrive Subsystem ................................................................. 21

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

# LIST OF FIGURES

Figure 1: Proposed Wireless Device Architecture ...........................................................4

Figure 2: Comparison of Standard Protocol Stack and The Wireless Protocol Stack
Architecture ...................................................................................................6

Figure 3: Interconnections to Standard Networks.........................................................8

Figure 4: Architecture Development Evolution ..............................................................9

Figure 5: An Example of Real Time Video Transmission providing Limited Retry.........12

Figure 6: Simple Point to Point Multimedia Device Network.........................................18

Figure 7: Complex  Wireless Multimedia Network .......................................................18

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

## Executive Summary

This document describes the development path for a core technology which will enable a unique set of applications for transmitting and receiving high quality digital video/audio signals over a wireless medium in a home or office environment. It is expected that this document will serve as the genesis for early review of this innovative, dedicated purpose component platform, and its resultant patent opportunities

The document's premise is that a time to market opportunity exists to establish de facto standards and produce base componentry for a high volume market in a variety of product formats. This unique opportunity is based on a nexus of three key developments:

1. The establishment by the Federal Communications Commission of a nonrestrictive usage frequency band in the 5 Ghz range, with channel bandwidth capability for high throughput multimedia data transmission.

2. The creation by Motorola, Inc. of the first commercially viable integrated circuitry to provide high speed, digitally formatted data transmission at this new frequency

3. The creation by MemoryLink Corp. of a highly integrated, multimedia processor and communication control circuit utilizing a proprietary audio/video data transfer format

The system which results would optimize the relatively unregulated characteristics of this new frequency allocation to provide extremely high quality video, audio and supporting data transmission in a remarkably small, low cost and power efficient end product package.

The document outlines the approach for creation of this unique component class as well as the potential broad ranging embodiments of both individual products and product systems. By demonstrating the market potential at a systems level, a vision is presented for far ranging participation in a revolutionary class of video-enabled, personal communication devices.

Wireless Multimedia Core Technology Overview

Confidential

D-980273-0001

15 February, 1998

## Definitions

The following terms have been coined and are used throughout this technology overview:

### Multimedia

Multimedia describes a system that uses a combination of graphics, still pictures, video, audio and text in an interactive way to provide information.

### Wireless Multimedia Device (WMD)

A Wireless Multimedia Device (WMD) is a classification of wireless devices that receives and/or transmits multimedia data.

### Wireless Multimedia Gateway (WMG)

Wireless Multimedia Gateway (WMG) is a classification of devices that provides a wireless  distribution and/or collection of  multimedia data to/from one or more WMDs. Such a device may also provide storage or provide a gateway to other standard Multimedia devices or Networks.

## Core Technology Concept Specification

The first stage in defining the potential for a series of high quality video/audio-based product development lies in creation of a basic set of enabling technologies. These technologies are predicated on the concept that a dedicated set of data transfer and control protocols would enhance the overall performance and cost profiles of any end product schemes utilizing the approach. The following proposed hardware architecture and communications protocol is intended to provide this low cost / high performance solution. As opposed to more general purpose network formats, the creation of a dedicated purpose wireless protocol layering model is not intended to create an interchangeable set of protocol layer building blocks. Rather, it gains its operating advantages via a tightly coupled integration of communication protocols,  which are targeted to provide an optimum solution to the very specific application of transferring optimized blocks of audio/video information in a high frequency digital state.

The proposed architecture will consequently be less costly based on this narrower set of protocol requirements and the tighter integration of the layers. Because the communication protocol processing is highly integrated, it reduces the general protocol service access requirements needed in more generally applied interchangeable protocol modules. It's functionality, in turn, is limited to a very focused set of requirements. Thus It can be implemented at a very high level of integration, such as a single chip Application Specific Integrated Circuit (ASIC), which reduces the cost of many components while providing the speed needed for some of the higher data rates.

## Proposed Architecture Technical Description

A proposed architecture for wireless devices integrates the various communication protocol layers into a common processing block between the physical layer and the application layer. This architecture decouples the communication protocol layers from the RF transceiver functional block. It also decouples the communication protocol layers from the multimedia I/O which represents the application layer. The architecture is based upon a presumed system in which a variety of transmission and reception devices are operating. An example of this architecture is shown in Figure 1.

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998



**Figure 1: Proposed Wireless Device Architecture**

Figure 1 indicates that encoding/decoding algorithms and transport protocols are configured and optimized based on the multimedia data type and the user's preferences.  These various data paths converge upon the more common networking, bandwidth allocation, and RF medium access protocols.

Wireless Multimedia Core Technology Overview

D-980273-0001

**Confidential**

15 February, 1998

As the figure above shows, there are differences in transport protocol for real time video and verified video. Real time video, and real time audio for that matter, are isochronous. This means that these transport protocols must balance the reliable transfer concerns with the timing required for proper presentation at the receiving end. Verified video or audio, in the context of this document, indicates that the intended immediate destination for the multimedia data is not real time presentation, but rather storage. It is referred to as "verified" since higher levels of reliable transfer can be used without high bandwidth usage.

**Protocol Layer Model**

The protocol layer stack model to be used in the proposed architecture is compared to the International Telecommunication Union (ITU) standard network protocol layer model in Figure 2.

Wireless Multimedia Core Technology Overview          **Confidential**

D-980273-0001                                          15 February, 1998



**Figure 2: Comparison of Standard (ITU) Protocol Stack and The Wireless Protocol Stack Architecture**

The advantages of a proprietary multimedia communications protocol stack over the ITU standard for this architecture is optimum use of bandwidth, cost, performance, and the flexibility to tailor the protocols for the various multimedia transmissions.

The ITU standard seeks to define each layer independently and to define a set of protocol access points between each layer. The strict interpretation of this model results in creating a set of interchangeable protocol building blocks that provide a very general solution to digital communications networking.  Each general purpose protocol building block tends to be a costly, yet reasonable solution for a broad range of networking challenges. This architecture is critical for heterogeneous, standardized networks that are built from commercially available, interoperable components. Conversely, the proposed dedicated purpose architecture is not intended to provide solutions for building heterogeneous networks from various commercially available, interoperable components. It is intended to build a homogeneous RF wireless network with a uniquely qualified set of components.

The proposed architecture focuses upon providing optimum solutions for a particular family of wireless devices. It provides transmission reliability at the link layer and not on an end-to-end regime.  An end-to-end reliability is not needed since there is no multiple-hop routing in the common uses of the wireless network. If an application is developed which needed end-to-end reliability within the wireless network, layers could be added between the application and the integrated protocol processing block.  For the current applications, the transmission reliability is specific tailored to the needs of the user, the multi-media data type being transferred, and the RF environment.

The proposed architecture is then intended to operate in a somewhat closed homogeneous RF wireless network. The limited set of components that will operate within the network will only need to be interoperable with each other. The closed nature of the network allows value added features to be included,  with a controlled, limited impact upon existing device interoperability. The ability to include such value added features, allows the wireless product developer to differentiate this product from the others in the market using other network approaches.


**Open Systems Interoperability**

The closed aspect of this architecture does not, however, limit interoperability with other, more general purpose networks. This overview presumes the existence of some type of gateway to bridge the wireless network with the standard networks.  Figure 3 illustrates the use of a gateway to interconnect the proposed wireless network to standard networks.

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998



**Figure 3: Interconnections to Standard Networks**

The "wireless multimedia gateway" depicted in Figure 3 provides protocol translation to convert the proprietary wireless protocols to the standard public network protocols or the standard PC interface protocols. The gateway converts the focused, optimized protocols used on the wireless network to general purpose protocols used in the open system networks. In essence the gateways provide the wireless network devices with points of interoperability to outside systems.

Wireless Multimedia Core Technology Overview

D-980273-0001

Confidential

15 February, 1998

**Architecture Development Evolution**

The proposed architecture lends itself to the development evolution that is shown in Figure 4. An existing demonstration model consists of a multiple board set as shown to the left section of the figure. The next stage will be two board set with one board will provide the integrated multimedia communication protocol processing. The other board will provide the RF transceiver functionality. (What is not shown in this configuration is the various application layer components such as, image sensors, keypads, and microphones, which would be chosen to match the functionality of a particular product using this core architecture.) Based upon this study, the final stage will be a set of ASICs. One digital ASIC will provide the integrated communication protocol processing. The other, an analog or mixed signal ASIC, will provide the RF transceiver functionality.



Figure 4: Architecture Development Evolution

## Developmental Issues

Given the wide applicability of the proposed architecture, there are a variety of developmental questions which remain. The answer to these questions lies in the underlying technology and its potential for streamlining the audio/video transport and control process. The following sections describe tradeoffs and protocol options that will likely be considered for any product or set of products to be developed using this technology.

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

### Bandwidth Tradeoffs

This technology provides flexibility of bandwidth usage for video quality and transmission reliability tradeoffs. Bandwidth can be traded for video quality and transmission reliability based on the needs of a given application.

This technology approach is inherently bandwidth sensitive. The estimated peak bandwidth limit using Motorola's current RF transceiver is at least 10 Mbps. This rate is sufficient to support various combinations and quality levels of the transmission of video, still images, audio, data, graphics and text. The goal is to provide a bandwidth usage strategy that will accommodate the maximum number of devices in a wireless network with highest possible transmission reliability and the level of video quality necessary for a given application.

### Video Quality Issues

Video quality is singled out for discussion over other multimedia types because of the large demand placed on bandwidth by video transmission and the bandwidth tradeoffs that are possible with video. Video quality is represented as resolution of each video frame, the rate at which the video frames are updated and compression rate of the transmitted video.

The resolution of still images that make up the video are only limited by the image sensor of the camera. Given a high end image sensor, video resolution can be supported in a range from HDTV or high resolution computer monitor quality to very small thumbnail images. The lower the video resolution the more grainy the video image appears. Higher video resolution will require commensurate higher bandwidth usage for transmission. Selection of video resolution is based on the application demands and/or the user's preferences.

Video frame rate is the speed that still image frames are presented upon the video monitor to produce the illusion of full motion video. The considered technology can support video frame rates ranging from National Television Standards Committee's (NTSC) standard of 60 interlaced fields per second  through stop action video used for video conferencing to single frame still images. Slower than the above noted video frame rates can introduce an unintended effect of jerkiness in the motion of high speed "action" video sequences.  Faster video frame rate signals will require higher bandwidth usage for transmission.  Selection of video frame rate is, again, based on the application demands and/or the user's preferences.

Video compression rate is an indication of the amount by which the video data has been reduced using various compression techniques. For instance, broadcast quality, uncompressed digital video would require a bandwidth of 150 Megabits per second (Mbps). Given the probable 10 Mbps limit of the proposed RF subsystem, uncompressed digital video transmission is not practical. The current standard video compression algorithms, including MPEG, Wavelet, or H.320, will compress video to within these speed limitations. Any video compression will cause some loss of the video data, but the amount of loss can be limited based on the video compression rate. Lower rates of video compression provide higher perceived image quality and use more bandwidth. The compression ratio / bandwidth tradeoff is dependent upon the application. A baby monitor, for instance, could operate with a high video compression rate and use less bandwidth because of the lower demands for image quality.

## Video Reliability Issues

Video reliability is singled out for discussion over other multimedia types because of the high demand placed on bandwidth by video transmission. As with video quality, the unique timing requirements of video directly relate to reliability. As discussed earlier, there is a is a different set of concerns with the transmission of real time video versus verified video. As previously noted, real time video is a video stream that is played back, to the user's perception, immediately upon reception. Verified video, or non-real time video, is not intended to be played back immediately, but rather is stored for later viewing.

The transmission of real-time video must be isochronous to prevent buffer over flow or underflow in the receiving end. In other words a steady flow of video data must be received such that it can be displayed without either running out of or being overrun by video data. Non-real time video is not sensitive to this problem, unless the transmitting end is in danger of overrunning its buffers between the image acquisition and transmission phases.

Wireless Multimedia Core Technology Overview                **Confidential**

D-980273-0001                                                15 February, 1998

The transmission of real time video and non-real time video presents a tradeoff in reliability. The reliable transmission of video data that results in later video delivery for a real time application serves no purpose. Specifically, video that is not received within the presentation time will cause a frame skip. In the event that a frame is to be presented but has not been completely received, a buffer underflow condition occurs which results in a frame skip. Transmission of non-real time video is not constrained by the timing of immediate playback. As a result more reliable transmission methods can be used to create a non-real time yet verified video transmission, thus the term "verified video".

There are methods that can be used to provide some limited measure of reliability for real time video transmission. The goal of these methods is to provide time for transmission retries prior to presentation time. These methods tend to be balanced between the amount of reliability and allocation, versus bandwidth or larger receive buffer sizes and increased video latency. Figure 5 presents a simplified example of video frame transmission timing which illustrates some of the parameters for the retransmission methods. In practice these techniques may be complicated by such issues as the MPEG video compression scheme, which does not always transmit full video frames.



**Figure 5: An Example of Real Time Video Transmission providing Limited Retry**

As Figure 5 shows, a burst of video frame data at bandwidths higher than the constant video rate will provide time for transmission retries prior to the next video frame burst. Using this technique, average video bandwidth increases based on the average number of retries. The video burst rate of bandwidth that is needed to support this method depends upon the amount of time left for retries, which in turn dictates the reliability of the transmission.

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

Time for transmission retries can also be increased by providing more buffer space for in transit video data. Increased buffering will increase the video latency which, as shown in the figure, is the time between capturing and presenting the video. The amount of acceptable video latency will be dependent upon the application. For example, long video latencies in a two-way interactive video application can be awkward and distracting to the users.

Real time audio is also isochronous and as such shares these same issues. However, due to lower bandwidth requirements for audio, this issue is not as costly to solve in terms of bandwidth, processing power, and end-to-end latency.

In case of audio/video program transmissions, there will be the added complication of the reliable, yet timely delivery of both the audio and video data. While it may be less costly for reliable audio transmission, the audio and video presentation must be synchronized for any useful audio / video application.

Data or text transmissions are typically not tolerant of any data loss, but again the lower bandwidth requirement lessens the cost of "Forward Error Correction" or transmission retries.

**Multimedia Encoding and Communication Protocols**

Another area that must be addressed is the development of proprietary multimedia encoding and communication protocols between the wireless devices. As this paper has described earlier, the FCC has not mandated a particular protocol or any requirements for interoperability in this frequency band. (This study advocates such proprietary protocols should be developed to optimize performance and cost.)

Issues that should be addressed in the development of multimedia communication protocols include, but are not limited to:

- Transmit data unit size,

- Method of access control to the RF media,

- The use of and allocation of specific bandwidths for both upstream and downstream transmissions,

- The ratio of data compression traded off with used bandwidth and video quality, and

Confidential

- Reliability of data transfer.

Transmit data unit size represents the size of the data units passed between wireless devices. This size will have a direct effect on the percentage of bandwidth required for overhead and the processing power required at both ends of the transmission. Another factor in selecting transmit data unit size is the required reliability of the data transfer coupled with the Bit Error Rate (BER) environment of the RF media. Transmit data unit size, BER and the required reliability of the data transfer may dictate the use of a Forward Error Correction (FEC) method and transmission retries. The method of access control to the RF media will be selected based on:

- The number of wireless devices operating within range of one another,

- The applications required bandwidth for each device

- The expected traffic load.

Methods that could be employed include Frequency Division Multiplex (FDM) techniques or Time Division Multiplex (TDM) techniques or in some advanced cases Code Division Multiplex (CDM) techniques. Methods may also include fixed allocation of bandwidth or dynamic allocation of bandwidth based on need.

Another consideration is the selection of decentralized type of media access control over a direct central control of allocation by a gateway. For instance, decentralized control has the advantage of allowing any combination of wireless devices to interact, without the added expense of a central control unit. This approach will reduce the consumer's initial entry cost to the market. A decentralized control approach also minimizes the risk of single point failure.


## Common Architecture Features

The wireless transmission technology being considered in the lightly regulated environment of the 5.2 GHz band is very flexible. The flexibility of this technology can be taken advantage of to develop a whole family of products, each with its own characteristic use of the technology. However, it is likely that those products that will be ultimately based upon the integration of this optimized audio/video transport data and control format will likely share many common attributes. For example, if they are to interoperate at the local area level, each must:

- Support a subset of the various multimedia transport protocols

14

Wireless Multimedia Core Technology Overview

D-980273-0001

**Confidential**

15 February, 1998

- Provide the RF and antenna control sections

- Share a networking and RF media access control  algorithm

Considering this common architectural set, it would seem that a set of common building blocks should be designed into the circuitry being offered. Each device design would include those building blocks which it needs to provide its functionality. Those considered most important at this stage of integration include the following.


**Networking and Media Access Control**

The challenge for networking and media access control will be to define an algorithm that will support any product or system configuration, each of the various multimedia bandwidth demands, each of the multimedia transport protocols, and future system developments.

One of the primary issues of a network protocol in a wireless network will be to allocate bandwidth and time slots to the members of the network. This issue indicates a tighter integration of network and media access control layer is needed.

For example, in a complex network, such as is shown in Figure 7,  a "smart" control of bandwidth based on the user's intentions can be envisioned. Under this scenario,  the user may have multiple low resolution video inputs. In the event that the user wishes to focus in detail on the output of a single video source, commands of  to increase frame rate or resolution may be sent to the camera or other input device.  At the same time, commands may be sent  to the other video image capture devices to reduce their frame rate or resolution in an effort to balance the bandwidth usage.


**System Configuration and Transport Protocol Issues**

If this product class is to be offered as a configurable system, the media access control algorithm must support from the minimum system configuration up to a maximum configuration. Consideration must make for potential future products requirements to prevent obsolescence of early product components in later system configurations.

The need for flexible system configuration indicates a need for a decentralized network control.  For instance, forcing a consumer to purchase a centralized network control component such as a wireless gateway may exceed target pricing for initial devices offered.

15

Media access control will then need to support all the transport protocols for a variety of real time data transmission formats including audio/video, verified audio/video, high resolution still images and control and information data transmission.

## Multiple Users and Component Addressing Issues

While an initial system may be geared to support a single user, the possibility of multiple users in the future must be addressed.  With an addition of a gateway (see below under "General Product Characteristics"),  the home wireless network could be a conduit for audio/video recording and playback, video on demand from an outside network, and wireless network browsing (as well as other functions) simultaneously.

In a multi-user, multi-function environment, shared components such as monitors or disk drives must be addressable and may also must provide a form of dedicated access to prevent users from corrupting each other's data.

## Ease of Use Issues

Considering the history of the personal computer consumer market,  it makes sense to create from the onset a system that is easy for the consumer to use and re-configure. The initial products should be capable of detecting the components in the system configuration and acting accordingly. Adding a new component to the system should not pose a technical challenge to the user.

## Privacy and Security Issues

Since this product is a wireless technology being developed for the home, consideration must be made for privacy and security.  Algorithms must be developed  that allow a home's wireless components to interact without concern that components outside the home network can gain access or provide interferrence. As new components that are added to the network, each must be easily synchronized with the unique security "keying" that  provides secure access.

16

Wireless Multimedia Core Technology Overview    Confidential
D-980273-0001    15 February, 1998

## Product Configurations

Since a basic aim for a system of this type will be modularity, basic system configurations should be identified as integration phases progress. While more market inputs must likely be obtained to further define these system potentials, it is likely that ultimate system characteristics will also unfold within one of the following main product configurations for video and/or audio delivery:

### Point To Point Video

This category encompasses the set of applications where there is a need to transmit video from an origination site to a reception site.

### Multi-Point Video

This category encompasses the set of applications where there is a need to transmit video to or from an origination site to multiple reception sites.

### Full Duplex Video

This category includes the set of applications where there is a need to transmit and/or receive video from two or more origination and/or reception sites.

### Point-To-Point, Multi-Point, Full Duplex Audio

The same options exist for audio configurations to be added to most of the video configurations.

### Point-To-Point, Multi-Point, Full Duplex Data Transmission

The same options exist for data acquisition and transfer configurations to be added to most of the video configurations.

17

Wireless Multimedia Core Technology Overview
D-980273-0001

**Confidential**

15 February, 1998

The range of these potential configurations are illustrated by figures 6 and 7 below.



**Figure 6: Simple Point to Point Multimedia Device Network**



**Figure 7: Complex Wireless Multimedia Network**

Wireless Multimedia Core Technology Overview

D-980273-0001

Confidential

15 February, 1998

## General Product Characteristics

While it is beyond the scope of this overview to attempt to define specific products based upon the above proposed architecture, there are potential product characteristics which are suggested by the outlined system capabilities.

### External Network Support

The case has been made for an optimized proprietary set of operating standards and functions within the local area. However, many of the potential product embodiments based upon this core technology are sure to require connection with outside, standard networks such as the Internet. In this case, a device class for providing data translation support may also present an opportunity for early definition and provision of dedicated purpose, integrated application modules for the market place. Termed "wireless gateway" for this discussion, this class of devices will likely share some common characteristics.

Various models and options of wireless gateways may be provided. All wireless gateway models will likely be capability of receiving and transmitting at bandwidth levels that are necessary to transfer the various multimedia data types, remote control, or transport protocol signaling. Wireless gateways must be capable of supporting the features of the other devices in the premise's wireless network, as well as the user 's external connection requirements. Each user will have a different set of expectations for connection to the outside world and potential hardwired networks within the household that the gateway must support.

The high end model wireless gateways could provide expansion slots for various Network Interface Cards (NIC). The fully equipped gateway may support cable modems, satellite antenna connections, and telephone lines, to the external world as well as internal hardwired networks such as Ethernet.

The wireless multimedia gateway will likely contain the capability of high bandwidth receive and transmit. For instance, it may receive verified video and still images for storage. It may transmit video either real time to the monitor or verified video and still images for transfer to the PC or the network. Or it may transmit and receive at much lower rates for remote control and transport protocol signaling.

The gateway may also provide direct access to non-wireless shared resources, such as disk drives and printers.

Confidential

The gateway may need to receive remote control from either a directly connected PC, an incoming telephone call, or a wireless remote control device. Remote control commands from a PC or the external network may be routed to other hardwired wireless devices.

## Camera Subsystem

Whatever the ultimate product embodiments, various models of wireless video image acquisition devices such as cameras may be provided. All camera models will likely use high bandwidth for transmission of real time video data. Each could also use low bandwidth to transmit and receive for remote control and transport protocol signaling. Higher end camera models may provide more flexibility and capabilities in terms of video frame rates, image resolution and video compression rates. They may also support synchronized audio and video. Inexpensive camera applications, such as an infant monitor, may meet target costs and target bandwidth usage by taking advantage of low resolution image sensor, fixed transmitted resolutions, slow, fixed rate video framing, and high video compression ratios.

Analysis of the various modes of operation with respect to bandwidth requirements will likely need to be undertaken. A system design goal will likely be to preserve bandwidth since it is the most important, time critical resource upon which these products depend.

## Monitor Subsystem

The wireless monitor supported by this modular system could also impose a wide range of demands. In on embodiment it could be a high bandwidth receive device and low bandwidth transmit device. It may receive real time audio/video only for immediate playback or still images for display. It in turn may transmit and receive at much lower rates for remote control and transport protocol signaling.

Other various models of wireless video monitors may also be provided, each with its own minimum and maximum demands. For instance, some monitor models may use high bandwidth for reception of video stream data or high resolution still images. Higher end monitor models will likely provide more capabilities in terms resolution and compatibility with the higher end cameras .

Wireless Multimedia Core Technology Overview

**Confidential**

D-980273-0001

15 February, 1998

All monitors will likely need to be able to receive real time video whether it is received from a camera or a storage device. Added options may include provision of a port for a photo printer that prints the currently displayed still image or video frame. Among the advanced features of a wireless monitor there may be an option to split the screen for inputs from various sources or display on screen information in the form of overlays or digital effects. This option is also highly dependent upon how the bandwidth is shared between various components.

### Diskdrive Subsystem

This storage peripheral, denoted as "wireless disk drive," will be have the capability of high bandwidth data receive and transmit. It will likely receive verified audio/video and still images for storage. It should also likely be capable of receiving real time audio/video for applications that both record and play back simultaneously. Transmission of audio/video data in either real time mode to the monitor or verified audio/video and still images for storage to the gateway could be a feature. As with other network devices, the drive could transmit and receive at much lower rates for remote control and transport protocol signaling. This device should provide storage that can be archived and is easily expandable. (One configuration option may support a removable hard disk type device to provide such capability. For instance, there are one or two gigabyte removable disks on the market today that would provide sufficient storage for log video streams and a multitude of still images. Even the 100 Megabyte removable disks would be useful for fairly extended video streams.)

More than one type of wireless video disk drive may be provided. All wireless disk drive models will likely bear the capability of both receive and transmit using variable bandwidths needed to transfer the various multimedia data types, remote control, or transport protocol signaling. The higher end monitor models will likely provide more capabilities in terms storage and perhaps multiple user support features.

In later system the wireless disk drives could function as a shared resource for multiple PCs which are themselves wireless, or connected through the gateway. Such a device will be required to maintain the integrity of data by providing short windows of dedicated access to each user.

 *MOTOROLA*

*Intellectual Property Department*
*Patents, Trademarks and Licensing*

April 13, 1998

Peter Stranwitz
PLEXUS
55 Jewelers Drive
Neenah, WI 54957

Dear Mr. Stranwitz,

Re: Wireless Multimedia Core Technology Overview for Patent Review

I refer to your document entitled "Wireless Multimedia Core Technology Overview for Patent Review", dated February 15, 1998 and marked as having been prepared for MemoryLink Corp. I have reviewed this from the point of view of identifying a basis for patent applications that might be filed as a result of the design effort between Motorola and MemoryLink or its associated companies.

Without forming any opinion as to whether there are indeed patentable ideas referenced in this document, I propose that Motorola and MemoryLink enter into an agreement under which one or more joint patent applications are filed. I propose that the patent application(s) will focus on the following technical features:
• the general concept of a self-contained wireless camera with local display as well as compression of video images and transmission to a computer device accessible via the Internet for remote display;
• switchable selection between different video compression schemes, for example MPEG and wavelet compression selectable according to application (see Fig. 1);
• balancing the load in a complex network, for example by sending commands to increase frame rate or resolution to a camera or input device and at the same time sending commands to other video image capture devices to reduce their frame rate or resolution. (page 15).

I conducted a brief search of issued patents and identified an old patent (4,097,893 - now expired) relating to a portable wireless camera device. Any patent application filed will have to distinguish over this prior art. I enclose an abridgment from the USPTO website and I will obtain a copy of the patent.

It is my understanding from Gary Schultz and Jan Wyckoff that the inventors for these ideas are yourself, Gary, Jan, and Bob Kniskern. Please let me know if you or Bob disagree with this determination of inventorship.

It is also my understanding that Bob is CEO of Adaptive Micro-Ware and that Adaptive Micro-Ware has agreed to assign intellectual property rights in this project to MemoryLink. Please confirm that MemoryLink will be the ultimate registered assignee of any inventions of yours and of Bob's.

EXHIBIT

tabbies®

5

I enclose a draft agreement setting out proposed terms under which such an application or patent will be filed, prosecuted and owned. The above referenced document is appended to the agreement, with certain deletions. I have deleted references in Fig. 1 and page 17 to data transmission and I have deleted the description of the wireless gateway at pages 19 and 20. The reason for these deletions is that these are areas where Motorola has prior involvement, and we are not able to enter into any agreement which might result in joint ownership of intellectual property in these areas.

The proposed agreement contemplates taking advantage of this department for preparation and filing of patent applications. Motorola is open to alternative proposals if this is not to your satisfaction. I would be keen to see a copy of the agreement between MemoryLink and Adaptive MicroWare if possible. Alternatively, Adaptive MicroWare can be added as a party to the new agreement.

I would be pleased to hear your response to this proposal at your earliest convenience. We would be keen to conclude an agreement within the next week so that work can start on preparation of a patent application for filing as soon as possible thereafter. If you would like to arrange a meeting to discuss the matter, please let me know.

Sincerely

Hugh C. Dunlop
Senior Patents Manager

enc.

AEE

## JOINT PATENT FILING AGREEMENT

**This Agreement** is effective as of May 1, 1998, between Motorola, Inc., a corporation of the state of Delaware, having offices at 899 West Diggins Street, Harvard, Illinois 60033, (hereinafter "MOTOROLA"), and Memorylink Corp. of 2631 Northern Road, Unit 420, Appleton, Wisconsin 54914, (hereinafter "MEMORYLINK"), a body corporate under the laws of Wisconsin

**Whereas** MOTOROLA and MEMORYLINK are in the process of defining a specification for a 5GHz wireless camera product and compatible base station that will enable video, audio and control information, and systems comprising the aforesaid, in which a MOTOROLA design of a 5GHz radio will be incorporated, the state of progress of which is described in the attached documents "Wireless Multimedia Core Technology Overview", attached as Exhibit A and "Discussion of Media and Control Data Transport", attached as Exhibit B,

**Whereas** the parties have executed a letter of intent and are continuing discussions in the context of the letter of intent,

**Whereas** it is the desire of the parties to protect inventions jointly devised by the parties by filing one or more patent applications and

**Whereas** and the parties wish to outline and describe certain responsibilities to be assumed by the parties in preparation and filing of patent applications.

**Now, therefore,** in consideration of the mutual agreements and undertakings herein contained, the parties agree as follows:

1. **Term.** The Agreement is for two years from the effective date, unless sooner terminated in accordance with Paragraph 2 below.

2. **Termination.** Either party may at any time terminate this Agreement with or without cause by giving the other party not less than thirty (30) days prior written notice.

3. **Confidentiality.** Exchange of confidential information is governed by the terms of a nondisclosure agreement between the parties dated attached as Exhibit C (the "Nondisclosure Agreement"). The obligations under such Nondisclosure Agreement shall survive any termination, expiration or cancellation of this Agreement by either party.

4. **Joint Inventions.** Without prejudice to each party's rights or claims to any prior inventions independently developed by either party, all inventions made jointly by MEMORYLINK and MOTOROLA described or suggested for the first time in Exhibit A shall be jointly owned by MEMORYLINK and MOTOROLA without any obligation of accounting to the other, each party retaining an undivided half interest in such inventions and, except as provided in Paragraphs 5-10, the right to exercise any and all rights accorded the owners thereof.

5. **First Right to File.** In the case of each discovery, improvement or invention jointly owned by MEMORYLINK and MOTOROLA in accordance with Paragraph 4, MOTOROLA shall have the first right of election to file a joint application in the United States and other countries.

HCD April 7, 1998

EXHIBIT
tabbies 6

2

6. **Notification of Election.** MOTOROLA shall notify MEMORYLINK in writing, at the earliest practicable date, whether or not, and in which countries of the world MOTOROLA elects to file such application. The choice of countries beyond the first country shall be made within the time specified by law or treaty during which such subsidiary filings are permitted. MEMORYLINK shall have the right to file applications on inventions in all other countries.

7. **Expense of Filing etc.** The expense for preparing, filing and prosecution of each joint application, and for issuance of the respective patent shall be borne by the party which prepares and files the application (the "filing party"). Each party, at its own expense, shall co-operate fully with the filing party as may be necessary for the proper preparation, filing and prosecution of each such application and the maintenance, renewal and defense of each application covering such invention. Where such joint application for patent is filed by either party in a country which requires the payment of annual taxes or annuities on a pending application or on an issued patent, the filing party, prior to filing, shall notify the other party, requesting the other party to indicate whether it will agree to pay one-half (1/2) of such annual taxes or annuities. If, within sixty (60) days after receiving such notice, the non-filing party fails to assume in writing the obligation to pay its one-half (1/2) share of such annual taxes or annuities, or if either party subsequently fails, within sixty (60) days of demand, to continue such payments, it shall forthwith relinquish to the other party, providing said other party continues such payments, its right, title and interest to such application and patent with respect to that country. The right, title and interest shall be subject, however, to retention of a paid-up, non-exclusive, nonassignable and irrevocable license, without the right to grant sub licenses, in favor of the relinquishing party, to make, have made, use, lease, sell, or otherwise dispose of apparatus and/or use or practice any methods under said application and patent.

8. **No Liability.** The filing party shall have sole discretion as to the prosecution of any joint application and shall have no liability to the other party for malpractice in such prosecution. NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER PARTY FOR INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER.

9. **Right to Take Up Prosecution.** In the event that the filing party shall decide to abandon, or otherwise not to prosecute, any jointly owned application, or not to maintain, defend or renew any jointly owned patent, it shall notify the other party thereof, in writing, at the earliest practicable date, and such other party shall have the right, as its expense, to prosecute such application or to take up such maintenance or defense or renewal, as the case may be. The filing party agrees, at the other party's expense, to co-operate fully with the other party to assist the other party in obtaining, maintaining, defending and renewing such patent right hereunder. Thenceforth, the party exercising its right under this Paragraph 9 shall be deemed "the filing party" for purposes of Paragraphs 7 and 8.

10. **Right to Grant Licenses.** Each party shall have the right to grant non exclusive licenses under any terms and conditions that it desires under each jointly owned patent application or patent, provided that it shall have fulfilled its obligation, if any, to pay its share of taxes or annuities imposed on such pending application or patent; and such party shall retain any consideration that it may receive therefor without having to account to the other joint owner. Each party consents to the granting of such non exclusive licenses by the other party, and agrees not to assert any claim with respect to any such

HCD April 7, 1998

patent or application licensed by the other party against the licensee or licensees thereunder for the terms of any such license.

**11.** **No License, Waiver or Non-assertion of Background Rights.** Nothing in this Agreement is to be construed as a license under, waiver of or agreement not to assert any background rights of either party, even if those background rights would prevent the other party from practicing such joint inventions.

**12.** **News Releases.** Neither party may use the name of the other in news releases, publicity, advertising, or other promotion without the prior written consent of the other except as may be required by operation of law.

**13.** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**14.** **Independent Contractors.** The parties are independent contractors for the performance of the services required by this Agreement, and neither party shall have control over the methods and means of accomplishment of the results of the other party's employees except to the extent of the joint participation anticipated by this Agreement. Each party is and shall remain the sole employer and principal as to the employees of each, and shall perform all requirements of an employer under federal, state and local laws and ordinances as to the employees of each. Under no circumstances will the employees of one party be construed as the employees of the other party for any purposes.

**15.** **Entire Agreement.** This Agreement and the Non-Disclosure Agreement constitute the entire agreement between the parties and merge all prior agreements and discussions, written or oral, with respect to the ownership of inventions and filing of patent applications.

**In witness whereof** the parties have caused this Agreement to be executed by their duly authorized representatives.

**Motorola, Inc.**                                    **Memorylink Corp.**

Signature: _____        Signature: _____

Name: _____            Name: Peter Stranwitz

Title: _____             Title: _____

Date: _____             Date: _____

HCD April 7, 1998

Motorola Confidential Proprietary (upon completion)    Page 1

AEE

 **MOTOROLA**    

Disclosure for Patent Committee Review
Submitted Pursuant to Employee Agreement

| For Committee Use Only | |
|---|---|
| Disclosure Number | Date |
| Division(s): | |
| Patent Committee Action: | |

SHORT ☐ *When using the short form (single page), the review committee may request additional information before reaching a decision.*

EXPANED ☑ *Use additional pages in the expanded form if you feel more information will be necessary for the committee to reach a decision.*

**1. Title of Invention:**          **1a. Key Words:**

**2. Primary or contact point inventor(s)** *Use your full first, middle and last names. Use page 2 of the expanded disclosure form for contributing inventors.*

| 1) STRANAWITZ PETER *Peter Stranowitz* | PLEXUS CORP | 920-751-3301 |
|---|---|---|
| Name / Signature | Dept. No. / Location/Rm# | Phone Number |
| U.S.A. | 55 Jewelers Park   Neenah   WI   54957 | |
| Citizenship / Commerce ID | Street   City   State   Zip | |

| 2) KNISKERN ROBERT J *(signature)* | ADAPTIVE MICROWARE | 219-484-0046 |
|---|---|---|
| Name / Signature | Dept. No. / Location/Rm# | Phone Number |
| USA | 6917 INNOVATION BLVD   FORT WAYNE   IN   46818 | |
| Citizenship / Commerce ID | Street   City   State   Zip | |

| 3) SCHULZ GARY D. *Gary Schulz* | OR404   IL33 | 847-576-5577 |
|---|---|---|
| Name / Signature | Dept. No. / Location/Rm# | Phone Number |
| U.S.A. | 50 E. COMMERCE DR.   SCHAUMBURG   IL   60173 | |
| Citizenship / Commerce ID | Street   City   State   Zip | |

**3. What was the probelm(s) to be solved by the invention or what was the need(s) for the invention:**

see attached

**4. What is the prior art, and why doesn't it resolve the problem(s) or fulfill the need(s):**

US 3784625

IP webcamera — unidirectional, not wireless

**5. What is the invention being disclosed:**

see ~~attached~~ additional information page

**6. How does this invention resolve the problem(s) and fulfill the need(s) in a new way:** *Attach any drawings or diagrams that you feel are necessary for clarification.*

see attached

**7. Date of conception** _____ **and if applicable, the date first build (or written) and successfully tested:** JAN 9, 1998

**8. Product(s) this invention may be used in:** see attached

**9. Date the first offer for sale was made for a product <u>incorporating</u> this invention:** _____

**10. Date the first disclosure of this invention was made outside of Motorola without a nondisclosure agreement:** _____

**11. Approvals:** *1)*Technical Staff or Patent Liaison *2)*Management *Signing this form attests to the fact that you understand the invention.*

1) _____
   Name / Signature / Dept. No. / Location/Rm# / Phone Number

2) _____
   Name / Signature / Dept. No. / Location/Rm# / Phone Number

**11. Witnesses:**

Witness: *(signature)* Date: Apr 21, 98   Witness: _____ Date: _____
HUGH DUNLOP

Motorola Confidential Proprietary (upon completion)

**EXHIBIT**
7

Motorola Confidential Proprietary (upon completion)                    Page 2

*Motorola Patent Disclosure - Expanded Form*

13. **Contribution Inventor(s):** *Patent Department will determine legal inventorship*

4)

| WYCKOFF   JAN-MICHAEL | *[signature]* | OR404 | 1L33 | 847-538-1803 |
|---|---|---|---|---|
| Name | Signature | Dept. No. | Location/Rm# | Phone Number |
| U.S.A. | | 50 E. COMMERCE DR | SCHAUMBURG | IL | 60173 |
| Citizenship | Commerce ID | Street | City | State | Zip |

5)

| | | | | |
|---|---|---|---|---|
| Name | Signature | Dept. No. | Location/Rm# | Phone Number |
| Citizenship | Commerce ID | Street | City | State | Zip |

6)

| | | | | |
|---|---|---|---|---|
| Name | Signature | Dept. No. | Location/Rm# | Phone Number |
| Citizenship | Commerce ID | Street | City | State | Zip |

7)

| | | | | |
|---|---|---|---|---|
| Name | Signature | Dept. No. | Location/Rm# | Phone Number |
| Citizenship | Commerce ID | Street | City | State | Zip |

8)

| | | | | |
|---|---|---|---|---|
| Name | Signature | Dept. No. | Location/Rm# | Phone Number |
| Citizenship | Commerce ID | Street | City | State | Zip |

14. **What is the business impact of having a patent on this invention, for Motorola and/or competition:**

see attached

15. **Expanded description; list any additional details you feel would be helpful in describing the invention:**

see attached

16. **Additional details concerning the prior art related to this invention:**

see.

Attach any backup documents or provide any other information you feel would be helpful in determing the desirability of obtaining a patent on this invention.  Any attachments that are critical to the disclosure of the invention should be witnessed.

Motorola Confidential Proprietary (upon completion)

Motorola Confidential Proprietary (upon completion)

*Motorola Patent Disclosure - Additional Information*                                         Page 3

**Additional Information:**

Duplex

- the general concept of a self-contained /wireless camera with local display as well as compression of video images and transmission to a computer device accessible via ~~the standard~~ *networks* ~~Internet~~ for remote display;  ~~Duplex~~
- switchable selection between different video compression schemes, for example MPEG and wavelet compression selectable according to application (see Fig. 1);
- balancing the load in a complex network, for example by sending commands to increase frame rate or resolution to a camera or input device and at the same time sending commands to other video image capture devices to reduce their frame rate or resolution. (page 15).

- internet video subnet accessible as a unified piece including data necessary for efficient transport of wireless video and audio and associated control information, accessible and available through standardized networks

PATENT APPLICATION

## ASSIGNMENT AND AGREEMENT

For and in consideration of the sum of One Dollar to us in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, we,

**Peter Strandwitz of Neenah, Wisconsin,**

**Robert J. Kniskern of Fort Wayne, Indiana,**

**Gary Schulz of Schaumburg, Illinois and**

**Jan-Michel Wyckoff of Schaumburg, Illinois,**

have sold, assigned and transferred, and do hereby sell, assign and transfer unto

**MOTOROLA, INC.,** a Delaware corporation, having its principal office in Schaumburg, Illinois, United States of America, and

**MEMORYLINK CORP.,** a Wisconsin corporation having its principal office in at 2631 Northern Road, Unit 420, Appleton, Wisconsin 54914, United States of America their successors, assigns, and legal representatives, jointly and equally, the entire right, title and interest for the United States of America in and to certain inventions relating to improvement in **SELF-CONTAINED WIRELESS CAMERA DEVICE, WIRELESS CAMERA SYSTEM AND METHOD** (Case No. BW00030), described, illustrated and claimed in an application for Letters Patent of the United States of America executed by us on the dates indicated by our signatures below, together with the entire right, title and interest, jointly and equally, in and to said application, and in and to Letters Patent which may be issued upon said application, and upon any division, extension, continuation or reissue thereof.

We hereby also sell, assign and transfer unto the said MOTOROLA, INC. and MEMORYLINK CORP., jointly and equally, the entire right, title and interest in and to said invention and in and to applications for Letters Patent therefor in all countries foreign to the United States of America, including all rights under any and all international conventions and treaties in respect of said invention and said applications for Letters Patent in foreign countries, and we further authorize the said MOTOROLA, INC. and MEMORYLINK CORP., to apply for Letters Patent in foreign countries directly in its own name, and to claim priority of the filing date of the said application for Letters Patent of the United States of America under the provisions of any and all international conventions and treaties.

We hereby authorize and request the Commissioner of Patents of the United States of America to issue Letters Patent upon the aforesaid application, division, extension, continuation or reissue, to the said MOTOROLA, INC. and MEMORYLINK CORP., for the sole use and behoof of said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal

HCD 6/10/98

- 1 -

PATENT
REEL: 9300 FRAME: 0266

**EXHIBIT**

tabbies’

8

representatives, to the full end of the term for which said Letters Patent may be granted, the same as they would have been held and enjoyed by us had this assignment not been made, and we hereby authorize and request the equivalent authorities in foreign countries to issue the patents of their respective countries to the said MOTOROLA, INC. and MEMORYLINK CORP. jointly and equally.

We agree that, when requested, we will, without charge to said MOTOROLA, INC., but at its expense, sign all papers, take all rightful oaths, and do all acts which may be necessary, desirable or convenient for securing and maintaining patents for said inventions in any and all countries and for vesting title thereto in said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal representatives or nominees.

We covenant with said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal representatives, that the interest and property hereby conveyed is free from all prior assignment, grant, mortgage, license or other encumbrance.



_____          _____6/12/98_____
Peter Strandwitz                                          DATE

(STATE OF ~ısconsın        )

(COUNTY OF ~ınnabego      )

I, ___Joseph D. Kaufman___, a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this _12_ day of _June_ 19_98_.          )

_____
Notary Public

SEAL                                                    My commission ~~expires~~ is Permanent

HCD 6/10/98

-2-

PATENT
REEL: 9300 FRAME: 0267

_(signature)_

Robert J. Kniskern                                           $\overline{\text{June 11, 1998}}$
                                                            DATE

(STATE OF    INDIANA    )

(COUNTY OF    ALLEN    )

I, __KATHY J. LEFEVER__ a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this 11th day of June 19 98

_(signature)_ Kathy J. Lefever
                                                            Notary Public

SEAL

My commission expires: 11/28/98

_(signature)_ Gary Schulz

Gary Schulz                                                 $\overline{\text{6-18-98}}$
                                                            DATE

(STATE OF        )

(COUNTY OF        )

I, _____ a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this ___ day of __, 19_____.

_____
                                                            Notary Public

SEAL

My commission expires:

HCD 6/10/98

-3-

PATENT
REEL: 9300 FRAME: 0268

Jan-Michel Wyckoff

DATE

(STATE OF                    )

(COUNTY OF                    )

I, _____ a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this ____ day of __, 19____ ____ _____.

_____
                                    Notary Public
SEAL
My commission expires.

HCD 6/10/98

-4-

PATENT
REEL: 9300 FRAME: 0269



PATENT APPLICATION

## ASSIGNMENT AND AGREEMENT

For and in consideration of the sum of One Dollar to us in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, we,

**Peter Strandwitz of Neenah, Wisconsin,**

**Robert J. Kniskern of Fort Wayne, Indiana,**

**Gary Schulz of Schaumburg, Illinois and**

**Jan-Michel Wyckoff of Schaumburg, Illinois,**

have sold, assigned and transferred, and do hereby sell, assign and transfer unto

**MOTOROLA, INC.,** a Delaware corporation, having its principal office in Schaumburg, Illinois, United States of America, and

**MEMORYLINK CORP.,** a Wisconsin corporation having its principal office in at 2631 Northern Road, Unit 420, Appleton, Wisconsin 54914, United States of America their successors, assigns, and legal representatives, jointly and equally, the entire right, title and interest for the United States of America in and to certain inventions relating to improvement in **SELF-CONTAINED WIRELESS CAMERA DEVICE, WIRELESS CAMERA SYSTEM AND METHOD** (Case No. BW00030), described, illustrated and claimed in an application for Letters Patent of the United States of America executed by us on the dates indicated by our signatures below, together with the entire right, title and interest, jointly and equally, in and to said application, and in and to Letters Patent which may be issued upon said application, and upon any division, extension, continuation or reissue thereof.

We hereby also sell, assign and transfer unto the said MOTOROLA, INC. and MEMORYLINK CORP., jointly and equally, the entire right, title and interest in and to said invention and in and to applications for Letters Patent therefor in all countries foreign to the United States of America, including all rights under any and all international conventions and treaties in respect of said invention and said applications for Letters Patent in foreign countries, and we further authorize the said MOTOROLA, INC. and MEMORYLINK CORP., to apply for Letters Patent in foreign countries directly in its own name, and to claim priority of the filing date of the said application for Letters Patent of the United States of America under the provisions of any and all international conventions and treaties

We hereby authorize and request the Commissioner of Patents of the United States of America to issue Letters Patent upon the aforesaid application, division, extension, continuation or reissue, to the said MOTOROLA, INC. and MEMORYLINK CORP., for the sole use and behoof of said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal

HCD 6/10/98

- 1 -



representatives, to the full end of the term for which said Letters Patent may be granted, the same as they would have been held and enjoyed by us had this assignment not been made, and we hereby authorize and request the equivalent authorities in foreign countries to issue the patents of their respective countries to the said MOTOROLA, INC. and MEMORYLINK CORP. jointly and equally.

We agree that, when requested, we will, without charge to said MOTOROLA, INC., but at its expense, sign all papers, take all rightful oaths, and do all acts which may be necessary, desirable or convenient for securing and maintaining patents for said inventions in any and all countries and for vesting title thereto in said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal representatives or nominees.

We covenant with said MOTOROLA, INC. and MEMORYLINK CORP., their successors, assigns and legal representatives, that the interest and property hereby conveyed is free from all prior assignment, grant, mortgage, license or other encumbrance.


_____  ___ _____        DATE  _____
Peter Strandwitz

(STATE OF                    )

(COUNTY OF                     )

I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this ____ day of __, 19_____.


                                        _____
                                              Notary Public

SEAL                                    My commission expires:


HCD 6/10/98                        -2-

Robert J. Kniskern _____     <u>DATE</u>

(STATE OF                    )

(COUNTY OF

I, _____, a Notary Public in and for the County and State aforesaid,
do hereby certify that the same persons whose names are subscribed to the foregoing instrument,
appeared before me this day in person and acknowledged that they signed, sealed and delivered
said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

    Given under my hand and notarial seal this ____ day of __, 19_____.


SEAL                                                    _____
                                                        Notary Public
                                              My commission expires:


Gary Schulz _____              6-22-98
                                                  <u>DATE</u>

(STATE OF Illinois          )

(COUNTY OF Cook

I, Terri S Hughes _____, a Notary Public in and for the County and State aforesaid,
do hereby certify that the same persons whose names are subscribed to the foregoing instrument,
appeared before me this day in person and acknowledged that they signed, sealed and delivered
said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

    Given under my hand and notarial seal this 22 day of June 98

                                                   _____
                                                   Notary Public
SEAL                                       My commission expires: 8/8/01


    OFFICIAL SEAL
    TERRI S HUGHES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/08/01


HCD 6/10/98

-3-


PATENT
REEL: 9300 FRAME: 0272



Jan-Michel Wyckoff

DATE 6/22/98

(STATE OF Illinois, )

(COUNTY OF Cook )

I, Terri Hughes , a Notary Public in and for the County and State aforesaid, do hereby certify that the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of June, 1998.

Notary Public

SEAL

My commission expires: 04/06/01

**OFFICIAL SEAL
TERRI S HUGHES**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:04/06/01

HCD 6/10/98

- 4 -

PATENT
REEL: 9300 FRAME: 0273

SELF-CONTAINED WIRELESS CAMERA DEVICE,

WIRELESS CAMERA SYSTEM AND METHOD

### Abstract of the Disclosure

5

     A self-contained wireless camera (10) and a wireless camera
system (25) having such a device and a base station (20). Video
processing (e.g. video compression) circuitry (200, 210) of the camera
device receives video signals from a camera (130) and provides

10    processed video signals. These are transmitted over a shared radio
channel. A radio receiver (101) receives processed (e.g. compressed)
video signals from the base station or another camera device. Images
from the camera or the base station are displayed in a selected manner
on a display or monitor (140). The base station device (20) receives

15    processed (e.g. compressed) video signals, stores them and retransmits
them. A command signal is received by the radio receiver to modify
operation in such a manner as to control bandwidth usage. Wireless
camera devices can adjust their operation to accommodate other
wireless camera devices. Different transport protocol modules 230 and

20    240 can be selected according to the application that the user selects for
operation.

EXHIBIT

9

BW00030-Strandwitz

# SELF-CONTAINED WIRELESS CAMERA DEVICE,
## WIRELESS CAMERA SYSTEM AND METHOD

### Field of the Invention

5

This invention relates to wireless camera devices, including but not limited to video camera devices and still image devices, and it relates to a wireless camera system comprising a self contained wireless camera device in combination with a base station device. It also relates

10 to an architecture for provision of peripheral devices in such a system.

### Background of the Invention

Simple master-slave portable wireless video recording devices

15 have been proposed in the past, designed to produce video and associated signals and transmit these wirelessly to a recording station. US Patent No. 4,097,893 describes one such analog device, in which start and stop (i.e. pause) operation of the recording station is controlled from the camera station. Communication of images from the camera

20 station to the recording station is over a VHF or UHF radio channel
The establishment by the Federal Communications Commission of a nonrestrictive usage frequency band in the 5 GHz range, with channel bandwidth capability for high throughput multimedia data transmission creates a new opportunity for wireless consumer devices

25 having broader bandwidth capability than has heretofore been possible. The ability to efficiently use these frequencies requires greater attention to be given to bandwidth management.

Functionality of previously proposed wireless camera devices has been fairly limited and such devices have so far found little or no acceptance in the consumer marketplace. There is believed to be a demand for a compact, highly functional, broadband wireless camera

5    device.

### Brief Description of the Drawings

FIG. 1 is a schematic view of a simple point to point multimedia

10   device network in accordance with the invention.

FIG. 2 is a block diagram illustrating the elements of a wireless camera device according to the preferred embodiment of the invention, with optional additional elements for purposes of description of a wireless gateway.

15   FIG. 3 illustrates a comparison between the protocol structure of a device according to the preferred embodiment of the invention and a standard protocol structure.

FIG. 4 illustrates a wireless camera system according to a preferred embodiment of the invention.

20   FIG. 5 is a time diagram illustrating video frame transmission for the purposes of explanation of re-transmission.

FIG. 6 is a system similar to that of FIG. 4 but with additional wireless camera devices.

FIG. 7 illustrates a system similar to that of FIG. 6, in the context

25   of a security system.

FIG. 8 is a table illustrating examples of selection of different combinations of parameters for the purposes of bandwidth control.

2

Detailed Description of the Drawings

      Referring to FIG. 1, a basic configuration of a system 25
according to a preferred embodiment of the present invention is
5    shown, comprising a camera device 10 and a base station 20, which
is illustrated in a basic form as being a radio base station with a
monitor, but can be a mere storage and replay device without a
monitor or can be a gateway device.

      A first stage in defining the potential for a high quality
10    video/audio-based product, such as that of FIG. 1, lies in creation of a
basic set of enabling technologies.  These technologies are predicated on
the concept that a dedicated set of data transfer and control protocols
can enhance the overall performance and cost profiles of any end
product schemes utilizing the approach.  The following proposed
15    hardware architecture and communications protocol is intended to
provide this low cost/high performance solution.  The dedicated
purpose wireless protocol layering model described provides operating
advantages via a tightly coupled integration of communication
protocols, which are targeted to provide an optimum solution to the
20    very specific application of transferring optimized blocks of
audio/video information in a high frequency digital state.   The
architecture is consequently less costly based on this narrower set of
protocol requirements and the tighter integration of the layers.  Because
the communication protocol processing is highly integrated, it reduces
25    the general protocol service access requirements needed in more
generally applied interchangeable protocol modules.  It has a focused
set of requirements and can thus be implemented at a very high level
of integration, such as a single chip Application Specific Integrated

3

Circuit (ASIC), which reduces the cost of many components while providing the speed needed for some of the higher data rates.

An architecture for a wireless device is illustrated in FIG. 2. The device comprises a full duplex RF transceiver 100 connected to a
5    processor 110, which in turn is connected to a manual input 120 (such as a keypad or control panel), a camera 130 (which has still image and video capability but more generally is any image capture device), a video monitor 140, a speaker 150, and a microphone 160. The transceiver 100 comprises a receiver 101 and a transmitter 102.
10    A network gateway 170, with protocol translator 175, is also shown in phantom outline. This network gateway is optional in a self-contained wireless camera device and is illustrated here for purposes of later explanation and description of a base station.

The processor 110 can be a microprocessor or digital signal
15    processor or can take the form of an ASIC (with or without an integrated microprocessor). The exact implementation is not important. The processor 110 comprises a video encoding/decoding module 200 (having video compression circuitry 201 and decompression circuitry 202) coupled at an input and an output of the
20    processor to the camera 130 and the video monitor 140 respectively; a still image encoding/decoding module 210 (having video compression circuitry 211 and decompression circuitry 212) also coupled at an input and an output of the processor to the camera 130 and the video monitor 140. It also comprises audio encoding/decoding module 220
25    coupled at an input of the processor 110 to the microphone 160 and at an output of the processor to the speaker 150.

Within the processor 110 there is also a communications controller 190 coupled to the RF transceiver 100. Coupled between the video encoding/decoding module 200 and the communications

4

controller 190 are a real time video transport protocol module 230 and a verified video transport protocol module 240. Coupled between the still image encoding/decoding module 210 and the communications controller 190 are a still image transport protocol module 250. Coupled

5   between the audio encoding/decoding module 220 and the communications controller 190 is an audio transport protocol module 260. Selection logic 290 is provided, coupled by control connections (shown in dotted outline) to the various modules 200-260. The selection logic 290 is coupled to the communications controller 190 and

10  to a control data generating module 280, which is coupled to the manual input 120.

In the preferred embodiment, still image encoding/decoding module 210 performs discrete cosine transform or block oriented image compression, such as JPEG (Joint Photographers Expert Group)

15  compression and video encoding/decoding module 200 performs full frame compression, such as wavelet or MPEG (Motion Picture Expert Group) compression. Other types of compression can be used in the modules.

In operation, images are captured by the camera 130 and encoded

20  in either video encoding/decoding module 200 or still image encoding/decoding module 210. They are passed to the respective transport protocol module 230, 240 or 250 and passed to the communications controller 190 for transmission by the RF transceiver 100 over a wideband radio channel. At the same time they can be

25  displayed on video monitor 140. Images are received by the RF transceiver 100 and passed by the communications controller 190 to a selected one of the protocol modules 230, 240 and 260 and from there to

6.

the corresponding video encoding/decoding module 200 or still image
encoding/decoding module 210 for decoding and for display on the
video monitor 140.

     Audio signals are received by the microphone 160, encoded in
5    encoding/decoding module 220 and passed to the communications
controller 190 via audio transport protocol module 260, for
transmission (with accompanying video signals if selected).  Audio
signals are received by the transceiver 100 (e.g. with accompanying
video signals) and are passed by audio transport protocol module 260 to
10   audio encoding/decoding module 220, where they are decoded and
output from the speaker 150.

     Different transport protocol modules such as modules 230 and
240 are selected according to the application that the user selects for
operation.  Thus, real time video transport protocol module 230 is
15   selected for real time video and minimizes delay of transmission and
delay variation to avoid "jitter", while verified video transport
protocol module 240 performs error correction or selected
retransmission to provide error-reduced transmission at the expense of
delay in transmission.  The selection of the transport modules 230-260
20   and the encoding/decoding modules 200-220 is performed by selection
logic 290.

     There are two principal processes by which selection logic selects
the desired transport modules and the encoding/decoding modules.
The first method is by manual selection via the manual input 120 and
25   the second method is by receipt of commands from the RF transceiver
100.

     To manually select a transport module and corresponding
encoding/decoding module, the user selects an application using the
manual input 120.  For example, the user can select real time video

6

mode, or verified video mode, or sill image mode and control data generating module 280 generates corresponding control data for selection logic 290 to select the corresponding transport protocol module 230, 240 or 250 and its corresponding encoding/decoding module 200 or 210.

5

To remotely select a transport module and corresponding encoding/decoding module, control data is received via radio transceiver 100 and passed to selection logic 290 via communications controller 190. As before, the selection logic selects the corresponding transport protocol module 230, 240 or 250 and its corresponding encoding/decoding module 200 or 210.

10

Under control of the manual input 120, control data generating module 280 can generate control data for transmission via the communications controller 190 through the RF transceiver 100 to another camera device or to a base station over the wideband radio channel. If sent to another camera device, the control data is received by corresponding selection logic in the remote camera device. When control data generating module 280 generates control data for transmission to a remote camera device, it can simultaneously cause a selection by selection logic 290 of corresponding encoding/decoding and transmission modules in the device 100.

15

20

Control signals or commands that can be generated by control data generating module 280 fall into three categories: video control commands, video quality control commands and bandwidth control commands. Video control commands include pause, replay, rewind and fast-forward. They also include sets of commands that cause selection of automatic mode vs. manual mode. Video quality control commands include frame size, frame resolution, frame rate, compression type and compression ratio. Bandwidth control

25

7

commands define percentage of allocation of bandwidth for a given camera or from one camera to another, expressed as a bandwidth allocation value or a proportion of available bandwidth for as the number of camera devices permitted in a band.

5    Video encoding/decoding module 200 and real time video transport protocol module 230 can together be viewed as first video processing and video reconstruction circuitry that provide to the transceiver 100 selectively processed first video signals processed according to a selected protocol scheme and provide reconstructed

10   second video signals to the monitor 140. Similarly, video encoding/decoding module 200 and verified video transport protocol module 240 can together be viewed as second video processing and video reconstruction circuitry that provide to the transceiver 100 selectively processed first video signals processed according to a

15   different selected protocol scheme and provide reconstructed second video signals to the monitor 140. Similarly, reliable still image encoding/decoding module 210 and reliable still image transport protocol module 250 can together be viewed as third video processing and video reconstruction circuitry.

20   Each selected protocol scheme has at least one of a selectable transport protocol, a selectable image coding (compression/decompression) protocol, a selectable audio protocol scheme and a selectable control protocol. Selection of different protocols gives rise to different bandwidth usages and allows more

25   optimized or balanced usage of available bandwidth.

The architecture described and illustrated integrates the various communication protocol layers into a common processing block between the physical layer and the application layer. This architecture decouples the communication protocol layers from the RF transceiver

8

functional block. It also decouples the communication protocol layers from the multimedia I/O which represents the application layer. The architecture is based upon a presumed system in which a variety of transmission and reception devices are operating.

5      Encoding/decoding algorithms and transport protocols are configured and optimized based on the multimedia data type and the user's preferences. These various data paths converge upon the more common networking, bandwidth allocation, and RF medium access protocols.

10     FIG. 2 shows that there are differences in transport protocol for real time video and verified video. Real time video, and real time audio are isochronous. This means that these transport protocols must balance the reliable transfer concerns with the timing required for proper presentation at the receiving end. For verified video or audio,

15     the intended immediate destination for the multimedia data is not real time presentation, but rather storage. It is referred to as "verified" since higher levels of reliable transfer (e.g. higher error correction and/or re-transmission) can be used without high bandwidth usage.

       The protocol layer stack model to be used in the proposed

20     architecture is compared to the International Telecommunication Union (ITU) standard network protocol layer model in FIG. 3.

       On the left hand side of the figure, the standard ITU protocol layer model is illustrated, comprising a physical layer 300 and a data layer link layer 301 having a link level reliability sub-layer 302 and a

25     media access control sub-layer 303. Above the data link layer is a network layer 304 and above the network layer 304 are a session layer 306, a presentation layer 307 and an application layer 308. To the right of this standard model is illustrated, for purposes of comparison, the protocol layer stack model for a camera device according to the

9

preferred embodiment of the invention. This model comprises an RF modem 350, a layer 361 which integrates encoding/decoding, encryption, transport protocol, network protocol, bandwidth allocation, and media access control. The encoding/decoding and encryption is an

5   application specific presentation layer. The transport protocol is an application specific reliability protocol. Above these integrated protocol layers is the application 362.

The RF modem layer 350 is implemented in the full duplex RF transceiver 100 of FIG. 2. The integrated protocol layers 361 are

10   implemented in the processor 110 of FIG. 2 and the application layer 362 is implemented in the form of the camera 130, the video monitor 140, the speaker 150, the microphone 160, and the network gateways 170 of FIG. 2. In the preferred embodiment, the integrated protocol layers 361 are admitted on a logic board and a radio control board, in which

15   processes of the protocol below the dotted line of FIG. 3 are implemented on the radio control board and processes above the dotted line are implemented on a logic board. In effect, this has the result that the encoding/decoding modules 200, 210 and 220 and the transport protocol modules 230, 240, 250 and 260 are all implemented on the logic

20   board and the communications controller 190 is implemented on a separate communications control board. The selection logic 290 and the control data generating module 280 are implemented on the logic board. These details are, of course, not critical and greater integration can be achieved with all the elements of the integrated critical layers

25   being implemented in a single, highly integrated module.

The advantages of a proprietary multimedia communications protocol stack over the ITU standard for this architecture is optimum use of bandwidth, cost, performance, and the flexibility to tailor the protocols for the various multimedia transmissions.

10

The ITU standard seeks to define each layer independently and to define a set of protocol access points between each layer. The strict interpretation of this model results in creating a set of interchangeable protocol building blocks that provide a very general solution to digital communications networking. Each general purpose protocol building block tends to be a costly, yet reasonable solution for a broad range of networking challenges. This architecture is critical for heterogeneous, standardized networks that are built from commercially available, interoperable components. Conversely, the dedicated purpose architecture now described builds a homogeneous RF wireless network with a uniquely qualified set of components.

The architecture described focuses upon providing optimum solutions for a particular family of wireless devices. It provides transmission reliability at the link layer and not on an end-to-end regime. (An end-to-end reliability is not needed since there is no multiple-hop routing in the common uses of the wireless network.) If an application is developed which needed end-to-end reliability within the wireless network, layers can be added between the application layer 362 and the integrated protocol processing block 361. For the current applications, the transmission reliability is specific tailored to the needs of the user, the multi-media data type being transferred, and the RF environment.

The architecture described operates in a somewhat closed homogeneous RF wireless network. The limited set of components that operate within the network only need to be interoperable with each other. The closed nature of the network allows value added features to be included, with a controlled, limited impact upon existing device interoperability. The ability to include such value added

11

12

features, allows the wireless product developer to differentiate this product from the others in the market using other network approaches.

The closed aspect of this architecture does not, however, limit interoperability with other, more general purpose networks. Network
5   gateways 170 bridge the wireless network with other standard networks. FIG. 4 illustrates the use of a gateway to interconnect the proposed wireless network to standard networks.

The presence or absence of network gateways 170 in a particular device depends on the function of that device.  For
10   example, a self contained wireless video or still camera need not have network gateways 170, while a dedicated base station preferably has network gateways 170 but does not have the camera 130, video monitor 140, speaker 150 or microphone 160.  Accordingly, the particular application layer devices that are included in any
15   particular product will depend on the intended function of the camera device product.

Referring to FIG. 4, the wireless camera device of FIG. 1 is shown communicating over a wideband radio channel 400 to a wireless multi-media gateway 401 and a wireless disk drive 402 and a wireless monitor
20   403, as well as other miscellaneous devices which will not be described in detail, but may include a lap-top computer 404, a remote control device 405 and a printer 406. Each of the devices 100 and 401 thru 406 has an architecture as described with reference to FIG. 2 and FIG. 3.  The gateway 401 communicates with a multi-media personal computer 410
25   having a monitor 411 and audio speakers 412 and it communicates with a public or private network 420.

The wireless multimedia gateway depicted in FIG. 4 provides protocol translation to convert the wireless protocol to the standard public network protocol or the standard PC interface protocol.  The

12

gateway converts the focused, optimized protocol used on the wireless network to general purpose protocol, such as Internet protocol (IP) used in the open system networks. In essence the gateway provides the wireless network devices with points of interoperability to outside

5    systems. The provision of the gateway 401 has a number of advantages, including the ability to network multiple camera devices and operate them under remote control.

This invention, in its preferred embodiment, also provides flexibility of bandwidth usage for video quality and transmission

10    reliability tradeoffs. Bandwidth can be traded for video quality and transmission reliability based on the needs of a given application.

The approach described is inherently bandwidth sensitive. The estimated peak bandwidth limit is at least 10 Mbps. This rate is sufficient to support various combinations and quality levels of the

15    transmission of video, still images, audio, data, graphics and text. A goal is to provide a bandwidth usage strategy that will accommodate the maximum number of devices in a wireless network with highest possible transmission reliability and the level of video quality necessary for a given application.

20    Video quality and reliability are singled out for discussion over other multimedia types because of the large demand placed on bandwidth by video transmission and the bandwidth tradeoffs that are possible with video. Video quality is represented as resolution of each video frame, the rate at which the video frames are updated and

25    compression rate of the transmitted video.

The resolution of still images that make up the video are only limited by the image sensor of the camera. Given a high end image sensor, video resolution can be supported in a range from HDTV (high definition television) or high resolution computer monitor quality to

13

very small thumbnail images. The lower the video resolution the more grainy the video image appears. Higher video resolution will require commensurate higher bandwidth usage for transmission. Selection of video resolution is based on the application demands
5   and/or the user's preferences.

Video frame rate is the speed that still image frames are presented upon the monitor of the base station 20 or the monitor 140 of the camera device to produce the illusion of full motion video. The described technology can support video frame rates ranging from
10   National Television Standards Committee's (NTSC) standard of 60 interlaced fields per second through stop action video used for video conferencing to single frame still images. Slower than the above noted video frame rates can introduce an unintended effect of jerkiness in the motion of high speed "action" video sequences. Faster video frame
15   rate signals will require higher bandwidth usage for transmission. Selection of video frame rate is, again, based on the application demands and/or the user's preferences.

Video compression rate is an indication of the amount by which the video data has been reduced using various compression techniques.
20   For instance, broadcast quality, uncompressed digital video requires a bandwidth of 150 Megabits per second (Mbps). Given 10 Mbps limit of the RF subsystem, uncompressed digital video transmission is not practical. Current standard video compression algorithms, including MPEG, wavelet, or H.320, will compress video to within these speed
25   limitations. Any video compression will cause some loss of the video data, but the amount of loss can be limited based on the video compression rate. Lower rates of video compression provide higher perceived image quality and use more bandwidth. The compression ratio/bandwidth tradeoff is dependent upon the application. A baby

14

monitor, for instance, could operate with a high video compression rate and use less bandwidth because of the lower demands for image quality.

     As with video quality, the unique timing requirements of video
5    directly relate to reliability. As discussed earlier, there is a different set of concerns with the transmission of real time video versus verified video. As previously noted, real time video is a video stream that is played back, to the user's perception, immediately upon reception. Verified video, or non-real time video, is not intended to be played
10    back immediately, but rather is stored for later viewing.

     The transmission of real-time video must be isochronous to prevent buffer over flow or underflow in the receiving end. In other words a steady flow of video data must be received such that it can be displayed without either running out of or being overrun by video
15    data. Non-real time video is not sensitive to this problem, unless the transmitting end is in danger of overrunning its buffers between the image acquisition and transmission phases.

     The transmission of real time video and non-real time video presents a tradeoff in reliability. The reliable transmission of video
20    data that results in later video delivery for a real time application serves no purpose. Specifically, video that is not received within the presentation time will cause a frame skip. In the event that a frame is to be presented but has not been completely received, a buffer underflow condition occurs which results in a frame skip.

25    Transmission of non-real time video is not constrained by the timing of immediate playback. As a result more reliable transmission methods can be used to create a non-real time yet verified video transmission, thus the term "verified video".

15

16

Re-transmission can be used to provide some limited measure of reliability for real time video transmission. A goal of this method is to provide time for transmission retries prior to presentation time. The method tends to balance the amount of reliability and allocation, with
5    bandwidth or larger receive buffer sizes and increased video latency. FIG. 5 presents a simplified example of video frame transmission timing which illustrates some of the parameters for the retransmission method. In practice the technique may be complicated by such issues as the MPEG video compression scheme, which does not always transmit
10    full video frames.

As FIG. 5 shows, a burst of video frame data at bandwidths higher than the constant video rate will provide time for transmission retries prior to the next video frame burst. Beginning at time t the image capture device (e.g. camera 130) has captured a complete video
15    frame N. Starting at this time it is the function of the transport protocol layer to deliver this frame reliably to the corresponding transport protocol layer at the receiving end.

Time t+1 (which occurs following a guard band following preceding activity on the channel), the transmitter transmits the video
20    frame N in a data burst, completed at the time t+2. Starting at time t+2, there is a period extending to time t+3 during which the transport protocol layer module of the receiving device (specifically verified video transport protocol module 240 of FIG. 2) receives the video frame N data burst, performs error correction using any embedded error
25    correction code in the data burst and determines whether the data burst is received correctly. If it is not received correctly, the verified video transport protocol module of the receiver sends a negative acknowledgment message to the verified video transport protocol layer module of the transmitter and there is an opportunity for the

16

transmitter to perform a re-try, retransmitting video frame N data burst. At time t+4 illustrated by the dotted line in FIG. 5, there is a deadline for receiving video frame N. If the receiver does not successfully receive video frame N before this deadline, the video

5    frame is dropped.

The receiver has a timer (not shown in FIG. 2) which commences timing at time t+2 (or can commence timing at t+1), as measured at the receiving end, and if the receiver transport layer protocol cannot determine before time t+4 that frame N has

10   successfully been received, it drops the frame and awaits the next video frame data burst N+1. This data burst is transmitted by the transmitting device at time t+5, ending at time t +6. The receiver (assuming it has successfully received video frame N data burst) waits until time t+7 before presenting video frame N on the receiver

15   monitor. By delaying until time t+7, the receiver has the time from t+4 until t+7 as its minimum received video processing time. If the receiver fails to receive video frame N data burst, it can simply present the preceding video frame. The overall latency in the system is from time t to time t+7. Every frame will be delayed by the receiver until

20   time t+7 (regardless of whether the frame was received before time t+4), with the result that jitter at the receiver monitor is avoided.

Using this technique, average video bandwidth increases based on the average number of retries. The video burst rate of bandwidth that is needed to support this method depends upon the amount of

25   time left for retries, which in turn dictates the reliability of the transmission.

Time for transmission retries can also be increased by providing more buffer space for in transit video data. Increased buffering will increase the video latency which, as shown in the FIG. 5, is the time

17

between capturing and presenting the video. The amount of acceptable video latency will be dependent upon the application. For example, long video latencies in a two-way interactive video application can be awkward and distracting to the users.

5      Real time audio is also isochronous and as such shares these same issues. However, due to lower bandwidth requirements for audio, this issue is not as costly to solve in terms of bandwidth, processing power, and end-to-end latency.

In case of audio/video program transmissions, the audio and
10   video presentations are synchronized.

The method of access control to the RF media is not critical. Methods that can be employed include Frequency Division Multiplex (FDM) techniques or Time Division Multiplex (TDM) techniques or in some advanced cases Code Division Multiplex (CDM) techniques.
15   Methods may also include fixed allocation of bandwidth or dynamic allocation of bandwidth based on need.

It is not critical whether a decentralized type of media access control is used in, or a direct central control of allocation by a gateway is used. For instance, decentralized control has the advantage of
20   allowing any combination of wireless devices to interact, without the added expense of a central control unit. A decentralized control approach also minimizes the risk of single point failure.

The wireless transmission technology in the lightly regulated environment of the 5.2 GHz band is very flexible. The flexibility of this
25   technology can be taken advantage of to develop a whole family of products, each with its own characteristic use of the technology. Those products share many common attributes. For example, if they are to interoperate at the local area level, each must: support a subset of the

18

various multimedia transport protocols; provide the RF and antenna control sections; and share a networking and RF media access control algorithm.

One of the primary issues of a network protocol in a wireless network is to allocate bandwidth and time slots to the members of the network. This issue favors a tight integration of network and media access control layer. For the purpose of explanation of bandwidth allocation and control, FIG. 6 is presented, illustrating a network such as that of FIG. 4 with the addition of second and third wireless camera devices 600 and 601.

In the complex network, of FIG. 6, a "smart" control of bandwidth based on the user's intentions is provided. Under this scenario, the user may have multiple low resolution video inputs. In the event that the user wishes to focus in detail on the output of a single video source, e.g. wireless camera device 600, commands to increase frame rate or resolution may be sent to the camera device 600 (or other input device). At the same time, commands are sent to the other video image capture devices 100 and 601 to reduce their frame rates or resolution in an effort to balance the bandwidth usage.

The capability described enables the organization of a number of "local" RF clusters of devices into logically accessible "higher level" groups that shield the user from the specific internal system details of that organization, and still permit an authorized remote user to modify the operation of any particular device.

One simple application example that could use this approach would be a campus security system illustrated in FIG. 7 that has a considerable number of wireless devices providing audio and visual surveillance. These devices could be arranged in groups 700 and 701 at various physical locations, (for instance at doors and windows of the

19

20

buildings in the complex). These "local" RF clusters of devices could be interconnected by standardized Local Area Networks (LAN's) 710 to provide access to the devices from display equipment located anywhere on the LAN (e.g. security monitoring stations 715 and 720 via wireless

5    gateways 716 and 721).

This approach to organizing the access to the devices provides a very powerful logical mapping or switching capability. For instance, the media information from a group of cameras located on the rear of the first building could be accessed as a single file of media data that

10    contains multiple timestamped views and is logically labeled as "Building One - Rear Loading Dock". In addition, the users operating the display equipment could change various operating parameters of the surveillance equipment for maximum flexibility.

FIG. 8 illustrates examples of various parameters that can be

15    adjusted to control bandwidth utilization between multiple devices operating on a common bandwidth. The various rows in the table of FIG. 8 are different parameters that can be adjusted or selected and the different columns show various examples of how these parameters give rise to different bandwidth utilization estimates.

20    The adjustable parameters fall into four broad categories: image parameters, audio parameters, control parameters and transport parameters. Selectable image parameters include frame size, frame resolution, frame rate, compression type, compression rate, compression ratio and auto mode. Selectable audio parameters include

25    number of audio channels, sampling rate, compression type, compression ratio and auto mode. Control parameters include local operation, remote operation and on-demand mode. Transport parameters include real time (i.e. no error correction) verified (i.e. with error correction), variable and auto mode.

20

21

In examples 1 and 2 of FIG. 8 the frame size is 512 X 512 and the
frame resolution is 270 X 352.  In the first example the frame rate is 15
frames per second, the compression type is JPEG, the compression ratio
is 50% and auto mode is off.  In the second example, the frame rate is 30

5      frames per second, the compression type is wavelet #1, the
compression ratio is 30% and the auto mode is off.  For examples 1 and
2 the audio parameters are the same and the control parameters are the
same.  In example 1 error correction is used while in example 2 error
correction is not used.  As a result of these alternative selections of

10     parameters, example 2 gives rise to higher bandwidth utilization than
example 1.  In the table the estimated bandwidth utilization of example
2 is 50%, while the estimated bandwidth utilization  for example 1 is
only 30%.

        From this, it can readily be seen that two cameras can

15     simultaneously be operated using the high frame rate and high level of
verification of example 2, but if a third camera device is to enter the
same bandwidth, it would be preferable (indeed necessary) for all three
cameras to revert to the combination of parameters illustrated in
example 1.  The switching from the set of parameters of example 2 to

20     the set of parameters of example 1 takes place in response to each
camera that is operating according to the parameters of example 2
receiving a control command requiring those cameras to degrade to a
lower bandwidth utilization.  The control command can come from a
central controller such as the security monitoring station 715 of FIG. 7

25     or can come from the third camera (e.g. camera device 601 of FIG. 6)
making a request to enter the shared bandwidth. The latter scenario
provides an ad hoc network in which all users would voluntarily
degrade as the network became more congested.  In such an
arrangement it is preferable to provide a minimum level of service

21

(e.g. that of example 1) beyond which a given device would not degrade further. Upon reaching this minimum level of service, all devices being requested to degrade respond with a negative acknowledgment, in effect telling the requesting device that no further bandwidth is available.

The third example of FIG. 8 has the same frame size as the first two examples, but has a higher frame resolution of 480 X 352 pixels and uses MPEG compression. Two audio channels are provided, using MPEG audio compression, and remote and on demand control is enabled. In this example, a single wireless camera device will use 75% of the available bandwidth. Clearly when a single camera device operates using these parameters, no other device is able to enter the channel (unless that other device can enter at a bandwidth utilization even lower than the bandwidth utilization of example 1).

In the scenario of FIG. 7, in the event that a user monitoring the surveillance area from one of the security monitoring stations 715 and 721 wishes to examine with greater scrutiny a particular camera, a command can be sent to one of the cameras (e.g. camera device 601 of FIG. 6) instructing that camera to increase its resolution as shown in example 3 of FIG. 8 and to change its compression type, while at the same time frames are sent to other camera devices (e.g. devices 10 and 600) instructing those camera devices to degrade completely, either by ceasing transmission or by reducing their frame rates to a very low level.

In the preferred embodiment, selection logic 290 of FIG. 2 comprises a pre-programmed table of different levels of service in which different combinations of parameters of FIG. 8 are pre-programmed. In this manner, a user can select, through manual input 120, a particular package of parameters to support a particular desired

22

application. Examples of packages of desired parameters could include still images, scenic video, motion video, security surveillance, etc. According to the selected application, the optimum package of parameters is selected.

5       Referring one again to FIG. 6, the provision of gateway 401 makes the home wireless network a conduit for audio/video recording and playback, video on demand from an outside network, and wireless network browsing (as well as other functions) simultaneously.

In a multi-user, multi-function environment, shared
10    components such as monitors or disk drives 402 must be addressable and may also must provide a form of dedicated access to prevent users from corrupting each other's data.

The system is easy for the consumer to use and reconfigure. The initial products should be capable of detecting the components in the
15    system configuration and acting accordingly. Adding a new component to the system should not pose a technical challenge to the user.

Privacy and security algorithms are included that allow a home's wireless components to interact without concern that components outside the home network can gain access or provide interference.
20    These algorithms provide authentication and encryption. As new components that are added to the network, each is easily synchronized with the unique security "keying" that provides secure access.

Some of the main product configurations for video and/or audio delivery are: point to point video; multi-point video; full duplex video;
25    and point-to-point, multi-point, full duplex audio.

The point to point video category encompasses the set of applications where there is a need to transmit video from an origination site to a reception site. Multi-point video encompasses the set of applications where there is a need to transmit video to or from an

23

origination site to multiple reception sites. Full duplex video includes
the set of applications where there is a need to transmit and/or receive
video from two or more origination and/or reception sites.

The same options exist for audio configurations to be added to
5   most of the video configurations.

The range of these potential configurations are illustrated by FIG.
6 . Many of the potential product embodiments described based upon
the core technology require connection with outside, standard
networks such as the Internet. In this case, a device class for providing
10   data translation support also present an opportunity for provision of
dedicated purpose, integrated application modules. Termed "wireless
gateway" for this discussion, this class of devices share some common
characteristics.

Various models and options of wireless gateways may be
15   provided. All wireless gateway models capability of receiving and
transmitting at bandwidth levels that are necessary to transfer the
various multimedia data types, remote control, or transport protocol
signaling. Wireless gateways must be capable of supporting the features
of the other devices in the premise's wireless network, as well as the
20   user's external connection requirements. Each user will have a
different set of expectations for connection to the outside world and
potential hardwired networks within the household that the gateway
must support.

A high end model wireless gateway could provide expansion
25   slots for various Network Interface Cards (NIC). The fully equipped
gateway may support cable modems, satellite antenna connections, and
telephone lines, to the external world as well as internal hardwired
networks such as Ethernet.

24

The wireless multimedia gateway contains the capability of high bandwidth receive and transmit. For instance, it can receive verified video and still images for storage. It may transmit verified video either real time to the monitor or verified video and still images for transfer to

5    the PC or the network, or it may transmit and receive at much lower rates for remote control and transport protocol signaling.

The gateway may also provide direct access to non-wireless shared resources, such as disk drives and printers. The gateway provides the ability to receive remote control from either a directly

10   connected PC, an incoming telephone call, or a wireless remote control device. Remote control commands from a PC or the external network may be routed to other hardwired wireless devices.

Various models of wireless video image acquisition devices such as cameras may be provided. All camera models can use high

15   bandwidth for transmission of real time video data and each can use low bandwidth to transmit and receive for remote control and transport protocol signaling. Higher end camera models may provide more flexibility and capabilities in terms of video frame rates, image resolution and video compression rates. They may also support

20   synchronized audio and video. Inexpensive camera applications, such as an infant monitor, can have lower target bandwidth usage by taking advantage of low resolution image sensor, fixed transmitted resolutions, slow, fixed rate video framing, and high video compression ratios.

25   The wireless monitor supported by this modular system could also impose a wide range of demands. In on embodiment it could be a high bandwidth receive device and low bandwidth transmit device. It may receive real time audio/video only for immediate playback or still images for display. It in turn may transmit and receive at much lower

25

26

rates for remote control and transport protocol signaling. Other various models of wireless video monitors may also be provided, each with its own minimum and maximum demands. For instance, some monitor models may use high bandwidth for reception of video stream

5      data or high resolution still images. Higher end monitor models will likely provide more capabilities in terms resolution and compatibility with the higher end cameras.

Monitor 403 is able to receive real time video whether it is received from a camera or a storage device. Added options may

10     include provision of a port for a photo printer that prints the currently displayed still image or video frame. Among the advanced features of a wireless monitor there may be an option to split the screen for inputs from various sources or display on screen information in the form of overlays or digital effects. This option is also highly dependent upon

15     how the bandwidth is shared between various components.

The storage peripheral 402 denoted as "wireless disk drive," has the capability of high bandwidth data receive and transmit. It receives verified audio/video and still images for storage. It is also capable of receiving real time audio/video for applications that both record and

20     play back simultaneously. An optional feature is transmission of audio/video data in either real time mode to the monitor or verified audio/video and still images for storage to the gateway. As with other network devices, the drive transmits and receives at much lower rates for remote control and transport protocol signaling. This device

25     provides storage that can be archived and is easily expandable. (One configuration option may support a removable hard disk type device to provide such capability. For instance, one and two gigabyte removable disks are available on the market today that provide sufficient storage

26

for log video streams and a multitude of still images. Even a 100 Megabyte removable disk would be useful for fairly extended video streams.)

More than one type of wireless video disk drive may be

5 provided. All wireless disk drive models bear the capability of both receive and transmit using variable bandwidths needed to transfer the various multimedia data types, remote control, or transport protocol signaling. The higher end wireless disk drive models provide more capabilities in terms of storage and multiple user support features.

10 In summary, the system described optimizes the relatively unregulated characteristics of the new frequency allocation to provide extremely high quality transmission in a small, low cost and power efficient end product package, enabling the creation of a revolutionary class of video-enabled, personal communication devices.

15 The various arrangements described above and illustrated in the figures are given by way of example only and modifications of detail can be made by one of ordinary skill in the art without departing from the spirit an scope of the invention.

We claim:

27

28

Claims



1.    A self-contained wireless camera device comprising:

a camera;

5      video processing circuitry coupled to the camera, receiving video signals from the camera and providing selectively processed first video signals, processed according to a selected protocol scheme;

selection logic coupled to the video processing circuitry to control selection of a protocol scheme;

10      a radio transmitter coupled to the video processing circuitry for transmission of the processed first video signals;

a radio receiver for receipt of processed second video signals;

video reconstruction circuitry coupled to the radio receiver, receiving the processed second video signals and providing

15   reconstituted second video signals; and

a display selectively coupled to the camera and the video reconstruction circuitry, selectively displaying images from the camera and images represented by the reconstituted second video signals.

20   2.    The wireless camera device of claim 1 wherein:

the video processing circuitry comprises video compression circuitry such that the selectively processed first video signals are selectively compressed first video signals, compressed according to a selected compression scheme;

25      the processed second video signals are compressed second video signals; and

the video reconstruction circuitry comprises video decompression circuitry such that the reconstituted second video signals are decompressed second video signals.

28

3.    The wireless camera device of claim 2, for communication with
a base station device from which the compressed second video signals
are transmitted to the wireless camera device, the wireless camera

5    device further comprising:

control circuitry, generating control commands, the control
circuitry being coupled to the radio transmitter whereby the radio
transmitter transmits the control commands to the base station device
for control of transmission of the compressed second video signals.

10

4.    The wireless camera device of claim 3, wherein the control
commands include: a video replay command; a rewind command; and
a fast forward command.

15    5.    The wireless camera device of claim 3, wherein the control
commands include a video quality command.

6.    The wireless camera device of claim 3, wherein the control
commands include a bandwidth control command.

7.    A wireless camera system comprising:

a self-contained wireless camera device comprising:

    a camera;

5       video compression circuitry coupled to the camera, receiving
         video signals from the camera and providing compressed
         first video signals;

    a radio transmitter coupled to the video compression circuitry
        for transmission of the compressed first video signals;

10      a radio receiver for receipt of compressed second video signals;

    video decompression circuitry coupled to the radio receiver,
        receiving the compressed second video signals and
        providing decompressed second video signals;

    a display selectively coupled to the camera and the video

15        decompression circuitry, selectively displaying images
        from the camera and images represented by the
        decompressed second video signals

and a base station device comprising:

    a radio receiver receiving the compressed first video signals;

20      a storage device for storing signals derived from the compressed
        first video signals; and

    a transmitter coupled to the storage device for retransmitting the
        compressed first video signals as compressed second video
        signals.

30

8.    The wireless camera system of claim 7, wherein the wireless
camera device comprises control command generation circuitry
coupled to the radio transmitter, generating control commands to be
5    sent to the base station device and wherein the base station device
comprises control command signal receive circuitry responsive to the
control commands to control retrieval of the signals derived from the
compressed first video signals stored in the storage device and
retransmission of the compressed second video signals.

10

9.    The wireless camera system of claim 8, wherein the control
commands include: a video replay command; a rewind command and
a fast forward command.

15    10.    The wireless camera system of claim 7, wherein the base station
device has transport circuitry operable to deliver video signals derived
from the compressed first video signals as internet protocol packets at
an output port.

11.   A self-contained wireless camera device comprising:

a camera;

a user selection input;

video compression circuitry coupled to the camera and to the

5    user selection input, receiving video signals from the camera and
providing compressed first video signals, compressed according to a
selected one of at least two compression schemes, dependent on the
user selection input; and

a radio transmitter coupled to the video compression circuitry

10   for transmission of the compressed first video signals.

12.   The wireless camera device according to claim 11, wherein the
video compression circuitry comprises first compression means and
second compression means for selectively compressing the video

15   signals according to the selected one of the at least two compression
schemes.

13.   The wireless camera device according to claim 12, wherein the at
least two compression schemes are selected from a group comprising:

20   discrete cosine transform compression; full frame compression;
wavelet compression; MPEG compression; JPEG compression; and
vector quantization compression.

14.   The wireless camera device according to claim 11, wherein the

25   user selection input is arranged for selection of one of a plurality of
user applications and wherein the selected one of the at least two
compression schemes is selected dependent on an application selected.

32

15.    A self-contained wireless camera device comprising:

a camera;

video compression circuitry coupled to the camera, receiving
5    video signals from the camera and providing compressed first video
signals;

a radio transmitter coupled to the video compression circuitry
for transmission of the compressed first video signals; and

a radio receiver for receipt of command signals, wherein the
10    video compression circuitry is responsive to receipt of a control
command by the radio receiver to modify operation of the video
compression circuitry.

16.    The wireless camera device of claim 15, wherein the video
15    compression circuitry is responsive to receipt of a control command by
the radio receiver to selectively increase and decrease bandwidth of the
compressed first video signals.

33



17.   A wireless camera system comprising:

a first wireless camera device comprising:

    a camera;

5    video compression circuitry coupled to the camera, receiving
       video signals from the camera and providing compressed
       first video signals;

    a radio transmitter coupled to the video compression circuitry
       for transmission of the compressed first video signals;

10    a radio receiver for receipt of command signals, wherein the
       video compression circuitry is responsive to receipt of a
       first control command by the radio receiver to modify
       operation of the video compression circuitry;

and a base station device comprising:

15    control circuitry receiving a second control command seeking
       service for a second wireless camera device; and

    a transmitter, coupled to the control circuitry, for transmitting to
       the first wireless camera device the first control command,
       thereby causing the first wireless camera device to adjust

20       its operation to accommodate the second wireless camera
       device.

18.   The system of claim 17, wherein the base station device
comprises a user selection input and the control circuitry is coupled to

25  the user selection input to receive the second control command from
the user selection input.

34

19. The system of claim 17, wherein the base station device comprises a radio receiver and the control circuitry is coupled to the radio receiver to receive the second control command from the second wireless camera device.

5

20. The system of claim 17, wherein the first wireless camera device and the second wireless camera device share use of a common radio channel.

10

21. The system of claim 17, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to modify operation of the video compression circuitry to decrease bandwidth of the compressed first video signals.

15

22. The system of claim 21, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to decrease frame rate.

20

23. The system of claim 21, wherein the video compression circuitry of the first wireless camera device is responsive to receipt of the first control command to decrease resolution.

35

29

24.    A method of operation of a self-contained wireless camera device comprising:

receiving video signals from a camera;

providing a selection of a protocol scheme;

5    providing processed first video signals processed according to the protocol scheme;

transmitting the processed first video signals over a shared radio channel;

receiving processed second video signals from the shared radio

10    channel and providing reconstituted second video signals; and

selectively displaying images from the camera and images represented by the reconstituted second video signals.

25.    The method of claim 24 wherein:

15    the step of providing a selection of a protocol scheme includes providing a selection of a compression scheme;

the processed first video signals are compressed first video signals, compressed according to a selected compression scheme;

the processed second video signals are compressed second video

20    signals; and

the reconstituted second video signals are decompressed second video signals.

26.    The method of claim 25, further comprising:

25    generating control commands and transmitting the control commands to a base station device for control of transmission of the compressed second video signals.

36



27.    The method of claim 26, wherein the control commands include: a video replay command; a rewind command; and a fast forward command.

5

28.    The method of claim 26, wherein the control commands include a video quality command.

29.    The method of claim 26, wherein the control commands include
10    a bandwidth control command.

09102457.0992298

37



30.    A method of operation of a wireless camera system having
a self-contained wireless camera device and a base station device,
the method comprising, at the wireless camera
device:receiving video signals from a camera and
5              providing compressed first video signals;
transmitting the compressed first video signals over a shared
radio channel;
receiving compressed second video signals at a radio receiver;
decompressing the compressed second video signals and
10             providing decompressed second video signals; and
selectively displaying images from the camera and images
represented by the decompressed second video signals,
and at the base station device:
receiving the compressed first video signals from the radio
15             channel;
storing signals derived from the compressed first video signals;
and
retransmitting the compressed first video signals as compressed
second video signals.
20

31.    The method of claim 30, further comprising:
generating control commands at the wireless camera device;
sending the control commands to the base station device;
receiving the control commands at the base station device;
25             controlling retrieval of signals derived from the compressed first
video signals in response to the control commands; and
retransmitting the compressed second video signals.

38



32.    The method of claim 31, wherein the control commands include a video replay command; a rewind command; and a fast forward command.

5    33.    The method of claim 30, comprising delivering video signals derived from the compressed first video signals as internet protocol packets at an output port.

34.    A method of operation of a self-contained wireless camera
10    device comprising:

receiving video signals from a camera and providing compressed first video signals, compressed according to a selected one of at least two compression schemes, dependent on a user selection input; and

15    transmitting the compressed first video signals.

35.    The method of claim 34, comprising selectively compressing the video signals according to the selected one of the at least two compression schemes.

20

36.    . The method of claim 35, wherein the at least two compression schemes are selected from a group comprising: discrete cosine transform compression; full frame compression; wavelet compression; MPEG compression; JPEG compression; and vector quantization
25    compression.

39

37.    The method of claim 34, comprising user selection of an application and user selection of one of a plurality of user applications, dependent on an application selected.

5      38.    A method of operation of a self-contained wireless camera device comprising:

receiving video signals from a camera and providing compressed first video signals;

10      transmitting the compressed first video signals;

receiving control commands; and

controlling compression of video signals responsive to receipt of a control command.

15      39.    The method of claim 38, comprising selectively increasing and decreasing bandwidth of the compressed first video signals in response to receipt of the control command.

40



40.    A method of operation of a wireless camera system having a first wireless camera device and a base station device, comprising, at the first wireless camera device:

    processing video signals from a camera to provide compressed
        first video signals;

5    transmitting the compressed first video signals;

    receiving control commands; and

    modifying the processing of the video signals in response to a
        first control command received,

10  and at the base station device:

    receiving a second control command seeking service for a second
        wireless camera device; and

    transmitting to the first wireless camera device the first control
        command, thereby causing the first wireless camera device

15         to adjust its operation to accommodate the second wireless
        camera device.

41.    The method of claim 40, wherein receiving includes receipt of the second control command in response to user selection input.

20

42.    The method of claim 40, wherein receiving includes receipt of the second control command from the second wireless camera device.

43.    The method of claim 40 wherein the first wireless camera device

25  and the second wireless camera device share use of a common radio channel.

44.    The method of claim 40, wherein the first wireless camera device is responsive to receipt of the first control command to decrease bandwidth of the compressed first video signals.

5    45.    The method of claim 40, wherein the first wireless camera device is responsive to receipt of the first control command to decrease frame rate.

10    46.    The method of claim 40, wherein the first wireless camera device is responsive to receipt of the first control command to decrease resolution.

42

FORM PTO-1595
1-31-92

07-14-1998

████████████████

100763571

**ET**

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

CASE NO: BW00030

...ed original documents or copy thereof.

To the Honorable Commissioner of Pt...

**1. Name of conveying party(ies):**

1 Peter Strandwitz    4 Jan-Michel Wyckoff
2 Robert J. Kniskern
3 Gary Schulz

Additional name(s) of conveying party(ies) attached? Yes XNo

**2. Name and address of receiving party(ies):**

Name: _____ Motorola, Inc. _____

Internal Address: __ Corporate Offices __

_____ Intellectual Property Department __

Street Address: ___ 1303 E. Algonquin Road __

City: Schaumburg ___ State: IL ___ ZIP: 60196

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**3. Nature of Conveyance:**

☒ Assignment        ☐ Merger

☐ Security Agreement   ☐ Change of Name

☐ Other _____

Execution Date: 1 6-12-98 2 6-11-98 3 & 4 6-22-98

**4. Application number(s) or patent numbers(s):**

If this document is being filed together with a new application, the execution date of the application is 6-22-1998 __

A. Patent Application No.(s)

B. Patent No.(s)

Additional numbers attached? ☐ Yes ☒ No

**5. Name and address of party to whom correspondence concerning document should be mailed:**

Name: _____ Motorola, Inc. _____

Internal Address: Corporate Offices _____

_____ Intellectual Property Department ___

Street Address: ___ 1303 E. Algonquin Road __

City: Schaumburg ___ State: IL ___ ZIP: 60196

**6. Total number of applications and patents involved: 1**

**7. Total fee (37 CFR 1.21(h)):** ............ $ 40.00

☐ Enclosed

☒ Authorized to be charged to deposit account

**8.** Deposit account number:
   11-4772

(Attach duplicate copy of this page if paying by deposit account)

**DO NOT USE THIS SPACE**

**9. Statement and signature.**

To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

_____ Thomas G. Be...
Name of Person Sig...

_Thomas G. Berry_
Signature

6-22-1998
Date

Total number of pages comprising cover sheet: 1

OMB No. 0651-0011 (exp. 4/94)

**Do not detach this portion**

Mail documents to be recorded with required cover sheet information

**Commissioner of Patents and Trademarks**
**Box Assignments**
**Washington, D.C. 20231**

Public burden reporting for this sample cover sheet is estimated to average about 30 minutes per document to be recorded, including time for reviewing the document and gathering the data needed, and completing and reviewing the sample cover sheet. Send comments regarding this burden estimate to the U.S. Patent and Trademark Office, Office of Information Systems, PK2-100C, Washington, D.C. 20231, and to the Office of Management and Budget, Paperwork Reduction Project, (0651-0011), Washington, D.C. 20503

Rev. 9/30/92

**PATENT**
**REEL: 9300 FRAME: 0265**

**EXHIBIT**

_10_

Express Mail Number: EI382863887US                 BW00027 Schulz et al.

## SELF-CONTAINED CAMERA DEVICE AND METHOD FOR
## CAPTURING AND COMMUNICATING IMAGES VIA A MODEM

### Field of the Invention

5          The present invention relates to a self-contained camera device
and method for capturing and communicating images via a modem.


### Background of the Invention

Currently, self-contained camera devices use external cabled

10    connections to interconnect portable video cameras to radio frequency
transmitters (typically analog video transmissions).  These devices
require dedicated redundant hardware to perform a dedicated function.
A common application for such devices is for use in electronic news
gathering activity and sports events.

15          Another application for a similar concept is in wireless in-home
video distribution.  In this application, a wireless video transmitter is
cabled to a device such as a video cassette recorder (VCR), which
enables the user to remotely view content without necessitating wiring
a household.  This application, however, requires a user to connect

20    separate video and audio cables, as well as a power cable, to the host
device resulting in a system that requires several pieces of equipment.





EXHIBIT

11

Thus, a need exists for a method and apparatus that provides an additional interface to the outside world without losing the functionality of a host device and provides for a way to achieve network connectivity for a consumer without the consumer having to

5   purchase redundant hardware.

## Brief Description of the Drawings

A preferred embodiment of the present invention is now described, by way of example only, with reference to the accompanying

10   drawings in which:

FIG. 1 is an isometric view of the preferred embodiment of the present invention;

FIG. 2 is a block diagram of a modem located on a host device according to the present invention;

15   FIG. 3 is an isometric view of a first alternative embodiment of the present invention;

FIG. 4 is an isometric view of a second alternative embodiment of the present invention; and

FIG. 5 is a block diagram of a destination device according to the

20   present invention.



**Detailed Description of the Preferred Embodiment**

The present invention allows for efficient re-use of any magnetically recordable media (e.g., consumer video or digital still camera equipment) by providing a means for additional external

5    interfaces to networks, closed circuit televisions, monitoring, surveillance, commercial video market, etc. The present invention enables such an additional external interface to the outside world without losing the functionality of a host device (i.e., the magnetically recordable media).

10    The present invention provides for a generic interface that is applied to either digital or analog formats for both video and audio transmission. The present invention consists of the electronics necessary to interface the existing magnetic media electronics device with the outside world via a transport, wireless or wireline. The

15    present invention allows the user of any magnetically recordable media to directly interface with the multimedia network by inserting a module or device in the form of a video or audio cassette and utilizing existing magnetic transducers to couple baseband modulation information to the transport.

20    Moreover, the present invention provides for a way to achieve network connectivity for the consumer without the consumer having to purchase redundant hardware. Thus, a person needs only one

3

device with accessories to perform a multitude of functions. For example, a user of a camcorder is allowed to re-use the major components of the camera subsystem by removal of the cassette tape and the insertion of a modem.

5    The present invention utilizes a self-contained camera device which comprises an image capturing device and a chassis. The chassis receives a storage module (e.g., a tape cartridge) or a modem (wired or wireless). A removable modem is mountable on the chassis and couplable to the image capturing device. The removable modem is either a wireless radio frequency (RF) modem with a radio network interface and antenna or a wireline modem with a wireline network interface. Coupling the removable modem to the chassis allows the image capturing device to transmit images via the radio or wireline network interface. The removable modem is replaceable with a storage module. Preferably, the removable modem has an identical form factor as the storage module, including an identical input-output interface.

The removable modem utilizes existing hardware on the host device and provides an additional interface to the outside world in place of the functionality of the cassette tape transport mechanism. The removable modem takes on the mechanical configuration of a video, audio, digital audio tape (DAT) or similar cassette, and uses the

4

existing consumer electronic tape drive as a docking station for a

peripheral, e.g., 5 GHz wireless radio, infra-red or wireline modem

with various interfaces, e.g., 10 base T or 1394. The installation of such

a peripheral can be made connectorless since it utilizes the existing

5    magnetic record heads of the host device.

As shown in FIG. 1, in the preferred embodiment of the present

invention, the self-contained camera device 10 is a camcorder (i.e., host

device) and the chassis 11 has a cavity 12 for receiving the storage

module (not shown) or the removable modem 13. The cavity 12 is also

10    adapted to receive a magnetic tape.

The cavity 12 includes a magnetic head 14 coupled to the image

capturing device 15 of the host device 10. The magnetic head 14

couples a video signal, which originates from the host device 10, by

picking up magnetic signals and duplicating the magnetic signals on

15    the modem 13.

As shown in FIG. 2, the modem 13 consists of several

components: a magnetic transducer 20, a demodulator 21, a format

conversion block 22, a logic and control application specific integrated

circuit (ASIC) 23, a radio or wireline network interface 24 (and an

20    antenna 25, if utilizing the radio network interface). The magnetic

transducer 20 is selectively and/or removably couplable to a magnetic

head 14 within the cavity 12. A coil 26 is placed in the magnetic

5

transducer 20 which picks up the magnetic signals generated by the

magnetic head 14. The magnetic transducer 20 establishes connectivity

with the host device 10 when the magnetic transducer 20 comes in

contact with or comes within close proximity to the magnetic head 14

5   of the host device 10. After the magnetic transducer 20 picks up the

magnetic signals from the magnetic head 14 of the host device 10, the

magnetic signals need to be demodulated.

The demodulator 21 is coupled to the magnetic transducer 20.

The demodulator 21 demodulates the magnetic signals picked up by

10  the magnetic transducer 20 and converts them into baseband video

signals. The demodulator 21 provides the baseband video signals to the

format conversion block 22.

The format conversion block 22 is coupled to the demodulator

21. The format conversion block 22 is specific to the type of host

15  electronic device 10 that the modem 13, or any other magnetic media

housing, is plugged/inserted into. The format conversion block 22

presents the demodulated video baseband information in a baseband

format ready for digitization by the video encoder/compression engine

which is part of a very large scale integration (VLSI) ASIC.

20  The logic and control ASIC 23 is coupled to the format

conversion block 22 and receives the baseband format from the format

conversion block 22. After format conversion, the digital video and

6

audio are packetized by the logic and control ASIC 23 and presented to

the radio or wireline network interface 24, i.e., 5 GHz radio. The logic

and control ASIC 23 controls the rate of modulation to the radio or

wireline network interface 24. For example, the logic and control ASIC

5    23 instructs the radio or wireline network interface 24 when to

transmit and receive signals, queries the radio or wireline network

interface 24 whether it received a packet, whether the packet contained

errors, whether there was a collision, or whether the logic and control

ASIC 23 needs to request that the packet is re-sent. Thus, the logic and

10    control ASIC 23 helps manage the radio or wireline network interface

24 and data framing.

　　　　If transferring files over the Internet, an internet protocol (IP), a

host device IP address and a destination device IP address are

embedded or downloaded in the logic and control ASIC 23.

15    Embedding or downloading such information enables the logic and

control ASIC 23 to know how to format the files and where to send the

information over the Internet.

　　　　The radio or wireline network interface 24 is coupled to the logic

and control ASIC 23. The radio or wireline network interface 24 is

20    either a point-to-point stand alone system or part of a multimedia

network. When the radio network interface 24 is utilized, the radio

network interface 24 transmits the digital signal to a destination device

7

via the antenna 25. When a wireline network interface 24 is utilized, the wireline network interface 24 transmits the digital signal to the destination device via an infra-red or wireline interface (e.g., 10 base T).

FIG. 3 illustrates an isometric view of a first alternative
5      embodiment of the present invention. As shown, the chassis 11 of the host device 10 is adapted to receive a storage module (e.g., a semiconductor memory), a modem, or any other network interface. The chassis 11 comprises a set of electric contacts 30 for selectively connecting to the semiconductor memory, the modem or any other
10     network interface.

As shown in FIG. 4, a second alternative embodiment of the present invention is applicable as a radio or wireline network interface for digital still cameras 40. The components of the modem 41 in the second alternative embodiment are the same as in the preferred
15     embodiment. The modem 41 is embedded in a module that also contains a mini flash storage interface. The modem 41 takes the place of the functionality of the storage module 42 and is inserted into the cavity 43 of the digital still camera 40. Embedding the modem 41 in a module that also contains a mini flash storage interface allows the
20     present invention to take advantage of the mini flash storage interface standard which is available across numerous vendor platforms.

A third alternative embodiment (not shown) replaces the entire tape drive transport module with a modem. All video cameras use a multi-lead interface from the tape drive transport module back to the electronics of the self-contained camera. The present invention allows

5    the tape drive transport interface to interface with the modem. The user can remove the tape drive transport module from the host device and insert a modem in its place. The modem has the same size, shape and form factor as the tape drive transport module and connects itself to the self-contained camera device via the multi-lead interface. Thus,

10    the user can interchange the tape drive transport module with the modem depending on his need.

At this point, capturing and communicating images at the self-contained camera device has been described. The remaining description focuses on receiving the images transmitted from the self-

15    contained camera device at a destination device (e.g., a personal computer).

As shown in FIG. 5, the destination device 50 has common circuitry as the modem 13 located on the host device 10. Embedded in or mountable on the destination device 50 are the following

20    components: a radio or wireline network interface 51, a logic and control ASIC 52, a format conversion block 53, an interface port (e.g., a network interface card) 54, a multimedia card 55, an integrated drive

9

electronics (IDE) or small computer system interface (SCSI) 56, and a hard drive 57. The radio or wireline network 51 is in communication with the modem 13 via an antenna 58 or a wireline. The logic and control ASIC 52 is coupled to the radio or wireline network interface 5 51. The format conversion block 53 is coupled to the logic and control ASIC 52. The interface port 54 is coupled to the format conversion block 53 via a 1394, a 10 base T (e.g., Ethernet) or a high speed serial bus 59. The multimedia card 55 is coupled to the interface port 54 via a system bus, e.g., protocol control information (PCI) 60. The IDE or SCSI 10 56 and a super video graphics array (SVGA) monitor (not shown) are coupled to the multimedia card 55. The hard drive 57 is coupled to the IDE or SCSI 56.

In operation, using a radio network interface 51 and an antenna 58, the RF signals are picked up by the antenna 58 on the destination 15 device 50 and are fed to a radio (e.g., 5 GHz radio). The radio network interface 51 down-converts the RF signals into baseband signals. The baseband signals are then fed into the logic and control ASIC 52. The logic and control ASIC 52 is able to read the data that comes over the baseband signals and strips out the data from the baseband signals to 20 create raw data which is fed into the format conversion block 53. The format conversion block 53 converts the raw data into one of several standard data formats (e.g., 10 base T, 1394, high speed serial, etc.). The

data flows from the format conversion block 53 to an interface port
(e.g., network interface card) on the destination device 50. The data is
then ported into a system bus 60 and into a multimedia card 55 by
using the appropriate software application. The data is now able to be

5    viewed on a computer monitor (e.g., a SVGA monitor) or stored on the
system hard drive 57, or other media storage device (e.g., floppy disk,
tape drive, etc.), that enables the user to view, manipulate and store the
video data. It is important to note that the wireline network interface
essentially operates in the same manner as the radio network interface.

10   The wireline network interface, however, has a wired or infra-red
connection to the destination device as opposed to a radio.

     While the invention has been described in conjunction with a
specific embodiment thereof, additional advantages and modifications
will readily occur to those skilled in the art. The invention, in its

15   broader aspects, is therefore not limited to the specific details,
representative apparatus and illustrative examples shown and
described. For example, the present invention is also applicable to
other forms of consumer imaging devices. The modem disclosed
herein could take the form of a data storage card, personal computer

20   memory card international association (PCMCIA) card or disk drive.
The electrical and mechanical interfaces could be configured to be
compatible with any of these standards. Various alterations,

11

modifications and variations will be apparent to those skilled in the art
in light of the foregoing description. Thus, it should be understood
that the invention is not limited by the foregoing description, but
embraces all such alterations, modifications and variations in

5   accordance with the spirit and scope of the appended claims.

       We claim:

Claims

1.    A self-contained camera device for capturing and
communicating images via a modem comprising:

an image capturing device;

5          a chassis for receiving a storage module or a modem; and

a removable modem, mountable on the chassis and couplable to
the image capturing device, wherein the modem is replaceable with
the storage module.

10    2.    The self-contained camera device according to claim 1 wherein
the modem is a wireless radio frequency modem.

3.    The self-contained camera device according to claim 1 wherein
the modem is wireline modem.

15

4.    The self-contained camera device according to claim 1 wherein
the self-contained camera device is a camcorder.

5.    The self-contained camera device according to claim 4 further
20    comprising a removable tape drive transport module.

13

6.    The self-contained camera device according to claim 1 wherein the self-contained camera device is a digital still camera.

7.    The self-contained camera device according to claim 1 wherein
5   the chassis has a cavity for receiving the storage module or the modem.

8.    The self-contained camera device according to claim 7 where the cavity is adapted to receive a magnetic tape.

10    The self-contained camera device according to claim 7 wherein the cavity includes a magnetic head coupled to the image capturing device and the removable modem comprises a magnetic transducer removably coupled to the magnetic head.

15   10.   The self-contained camera device according to claim 7 wherein the removable modem comprises:

a magnetic transducer selectively couplable with a magnetic head within the cavity;

a demodulator coupled to the magnetic transducer;

20    a format conversion block coupled to the demodulator;

a logic and control application specific integrated circuit coupled to the format conversion block; and

14

a network interface coupled to the logic and control application specific integrated circuit.

11. The self-contained camera device according to claim 10 wherein
5  the network interface is a radio network interface, and further comprising an antenna coupled to the radio network interface.

12. The self-contained camera device according to claim 10 wherein the network interface is a wireline network interface.

10

13. The self-contained camera device according to claim 1 wherein the chassis is adapted to receive a semiconductor memory.

14. The self-contained camera device according to claim 13 wherein
15  the chassis comprises a set of electric contacts for selectively connecting to the semiconductor memory.

15. The self-contained camera device according to claim 1 wherein the chassis comprises a set of electric contacts for selectively connecting
20  to the removable modem.

15 

16.    The self-contained camera device according to claim 1 wherein the removable modem has an identical form factor as the storage module, including an identical input-output interface.

5    17.    A housing for capturing and communicating images on a self-contained camera device via a modem comprising:

a magnetic transducer for picking up a magnetic signal generated by a magnetic head of a host device;

a demodulator for demodulating the magnetic signal picked up
10    by the magnetic transducer to produce a video baseband signal;

a format conversion block for formatting the video baseband signal;

a logic and control application specific integrated circuit for packetizing the video baseband signal; and
15    a network interface for communicating the video baseband signal to a destination device.

18.    The housing according to claim 17, wherein the housing has a same shape and size as a magnetic cassette tape.

20

16

19. The housing according to claim 17 wherein the magnetic transducer comes in contact with the magnetic head of the host device to establish connectivity.

5    20. The housing according to claim 17 wherein the magnetic transducer is within close proximity to the magnetic head of the host device to establish connectivity.

21. A self-contained camera kit of parts comprising:

10    a housing having image capturing capabilities and a chassis;

a removable tape drive transport module; and

a removable modem, wherein the removable tape drive transport module and the removable modem are alternatively mountable on the chassis.

15

22. A method of capturing and communicating images on a self-contained camera device via a modem comprising:

providing a housing having an image capturing device and a storage module;

20    replacing the storage module with the modem, wherein the modem has a network interface; and

17



operating the image capturing device to transmit images via the network interface.

26. A method of capturing and communicating images on a self-
5    contained camera device via a modem comprising:

entering a record mode;

activating a magnetic head of a host device;

utilizing a magnetic transducer to pick up a magnetic signal generated by the magnetic head of the host device;

10    demodulating the magnetic signal picked up by the magnetic transducer to produce a video baseband signal;

formatting and packetizing the video baseband signal; and

communicating the video baseband signal through a network interface.

15

18

*103408*

# SELF-CONTAINED CAMERA DEVICE AND METHOD FOR CAPTURING AND COMMUNICATING IMAGES VIA A MODEM

### Abstract of the Disclosure

5　　　　A self-contained camera device (10) and method for capturing

and communicating images via a modem (13). The self-contained

camera device (10) comprises an image capturing device (15) and a

chassis (11) for receiving a storage module or a modem (13). A

removable modem (13) is mountable on the chassis (11) and couplable

10　　to the image capturing device (15). The removable modem (13) is

replaceable with the storage module.

19

**JUDGE HIBBLER**
**MAGISTRATE JUDGE NOLAN**

**AEE**

 **MOTOROLA**

October 30, 1998

Mr. Peter Strandwitz
Plexus Corporation
55 Jewelers Park Drive
Neenah, WI   54957-0156

Re:     Joint Patent Filing Agreement

I have been able to locate my copy of the original agreement (prior to signature) and its attachments and I enclose these for re-execution, except that I have made the following changes:

• The effective date of the agreement and the NDA is May 1, 1998 (the date I received it back from you with your signature) and

• I have replaced references to "Fourth Generation Systems" with "Personal Communications Sector".

Please again sign both copies (including the NDA), initial each page and return to me.

I apologize for the loss of the original agreement.

Regards,

Hugh

Corporate Offices
1303 E. Algonquin Road, Schaumburg, IL 60196
Phone:   847/576.5214
Fax:   847/576.3750

EXHIBIT
12

JUDGE HIBBLER

MAGISTRATE JUDGE NOLAN

AEE

# Memorandum of Understanding

This Memorandum of Understanding ("MOU") is entered into between Motorola, Inc., through its Broadband Wireless Technology Center ("Motorola"), and MemoryLink Corp. ("ML"), and sets forth the intention of the parties relative to a strategic business relationship between them. The parties have both developed advanced technologies. Specifically, Motorola has developed a 5 GHz radio, Wireless Broadband products and subsystems for high speed access, and ML has developed a unique video compression technology, antenna switching system and has integrated these technologies with its own 5 GHz radio. It is believed that a joint effort combining ML's Video technologies with Motorola's Broadband Wireless Technology could result in a number of compelling new products that can be successfully commercialized.

1. The parties agree to evaluate which products and markets to initially focus on utilizing their combined technologies.

2. The parties agree to evaluate how best to market those products.

3. In the event these evalutions lead to mutual agreement that additional business opportunities exist, the parties will negotiate, in good faith, terms and conditions of one or more definitive agreements that will set forth the parties respective rights with regard to such opportunities.

4. Each party will be responsible for paying its own costs associated with the above activities, as well as all activities conducted to date.

5. Both parties have developed a product around wireless technologies. It is the intent of the parties to determine what if any existing components of two technologies can be combined to enhance functionality and/or reduce manufacturing costs. Motorola will take the lead in making this determination.

6. Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology. Without limiting the foregoing, Motorola will retain all rights to its 5 GHz radio and subsystems that it is currently developing or may hereafter develop. Nothing contained in this MOU shall be deemed to grant any party, by implication or otherwise, any license under any patents or patent applications or technologies of any other parties.

7. Disclosure of confidential information in connection with this MOU and the development of a definitive agreement will be governed by the terms of existing Nondisclosure Agreements dated March 29th, 2001 between the parties. During the term of this MOU, neither party, its affiliates, subcontractors, employees, agents and

Confidential                   Page 1                  8/23/01

EXHIBIT

13

consultants may, without consent of the other, release publicity items of any kind. Such publicity items may include news releases, articles, brochures, advertisements, prepared speeches, external company reports or other information releases (including denials or confirmations) related to this MOU or anticipation of more definitive agreements.

8. Each of the parties will act as, and will be, independent contractors in all aspects of this MOU. No party will act or have authority to act as an agent for the other party for any purpose. Unless otherwise expressly and mutually agreed in writing, the prospective relationship contemplated in this MOU shall not be an exclusive agreement. Each party reserves the right to enter into other cooperative relationships with other third parties.

9. This MOU sets forth the current intent of the parties with respect to the business activities described herein, but in no way gives rise to any legal obligations except obligations under paragraphs 4, 6, 7 and 8. The obligation of the parties to engage in any further business relationships is subject to negotiation and execution of a definitive agreement in form and substance satisfactory to both parties.

10. This MOU shall be governed by and interpreted in accordance with the domestic laws of the State of New York.

11. Upon written notice to the other party, either party may terminate this MOU at any time for any reason if it so chooses, without liability to the other party.

This MOU is effective as of the latest of the dates set forth below.

Motorola Inc., MBWTC

By: _T M A Frnnlly_

Title: _lowp V P_

Date: _9-23-01 8-23-01_
_PS_

MemoryLink Corp.

By: _Peter Strandum_

Title: _CEO_

Date: _8-27-01_

AEE

# Memorandum of Understanding

This Memorandum of Understanding ("MOU") is entered into between Motorola, Inc., through its Broadband Wireless Technology Center ("Motorola"), and MemoryLink Corp. ("ML"), and sets forth the intention of the parties relative to a strategic business relationship between them. The parties have both developed advanced technologies that utilize the 5 GHz spectrums. Specifically, Motorola has developed a 5 GHz radio and subsystems, and ML has developed a unique video compression technology, antenna switching system and has integrated these technologies with its own 5 GHz radio. ML has also been developing a 5 GHz gallium arsenide radio chip set. It is believed that a joint effort combining all or portions this 5 GHz gallium arsenide radio chip set could benefit Motorola product offering.

1. The parties agree to determine in a timely manner the feasibility of Motorola's use of all or part of the ML gallium arsenide radio chip set
2. In the event the parties decide to pursue the possibility of further colloboration, they will negotiate, in good faith, terms and conditions of one or more definitive agreements that will set forth the parties respective rights with regard to such future colloboration.

3. Each party will be responsible for paying its own costs associated with the above activities, as well as all activities conducted to date.

4. It is the intent of the parties to determine if the two radios can be combined resulting in enhance functionality and/or reduce manufacturing costs. Motorola will take the lead in making this determination.

5. Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology. Without limiting the foregoing, Motorola will retain all rights to its 5 GHz radio and subsystems that it is currently developing or may hereafter develop. Nothing contained in this MOU shall be deemed to grant any party, by implication or otherwise, any license under any patents or patent applications or technologies of any other parties.
6. Disclosure of confidential information in connection with this MOU and the development of a definitive agreement will be governed by the terms of existing Nondisclosure Agreements dated March, 29th 2001between the parties. During the term of this MOU, neither party, its affiliates, subcontractors, employees, agents and consultants may, without consent of the other, release publicity items of any kind. Such publicity items may include news releases, articles, brochures, advertisements, prepared speeches, external company reports or other information releases (including denials or confirmations) related to this MOU or anticipation of more definitive agreements.

7. Each of the parties will act as, and will be, independent contractors in all aspects of this MOU. No party will act or have authority to act as an agent for the other party for any

EXHIBIT
14

purpose. Unless otherwise expressly and mutually agreed in writing, the prospective relationship contemplated in this MOU shall not be an exclusive agreement. Each party reserves the right to enter into other cooperative relationships with other third parties.

8. This MOU sets forth the current intent of the parties with respect to the business activities described herein, but in no way gives rise to any legal obligations except obligations under paragraphs 3,,5, 6 and 7. The obligation of the parties to consummate the transactions contemplated herein is subject to negotiation and execution of a definitive agreement in form and substance satisfactory to both parties.

9. This MOU shall be governed by and interpreted in accordance with the domestic laws of the State of New York.

10. Neither this MOU nor any of the obligations or rights of the parties may be assigned, pledged or transferred by either party without the prior written consent of the other party.

11. Upon written notice to the other party, either party may terminate this MOU at any time for any reason if it so chooses, without liability to the other party.

This MOU is effective as of the latest of the dates set forth below.

Motorola Inc., Motorola

By: _____

Title: Corp VP

Date: 8-23-01

MemoryLink Corp.

By: _____

Title: CEO

Date: 8-27-01

**MemoryLink Corp.**
*36 Jewelers Park Drive, Suite 200*
*Neenah, Wisconsin 54957*

Phone: 920-725-7535
Fax: 920-725-6735

June 10, 2002

Mr Tom Freeburg
Mr Tony Kobrinetz
Canopy Wireless Broadband Products
50 E. Commerce Drive
Schaumburg, IL  60173

Via Email and Letter

Dear Tom and Tony,

Pursuant to our recent engineering meeting in Fort Wayne, the purpose of this letter is to initiate the joint development program that the engineering resources of MemoryLink and Motorola Labs are uniquely suited to implement.  Our recent discussions and engineering interchanges have convinced us more than ever that there is a tremendous synergy between our respective efforts that could be quickly expanded into a significant market opportunity.

Motorola has implemented, and is delivering, one of the first 5Ghz wireless data systems suitable for volume deployments to Internet Service Providers (ISP).  This has required significant hardware and software engineering development, and has resulted in a reasonable cost single board device that is based around FPGA and embedded microprocessor technology.  The product application target is to provide personal computers (PCs) full time access to the Internet through a subscription service with an operator.  This operator manages a combination wireless/wired infrastructure consisting of Subscriber Modules at the customer sites communicating with Access Points permanently deployed in zones near the customer, and connected to the Internet.

MemoryLink has spent considerable engineering resources over the last four years defining, and developing, a powerful set of core technologies that can be used to create an array of low cost multimedia capable wireless products.  In addition, a number of product reference designs targeted for peer to peer, private network applications have been created and demonstrated.

Examples of these MemoryLink application reference design targets are:

- Wireless multimedia senders/receivers-- Devices that can be used to distribute multiple channels of high quality video and audio throughout a building or local property.

EXHIBIT

15

# MemoryLink Corp.

*36 Jewelers Park Drive, Suite 200*
*Neenah, Wisconsin 54957*

*Phone: 920-725-7535*
*Fax: 920-725-6735*

- Wireless Private Video Networking (WVPN) --Devices that can conveniently provide high quality, low latency, full or half duplex video communication capability over a long distance.

These particular applications can be set up easily by the end customer and do not require any sort of fixed access point or infrastructure to operate.

Beyond these application targets there is clearly a first to market opportunity to supply equipment capable of bridging the application gap between devices designed for "local" peer to peer use, and the emerging fixed access point/multipoint subscriber wireless ISP architectures. In this way customer purchased devices can have significant utility as "stand alone" application solutions, at the same time enabling powerful new service models when access to Wide Area Network (WAN) transport is possible. One concept example of value added WAN service is an on-demand transport, throughout the community, of a video feed enabling municipal and public safety officials to video conference independent of wired infrastructure.

*MemoryLink proposes that we focus the development capability of the respective engineering teams on the goal of creating a low cost integrated, multimedia capable RF transport platform that can operate in peer to peer mode, independently of fixed access points, at the same time providing the protocol capability to enable on demand operation to fixed access points that can provide WAN services.*

It is envisioned that this multi-network capability can be engineered in such a way that the final product hardware cost is no more expensive than an equivalent "stand alone" device, and yet the ability to easily access WAN transport services would be viewed as a very significant product feature.

MemoryLink proposes that the Motorola RF Lab and MemoryLink start working immediately to create a new reference design platform that would have several important platform goals:

- The RF "front end" will be designed around a low cost, custom IC and the current MemoryLink RF chipset would be jointly modified to create this custom IC.
- The digital logic for the entire platform would be targeted for a single system on a chip (SOC) implementation.
- Commodity DRAM devices would be used where external memory is needed.
- Innovative mechanical and product packaging efforts would be employed to reduce costs and improve perceived value.

**MemoryLink Corp.**
*36 Jewelers Park Drive, Suite 200*
*Neenah, Wisconsin 54957*

*Phone: 920-725-7535*
*Fax: 920-725-6735*

To meet these aggressive platform goals, a significant commitment of full time resources on the part of both Memorylink and Motorola is essential. This commitment needs to be formalized immediately. The integrated nature of this development will require a single point of Program Management to provide schedule visibility and to coordinate prototype development and testing issues.

We suggest another engineering work session be convened as soon as possible to create an initial platform requirements specification and to assign preliminary engineering responsibilities.

In addition, we should create a document with sufficient scope to address the business needs of the parties to ensure that everyone involved is highly focused on the successful implementation of this exciting product platform.

Sincerely,

Bob Kniskern

President
MemoryLink Corp.
36 Jewelers Park Drive
Neenah, WI 54957


CC: Gary Schulz

AEE

## Memorandum of Understanding

The Memorandum of Understanding ('MOU') is entered into between Motorola, Inc., through its Broadband Wireless Technology Center ('Motorola'), and MemoryLink Corp. ('ML'), and sets forth the intention of the parties relative to a strategic business relationship between them. The parties have both developed advanced technologies that utilize the 5 GHz spectrums. Specifically, MemoryLink is developing advanced radio elements that can be integrated into a Canopy™ system to enhance its multi system capabilities. It is believed a joint effort could result in a 900 Mhz / 2.4 Ghz / 5.2 Ghz / 5.8 GHz all band radio architecture. Memory Link has also developed some unique video compression technology that could allow for DVD quality video capability over a Canopy™ fixed wireless network.

1. The parties agree to determine in a timely manner the feasibility of Motorola's use of all or part of the ML advanced radio elements (radio chip set).

2. In the event the parties decide to pursue the possibility of further collaboration, they will negotiate, in good faith, terms and conditions of one or more definitive agreements that will set forth the parties respective rights with regard to such future collaboration.

3. Each party will be responsible for paying its own costs associated with the above activities, as well as all activities conducted to date.

4. Each party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology. Without limiting the foregoing, Motorola will retain all rights to its radio and subsystems that it is currently developing or may hereafter develop. Nothing contained in this MOU shall be deemed to grant any party, by implication or to otherwise, any license under any patents or patent applications or technologies of any other parties.

5. Disclosure of confidential information in connection with this MOU and the development of definitive agreement will be governed by the terms of existing Nondisclosure Agreement dated March, 29th 2001 between the parties. The term of the Nondisclosure Agreement shall extend through the duration of this MOU. During the term of this MOU, neither party, its affiliates, subcontractors, employees, agents and consultants may, without consent of the other, release publicity items of any kind. Such publicity items may include news releases, articles, brochures, advertisements, prepared speeches, external company reports or other information releases (including denials or confirmations) related to this MOU or anticipation of more definitive agreements.

6. Each of the parties will act as, and will be, independent contractors in all aspects of this MOU. No party will act or have authority to act as an agent for the other party for any purpose. Unless otherwise expressly and mutually agreed in writing, the prospective relationship contemplated in this MOU shall not be an exclusive

Confidential                              1                            I


EXHIBIT
16

agreement.  Each party reserves the right to enter into other cooperative relationships with other third parties.

7.  This MOU sets forth the current intent of the parties with respect to the business activities described herein, but in no way gives rise to any legal obligations except obligations under paragraphs 3, 4, 5, 6 and 7.  The obligation of the parties to consummate the transactions contemplated herein is subject to negotiation and execution of a definitive agreement in form and substance satisfactory to both parties.

8.  This MOU shall be governed by and interpreted in accordance with the domestic laws of the State of New York.

9.  Neither this MOU nor any of the obligations or rights of the parties may be assigned, pledged or transferred by either party without the prior written consent of the other party.

10. Upon written notice to the other party, either party may terminate this MOU at any time for any reason if it so chooses, without liability to the other party.

This MOU is effective as the latest of the dates set forth below.

Motorola Inc., through its Broadband                    MemoryLink Corp
Wireless   Technology Center
By: _____                            By: _____
Title: _____                            Title: _____CEO_____
Date: ___1/24/2003_____                             Date: ___1/24/03_____



AEE    BANNER & WITCOFF, LTD.
       INTELLECTUAL PROPERTY LAW

TEN SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, IL 60606-7407

TEL: 312.715.1000
FAX: 312.715.1234
www.bannerwitcoff.com

January 29, 2003

JON O. NELSON
DIRECT DIAL: 312-463-5427
JNELSON@BANNERWITCOFF.COM

Mr. Brian Mancini
MOTOROLA, INC.
1303 E. Algonquin Road
Schaumburg, IL 60196

Re:    U.S. Patent Application No. 09/102,457 for "Self-Contained Wireless
       Camera Device, Wireless Camera System and Method"
       Our File No. 04482.00028

Dear Brian:

        In accordance with our discussion, we filed a divisional patent application on January 27, 2003 for claims that were not elected in the originally-filed patent application (U.S. patent application 09/102,457, BW00030-Strandwitz), which will be soon issued as a patent. The divisional patent application claims the priority date of the parent application. We are attaching a copy of the filed papers for your records. Also, we intend to prosecute this patent application in compliance with the associate power of attorney document that you signed.

        Also, we wish to schedule a conference call in which we may discuss modifying the assignment of this patent applicant as well as the soon-to-be issued patent. Please let us know when we can schedule the call.

        Please do not hesitate in contacting us if you have any questions.

Very truly yours,

Jon O. Nelson

JON:dlc
Enclosures

cc:    Jon Huard
       Ken Smolik

CHICAGO
WASHINGTON, D.C.
BOSTON
PORTLAND, OR.

EXHIBIT
17



AEE



BANNER & WITCOFF, LTD.
® INTELLECTUAL PROPERTY LAW

TEN SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-7407

TEL: 312.463.5000
FAX: 312.463.5001
www.bannerwitcoff.com

July 29, 2003

JON O. NELSON
DIRECT DIAL: 312-463-5427
JNELSON@BANNERWITCOFF.COM

Mr. Brian Mancini
MOTOROLA, INC.
1303 E. Algonquin Road
Schaumburg, IL 60196

     Re:    The Assignment Formalities
           Our File Nos. 04482.00028 and 4482.00016

Dear Brian:

     This is a follow up to the earlier correspondence and dialog relating to the above identified patent and the associated patent application. We understand that Motorola is willing to transfer the title to these rights to MemoryLink. In this regard, we have prepared an appropriate set of Assignments which we request be executed and returned for appropriate recordal. If you have any questions regarding these enclosures or suggestions as to the text of the Assignment, please let us know. If there is other consideration that is believed necessary, also please advise us so that we may consult with MemoryLink. Your kind attention to this is solicited.

                     Very truly yours,

                     Jon O. Nelson

JON:dlc
Enclosures

cc:    Jon Huard

CHICAGO
WASHINGTON, D.C.
BOSTON
PORTLAND, OR.

EXHIBIT
18
tabbies®

## ASSIGNMENT OF PATENT APPLICATIONS

THIS ASSIGNMENT is made on the ____ day of _____, 2003, by **Motorola, Inc.**, a Delaware corporation ("Assignor") 1303 East Algonquin Road, Schaumburg, Illinois 60196 to **MemoryLink Corp.**, a Wisconsin corporation ("Assignee") 36 Jewelers Park Drive, Suite 200, Neenah, Wisconsin 54957.

## RECITALS

1.    Assignor owns Patent Applications of the United States for certain new and useful improvements concerning the subjects listed below, which Patent Applications are numbered as shown below:

| Application No. | Filing Date | Title |
|---|---|---|
| 10/351,906 | January 27, 2003 | Self-Contained Wireless Camera Device, Wireless Camera System and Method |

(collectively, "Patent Applications"). Assignor is now the sole and exclusive owner of the Patent Applications and of all rights in the same.

2.    Assignee is desirous of acquiring the entire right, title, and interest in the Patent Applications.

## ASSIGNMENT

3.    NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is acknowledged, Assignor assigns to Assignee the inventions and the Patent Applications, Letters Patents that may be granted, and all related rights, including all rights and claims for the past and future infringement thereof, the same to be held and enjoyed by Assignee for his own use and enjoyment and for the use and enjoyment of his successors, assigns, or other legal representatives, to the end of the term or terms for which the Letters Patents may be granted or reissued, as fully and entirely as the same would have been held and enjoyed by Assignor, if the assignment had not been made, together with all claims for damages by reason of past infringement of the Letters Patents, with the right to sue for and collect the same for his own use and for the use of his successors, assigns, or other legal representatives. Further, Assignor assigns to Assignee all Assignor's right, title and interest in and to any other patent, patent pending, invention, or patentable asset of Assignor that has previously been assigned to or is owned by Assignor.

IN WITNESS WHEREOF, the parties have executed this Assignment on the \_\_\_\_\_ day of _____, 2003.

**MOTOROLA, INC**.

By:_____

Name:_____

Title:_____

## ASSIGNMENT OF PATENTS

THIS ASSIGNMENT is made on the ____ day of _____, 2003, by **Motorola, Inc.**, a Delaware corporation ("Assignor") 1303 East Algonquin Road, Schaumburg, Illinois 60196 to **MemoryLink Corp.**, a Wisconsin corporation ("Assignee") 36 Jewelers Park Drive, Suite 200, Neenah, Wisconsin 54957.

## RECITALS

1.    Assignor owns Letters Patents of the United States for certain new and useful improvements concerning the subjects listed below, which Letters Patents are numbered as shown below:

| Patent No. | Issue Date | Title |
|---|---|---|
| 6,522,352B1 | February 18, 2003 | Self-Contained Wireless Camera Device, Wireless Camera System and Method |

(collectively, "Letters Patents"). Assignor is now the sole and exclusive owner of the Letters Patents and of all rights in the same.

2.    Assignee is desirous of acquiring the entire right, title, and interest in the Letters Patents.

## ASSIGNMENT

3.    NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is acknowledged, Assignor assigns to Assignee the inventions and the Letters Patents, and any reissues of the Letters Patents, and all related rights, including all rights and claims for the past and future infringement thereof, the same to be held and enjoyed by Assignee for his own use and enjoyment and for the use and enjoyment of his successors, assigns, or other legal representatives, to the end of the term or terms for which the Letters Patents are or may be granted or reissued, as fully and entirely as the same would have been held and enjoyed by Assignor, if the assignment had not been made, together with all claims for damages by reason of past infringement of the Letters Patents, with the right to sue for and collect the same for his own use and for the use of his successors, assigns, or other legal representatives. Further, Assignor assigns to Assignee all Assignor's right, title and interest in and to any other patent, patent pending, invention, or patentable asset of Assignor that has previously been assigned to or is owned by Assignor.

IN WITNESS WHEREOF, the parties have executed this Assignment on the _____ day of _____, 2003.

**MOTOROLA, INC.**

By:_____

Name:_____

Title:_____



**MOTOROLA**
*intelligence everywhere*

Intellectual Property Department
Patents, Trademarks and Licensing

August 1, 2003

*Via facsimile/Confirmation by mail*

Jon O. Nelson
Banner & Witcoff, Ltd.
10 S. Wacker Dr.
Chicago, IL 60606-7407

> Re:    BW00030 - Strandwitz
>        Your Ref. 04482.00028 and 04482.00016
>        U.S. Patent: 6,522,352

Hello Jon,

I received your assignment papers. I'm sorry if you misunderstood our previous communication, but we are not willing to relinquish our rights in the above patent to MemoryLink. To reiterate, although we may have relinquished our first Right To Take Up Prosecution of a divisional application, letting that responsibility and cost fall to MemoryLink in accordance with our Agreement, we do not relinquish title thereto. Further, we expect to retain our jointly held title, on behalf of Motorola and MemoryLink, for the above patent and to any subsequent patent(s) issued due to the further prosecution by MemoryLink.

Regards,
MOTOROLA, INC.

By: _____
Brian M. Mancini, Attorney
Telephone: (847) 576-3992

BMM/tts
Motorola, Inc., Corporate Offices
1303 E. Algonquin Rd., Schaumburg, Illinois 60196
Fax: (847) 576-3750 Telephone: (847) 538-2725

1

EXHIBIT
19

 **MOTOROLA**

*Intellectual Property Department*
*Patents, Trademarks and Licensing*

## FAX COVER SHEET

DATE: _____November 5, 2003_____

TO: _____Jon Huard_____

(Addressee's Name)                  (Fax Number)

FROM: _____Brian Mancini_____      847-576-3992

(Extension)

Total number of page(s) ____3____ (including this page)

Re: Your file 04482.00028 and 4482.00016
   Strandwitz divisional of patent US 6,522,352

Hi Jon,

Per your letter of 9/18/2002, we set out to see if we can find a signed agreement for patent rights between Motorola and MemoryLink. We did come up with a signed MOU (attached), but we're still looking for the specific patent agreement. One thing I did find out is that Tom Freeburg would have been involved with this agreement as he was worked for Motorola at the time, but now works for MemoryLink. Maybe he kept a signed copy?

Regards,
Brian Mancini

NOTICE: This facsimile transmission may contain information that is confidential, privileged or exempt from disclosure under applicable law. It is intended only for the person(s) to whom it is addressed. Unauthorized use, disclosure, copying or distribution may expose you to legal liability. If you have received this transmission in error, please immediately notify us by telephone (collect) to arrange for return of the documents received and any copies made. Thank you.

*Intellectual Property Department*
*1303 E. Algonquin Rd., Schaumburg, IL 60196*
*Phone (847) 576-2725 • Fax (847) 576-3750*

04482/1

EXHIBIT
20

**MEMORYlink**
Wireless Broadband Innovations

36 Jewelers Park Drive, Suite 200
Neenah, Wisconsin 54956

Phone: 920-725-7535
Fax: 920-725-6735

October 15, 2007

Dear Mr. Roesslein:

This Letter of Intent summarizes the commitment of Motorola Inc., 1303 East Algonquin Road, Schaumburg, Illinois 60196 and Memorylink Corp., 36 Jewelers Park Drive, Suite 200, Neenah, Wisconsin 54956 to enter into a definitive agreement for the primary purpose of exploiting U.S. Patent No. 6,522,352 and all patents claiming priority therefrom (the "Agreement"). This Letter of Intent is subject to the following conditions:

BACKGROUND.

A.    In late 1997 and early 1998, Memorylink had several meetings with Motorola in which Memorylink presented technology concepts and application areas relative to transmitting video over wireless networks.

B.    In January 1998, a Memorandum of Understanding related to this work was executed by Motorola and Memorylink.

C.    After Memorylink successfully developed a camera-to-computer wireless real-time video link, and as a camera-to-camera wireless real time video link was being developed, it was agreed that the parties would file a joint patent application relative to the concepts and would continue to work together to further develop the concepts and the supporting core technologies. The camera-to-camera wireless real-time video link was demonstrated to Motorola on February 25, 1998.

D.    On June 22, 1998, U.S. Patent Application Serial No. 09/102,457 titled, "Self Contained Wireless Camera Device, Wireless Camera System and Method" was filed; this application subsequently issued as U.S. Patent No. 6,522,352. The patent was applied for based on a Memorylink document entitled "Wireless Multimedia Core Technology Overview".

E.    In later 1998, the Motorola Advanced Radio Lab, with whom Memorylink had been working, disbanded, and Motorola ceased work on the joint project. Memorylink continued working on the project. In order for Memorylink to continue to pursue the product possibilities, it became necessary for Memorylink to move forward on its own, including developing a radio which could support the application of the concepts.

F.    In mid 1999, Memorylink was contacted by Motorola's Global Software Group relative to using its wireless technology for rural development products.

EXHIBIT

2.1

Draft

G.     In late 1999, an agreement was executed between Memorylink and Motorola under which Memorylink would develop wireless data field nodes for agricultural purposes using Memorylink's newly developed radio.  Memorylink subsequently developed and delivered a large number of nodes to Motorola for field trials.

H.     In early 2000, a meeting was held with the Global Software Group to discuss telemedicine and distance learning applications.  As a result of that meeting, a document entitled "Application of PVN in Motorola Distance Applications" was created, and Memorylink demonstrated its Personal Video Network system at Motorola's Symposium on Integrated Rural Development.

I.     In early 2000, Motorola reformed the Advanced Radio Lab under the name of the Broadband Wireless Technology Center to develop the "Canopy" product, which had previously been known as the "WHISP" product.  Subsequently, Memorylink demonstrated to Motorola its progress with video technology during the time the group had been disbanded, including its radio technology.

J.     In 2001, Memorylink and Motorola began joint product development discussions, leading to two Memorandums of Understanding in August 2001: one related to evaluating joint product/business opportunities relative to video; the other related to combining Memorylink's 5 GHz radio chipset with Motorola's discrete radio.  On the basis of these Memorandums of Understanding, Memorylink ceased development of its radio and its radio chipset.

K.     At Motorola's request, Memorylink attended the January 2002 Consumer Electronics Show to jointly present multimedia applications using Memorylink's technology.

L.     At Motorola's request, Memorylink attended a security trade show in April 2002 to jointly present security applications using Memorylink's technology.

M.     In June 2002, a joint effort commenced to combine Memorylink's video technology and Motorola's radio technology to create a product development platform from which specific products could be developed.  This was called the MotoLink circuit board.  Memorylink had the board built with its video technology integrated onto the board and then submitted the board to Motorola to integrate certain elements of the Canopy radio onto it.

N.     At Motorola's request, Memorylink attended, demonstrated, and presented its video technology at the Motorola Homeland Security Technology Summit in July 2002.  A month later, Memorylink received a letter stating that Memorylink had been selected as a technology partner relative to homeland security; however, after numerous attempts by Memorylink to follow through nothing resulted.

O.     In December 2002, Memorylink wrote a letter to Motorola summarizing the current programs underway pursuant to the two Memorandums of Understanding..

Draft

P.      In January 2003, a fourth Memorandum of Understanding was entered into relative to jointly developing a multi-band radio utilizing Memorylink's radio chipset. Several meetings preceded this Memorandum of Understanding in which various concepts and approaches were presented and discussed.

Q.      On January 27, 2003, Memorylink filed a divisional patent application, U.S. Patent Application Serial No. 10/351,906. Motorola declined to participate in this filing, at which time Motorola stated that Memorylink could have exclusive ownership of any new claims allowed.

R.      In February, 2003, a Motorola press release stated that current and future Canopy systems intended to feature Memorylink's wireless video capabilities and advanced radio systems.

S.      On February 18, 2003, U.S. Patent Application Serial No. 09/102,457 issued as U.S. Patent No. 6,522,352. After U.S. Patent No. 6,522,352 issued Motorola informed Memorylink that it desired to retain ownership interest in any new claims allowed pursuant to the divisional patent filing.

T.      In April 2003, a Strategic Alliance Agreement was under review by the parties relating to joint product development and licensing.

U.      On April 30, 2003, during a meeting at Motorola in Chicago, Memorylink was informed that Motorola was no longer interested in pursuing any video applications and work on the Strategic Alliance Agreement ceased. Work by Motorola on the MotoLink board also ceased. Also, shortly thereafter, activity ceased relative to using some of Memorylink's chipset.

V.      Subsequent to the above events, Memorylink has continued to develop wireless products, all of which interface with the Canopy radio system. Certain of these products have been shown by Motorola at various trade shows on numerous occasions to highlight the capability of the Canopy system. In addition, over the past few years Memorylink has done engineering work for Motorola, none of it involving video.

TERMS AND CONDITIONS

1.      Assignment. Motorola will assign to Memorylink and to its successors, legal representatives, and assigns any and all of Motorola's right, title, and interests throughout the world in and to the invention and improvements described in U.S. Patent Application Serial No. 09/102,457 titled, "Self Contained Wireless Camera Device, Wireless Camera System and Method", together with the patent rights and rights of protection to the invention or improvements throughout the world, including any patent rights which may result or claim priority from U.S. Patent Application Serial No. 09/102,457, and in and to any and all divisional, continuation, reissue, reexamination, renewal, extension, substitution and confirmation applications, and patents granted thereon, including but not necessarily limited to U.S. Patent No. 6,522,352 and U.S. Patent Application Serial No. 10/351,906 (the "Patents").

Draft

    2.    <u>License Back</u>.  Memorylink will grant back to Motorola a non-exclusive, royalty-free, world-wide license to practice under the Patents; Motorola shall not have the right to sublicense the Patents without the prior express written permission of Memorylink, which permission can be denied in Memorylink's sole discretion.

    3.    <u>Licensing Program</u>.  Memorylink shall use reasonable commercial efforts consistent with its management of the Memorylink business as a whole to license the Patents (the "Licensing Program").  Motorola will provide to Memorylink a list of customers of Motorola to be excluded from the Licensing Program (the "Motorola Customers").  In addition, Motorola shall provide to Memorylink a schedule that sets forth any companies with which Motorola has an existing agreement that could restrict the enforcement of the Patents, together with an identification of when such agreements expire and when the Patents can be enforced against such companies.

    4.    <u>Consideration</u>.  Memorylink shall pay to Motorola forty percent (40%) of any and all royalty income received from licensees, including without limitation, up-front payments and royalty fees, subject to the following:

        a.    All costs and fees Memorylink incurs in the Licensing Program shall be fully creditable against Memorylink's payment obligations to Motorola.

        b.    All costs and fees Memorylink incurs in any actions to enforce the Patents shall be fully creditable against Memorylink's payment obligations to Motorola.

        c.    All costs incurred by Memorylink in the preparation, filing, prosecution, and maintenance of all Patents shall be fully creditable against Memorylink's payment obligations to Motorola.

    5.    <u>Patent Prosecution</u>.  Memorylink shall be responsible for the preparation, filing, prosecution, and maintenance of all Patents.  Subject to Paragraph 4.c. above, Memorylink shall be responsible for all costs incurred for the preparation, filing, prosecution, and maintenance of the Patents.

    6.    <u>Confidentiality</u>.  The parties agree to maintain the terms of this Letter of Intent confidential; provided, however, each party has the right to use advisors and consultants in its sole discretion as long as such advisors and consultants execute agreements with confidentiality obligations at least at restrictive as set forth herein.  This confidentiality obligation shall extend for a period of one (1) year from the date of this Letter of Intent.  This confidentiality obligation shall not apply to information which, at the time of disclosure, is reasonably available to the public, becomes reasonably available to the public through no fault of the receiving party, is possessed by the receiving party prior to receipt of the information from the disclosing party, becomes known to the receiving party from a third party who has no obligation of confidentiality to the disclosing party or is developed by the receiving party independently of the information received from the disclosing party.  [Except as otherwise required by applicable law, neither party shall issue any press release or make

Draft

any other public statement relating to or arising out of this Letter of Intent or the matters contained herein without the other party's prior written approval.]

7.  <u>Costs and Expenses</u>.  Except as expressly agreed to in writing, each party will be responsible for its own expenses relating to the transaction and, if an Agreement is not concluded, neither party shall be liable to the other for any costs, loss, damage nor injury resulting from or associated with the failure of the parties to enter into a definitive Agreement.

8.  <u>Assignment</u>.  This Letter of Intent shall not be assignable by a party without the other parties' prior written consent.

9.  <u>Governing Law</u>.  This Letter of Intent is to be interpreted in accordance with the laws of the State of Illinois.  The sole forum to resolve any disputes arising hereunder shall be a court of competent jurisdiction located in Cook County, Illinois.

10.  <u>Time Limit</u>.  This Letter of Intent is a summary of the good faith intentions of the parties to consummate a transaction embodied in the Agreement on the basic terms summarized above.  This Letter of Intent obligates the parties hereto to use their reasonable, good faith efforts to enter into a business relationship for the purpose of exploiting the Patents.  If a definitive Agreement is not reached by December 31, 2007, except for the confidentiality and cost and expenses provisions, this Letter of Intent will expire.

If the foregoing is acceptable, please so indicate by signing, dating, and returning to me on or before _____, the enclosed duplicate original of this Letter of Intent in the space provided below.  Upon return of this executed copy Memorylink will prepare a draft definitive Agreement for your review.  If not returned by such time, then the terms contained in this Letter of Intent shall be automatically withdrawn.

Sincerely,

Memorylink Corp.                                     Agreed and Accepted by:
                                                     Motorola Inc.


By:_____      By:_____

Name:_____      Name:_____

Title:_____     Title:_____