# EXHIBIT B

Exhibit B

Index to Unpublished Cases

*BPI Energy, Inc. v. IEC, LLC*, 2008 WL 4450301, (S.D. Ill.) Sept. 30, 2008

*Ferrari Fin. Servs. v. IIA, LLC*, No. 10 C 1200, 2010 WL 2836686, (N.D. Ill.) July 19, 2010

*Pampered Chef v. Alexanian*, 2010 WL 3602376, (N.D. Ill.) Sept. 14, 2010

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2008 WL 4450301 (S.D.Ill.)
(Cite as: 2008 WL 4450301 (S.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. Illinois.
BPI ENERGY, INC., et al., Plaintiffs,
v.
IEC (MONTGOMERY), LLC, et al., Defendants.

Civil No. 07-186-DRH.
Sept. 30, 2008.

James L. Defeo, Kip T. Bollin, Jennifer Mingus Mountcastle, Nicole K. Wilson, Stephen D. Williger, Thompson, Hine et al., Cleveland, OH, James L. Van Winkle, Van Winkle & Van Winkle, McLeansboro, IL, for Plaintiffs.

J. Gregory Copeland, Paul R. Elliott, Jennifer A. Powis, Tracy N. Leroy, Baker Botts, LLP, Houston, TX, Scott C. Helmholz, Brown, Hay et al., Springfield, IL, William A. Davis, Starnes Atchison LLP, Birmingham, AL, for Defendants.

*ORDER*
PROUD, United States Magistrate Judge.

*1 Plaintiff BPI Energy moved the Court to compel the defendants to produce documents being withheld based on attorney-client privilege, where the only attorney involved is Bruce Webster, who is both an attorney and president of the IEC "LLC" defendants, so the Court can determine the applicability of the asserted attorney-client privilege. **(Doc. 77)**. By order dated September 11, 2008, the defendants were directed to produce certain documents listed in their privilege log for in camera inspection. **(Doc. 128)**. The Court has now reviewed those documents.

From plaintiff's perspective, the defendants are inappropriately cloaking every document that passed through Bruce Webster with the attorney-client privilege. Defendants generally contend that the fact that Bruce Webster is general counsel for defendant Drummond Company, and simultaneously the sole corporate officer and general counsel for defendant IEC and all of the other "LLC" defendants, does not destroy the confidential nature of his legal communications with and among the defendant corporations. **(Doc. 86)**. Defendants assert that in every instance where attorney-client privilege is asserted relative to a document that passed by way of Bruce Webster, Webster was acting in his capacity as general counsel.

In *U.S. v. Evans,* 113 F.3d 1457 (7th Cir.1997), the Court of Appeals for the Seventh Circuit indicated that it has long adhered to articulation of the attorney-client privilege set forth by well-known legal scholar Dean Wigmore:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Id.* at 1461 (citing 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev.1961)).

The purpose of the [attorney-client] privilege is to encourage full disclosure and to facilitate open communication between attorneys and their clients. However, because "the privilege has the effect of withholding relevant information," courts construe the privilege to apply only where necessary to achieve its purpose. The mere assertion of a privilege is not enough; instead, a party that seeks to invoke the attorney-client privilege has the burden of establishing all of its essential elements.

*U.S. v. BDO Seidman,* **337 F.3d 802, 810-811 (7th Cir.2003) (internal citations omitted).**

Among the essential elements of the attorney-cli-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4450301 (S.D.Ill.)
(Cite as: 2008 WL 4450301 (S.D.Ill.))

ent privilege are the requirements that the communication be made to the attorney in confidence, and that the confidences constitute information that is not intended to be disclosed by the attorney." *Id.* at **811 (internal citations omitted)**. "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. U.S.,* **449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)**. " '[T]he privilege protects only the client's confidences, not things which, at the time, are not intended to be held in the breast of the lawyer....' " *U.S. v. Weger,* **709 F.2d 1151, 1154 (7th Cir.1983) (quoting *Clanton v. U.S.,* 488 F.2d 1069, 1071 (5th Cir.1974))**.

*\*2* As generally noted above, Bruce Webster acts as general counsel for defendant Drummond. Webster is the sole officer for defendants Vandalia Energy Company and IEC, the parent company of the LLC defendants. It is undisputed that, as the sole officer of those companies, Webster also acts as general counsel. Thus, it can be said that at times Webster undoubtedly wore "two hats"-sometimes simultaneously for multiple businesses. Under the "common interest" doctrine, an attorney can share information between multiple clients with a shared legal interest (regardless of whether there is actual litigation) without waiving the attorney-client privilege. *See U.S. v. Evans,* **113 F.3d 1457, 1467 (7th Cir.1997);** *In re Sulfuric Acid Antitrust Litigation,* **235 F.R.D. 407, 416 (N.D.Ill.2006) (offering an expansive discussion of the doctrine)**. However, the nature of the communication must be closely scrutinized to separate Webster's business communications from his legal communications, as the attorney-client privilege is narrow.

In *Kerr v. U.S. District Court for the Northern District of California,* 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976), the Supreme Court recognized the worthiness and efficiency of in camera review in determining such disputes. Accordingly, the Court has now examined the documents:

Log entries numbered 3, 9, 13-21, 23, 27, 30, 41, 42, 53, 61, 744-45, 1137-54, 1161-66, 1173-78, 1189-96, 1213-18, 1228-33, 1353, 1355, 1374-75, 1377, 1383-84, 1387, 1411, 1426-39, 1538, 1552, 1557, 1891-92, 2006, 2010, 2032, 2083, 2090-91, 2097, 2103, 2111, 2113-14, 2116, 2121-22, 2132-34, 2173, 2177, 2179-81 and from Defendants' Supplemental Privilege Log, (Ex. G), page 1, entries 6, 8-9, 24-26; page 2, entries 1-5, 7, 9, 20; page 3, entries 15-16; page 4, entries 9-10, 13-16, 26; page 5, entry 26; page 7, entries 3, 20-28; and page 8, entries 5, 8-15.

*All* of the aforementioned documents, save part of one, are protected from discovery under the attorney-client privilege (and in some instances under the work product doctrine). Document "IECM-Priv 0530" (which actually contains pages 530-535), contains a copy of an executed and notarized lease agreement between IEC (Montgomery), LLC, and BPI Energy, INC. The executed agreement, pages 530-533, by itself, is clearly not protected. However, the remaining pages of that document, pages 534-535, do warrant protection. Arguably, the Court could have extended protection to the document as a whole, but the Court is mindful that privilege is to be construed narrowly.

**IT IS THEREFORE ORDERED** that on or before **October 7, 2008,** the defendants shall produce to the plaintiffs Document "IECM-Priv 0530-0533." All other documents produced for in camera inspection are deemed protected from production and need not be produced to the plaintiffs.

**IT IS SO ORDERED.**

S.D.Ill.,2008.
BPI Energy, Inc. v. IEC (Montgomery), LLC
Not Reported in F.Supp.2d, 2008 WL 4450301 (S.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2010 WL 2836686 (N.D.Ill.)
(Cite as: 2010 WL 2836686 (N.D.Ill.))

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. Illinois,
Eastern Division.
FERRARI FINANCIAL SERVICES, INC., a Delaware corporation, Plaintiff,
v.
IIA, LLC a/k/a International Intelligence Agency, LLC, an Illinois limited liability company; Bonita Enterprises, LLC, an Alaska limited liability company; and Gerald Michael Abraham, Defendants.

No. 10 C 1200.
July 19, 2010.

Richard Allen Saldinger, Steven Bennett Towbin, Marylynne Kristy Schwartz, Shaw Gussis Fishman Glantz Wolfson & Towbin LLC, Chicago, IL, for Plaintiff.

Peter Michael Spingola, Sara Lillian Siegall, Chapman & Spingola, LLP, Michael J. Boxerman, Marcus Boxerman & Chatman LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**
GEORGE W. LINDBERG, Senior District Judge.

*1 On February 25, 2010, plaintiff Ferrari Financial Services, Inc. filed a motion seeking replevin of a Ferrari 612 Scaglietti ("Ferrari"). On March 12, 2010, the court granted plaintiff's motion for replevin and ordered defendant International Intelligence Agency, LLC ("IIA") to deliver the Ferrari to plaintiff. The court denied IIA's motion for reconsideration on March 30, 2010. On May 26, 2010, the court granted plaintiff's motion for rule to show cause as to why IIA should not be held in contempt of court for failing to return the Ferrari to plaintiff. Before the court is IIA's motion for reconsideration of the court's March 12, March 30, and May 26 orders ("orders"). For the reasons stated below, IIA's motion for reconsideration is granted in part and denied in part.

In support of its motion for reconsideration, IIA raises both evidentiary and procedural issues. IIA argues that two pieces of additional evidence warrant reconsideration of the court's March 30 order denying IIA's first motion for reconsideration. First, IIA submits an affidavit from Kevin Moore ("Moore") attesting that Scott Jackson released the Ferrari to Moore's representative sometime in the middle of 2009. Second, IIA presents a detailed account of its efforts to locate the Ferrari from March 12 onward. In its procedural argument, IIA asserts that the court's March 12 order for replevin should be reconsidered because it does not comport with the requirements of the Illinois Replevin Act. Relatedly, IIA asks the court to reconsider its May 26 order instructing IIA to show cause as to why it should not be held in contempt for disobeying the March 12 order.

Although the parties disagree somewhat over the applicable standard in this case, this court has the "inherent power to modify or rescind interlocutory orders prior to final judgment." *Peterson v. Lindner,* 765 F.2d 698, 704 (7th Cir.1985) (citation omitted). Reconsideration of interlocutory orders is appropriate "where the court has misunderstood a party, the court has made a decision outside the adversarial issues presented to the court by the parties, the court has made an error of apprehension (not of reasoning), a significant change in the law has occurred, or significant new facts have been discovered." *Dugan v. City of W. Chi.,* 2009 WL 742683, 1 (N.D.Ill.) (citation omitted).

IIA's first evidentiary argument that Moore's affidavit constitutes a basis for the court's reconsideration of its orders is unpersuasive. Even accepting as credible IIA's assertion that it was only recently able to locate Moore (despite previously managing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2836686 (N.D.Ill.)
(Cite as: 2010 WL 2836686 (N.D.Ill.))

Page 2

to find Moore in 2009 to collect the Ferrari), the court does not find Moore's affidavit credible. In his affidavit, Moore does not explain why he believes his "company" lawfully received possession of the Ferrari, nor does he identify the "representative" sent to collect the Ferrari or give any indication as to the Ferrari's current whereabouts. Moore's story is essentially a reformulation of Scott Jackson's earlier testimony, testimony which the court found was not credible. If Moore's affidavit indeed constitutes a "new fact," as IIA argues, the court does not find this new fact significant enough to warrant reconsideration of its March 30 order.

*2 In its second evidentiary argument, IIA maintains that its detailed documentation of its investigative efforts subsequent to the court's order for replevin warrants reconsideration. The court has dismissed this argument before, however. In response to IIA's first motion for reconsideration, the court held that IIA's post-order attempts at locating the Ferrari did not constitute a basis for reconsideration. Again, the court finds that documentation of IIA's search for the Ferrari after the court issued an order for replevin, detailed though it may be, is not a sufficient basis to reconsider any of the court's orders because it does not constitute a "significant new fact" or otherwise comport with the standard explained in *Dugan*. The court denies IIA's motion to reconsider its March 30 order because neither of IIA's evidentiary arguments constitutes a basis for reconsideration and the court declines to disturb its factual finding that IIA retains possession, custody, and/or control of the Ferrari.

In its procedural argument, IIA takes issue with the form of the March 12 order for replevin. Specifically, IIA argues that the court erred in ordering IIA to deliver the Ferrari directly to plaintiff. Under Illinois law, a court may not order a defendant to deliver property subject to an order for replevin directly to a plaintiff. *Jim's Furniture Mart, Inc. v. Harris,* 42 Ill.App.3d 488, 1 Ill.Dec. 175, 356 N.E.2d 175, 176 (Ill.App. 4th Dist.1976); 735 Ill. Comp. Stat. § 5/19-109 (2010). Accordingly, IIA's argument concerning the form of the order for replevin, which directed IIA to return the Ferrari to plaintiff, is meritorious. Plaintiff suggests that the court remedy this error with a *nunc pro tunc* order amending the order for replevin; however, a *nunc pro tunc* order "is limited to current correction of the record to speak an earlier truth: an order made earlier but not formally entered." *Transamerica Ins. Co. v. South,* 975 F.2d 321, 326 (7th Cir.1992) (citation omitted). Therefore, a *nunc pro tunc* order is not appropriate in this case.

Accordingly, the court will vacate its March 12 order and enter a new order for replevin, which will direct the U.S. Marshal as an "other officer" to collect the Ferrari. *See* 735 Ill. Comp. Stat. § 5/19-109 ("The order for replevin shall require the sheriff, or other officer to whom it is directed to take the property ...."). In accordance with the Illinois Replevin Act, the new order for replevin will also require plaintiff to post a bond of double the value of the property to be replevied. *See id.* at § 5/19-112. For purposes of this bond only, the court accepts IIA's proffered figure of $119,000.00 as the value of the Ferrari.

Finally, IIA's request that the court reconsider its May 26 order requiring IIA to show cause as to why it should not be held in contempt for disobeying the March 12 order is granted. The court vacates that order on the basis that the contempt matter is mooted by the court's ruling on the March 12, 2010, order for replevin

*3 ORDERED: Defendant International Intelligence Agency, LLC's ("IIA") motion for reconsideration [77] is granted in part and denied in part. The motion to reconsider the March 12, 2010, order of replevin [19] is granted and the order of replevin is vacated. Counsel for plaintiff Ferrari Financial Services, Inc. shall prepare and submit to the court a draft order for replevin. The court denies the motion to reconsider its March 30, 2010, order [31] denying IIA's first motion for reconsideration. The court grants the motion to reconsider its May 26,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2836686 (N.D.Ill.)
**(Cite as: 2010 WL 2836686 (N.D.Ill.))**

Page 3

2010, order [63] requiring IIA to show cause and vacates that order on the basis that the contempt proceedings are now moot. Plaintiff's motion to compel [92] is denied as moot.

N.D.Ill.,2010.
Ferrari Financial Services, Inc. v. IIA, LLC
Slip Copy, 2010 WL 2836686 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
**(Cite as: 2010 WL 3602376 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
The PAMPERED CHEF, Plaintiff,
v.
Sandy ALEXANIAN, Don Funt, Christine Laurich, Lori Mitchell, Valerie Newton, and Shannon Pell, Defendants.

No. 10 C 1399.
Sept. 14, 2010.

**Background:** Direct seller of kitchen tools filed action against its former sales representatives alleging breach of non-solicitation and confidentiality provisions in their employment agreements and against employees of new employer alleging tortious interference with its contracts with its sales force. Plaintiff sought order compelling third-party witness to answer certain deposition questions concerning conversations she had in presence of her counsel and defendants' counsel at time that she was preparing for her deposition.

**Holdings:** The District Court, Jeffrey Cole, United States Magistrate Judge, held that:
(1) third-party witness shared valid common interest with defendants and
(2) "chit chat" that third-party witness had with attorney for defendants regarding deposition preparation, in between her actual deposition preparation with her attorney, did not waive whatever attorney-client privilege might have existed as to conversations that third-party had with her attorney.

Motion denied.

West Headnotes

**[1] Privileged Communications and Confidentiality** 311H ☞101

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk101 k. Nature of Privilege. Most Cited Cases

The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law.

**[2] Privileged Communications and Confidentiality** 311H ☞100

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk100 k. In General. Most Cited Cases

Deeply rooted in public policy, and playing a vital role in the administration of justice, the attorney-client privilege remains one of the most carefully guarded privileges and is not readily to be whittled down.

**[3] Privileged Communications and Confidentiality** 311H ☞106

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk106 k. Purpose of Privilege. Most Cited Cases

The central concern of the attorney-client privilege, and its ultimate justification, is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice; without that frankness, sound legal advice is impossible, and without informed advice, the ultimate goal of the attorney-client privilege is unattainable.

**[4] Privileged Communications and Confidentiality** 311H ☞112

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk112 k. Construction. Most Cited Cases

Since the attorney-client privilege makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant information, it is strictly construed and is limited to those instances where it is necessary to achieve its purposes.

**[5] Privileged Communications and Confidentiality 311H €→129**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk128 Professional Character of Employment or Transaction
            311Hk129 k. In General. Most Cited Cases

**Privileged Communications and Confidentiality 311H €→130**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk128 Professional Character of Employment or Transaction
            311Hk130 k. Business Communications. Most Cited Cases

The attorney-client privilege is limited to situations in which the attorney is acting as a legal advisor; therefore, business advice is not protected.

**[6] Privileged Communications and Confidentiality 311H €→132**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk132 k. Communications from Client to Attorney and from Attorney to Client. Most Cited Cases

Although the attorney-client privilege is deemed generally to apply only to communications by the client, statements made by the lawyer to the client will be protected where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client.

**[7] Privileged Communications and Confidentiality 311H €→102**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk102 k. Elements in General; Definition. Most Cited Cases

The protection of the attorney-client privilege extends to confidential communications made by a client to his lawyer where legal advice of any kind is sought from a professional legal advisor in his capacity as such.

**[8] Privileged Communications and Confidentiality 311H €→168**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk168 k. Waiver of Privilege. Most Cited Cases

Knowing disclosure to a third-party almost invariably surrenders the attorney-client privilege.

**[9] Privileged Communications and Confidentiality 311H €→158**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk157 Communications Through or in Presence or Hearing of Others; Communications with Third Parties
            311Hk158 k. In General. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

As a general rule, statements made to one's attorney in the presence of a third-person are not within the scope of the attorney-client privilege; this is so despite the client's subjective intention to not waive the privilege.

**[10] Privileged Communications and Confidentiality 311H ⬅︎122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

Where a client communicates with his attorney in the presence of a third person who shares a common legal interest, the attorney-client privilege is not waived as to the information that is exchanged; parties may assert a common interest where they have an identical, not merely similar, legal interest in the subject matter of a communication and the communication is made in the course of furthering the ongoing, common enterprise.

**[11] Privileged Communications and Confidentiality 311H ⬅︎122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

Although occasionally termed a privilege itself, the common interest rule is an extension of the attorney-client privilege to otherwise non-confidential communications in limited circumstances; the rule protects the free flow of information from client to attorney whenever multiple clients share a common interest about a legal matter.

**[12] Privileged Communications and Confidentiality 311H ⬅︎122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

Under the common interest rule which protects the free flow of information from client to attorney whenever multiple clients share a common interest about a legal matter, the common interest must relate to a legal matter, not one that is solely commercial, though it need not relate to litigation per se.

**[13] Privileged Communications and Confidentiality 311H ⬅︎122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

The common interest rule which protects the free flow of information from client to attorney whenever multiple clients share a common interest about a legal matter applies broadly to civil litigation and includes situations where clients share a common legal interest but are represented by separate attorneys; the doctrine encompasses communications made in the presence of third-parties where the parties are coordinating a defense strategy or pooling information for a common legal purpose.

**[14] Privileged Communications and Confidentiality 311H ⬅︎129**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk128 Professional Character of Employment or Transaction

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

Page 4

311Hk129 k. In General. Most Cited Cases

The attorney-client privilege does not require that the interest be in litigation or that litigation be actual or imminent for communications to be privileged.

[15] Privileged Communications and Confidentiality 311H 122

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

The main purpose of common interest rule is to preserve the confidentiality of communications ordinarily outside the scope of the attorney-client privilege, where a common legal interest or defense strategy has been decided upon and undertaken by the parties and their respective counsel.

[16] Privileged Communications and Confidentiality 311H 122

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

Third-party witness shared valid common interest with defendant former sales representatives of direct seller of kitchen tools, and defendant employees of new employer, as required for common interest rule to apply to communications between third-party, her attorney, and attorney for those defendants, as exception to waiver of attorney-client privilege, in action brought by direct seller alleging breach of non-solicitation agreements and tortious interference under Illinois law, respectively, where third-party, new employer, and defendants had common interest agreement, third-party worked for new employer, and third-party had same contract with direct seller that former sales representatives did.

[17] Privileged Communications and Confidentiality 311H 122

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common Interest Doctrine; Joint Clients or Joint Defense. Most Cited Cases

Attorney-client communications under the common interest rule are not privileged in a subsequent controversy between the original parties to a common interest agreement.

[18] Privileged Communications and Confidentiality 311H 168

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk168 k. Waiver of Privilege. Most Cited Cases

"Chit chat" that third-party witness had with attorney for defendants regarding deposition preparation, in between her actual deposition preparation with her attorney, did not waive whatever attorney-client privilege might have existed as to conversations that third-party had with her attorney, since testimony about information that was not privileged could not waive privilege as to all that was privileged.

[19] Privileged Communications and Confidentiality 311H 168

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

311Hk168 k. Waiver of Privilege. Most Cited Cases

Waiver of the attorney-client privilege cannot stem from an unprivileged communication.

Dean A. Dickie, James William McConkey, Katharine N. Dunn, Kathleen Elizabeth Koppenhoefer, Ryan Christopher Williams, Miller, Canfield, Paddock and Stone, PLC, Chicago, IL, for Plaintiff.

Henry M. Baskerville, Jonathan M. Cyrluk, Stelter & Duffy, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER
JEFFREY COLE, United States Magistrate Judge.
### INTRODUCTION
*1 One of the defendants, Sandy Alexanian, used to work for the plaintiff as a sales representative. As part of her employment, she signed an agreement that precluded her from recruiting plaintiff's sales people to work for a competitor for two years after she left plaintiff. The agreement also contained a confidentiality provision regarding trade secrets. Ms. Alexanian left the plaintiff in February 2010, but had discussions with her new employer, Jewels by Park Lane, as early as October 2009. According to plaintiff, she began recruiting plaintiff's sales representatives for Park Lane before she resigned her position with plaintiff. Plaintiff also claims she misappropriated its trade secrets.

Thereafter, defendants Donald Funt, Christine Laurich, and Valerie Newton followed Ms. Alexanian to Park Lane. Plaintiff has sued them for breaching the non-solicitation and confidentiality provisions in their employment agreements. It has added Lori Mitchell and Shannon Pell, Park Lane employees, who, it claims, tortiously interfered with its contracts with its sales force.

The Pampered Chef seeks an order compelling Joyce Salela, a third-party witness, to answer certain deposition questions concerning conversations she had in the presence of her counsel, Dan Feeney, and the defendants' counsel, Jonathan Cyrluk, at the time she was preparing for her deposition in this case. The central thesis of the motion to compel is that the discussions between Ms. Salela, Mr. Feeney, and Mr. Cyrluk are discoverable because the confidential protections afforded by the attorney-client privilege are waived when an otherwise-privileged conversation takes place in the presence of a third-party. It is Ms. Salela's contention that the privilege was not waived because she and the defendants had a "common legal interest" agreement, and thus, the protections of the attorney-client privilege extended to her pre-deposition discussions with Mr. Feeney and Mr. Cyrluk. The plaintiff's ancillary argument is that Ms. Salela's testimony regarding some "chit chat" she had with Mr. Cyrluk waived whatever privilege might have existed as to all other conversations. Although not formulated this way, the argument in essence is that testimony about information that is not privileged waives the privilege as to all that is. To borrow one of Justice Frankfurter's *bon mots,* "[t]his is a horse soon curried." *Olberding v. Illinois Cent. R. Co.,* 346 U.S. 338, 340, 74 S.Ct. 83, 98 L.Ed. 39 (1953).

### FACTUAL BACKGROUND
#### A.
The Pampered Chef is a direct seller of essential kitchen tools whose products are sold primarily through in-home cooking demonstrations known as "Cooking Shows." (Complaint ¶ 12). At each of the shows, products are demonstrated and sold by a member of The Pampered Chef's sales team, which is comprised of more than 60,000 independent consultants working mainly on a commission and incentives basis. (*Id.*). Consultants and attendees prepare and serve dishes showcasing The Pampered Chef's products, as well as its proprietary recipes. This kind of sales strategy is alleged to be highly effective, often inspiring customers and hosts to become Pampered Chef consultants. The system's success is said to depend on repeat business, grassroots marketing, and the strength of the consultants' relationships with the company's customer base. Consequently, the company values as protectable assets and trade secrets the identities and contact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

information of its customers, as well as its sales field members. (*Id.* at ¶ 13-15).

*2 The Pampered Chef initially brought this suit only against Sandy Alexanian, a former Pampered Chef sales director, who left the company in 2010 to join Jewels by Park Lane, a direct seller of jewelry retailer, whose products are sold primarily through in-home jewelry shows. (Salela Response to Motion to Compel at 2). In its complaint, The Pampered Chef alleged that Ms. Alexanian violated the express terms of her written Independent Sales Director Agreement, in which she had agreed she would not (1) disclose any of The Pampered Chef's confidential, proprietary information and trade secrets for two years; and (2) solicit or recruit any members of The Pampered Chef's sales force to sell products or services for any other company for two years. (Complaint ¶ 1). The complaint accused Ms. Alexanian of misappropriating Pampered Chef trade secrets and breaching her Director Agreement by accessing the contact information of Pampered Chef sales force members, and "attempt[ing] to ... solicit and recruit Pampered Chef consultants to join Park Lane as sales representatives." (*Id.* at ¶ 5, 42).

After filing the complaint, The Pampered Chef's lawyers deposed three other members of Park Lane's sales team-including now-defendants Don Funt and Christine Laurich-who had previously been directors at The Pampered Chef. (Salela Response 2). During those depositions, counsel for the plaintiff asked the witnesses questions regarding the Director Agreements they had signed with Pampered Chef and their own compliance with those agreements. (*Id.*; Salela Response, Ex. C). At one point during Mr. Funt's deposition, his attorney expressed concern that plaintiff's counsel seemed to be framing his questions in an attempt to "somehow build a case against [Mr. Funt]." (Salela Ex. C at 40). Plaintiff's counsel responded that his questioning was "legitimate" and "may well lead to additional relevant evidence not only against Sandy Alexanian but others." (*Id.* at 41). Shortly after their depositions were taken, The Pampered Chef amended its complaint to add Mr. Funt and Ms. Laurich as defendants, accusing them of the same contractual and fiduciary breaches it had asserted against Ms. Alexanian. (Amended Complaint ¶ 70, 89).[FN1]

**B.**

On August 4, 2010, plaintiff's counsel deposed Ms. Salela, who is not a party. (Motion to Compel 1)("Motion"). Like Ms. Alexanian, Mr. Funt, and Ms. Laurich, Ms. Salela had previously been a Pampered Chef director, signed the same Director Agreement, and is currently affiliated with Park Lane. (Salela Response 3). During the questioning, plaintiff's counsel came to learn that Ms. Salela had met with her retained counsel, Mr. Feeney, in preparation for her deposition, and that the defendants' attorney, Mr. Cyrluk, was also present for a portion of that meeting. (Motion 1; Plaintiff's Ex. A at 19-20).[FN2] When Ms. Salela was asked specifically about what had been discussed in that meeting, Mr. Feeney objected on the basis that the question "call[ed] for privileged communications." (Plaintiff's Ex. A at 20).

*3 Plaintiff's counsel expressed his belief that "the privilege was broken by virtue of Mr. Cyrluk being present for the meeting," to which Mr. Feeney responded that Ms. Salela and the defendants had reached a written "joint interest agreement," which protected the communication despite Mr. Cyrluk's presence. Plaintiff's counsel then requested to see the agreement, but Mr. Feeney stated that he did not have a copy with him, and instructed Ms. Salela not to answer the question. (*Id.* at 21-23).

The attorneys continued to debate the privilege issue, and following a short recess, Ms. Salela was again asked questions regarding the conversation she had while in the presence of Mr. Feeney and Mr. Cyrluk. (*Id.* at 25-29). Ms. Salela answered the questions, but she did so in general terms, and without disclosing the specific contents of any communication she had with her attorney or Mr. Cyrluk

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

during the course of her deposition preparation. Her complete description of the conversation with Mr. Cyrluk was as follows: "We were talking about lunch. It was just sort of general not to worry have I been deposed before. I mentioned, you know, my background and different businesses that I was in. It was just kind of more of a general chitchat. I can't think of anything real specific." (Salela Response, Ex. F at 30). She stated that, "[i]t was a very short period of time, twenty minutes, had a sandwich, hi, how are you." (Id. at 31). Ms. Salela's sur-reply explains that she and Mr. Feeney met for purposes of deposition preparation, and the preparation session recessed for lunch when Mr. Cyrluk arrived. (Sur-Reply at 3). During the lunch break, she and Mr. Cyrluk engaged in small-talk over sandwiches, which she described as non-substantive "chitchat." (Id.). The conversation ended when the deposition preparation recommenced, and Mr. Cyrluk observed for several minutes before departing. (Id.).

The day after Ms. Salela's deposition, Mr. Feeney turned over a copy of the common interest agreement to plaintiff's counsel. The parties to the agreement are Jewels by Park Lane, Inc., Sandy Alexanian, Don Funt, Christine Laurich, Lori Mitchell, Valerie Newton, Shannon Pell, Grace Calderon, Joyce Salela, and Sybil Goade. (See Plaintiff's Ex. B). The agreement states in pertinent part:

> [T]he Parties have mutually concluded that their respective interests will be best served by a common and join investigation and defense of their common interests in connection with the Claims, thereby protecting the privileges and other protections that otherwise might arguably be waived in the absence of this Agreement.

(Id. at 2).

The parties intended for the agreement to cover "[a]ny oral communications" between or among any counsel and/or any of the parties to the agreement. (Id. at 4). And although the agreement states that the parties share a common interest presently, it also recognizes that adverse interests may arise in the future:

> *4 Prior to entering into this Agreement, each Party has been fully advised by her, his or its counsel of the possibility that the other Party, or an individual associated therewith, could later become witnesses against that Party or take positions adverse to that Party.
>
> 3
>
> Each Party acknowledges that ... her, his or its counsel has informed her, him or her of the general nature of certain conflicts that might arise. The common interest privileges described herein and recognized by this Agreement, and any other applicable privileges, doctrines and protections from disclosure, shall not be destroyed or impaired ... and in fact are specifically preserved ... if adversarial relationships subsequently arise between the parties.

(Id. at 5).

## ANALYSIS
### A.

[1][2][3] The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law. *Jaffee v. Redmond,* 518 U.S. 1, 11, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996); *Upjohn Co. v. United States* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Deeply rooted in public policy, *In re Ford Motor Co.,* 110 F.3d 954, 966 (3d Cir.1997), and playing a "vital role" in the administration of justice, *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.,* 406 F.3d 867, 878 (7th Cir.2005), it remains one of the most carefully guarded privileges and is not readily to be whittled down. *See Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379(1998).[FN3] The privilege's central concern-and its ultimate justification-is to encourage full and frank communication between attorneys

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and their clients and thereby promote broader public interests in the observance of law and the administration of justice. Without that frankness, sound legal advice is impossible, and without informed advice, the ultimate goal of the attorney-client privilege is unattainable. *Upjohn,* 449 U.S. at 389, 101 S.Ct. 677.

[4] But the privilege, like all testimonial privileges and all exclusionary rules, comes at a price. Since it makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant information, it is strictly construed and is limited to those instances where it is necessary to achieve its purposes. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 185, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39(1976); *Jenkins v. Bartlett,* 487 F.3d 482, 490 (7th Cir.2007); *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983)(scope of privilege should be "strictly confined within the narrowest possible limits").

[5][6][7][8][9] The protection of the privilege extends to *confidential* communications made by a client to his lawyer "[w]here legal advice of any kind is sought ... from a professional legal advisor in his capacity as such." *Rehling v. City of Chicago,* 207 F.3d 1009, 1019 (7th Cir.2000). *See also United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir.1997) (*quoting* 8 John Henry Wigmore, Evidence in Trials at *415 Common Law § 2292 (John T. McNaughton rev. 1961)).[FN4] Thus, "knowing disclosure to a third party almost invariably surrenders the privilege," *Burden-Meeks,* 319 F.3d at 899; *In re Pebsworth,* 705 F.2d 261, 263 (7th Cir.1983), and as a general rule, statements made to one's attorney in the presence of a third person are not within the scope of the attorney-client privilege. *Jenkins,* 487 F.3d at 490; *Evans,* 113 F.3d at 1462. This is so despite the client's subjective intention not to waive the privilege. *Jenkins,* 487 F.3d at 490; 8 Wigmore, Evidence § 2327.

**B.**

*5 [10][11][12] But like all general rules, this one has its exceptions. Where a client communicates with his attorney in the presence of a third person who shares either a common legal interest, the attorney-client privilege is not waived as to the information that is exchanged. *Evans,* 113 F.3d at 1461. Parties may assert a common interest where they have an identical-not merely similar-legal interest in the subject matter of a communication and the communication is made in the course of furthering the ongoing, common enterprise. *United States v. BDO Seidman, LLP,* 492 F.3d 806, 816 (7th Cir.2007). "Although occasionally termed a privilege itself," this common interest rule is really an "exten[sion] [of] the attorney-client privilege to otherwise non-confidential communications in limited circumstances." *BDO Seidman,* 492 F.3d at 815. The rule protects "the free flow of information from client to attorney ... whenever multiple clients share a common interest about a legal matter." *United States v. Schwimmer,* 892 F.2d 237, 243-44 (2nd Cir.1989). The common interest must relate to a legal matter, (not one that is solely commercial), though it need not relate to litigation *per se. In re Sulfuric Acid Antitrust Litigation,* 235 F.R.D. 407, 416-17 (N.D.Ill.2006). The common interest doctrine originally developed in criminal cases, as a "joint-defense privilege," where two or more co-defendants are frequently represented by a single attorney. *In re Grand Jury Subpoenas,* 89-3 and 89-4, *John Doe* 89-129, 902 F.2d 244, 248 (4th Cir.1990); *United States v. McPartlin,* 595 F.2d 1321, 1326 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Keplinger,* 776 F.2d 678, 701 (7th Cir.1985). Recognizing that "[c]ooperation between defendants in such circumstances is often not only in their own best interests but serves to expedite the trial or ... the trial preparation," *McPartlin,* 595 F.2d at 1337, the common interest rule has been extended in a wide range of circumstances, frequently those involving civil co-defendants, companies individually summoned before a grand jury, potential co-parties to prospective litigation, plaintiffs filing separate actions in different states and civil defendants who

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

were sued in separate actions. *In re Grand Jury Subpoenas,* 902 F.2d at 249 (collecting cases).

[13] Today, the doctrine applies broadly to civil litigation and includes situations where clients share a common legal interest but are represented by separate attorneys. *BDO Seidman,* 492 F.3d at 816; *In re Grand Jury Subpoenas,* 902 F.2d at 249; *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 90 (3rd Cir.1992). *Keplinger,* 776 F.2d at 701; *Evans,* 113 F.3d at 1466-67 (noting that the joint defense privilege is more aptly referred to as the common interest doctrine). The doctrine encompasses communications made in the presence of third parties where the parties are coordinating a defense strategy or pooling information for a common legal purpose.

*6 [14][15] Although originally limited in application to co-defendants, the Seventh Circuit permits both potential parties and parties who are not otherwise joined in litigation to assert the "common legal interest" privilege, even where it is not anticipated that the party will be sued in the future. *BDO Seidman,* 492 F.3d at 816, n. 6.[FN5] This view is adopted in the Restatement of The Law Governing Lawyers, which states: "If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged ... that relates to the matter is privileged as against third persons." Restatement (Third) of The Law Governing Lawyers § 76. This position serves the main purpose of the rule, which is to preserve the confidentiality of communications ordinarily outside the scope of the attorney-client privilege, where a common legal interest or defense strategy has been decided upon and undertaken by the parties and their respective counsel. *Evans,* 113 F.3d at 1467; *Keplinger,* 776 F.2d at 701.

C.

[16] All of the individuals who signed the written, common interest agreement now work for Park Lane, which is also a signatory. Some of them formerly worked for the plaintiff, but a few did not. Some are defendants here; others are not. The agreement indicates that plaintiff has threatened Park Lane and the individuals who are not yet named as defendants with claims similar to those pending in this case. The three individuals who have not been named defendants have been subpoenaed. Ms. Salela sold kitchenware for the plaintiff and left, along with some of the defendants herein, to sell jewelry for Park Lane. She had the same contract with the same prohibitions about soliciting plaintiff's sales people and misappropriating trade secrets. Even absent any written agreement, there is a real potential for Ms. Salela to be sued. In fact, the plaintiff has announced its plan to file a motion to amend its complaint to add two more Park Lane employees.

During Ms. Salela's deposition, plaintiff's counsel targeted information regarding whether she had personally engaged in the same or similar conduct as charged in the Amended Complaint. (Salela Ex. F). Considering the undeniable similarities between Ms. Salela and the current defendants, not to mention the fact that The Pampered Chef has previously added other correspondingly-situated third-party deponents as defendants to the suit, it would seem that Ms. Salela may well be next-although perhaps in a state court action, not in this suit, since her presence would destroy diversity. Indeed, Pampered Chef does not rule this out as a possibility in either its motion or its reply brief. Park Lane is paying her legal fees. And, whether Ms. Salela is added to this case or not, her common interest-memorialized in the July 14 Common Interest Agreement (See Salela Response Ex. B)-is in a narrow construction of the contractual and fiduciary obligations under the Pampered Chef's Director Agreements. (Salela Response 7).

*7 As a former Pampered Chef director, Ms. Salela further shares in the defendants' interest in preventing entry of an injunction that would effectively restrict her employment opportunities and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

their scope. (*Id.*). Ms. Salela is in an essentially identical position as the named director defendants, in that she had signed the same Pampered Chef Director Agreement before eventually leaving the position for employment with Park Lane. That agreement now forms the basis for the claims asserted and the relief sought in The Pampered Chef's lawsuit. As a result, the present litigation stands to directly affect Ms. Salela's rights and obligations under the Pampered Chef's Director Agreement. In short-and regardless of the fact that Ms. Salela is not, herself, in the lawsuit-it is clear that she and the defendants share a sufficiently common legal interest.

[17] The plaintiff contends that the parties to the agreement might one day become adversaries. And so they might. But as Judge Cardozo wrote famously in another context, "such a calculus of [possibilities] is beyond the science of the chancery." *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 547 (N.Y.1928). However, the potential for adversity adheres in many situations. It is one that the common interest agreement in this case recognizes,[FN6] (See Motion 7; Plaintiff's Reply 3-4), as does the common interest doctrine, itself. Hence the rule that communications are not privileged in a subsequent controversy between the original parties. *Simpson v. Motorists Mut. Ins. Co.,* 494 F.2d 850, 855 (7th Cir.1974). More importantly, the possibility of future discord between the parties is analytically irrelevant to the current alignment of their interests. It is enough that the parties presently share a common interest. *Cf., In re Total Containment, Inc.,* 2007 WL 1775364, *6 (Bkrtcy.E.D.Pa.2007)(" 'A common legal interest exists where the parties asserting the privilege were co-parties to litigation or reasonably believed that they could be made a party to litigation.' ").

Whatever an uncertain future may hold, for now, the various interests are not, as plaintiff would have it, "decidedly antagonistic." (Plaintiff's Reply at 4). Quite the contrary. In any event, the common interest doctrine as explicated by the Seventh Circuit "is not limited to situations in which the positions of the parties are compatible in all respects...." *McPartlin,* 595 F.2d at 1336. *See also, Grochocinski v. Mayer Brown Rowe & Maw LLP,* 251 F.R.D. 316, 327 (N.D.Ill.2008)("The common interest rule is not limited to parties who are perfectly aligned on the same side of a single litigation, rather the party asserting the privilege must simply demonstrate actual cooperation toward a common legal goal...."); *Matter of Quantum Chemical/Lummus Crest,* 1992 WL 71782, *3 (N.D.Ill.1992)("This doctrine applies even where the interests of the conferees are not compatible in all respects. [citing *McPartlin* ].").

*8 *Verigy U.S., Inc. v. Mayder,* 2008 WL 5063873 (N.D.Cal.2008) does not require a different result. There, Verigy sued Mayder, a former employee, for misappropriation of its intellectual property. A third party, and former employee of Verigy's predecessor, reportedly helped Mayder form his new company, but maintained that he, not Mayder or Verigy, was the owner of the disputed intellectual property. Nevertheless, he entered into a common interest agreement with Verigy, and they shared certain documents that Mayder wanted in discovery. 2008 WL 5063873 *1. The magistrate judge found that there was no common interest between Verigy and the third party. He noted that the third party had earlier disavowed any such common interest, consistently claimed ownership over the intellectual property-in direct conflict with Verigy-and that the third party might be testifying under a legal threat from Verigy.

The court found that the common interest between Verigy and the third party came down to a shared desire to see Verigy win its case against Mayder, which Verigy admitted was simply a case of "the enemy of my enemy is my friend." He also rejected the notion that Verigy and the third party shared their interests in the intellectual property, which was a completely different position than the third party had previously espoused. Finally, he explained that any other common interest the two

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

might have in continuing to conduct a cordial business relationship was a commercial, not a legal, interest. 2008 WL 5063873 *3. Here, Ms. Salela is not asserting any interest adverse to Park Lane in terms of trade secret ownership. Her common interest with the defendants is obviously far more than a case of "the enemy of my enemy is my friend." Ms. Salela works for Park Lane. There is also the element of the non-solicitation clause in this case that was absent in *Verigy*. Truly, the only real similarity is that, like Verigy and the third party, Ms. Salela and Park Lane share a commercial interest in the disputed trade secret or, as in *Verigy*, the intellectual property.

In *BDO Seidman*, the Seventh Circuit explained that the common interest exception applies to a range of communications to encourage "parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly." 492 F.3d at 815. That sums up what is going on here, even if there is a partial aspect or component as well.

### D.

[18] Finally, The Pampered Chef argues that even if Ms. Salela and the defendants share a valid common interest, her "disclosure of ... communications in Mr. Cyrluk's presence broke the privilege and rendered the privilege waived." (Motion at 6). The "disclosure" to which the plaintiff refers is Ms. Salela's testimony regarding a lunch conversation following her deposition preparation where she, Mr. Feeney and Mr. Cyrluk engaged in non-substantive "chitchat" over sandwiches. (See Salela Ex. F at 30):

*9 Q: How long during the course of your meeting with Mr. Feeney was Mr. Cyrluk present?

A: Just a few minutes. He came in for lunch .... 20 minutes.

3

Q: Tell me what, if anything, Mr. Cyrluk said to you during the course of the meeting when he was present with you and Mr. Feeney?

3

A: We were talking about lunch. It was just sort of general not to worry, have I been deposed before. I mentioned, you know, my background and different businesses that I was in. It was just more kind of general chitchat. I can't think of anything real specific.

Q: Did Mr. Cyrluk say anything at all to you about the allegations in the lawsuit?

A: No. (Salela Dep., at 26-30).

Plaintiff's counsel then asked whether Mr. Cyrluk asked about any of the parties in the lawsuit-he asked one by one-and Ms. Salela again answered, "no." (Salela Dep., at 31). He asked why she thought Mr. Cyrluk had been there, and she said she thought it was simply to "meet" her. (Salela Dep. at 31). He again asked how long Ms. Salela met with Mr. Cyrluk, and she answered as she did before: "It was a very short period of time, 20 minutes, had a sandwich, hi, how are you." (Salela Dep., at 31).

[19] The plaintiff wisely does not argue that any of this was privileged, even though for Ms. Salela's testimony to have amounted to a waiver, she would have had to have disclosed *privileged* information. "[W]aiver cannot stem from an unprivileged communication." *Allen-Bradley Co., Inc. v. Autotech Corp.*, 1989 WL 134500, 1 (N.D.Ill.1989). *See United States v. Seale*, 600 F.3d 473, 493 (5th Cir.2010)(" 'As a general rule, implied waiver of [the attorney-client privilege] occurs *when the party claiming the privilege has made any disclosure of a confidential communication* to any individual who is not embraced by the privilege.' ") (brackets and emphasis in original); *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir.1997); *United States v. Plache*, 913 F.2d 1375 (9th Cir.1990); *Lorenz v. Valley*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)
(Cite as: 2010 WL 3602376 (N.D.Ill.))

*Forge Ins. Co.,* 815 F.2d 1095, 1099 (7th Cir.1987).

Since Ms. Salela disclosed nothing confidential, and since content not chronology is what counts, it is quite beside the point that "the [disclosed] conversations were during the course of Ms. Salela's deposition preparation...." (*Plaintiff's Reply,* at 6). And unless the English language has lost all meaning, it is idle to contend that Ms. Salela's disclosures waived the privilege because that which was disclosed and that which was not, related "to the same subject matter-her deposition preparation." (*Plaintiff's Reply,* at 7).[FN7] *Cf., Chicago Bd. Options Exchange, Inc. v. International Securities Exchange, LLC,* 2008 WL 3285751, *3 (N.D.Ill.2008).

## CONCLUSION

The Motion to Compel quotes me in a telephone conference with counsel for the parties at the time of the Salela deposition as saying that the defendants' position was "totally wrong." But that comment was made without the benefit of briefing or even full explanation of the parties' respective positions-which given the setting was, of course, impossible. In any event, further reflection based upon plenary briefing has shown two things: First, "all judges make mistakes." *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1339 (7th Cir.1997)(Posner, J.),[FN8] and second, adversarial briefing is indispensable to informed decision-making, for "the judicial process [is] at its best" only when there are "comprehensive briefs and powerful arguments on both sides...." *Adamson v. California,* 332 U.S. 46, 59, 67 S.Ct. 1672, 91 L.Ed. 1903 (1946) (Frankfurter, J., concurring). *See also United States v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)(" '[t]ruth' is best discovered by powerful statements on both sides of the question.' ").[FN9] Having now had the benefit of the parties' thoughtful briefs and time for adequate study, the Plaintiff's Motion to Compel [101] is DENIED.

FN1. The amended complaint also names two other defendants-Lori Mitchell and Shannon Pell-who are both charged with tortiously interfering with The Pampered Chef's Sales Director Agreements through their involvement in soliciting and recruiting Pampered Chef directors to join Park Lane. (Amended Complaint at ¶ 2, 107, 114).

FN2. Both Mr. Feeney and Mr. Cyrluk were also present during Ms. Salela's deposition.

FN3. *Compare United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989)(the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism."). Bentham was perhaps the most acerbic and unrelenting critic of the privilege. *See* VIII Wigmore, Evidence, § 2291 at 549 (McNaughton rev. 1961).

FN4. The privilege is limited to situations in which the attorney is acting as a legal advisor. Business advice is not protected. *Burden-Meeks v. Welch,* 319 F.3d 897, 899 (7th Cir.2003). Although the privilege is deemed generally to apply only to communications by the client, statements made by the lawyer to the client will be protected where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client. *Rehling,* 207 F.3d at 1019.

FN5. The privilege does not require that the interest be in litigation or that litigation be actual or imminent for communications to be privileged. *BDO Seidman,* 492 F.3d at 816 n. 6; *see Evans,* 113 F.3d at 1467. So, the fact that Ms. Salela is not a defendant in this case-which plaintiff suggests scotches the common interest doctrine (Salela Dep., at 27-28)-does not matter.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Cf., In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 922 (8th Cir.1997) (If two or more clients with a common interest in a litigated or a non-litigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged ... that relates to the matter is privileged as against third persons); *United States v. Aramony,* 88 F.3d 1369, 1392 (4th Cir.1996); *Evergreen Trading, LLC ex rel. Nussdorf,* 80 Fed.Cl. 122, 143-144 (Fed.Cl.2007). Nor does it matter that Mr. Cyrluk is not Ms. Salela's attorney. *See United States v. McPartlin,* 595 F.2d 1321, 1337 (7th Cir.1979)(quoting Advisory Committee's Note to proposed Fed.R.Evid. 503(b)) ("The third type of communication occurs in the "joint defense" or "pooled information" situation, where different lawyers represent clients who have Some [sic] interests in common...."). *See also United States v. Schwimmer,* 892 F.2d 237, 243 (2nd Cir.1989); 3 Weinstein's Federal Evidence, 503.21[2] (2d ed.2002).

FN6. The plaintiff explains that the parties might one day line up on opposite sides of the question of who solicited whom. The individuals who formerly worked for the plaintiff might say that they were the ones induced to leave by Park Lane and Park Lane's employees and that they didn't induce anyone to go with them.

FN7. If plaintiff is right, a privilege log would result in a waiver of the very privilege the log was intended to protect, since what was disclosed and what was withheld related to the "same subject matter"-the described document.

FN8. *See also Willy v. Coastal Corp.,* 503 U.S. 131, 139, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992); *Illinois v. Allen,* 397 U.S. 337, 346-347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Pruitt v. Mote,* 503 F.3d 647 (7 th Cir.2007) (*en banc* )("Being manned by humans, the courts are not perfect and are bound to make some errors.").

FN9. *Accord Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613-614 (7th Cir.2006); *Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992); *Albrechtsen v. Regents of University of Wisconsin System,* 309 F.3d 433, 436 (7th Cir.2002)

N.D.Ill.,2010.
Pampered Chef v. Alexanian
--- F.Supp.2d ----, 2010 WL 3602376 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.