# EXHIBIT 1

## Unpublished Cases

## Index to Unpublished Cases

1.   *DirecTV, Inc. v. Adrian*, No. 03 C 6366,
      2004 WL 1660665 (N.D. Ill. 2004)

2.   *Frugoli v. Fougnies,*
      74 U.S.P.Q.2d 1716, 2004 WL 3372012 (D. Az. 2004)

3.   *Integrated Cards, L.L.C. v. McKillip Indus., Inc.,*
      2008 WL 3286981 (N.D. Ill. Aug. 8, 2008)

4.   *Moore v. Broadcom Corp.,*
      2008 WL 425932 (N.D. Cal. Feb. 14, 2008)

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 1660665 (N.D.Ill.)
(Cite as: 2004 WL 1660665 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
DIRECTV, INC., Plaintiff,
v.
Robert ADRIAN, Defendant.FN1

FN1. The other individuals plaintiff named
as defendants were severed from this suit
on May 17, 2004.

No. 03 C 6366.
July 22, 2004.

Paul Alan Rettberg, Timothy R. Rabel, Anne M.
Belanger, Ernie Burden, Eileen E. Madda, Adam C.
Toosley, Brandon K. Lemley, Querrey & Harrow,
Ltd., Chicago, IL, for Plaintiff.

Jim Stewart, Downers Grove, IL, pro se.

Thaddeus Toomer, Barrington, IL, pro se.

Todd C. Lyster, Todd C. Lyster & Associates, Mi-
chael J. Hirschtick, Attorney at Law, Theodore T.
Scudder, III, Dragan Ivetic, Ostojic & Scudder,
Chicago, IL, Michael G. Philipp, Wiedel, Hudzik,
Russ & Philipp, Downers Grove, IL, for Defend-
ants.

MEMORANDUM OPINION AND ORDER
PLUNKETT, J.

*1 Plaintiff has sued defendant for, among oth-
er things, his alleged violations of the Wiretap Act,
18 U.S.C. § 2510, et seq. Defendant has filed a Fed-
eral Rule of Civil Procedure ("Rule") 12(b)(6) mo-
tion to dismiss Counts III and V of the complaint.
For the reasons set forth below, the motion is gran-
ted in part and denied in part.

Background

Plaintiff is a California-based company that
distributes satellite television broadcasts across the
United States. (Compl.¶ 2.) To prevent unauthor-
ized reception of its broadcasts, plaintiff uses en-
cryption technology to scramble the signals. (Id. ¶
3.) The signals are unscrambled by a device
plaintiff calls an "Access Card," which is installed
in the satellite receivers of its customers. (Id. ¶¶
3–4.) Plaintiff alleges that defendant Adrian pur-
chased and used illegal pirate devices, which un-
scrambled plaintiff's signals and gave him access to
plaintiff's programming free of charge. (Id. ¶¶ 5–6,
17.)

In Count III of the complaint, plaintiff seeks
damages from Adrian for his alleged possession of
the pirating devices under 18 U .S.C. §§ 2512,
2520. In Count V, plaintiff seeks damages from Ad-
rian for his alleged conversion of plaintiff's prop-
erty. Adrian has moved to dismiss both counts,
claiming that neither states a claim on which relief
can be granted.

The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the
Court accepts as true all well-pleaded factual alleg-
ations of the complaint, drawing all reasonable in-
ferences in plaintiff's favor. Forseth v. Village of
Sussex, 199 F.3d 363, 368 (7th Cir.2000). No claim
will be dismissed unless "it is clear that no relief
could be granted under any set of facts that could
be proved consistent with the allegations." Hishon
v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct.
2229, 81 L.Ed.2d 59 (1984).

Discussion

In Count III, plaintiff alleges that defendant vi-
olated 18 U.S.C. § ("section") 2512, which prohib-
its knowing and intentional possession of any
device that is primarily used for "surreptitious in-
terception of wire, oral, or electronic communica-
tions." 18 U.S.C. § 2512(1)(b). Plaintiff seeks dam-
ages for that violation through section 2520, which
provides:

[A]ny person whose wire, oral, or electronic

Not Reported in F.Supp.2d, 2004 WL 1660665 (N.D.Ill.)
(Cite as: 2004 WL 1660665 (N.D.Ill.))

communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a). Defendant contends that the private right of action created by section 2520 extends only to violations of section 2511, which prohibits the intentional interception of electronic communication, not to violations of section 2512.

Defendant's argument is based primarily on the Fourth Circuit's decision in *Flowers v. Tandy Corp.,* 773 F.2d 585 (4th Cir.1985). In *Flowers,* a woman whose husband had taped her telephone conversations sought damages under section 2520 from the company that sold him the recording device. A jury awarded her substantial damages on the claim, and the company appealed.

*2 The Fourth Circuit reversed. In its view, the statute provided a cause of action only against those who illegally intercept communications (*i.e.,* violators of section 2511), not against those who manufacture or possess a pirating device (*i.e.,* violators of section 2512). *Id.* at 589.

Plaintiff says *Flowers* is distinguishable from this case in two respects. First, the *Flowers* court was interpreting a different version of section 2520, which said: "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall ... have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications." *Id.* at 588 n. 2. Because the statute now says that anyone whose communication is intercepted "in violation of this chapter may ... recover [damages] from the person ... [who] engaged in that violation," plaintiff argues, a violation of *any* section of the Wiretap Act can be redressed through section 2520. Second, unlike the defendant in *Flowers,* the defendant in this case is alleged to have violated both sections 2511 and 2512. Thus, plaintiff says, it states a viable

claim even under the *Flowers* court's logic.

Though there are a number of district court decisions that support plaintiff's argument, *see, e.g., DirecTV, Inc. v. Dyrhaug,* No. 03 C 8389, 2004 WL 626822 (N.D.Ill. Mar.26, 2004); *DirecTV, Inc. v. Gatsiolis,* No. 03 C 3534, 2003 WL 22669033 (N.D.Ill. Nov.10, 2003), the language of the statute does not. Section 2520 permits any person "whose wire, oral, or electronic communication is intercepted ... in violation of this chapter" to sue the person who "engaged in that violation." Read in context, the phrase "engaged in that violation" refers to the illegal interception or use. Thus, the plain language of that section limits the class of plaintiffs to those whose communications have been illegally intercepted, and the class of defendants to those who do the illegal intercepting.

Moreover, though the statute has changed since *Flowers* was decided, the vitality of that case has not. In its *Flowers*-era incarnation, section 2520 permitted those whose communications were "intercepted ... in violation of this chapter" to sue those "who intercept[ed], disclose[d], or use[d], or procure[d] any other person to intercept, disclose, or use such communications." *Flowers,* 773 F.2d at 588 n. 2. In other words, the statute imposed liability not only on those who did the intercepting, but on those who procured the interceptions as well. Subsequently, Congress removed the reference to procurers from section 2520. Because that amendment contracted, not expanded, the class of section 2520 defendants, the Fourth Circuit's holding that violations of section 2512 are not actionable under section 2520 is still sound.

Our analysis echoes that of the Eleventh Circuit in *DirecTV, Inc. v. Treworgy,* No. 03–15313, 2004 WL 1317849 (11th Cir. June 15, 2004), a case decided just last month. In *Treworgy,* as in this case, DirecTV sought to recover damages under section 2520 for the defendant's alleged violation of section 2512. The plain language of the statute, the Eleventh Circuit said, precluded such a claim:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1660665 (N.D.Ill.)
(Cite as: 2004 WL 1660665 (N.D.Ill.))

\*3 [S]ection 2520(a) properly defines both the victims for whose benefit the remedy exists and the offenders for whom liability is owed. The plaintiff is "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter" 18 U.S.C. § 2520(a). The defendant is "the person or entity which engaged in that violation." *Id.* The phrase "which engaged *in that violation*" makes apparent the intent of Congress to limit liability to a certain class of defendants. 18 U.S.C. § 2520(a) (emphasis added). Congress chose to confine private civil actions to defendants who had "intercepted, disclosed, or intentionally used [a communication] in violation of ... chapter [119 of title 18]." *Id.*

373 F.3d 1124, 2004 WL 1317849 at *3. Like the *Treworgy* court, we find no support in the statute for plaintiff's claim.

The fact that plaintiff alleges defendant violated both sections 2511 and 2512 does not change the result. Illegal interception, a violation of section 2511, is the touchstone of a section 2520 claim; it requires nothing more and can survive with nothing less. Plaintiff has alleged a section 2520 claim predicated on defendant's alleged interceptions in Count II of the complaint. The fact that defendant is alleged to have violated section 2511 by using a device prohibited by section 2512 does not transform the section 2512 violation into an independent claim.

In short, this Court, like the Fourth and Eleventh Circuits, is not persuaded that section 2520 creates a cause of action against violators of section 2512 of the Wiretap Act. Thus, the claim plaintiff asserts against defendant in Count III of the complaint is dismissed.

In Count V, plaintiff alleges that defendant is liable for conversion. To state a claim for conversion, plaintiff must allege that he has an absolute right to immediate possession of certain property, that he made a demand for possession and that de-

fendant wrongfully assumed control or dominion over the property. *Cirrincione v. Johnson,* 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67, 70 (Ill.1998). Though plaintiff has made the requisite allegations, defendant contends that its claim must be dismissed because: (1) intangible property cannot, as matter of law, be the subject of a conversion claim; and (2) even if it could, plaintiff has not alleged that defendant's interception of the signals caused plaintiff to lose all control over them.

Whether intangible property can be converted is an unsettled question in Illinois. The Illinois Supreme Court has not squarely decided the issue, though it has stated that "an action for conversion [ordinarily] lies only for personal property which is tangible." *In re Thebus,* 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (Ill.1985) (internal quotation marks and citation omitted). Moreover, in at least one case, the Illinois Appellate Court has interpreted that statement as an absolute prohibition on conversion claims for intangibles: "Our supreme court has stated that an action for conversion lies only for personal property that is tangible or at least represented by or connected with something tangible." *Bilut v. Northwestern Univ.,* 296 Ill.App.3d 42, 230 Ill.Dec. 161, 692 N.E.2d 1327, 1334 (Ill.App.Ct.1998) (citing *Thebus* ). However, the appellate court also has, on more than one occasion, refuted that notion. *See Stathis v. Geldermann, Inc.,* 295 Ill.App.3d 844, 229 Ill.Dec. 809, 692 N.E.2d 798, 807 (Ill.App.Ct.1998) ("In this State, ... parties may recover for conversion of intangible assets."); *Conant v. Harris,* 165 Ill.App.3d 783, 117 Ill.Dec. 406, 520 N.E.2d 757, 763 (Ill.App.Ct.1987) (upholding conversion claim based on theft of confidential information).

\*4 Though the question is a close one, we think the latter cases represent the better approach. As our court of appeals noted in *FMC Corp. v. Capital Cities/ABC, Inc.,* 915 F.2d 300 (7th Cir.1990):

The conception that an action for conversion lies only for tangible property capable of being identified and taken into actual possession is based on

Not Reported in F.Supp.2d, 2004 WL 1660665 (N.D.Ill.)
(Cite as: 2004 WL 1660665 (N.D.Ill.))

a fiction on which the action of trover was founded—namely, that the defendant had found the property of another which was lost—and that such conception has become, in the progress of law, an unmeaning thing which has been discarded by most courts.

*Id.* at 304–05 (internal quotation marks, alterations and citations omitted). Indeed, the court said, "the modern trend of state law" is to protect intangible business assets through conversion actions. *Id.* at 305. Plaintiff alleges that its satellite signals are the primary asset of its business. (Com pl.¶¶ 2–5.) It should be able to redress the theft of that asset, regardless of the form it takes.

We also not believe that defendant's failure to exercise exclusive control over the signals defeats the conversion claim. The essence of conversion is "the exercise of control by the defendant over the chattel in a manner inconsistent with the plaintiff's right of possession." *Dickson v. Riebling,* 30 Ill.App.3d 965, 333 N.E.2d 646, 648 (Ill.App.Ct.1975); *see FMC,* 915 F.2d at 304 (stating that "[t]he gist of conversion is the interference with control of the property") (internal quotation marks, citation and emphasis omitted). Because defendant's alleged interception of plaintiff's signals was inconsistent with plaintiff's ownership rights, plaintiff's conversion claim may stand.

### Conclusion

For the reasons stated above, defendant Adrian's motion to dismiss Counts III and V of the complaint is granted in part and denied in part. The motion is granted as to the claim asserted in Count III, which is dismissed with prejudice. The motion is denied as to the claim asserted in Count V.

N.D.Ill.,2004.
DirecTV, Inc. v. Adrian
Not Reported in F.Supp.2d, 2004 WL 1660665 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

74 U.S.P.Q.2d 1716

2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716

**(Cite as:74 U.S.P.Q.2d 1716)**

Frugoli
v.
Fougnies

U.S. District Court District of Arizona
No. CIV 02-957-PHX RCB

Decided August 25, 2004

PATENTS

1 Patentability/Validity - Inventorship (§ 115.13)
Infringement - Defenses - Estoppel; laches (§ 120.1103)
Plaintiff's claim that he should be named as co-inventor of patent for prepaid wireless telephone system is barred by laches, since record indicates that reasonable person in plaintiff's situation would have known by mid-1995 that he might have rights that needed to be protected by filing lawsuit, but plaintiff did not file instant action until 2002, after entering into contract with telecommunications company in which plaintiff agreed to transfer his rights in patented system to company, and bring present suit, in exchange for payment, since defendants have suffered economic prejudice from plaintiff's delay, in that they have expended substantial amounts of time and money pursuing patented technology, since defendants have suffered evidentiary prejudice, in that witnesses will have difficulty remembering details from time period during which plaintiff purportedly contributed to invention, since plaintiff's arguments that he was naive as to his patent rights and that defendants attempted to hide their patenting efforts are without merit, and since unreasonableness of plaintiff's delay is underscored by his opportunism, in that telecom company's substantial payment to plaintiff is sole basis for his having filed suit at this time.

2 Patentability/Validity - Inventorship (§ 115.13)
Infringement - Defenses - Estoppel; laches (§ 120.1103)
Plaintiff's claim that he should be named as co-inventor of patent for prepaid wireless telephone system is barred by equitable estoppel, since plaintiff, who reasonably should have known that defendants filed patent application, and who was fully aware of named inventors' use of patented technology, misled defendants by remaining silent for nearly eight years before filing suit, since defendants relied on plaintiff's misleading conduct by investing substantial time and money in invention and protection thereof, since defendants will suffer economic and evidentiary prejudice if plaintiff's claim proceeds, and since there is no fault or fraud on defendants' part.

3 Patentability/Validity - Inventorship (§ 115.13)
Plaintiff's claim for correction of inventorship of patent for "fully transparent" prepaid wireless telephone system is denied, even though plaintiff claims that named inventors did not have technical expertise to devise solution using full "transparency," that plaintiff's telecommunications and computer networking experience was necessary to fill gap, and that plaintiff contributed ideas for use of T1 lines to connect cellular switch to host computer, for use of LAN and WAN networking technologies, and for use of subscriber database server constructed of plurality of hard disk drives configured as redundant array of independent drives, since defendant electrical engineer was credible witness and his testimony exhibited thorough understanding of patented system, since plaintiff failed to demonstrate that he was only person capable of contributing his claimed ideas, and since plaintiff was less than credible witness, in that his testimony was contradictory, evasive, and uncooperative.

4 Patentability/Validity - Inventorship (§ 115.13)
Plaintiff failed to provide sufficient evidence to corroborate claim that his contributions to patent for "fully transparent" prepaid wireless telephone system warrant naming him as co-inventor, since plaintiff failed to demonstrate that his expertise was necessary to creation of patented system, in view of

defendant electrical engineer's demonstration of his own expertise, since fact that parties worked together for several months does not corroborate plaintiff's claim, in that defendant testified that parties worked together building system that had already been conceived, and that plaintiff merely assisted at implementation stage, since diagram prepared by plaintiff dates from time long after invention had been conceived, whereas defendants have produced evidence that they had achieved total "transparency" before plaintiff became involved, since expert testimony stating that only plaintiff had requisite knowledge to conceive invention is insufficient to carry plaintiff's burden of proof, and since plaintiff's attendance at meeting with patent counsel could be attributed to his assistance at reduction-to-practice phase of invention, and does not establish that plaintiff made inventive contributions to patented system.

5 Patentability/Validity - Date of invention - Conception (§ 115.0403)
Patentability/Validity - Inventorship (§ 115.13)
Standard for establishing inventorship requires "inventive act," meaning contribution to conception of invention that is "not insignificant" in light of invention as whole, and which does more than merely explain well-known concepts or current state of art, but which can be result of exercise of ordinary skill; in present case, plaintiff's alleged contributions to "fully transparent" prepaid wireless telephone system are not legally sufficient to establish his claimed status as co-inventor, even if truth of his allegations are accepted at face value, since ideas claimed by plaintiff include addition of T1 lines to connect cellular switch to host computer, use of LAN and WAN networking technologies, and use of subscriber database server constructed of plurality of hard disk drives configured as redundant array of independent drives, and since evidence, including plaintiff's deposition testimony, supports conclusion that such ideas were not inventive, and were instead concepts well-known in art that would have been obvious to persons of ordinary skill.

PATENTS
Particular patents - Electrical - Wireless telephone 5,722,067, Fougnies and Harned, security cellular telecommunications system, claim for correction of inventorship denied.
6,157,823, Fougnies and Harned, security cellular telecommunications system, claim for correction of inventorship denied.

Action by Gerald E. Frugoli against Douglas V. Fougnies, Daniel B. Harned, Larry Day, Freedom Wireless Inc., and Wireless Pathways Inc. for correction of patent inventorship under 35 U.S.C. § 256. Judgment for defendants.

Pierre R. Yanney, Scott G. Lindvall, Patricia J. Clarke, Frank Maldari, James F. Hanft, Robert S. Weisbein, and Kevin L. Reiner, of Darby & Darby, New York, N.Y.; Richard A. Halloran, of Lewis & Roca, Phoenix, Ariz., for plaintiff.

Steven G. Madison, A. William Urquhart, William C. Price, Marshall M. Searcy III, Diane C. Hutnyan, Christopher Tayback, and Aimee E. DeSantis, of Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, Calif.; Hal Michael Clyde and Rebecca K. Setlow, of Perkins Coie Brown & Bain, Phoenix, for defendants.

Broomfield, S.J.

I. Introduction

This case commenced when Plaintiff Gerald E. Frugoli ("Frugoli") filed his complaint on May 22, 2002. Doc. 1. The primary claim for relief brought by Frugoli against Defendants Douglas V. Fougnies, ("Fougnies") et al., (collectively "Defendants") is for correction of inventorship pursuant to 35 U.S.C. § 256. Over the course of the past two years, discovery has been conducted, and various motions have been heard and resolved by this court.

Between May 25-27, 2004, this court conducted an

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

"inventorship hearing," during which time the parties presented their evidence with regard to the inventorship issue. At the conclusion of that hearing on May 27, 2004, the court took the matter under advisement. Having carefully considered the evidence presented, as well as the arguments of counsel, the court now rules.

## II. Issues for Consideration

The court must make certain legal and factual determinations at this time. It will first determine whether it needs to reach the merits of the inventorship issue in light of the defenses of laches and estoppel. If the court does reach the merits of Frugoli's claim, it must make a factual determination as to whether Frugoli has carried his burden of proof to establish his alleged inventive contributions. If Frugoli sustains *1718 his burden as to this factual issue, a legal issue remains as to whether Frugoli's contributions render him an "inventor" under the relevant legal authorities.

The court will not set forth all of its findings of fact at the commencement of this order, but will provide only a broad factual overview. The court will then set forth the additional relevant facts which have been established by the parties in its analysis of each of the issues under consideration.

## III. Factual Overview

On December 23, 1994, Fougnies and Dan B. Harned ("Harned") filed an application for a patent, which eventually issued as United States Patent No. 5,722,067 (the " '067 patent"), entitled "Security Cellular Telecommunications System," on February 24, 1998. The patent named Fougnies and Harned as co-inventors. On December 5, 2000, the United States Patent and Trademark Office issued a continuation patent for this system (which also names Fougnies and Harned as co-inventors), as United States Patent No. 6,157,823 (the " '823 patent").

The assignee of both patents is Freedom Wireless, Inc. The purpose of the inventorship hearing was to provide Frugoli an opportunity to present his evidence to establish his claim that he, too, should have been named a co-inventor of these patents.

In 1990, Fougnies founded a company called Cellular Express,[FN1] which sold cellular phones and accessories, as well as wireless airtime packages for a commission from telecommunications giant Bell Atlantic. In late 1993, Fougnies, a businessman with minimal technical experience, and Harned, an electrical engineer with extensive technical training and experience, desired to create a prepaid wireless system which would provide an avenue for customers with poor credit to obtain cellular phones.

In late 1993, Frugoli, an individual without an engineering degree (he apparently has a high school diploma with post-high school training in the computer field), but who had previously gained extensive computer networking training and experience,[FN2] was hired by a company called Quincy Street Corporation ("QSC") as a Network Administrator and PC Application Specialist. At that time, QSC was primarily a computer software and services firm located in Phoenix, Arizona.

In the spring of 1994, Frugoli, while shopping with a friend at a Cellular Express store, noticed a problem with an employee's inability to track products and other information on a company-wide basis. As a result, he offered QSC's services to Cellular Express. This exchange initiated a series of meetings between Cellular Express and QSC which eventually led to QSC being hired, in April of 1994, to perform computer networking services for Cellular Express.

In the ensuing months, QSC, pursuant to its agreement with Cellular Express, created new "point of sale" software, which permitted employees to easily perform retail tasks. In addition, QSC was retained to create local area networks (LANs) for each of Cellular Express' retail stores, and to connect the various stores' LANs together in a wide area net-

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                                Page 4
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

work (WAN). While there is some dispute as to whether Cellular Express' stores already had LANs in place at the commencement of QSC's work, it is clear that whatever system was in place in those stores it was sufficiently outdated and inefficient that QSC was required to essentially create new LANs for each location.

Frugoli, in his capacity as a QSC employee, worked with Cellular Express to design and implement the new computer network. As noted above, it was around this same time period that Fougnies and Harned were attempting to find a satisfactory solution for selling prepaid wireless airtime to credit-challenged customers. Cellular Express needed the computer network being designed by QSC to not only service its retail operations, but also to service the prepaid wireless system it was in the process of designing in the spring of 1994.

Since Frugoli was the primary contact with QSC regarding computer networks, and since he also had telecommunications experience and knowledge, he was asked to work- *1719 primarily with Harned-on helping the named inventors to accomplish the end goal of achieving what Defendants have called a "fully transparent" prepaid wireless system. It is in this context that Frugoli claims to have made such significant contributions to the patented system that he should also be named an inventor, along with Fougnies and Harned. Defendants contend that Frugoli never contributed to the "conception" of the invention at all, but only helped them to reduce the system they invented to practice.

### IV. Analysis of Issues Presented

#### A. Laches

Defendants argue that two legal defenses preclude this court from analyzing the merits of this dispute: laches and estoppel. The court will first consider the defense of laches. As this argument goes, Defendants contend that the court should not consider

the factual issue of whether Frugoli actually invented anything related to the patented system since Frugoli waited so long to bring his inventorship claim.

In *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 [ 22 USPQ2d 1321] (Fed. Cir. 1992), the Federal Circuit discussed the laches defense in great detail. That court noted:

It is . . . well settled that, to invoke the laches defense, a defendant has the burden to prove two factors:

1. the plaintiff delayed in filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and

2. the delay operated to the prejudice or injury of the defendant.

*Id.* at 1032,*citing, inter alia, Costello v. United States*, 365 U.S. 265, 282 (1961). Defendants bear the burden to establish the laches defense by a preponderance of the evidence. *Id.* at 1045.

While the *Aukerman* Court set forth the foregoing factors, it also emphasized that the defense-having its origins in equity-is one committed to the sound discretion of the trial court. *Id.* As a result, this court cannot simply apply "mechanical rules," but must consider the "particular facts and circumstances of each case and weigh the equities of the parties."*Id.* For example, as to the first factor, the amount of time which may be deemed "unreasonable" has no fixed boundaries, but depends on the circumstances of a particular case. *Id.*

While *Aukerman* emphasizes that the trial court must consider all the circumstances, it also states that a six-year delay in filing suit provides a rebuttable presumption that laches applies. *Id.* at 1034-35.As noted above, this six-year period commences at the time the "plaintiff knew or reasonably should have known of its claim." *Id.* at 1032.Even if it is established, however, that a

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                                                        Page 5
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

plaintiff reasonably should have known of his cause of action six years before filing suit, this court retains its discretion: "[l]aches remains an equitable judgment of the trial court in light of all the circumstances."*Id.* at 1036.

While the court will consider both the unreasonable delay and prejudice factors, even if those factors are established, that does not establish the existence of laches. Rather, those factors merely "lay the foundation" for the court's exercise of discretion. *Id.* Hence, "[w]here there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied."*Id.*

### i. Unreasonable and Inexcusable Delay

As noted above, Defendants bear the burden of proof, by a preponderance of the evidence, to demonstrate that laches applies. *Supra.* First, it must be determined when Frugoli knew, or reasonably should have known, of his claim against Defendants. Since Frugoli alleges that Defendants injured him by failing to name him as an inventor of the transparent prepaid wireless system, the time period for laches commences when he knew, or reasonably have known, that Defendants had filed an application for a patent on the system, and failed to name him.

### a. Meeting with Patent Attorney

1 It is clear from the contemporaneo us Day-Timer notes of Cellular Express' corporate secretary, Gary Gunn, that in October of 1994, Frugoli attended a meeting with the named inventors, and others, at the office of Phoenix patent attorney David Rosenbaum. The purpose of this meeting was to explore whether a patent application could be filed with regard to the fully-transparent prepaid *1720 wireless system. Frugoli testified that, at the conclusion of the meeting, he and Fougnies were excited about

the prospect of securing a patent on this technology. Frugoli himself believed the invention to be unique. He further testified that Fougnies expressed to him at that time words to the effect of, "won't it be exciting to have our names on the patent." An application for the '067 patent was filed in December of 1994.

### b. 1995 Advertisements

Frugoli knew that in 1995, Cellular Express was exploiting the invention by advertizing and selling prepaid wireless airtime. Indeed, Frugoli admits to having seen printed ads around this time-period that promoted the prepaid wireless system, and that he regularly visited Cellular Express' main store (at 7th Avenue and Camelback in Phoenix) where large window ads marketed the system. While Frugoli disputes that he read the substance of the storefront ads, or that he ever saw the "patent pending" notices on the printed ads, he has nevertheless admitted that he knew by mid-1995 that the named inventors were selling prepaid airtime on the system.

### c. The 1995 "Assignment"

In addition to the foregoing, Frugoli testified that, at some time in early to mid-1995, he was asked by Fougnies to sign a document which purported to assign to Cellular Express any rights that Frugoli had acquired in the patented invention. The circumstances of this "assignment" were the subject of substantial dispute at the hearing, as is more fully discussed below; however, for present purposes, the court notes that Frugoli claims to have discussed the matter with an attorney, whose full name and location he could not recall, but who, he claims, advised against signing the document.

In August of 1995, Frugoli moved away from the Phoenix area, and thereafter maintained only limited, sporadic contact with the named inventors. Nevertheless, in the following several years, he

74 U.S.P.Q.2d 1716                                                                                              Page 6
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

never inquired as to the statue of the patent applications, or whether his name had been on any patent applications.

### d. 2002 Contact with Verizon

It was not until early 2002 that Frugoli was contacted by counsel for another telecommunications giant, Verizon Wireless, who served him with a deposition subpoena in a related lawsuit involving the patented system. In that lawsuit, currently pending in federal court in Boston, Massachusetts, Verizon is being sued by the named inventors (Fougnies and Harned) who claim that it (Verizon), as well as various other cellular phone companies, have infringed on the '067 and '823 patents. At his deposition, Frugoli gave testimony related to his purported inventive contributions to the prepaid system and, later, had further discussions with Verizon's counsel regarding those alleged contributions.

As a result of the discussions between Verizon's counsel and Frugoli, a deal was struck whereby Verizon made an up-front payment of $200,000 to Frugoli in exchange for any rights Frugoli might have in the patented system. Frugoli agreed to bring the present lawsuit for correction of inventorship. If successful in the present case, Frugoli will be paid the greater of $50,000 annually (for ten years), or 12% of annual licensing royalties. Finally, although admittedly financed and controlled by Verizon, Frugoli brought this suit to assert his claimed rights in the patented system.

### ii. Prejudice to the Defendants

Material prejudice must be established as part of the laches defense.*Aukerman*, 960 F.2d at 1033.Such prejudice may be either economic or evidentiary. *Id.* First, with regard to "economic prejudice," this element may be established by demonstrating that a defendant will suffer the loss of monetary investments or incur damages which likely

would have been prevented by an earlier suit. *Id.*

### a. Economic Prejudice

As noted above, it is altogether clear that Verizon is Frugoli's master in the present litigation. It has control not only over Frugoli's choice of counsel, but also his litigation strategy. Verizon's presence alone speaks to the prejudice suffered by Defendants due to Fru-goli's extraordinary delay in bringing this lawsuit. Over the course of the several years prior to Frugoli's lawsuit, Defendants expended substantial sums of time and money pursuing the patented technology. Plaintiff's agreement with Verizon, however, permits it to license the technology to others, including other defendants in the Boston infringement lawsuit. If Frugoli is successful in the present case, Defendants will likely lose their ability to protect *1721 the invention they have so earnestly pursued.

### b. Evidentiary Prejudice

Evidentiary prejudice also exists. To establish this element, one need only establish an inability to present a full and fair defense on the merits due to such eventualities as the "loss of records, the death of a witness, or the unreliability of memories of long past events," which result in an "undermining [of] the court's ability to judge the facts."*Aukerman*, 960 F.2d at 1033.Even considering the facts in the light most favorable to Frugoli, his purported contribution to the patents had occurred by October of 1994, when the meeting with patent counsel occurred. Since this lawsuit was not filed until May 2002, well over seven years passed between the time of alleged conception and the filing of suit.

While the evidence bearing on the issue of inventorship is discussed below, the court is persuaded that Defendants have suffered evidentiary prejudice in this case. Recalling events from the 1994-95 time-frame would be difficult for any percipient

74 U.S.P.Q.2d 1716                                                                                          Page 7
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

witness.

Indeed, Cellular Express' Senior Vice-President of Operations, Gary Gunn, who also served as the corporation's secretary, has been particularly affected by the passage of time. Since 1997, he has suffered two heart attacks, and as a result, has suffered a condition which greatly affects his memory. At the hearing, Plaintiff presented Gunn's deposition testimony (in a video form) over the objection of Defendants on competency grounds. He was not called as a live witness at trial, as he is effectively unavailable to testify. In any case, Mr. Gunn attended the patent meetings with counsel, and created notes which have been used by Frugoli in his attempt to establish inventorship. Gunn's notes contain at least one notation which Frugoli has used to further his claim that he contributed a "unique" element to the patented system. In addition, the named inventors testified at the trial that other records existed which further corroborate their conception of the prepaid technology.

### iii. Plaintiff's Justification for his Delay

Since laches is a doctrine arising in equity, the court must not only consider the factors of delay and prejudice, but also any justification for the delay in bringing suit. *Aukerman*, 960 F.2d at 1033.While *Aukerman* provides some examples of "justifications" which have lead the court to forgive substantial delays in bringing suit (e.g., other litigation, negotiations with the accused, and wartime conditions) ( *id.*), no such excuse is offered by Frugoli.

Frugoli asserts that he was naive as to his patent rights and that Defendants attempted to hide their patenting efforts from him. This argument has no merit. As noted above, Frugoli admits that he never inquired as to the status of any patent applications even after the initial meeting with Rosenbaum. He seeks to excuse this odd lack of curiosity by stating that he did not understand how one would seek a

patent, or what the requirements were for being named on a patent.

Nevertheless, despite Frugoli's argument that Defendants hid their efforts to obtain a patent, hearing exhibit 578 contains copies of five advertisements (with dates between December 1994 and February 1995) from a Phoenix newspaper (the "New Times"), all of which depict the patented system (i.e. the technology advertised allowed a user to activate any phone, with no need to dial any access/passcodes), and all of which contain a "patent pending" notation. If Defendants made an effort to hide their patent application from Frugoli, they made no effort to hide their patenting efforts from the rest of the world.

Further, in mid-1995 Frugoli was asked by his employer, the owner of QSC, to sign an assignment of any rights he may have had to Cellular Express. It is difficult to imagine more compelling notice.

Finally, by February of 1998, the '067 patent issued. It is well-settled that the issuance of a patent and recordation in the Patent Office constitute notice to the world of its existence. *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 393 (1936). HadFrugoli brought suit soon after this presumed "notice to the world" had issued, the present analysis may be different. But Frugoli did not assert his rights in February of 1998 at the commencement of the period of "constructive notice": he waited yet another four years to bring his claim.

### iv. Conclusion as to Laches Defense

This court is convinced that, but for the discussions with Verizon's counsel and the substantial payment he received, Frugoli would continue to sleep on his purported rights today. *1722 There is no question but that a reasonable person in Frugoli's shoes-one who truly believed he had contributed to a valuable technology that may be the subject of a patent-would have known, by mid-1995, that s/he might have rights that needed to be protected by filing a

74 U.S.P.Q.2d 1716                                                    Page 8
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

lawsuit. If a person in Frugoli's position cannot be presumed to be aware of the potential filing of a patent application given the above facts, such a presumption can likely never arise. The court appreciates Frugoli's argument that he did not have *actual* knowledge of the existence of a patent until subpoenaed in the Massachusetts litigation (a finding this court does not make); nevertheless, the time period for laches does not commence at the time one acquires actual knowledge of legal rights. *Aukerman* is clear that the time period begins when one reasonably should know of his/her purported rights. *Aukerman,* 960 F.2d at 1032.

Frugoli not only attended at least one meeting with patent counsel, he also claims to have been told by Foughies that he would be named on the patent. He claims to later have been asked to assign away any rights he might have in the technology, and that an attorney-friend advised against doing so. While he claims that the patent application was hidden from him-anyone looking at an advertisement for the technology (ads which Frugoli admits to having seen) would know that a patent was pending on it. The notion that one who contributed in a significant way to a technology would not take great interest in an advertisement for that technology, and thus notice the patent pending statement, is not credible.

Frugoli, having left Phoenix in late 1995, never made a later inquiry of the named inventors as to the filing of a patent application even though he knew that the technology was being pursued by Cellular Express, and that the named inventors were profiting from it. Considering these facts in a light most favorable to Frugoli, it is unreasonable that he should wait so long to assert his rights in the invention.

The unreasonableness of Frugoli's delay is underscored by the opportunism that preceded his filing of the present lawsuit. As noted above, Verizon's substantial payment to Fru-goli is the only basis for Frugoli having brought this lawsuit at this time. While Verizon apparently has much to gain by receiving any rights Frugoli may be able to establish

through this case, Defendants have everything to lose. Frugoli's delay left the named inventors very safe in the assumption that they could invest in the patented technology, including investing in the pursuit of potential infringers. It has also left the named inventors prejudiced in their ability to present a complete defense to an inventorship claim on the merits.

In sum, the more than six-year delay between the time Frugoli should reasonably have known of his purported rights and this lawsuit has created a presumption that laches applies-a presumption which Frugoli has entirely failed to rebut. Frugoli's attempts to argue naivete, ignorance and fraud are all meritless. But for Defendants' decision to pursue Verizon for infringement, Verizon would not have deposed Frugoli and Frugoli would not have been paid to bring this lawsuit. This case was not brought by one who earnestly seeks to right a long-passed wrong which has been hidden from him. Frugoli's pure opportunism defeats any attempt in equity to rebut the presumption that laches applies. Frugoli's inventorship claim must be dismissed on this ground alone.

### B. Equitable Estoppel

In addition to laches, Defendants argue that equitable estoppel applies.*Aukerman* also sets forth the three elements necessary to establish this defense, which include:

1. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence.

2. The other relies upon that communication.

3. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*Id.* at 1041.Like laches, even if the foregoing elements are established, a finding that estoppel ap-

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                                          Page 9
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

plies falls within the sound discretion of the trial court. *Id.* If the court does apply this doctrine, however, all relief on a claim may be barred. *Id.* Defendants also bear the burden to establish this defense by a preponderance of the evidence. *Id.* at 1046.

Unlike laches, there is no presumption of estoppel regardless of the period of time *1723 which has elapsed prior to filing suit; nevertheless, as discussed below, an undue delay may help establish the "misleading communication" prong. *Id.* at 1042-43.

### i. Misleading Communication

To estop the present claim, Defendants must first demonstrate that Frugoli, with knowledge of the true facts, has communicated something to them in a misleading way. *Id.* at 1041;*Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.*, 794 F.Supp. 202, 205 [ 24 USPQ2d 1703] (S.D. Tex. 1992). In the context of this case, Frugoli must have communicated, by words, conduct or silence, that Defendants would not be disturbed in their exploitation of the patented technology. *Id.* at 1042.As a prerequisite, Defendants must have known, or reasonably been able to infer, that Frugoli knew of their patenting activities for some period of time. *Id.; Stewart & Stevenson*, 794 F.Supp. at 205.

Defendants do not allege any expressly misleading statements from Frugoli, but that his conduct amounted to a misleading communication. "Misleading conduct" will support a defense of equitable estoppel where affirmative conduct or inaction is combined with other factors concerning the relationship between the parties that supports an inference that a known claim has been abandoned, *Id.; Stewart & Stevenson*, 794 F.Supp. at 205.

The *Stewart & Stevenson* case, while not binding on this court, is persuasive since it presents facts on all fours with the present case. There, a purported co-inventor filed suit several years after learning of the defendant's patent application. 794 F.Supp. at 205.The court found misleading "inaction" by virtue of the fact that, in the several years since the plaintiff learned of the defendant's filing of patent applications, it never inquired into the scope of the patents being pursued, nor asserted that it made contributions rising to the level of co-inventorship. *Id.; see also, MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568 [ 10 USPQ2d 1287] (Fed. Cir. 1989) (misleading conduct where plaintiff knew of patent application and failed to sue for four years, having told defendant that patent rights were unimportant to him).

The *Stewart & Stevenson* court emphasized that a significant delay in filing suit by one with knowledge may constitute misleading conduct, stating:

> Through a simple inquiry, well within the bounds of reasonable diligence, [plaintiff] could have known the subject-matter of those applications exactly. [Plaintiff] clearly delayed in filing suit; the only question is whether the delay was five years or six years. In either event, the delay was unreasonable. Though not an independent element of estoppel, an unreasonable delay may be evidence of misleading conduct.

*Id.* at 205,*citing Aukerman*, 960 F.2d at 1042.

2 Construing the facts in a light mo st favorable to Frugoli, there is no question but that he reasonably should have known of Defendants' filing of a patent application. As discussed above, Frugoli was fully aware of Defendants' meetings with Rosenbaum, and indeed, claims to have attended two such meetings. He was aware that the named inventors were pursuing the technology. Since he continued to maintain Cellular Express' networks prior to moving out of state in August of 1995, he was fully aware of the named inventor's use of the technology, and the fact that they were marketing that system for a profit through 1995.

Also as discussed above, it is well-established that despite Frugoli's knowledge of Defendants' patent-

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                      Page 10
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

ing activities, he never inquired as to the scope of the application, or whether he had been named a co-inventor. Further, though Frugoli claims that Defendants hid their patent applications from him, there can be no question but that the named inventors advertised the patent pending nature of the system to the world.

For Frugoli to remain silent until May 2002-the invention having been completed at the latest by the time of the first Rosenbaum meeting in October 1994-and even then to only assert a claim after a substantial payment by a very interested third-party, is precisely the kind of misleading conduct that is contemplated by this defense.

### ii. The Actor Relies Upon the

The second element of a defense of equitable estoppel is that the Defendants must have substantially relied on the misleading conduct of the patentee in connection with taking some action. *Aukerman*, 960 F.2d at 1042-43.To prove such reliance, Defendants must show that their relationship with Frugoli *1724 lulled them into a sense of security in going ahead with their own actions. *Stewart & Stevenson*, 794 F.Supp. at 206.Activities that promote the technology, such as preparing a business plan and making capital investments are also evidence of reliance. *Id.*

This court is persuaded that Defendants relied on Frugoli's misleading conduct. Not only have they invested substantial time and money into the deployment and marketing of the patented system, they have undertaken significant efforts to protect that technology from infringement.

The bringing of a patent infringement lawsuit is evidence of reliance for purposes of establishing estoppel. *Pannu v. Iolab Corp.*, 96 F.Supp.2d 1359, 1369 (S.D. Fla. 2000). Unaware that Frugoli would claim inventorship, Defendants have initiated, funded and pursued a patent infringement lawsuit against nine of the largest cellular wireless carriers

in the country (including Verizon). That lawsuit would be substantially undermined if-at this extremely late date-Verizon were to acquire Frugoli's "rights" in the technology, which it could then license to other infringers. While the latter risk is merely potential at this point, there is clear evidence of reliance by Defendants simply by virtue of their pursuit of the patents, their deployment of the technology, and their substantial efforts to protect that investment.

### iii. The Actor Would Be Materially Prejudiced if the Claim Proceeds

Finally, the defendant must show that it will be materially prejudiced if the plaintiff is permitted to proceed with its lawsuit. *Aukerman*, 960 F.2d at 1043.This element, identical to the "prejudice" element of laches, may be established by showing a change of economic position or a loss of evidence. *Id.* As noted with regard to the laches defense, Defendants have successfully established this element.

### iv. Conclusion as to Equitable

As with laches, Defendants have persuaded the court by the requisite standard of proof that they are entitled to invoke the defense of equitable estoppel. These doctrines being equitable in nature, this court has no difficulty finding that Frugoli's claim should be barred. There is no evidence that Defendants defrauded Frugoli in their patenting efforts. The undisputed evidence reveals that they marketed the system with patent pending notices on their advertisements, which substantially undercuts any accusation of fraud.

In light of the lack of fault or fraud on Defendants' part, the court is left with nothing to balance on Frugoli's side of the equation. As discussed above, Defendants reasonably became very safe in the assumption that no one would assert an inventorship claim against them by May of 2002. When a claim

74 U.S.P.Q.2d 1716                                                                                    Page 11
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

was finally asserted, it was motivated only by a large payment from a cellular carrier that has been accused of infringing the technology at issue. These being the equities of the case, the court finds that Plaintiff must be estopped from proceeding with this claim.

### C. Inventorship Claim: Whether Frugoli has Met his Burden of Proof to

Since laches and estoppel bar Frugoli's claim, the court does not need to reach the merits of the inventorship issue at all. For completeness of the analysis, however, the court will proceed to consider the factual and legal bases for Frugoli's claim as though the foregoing defenses had not been established.

### i. Inventorship "Evidentiary" Standard of Review

Controlling case law imposes a heavy burden on plaintiffs, such as Frugoli, who seek to correct the inventorship of an issued patent. The Patent Act provides a presumption of validity to issued patents. *Winbond Electronics Corp. v. International Trade Comm'n.*, 262 F.3d 1363, 1371 [ 60 USPQ2d 1029] (Fed. Cir. 2001); *see* 35 U.S.C. § 262 ("Presumption of validity"). This includes the presumption that the named inventors on the patent are the "true and only" inventors. *Id., citing , Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 [ 41 USPQ2d 1782] (Fed. Cir. 1997). In order for Frugoli to rebut this presumption, he must present "clear and convincing, corroborated evidence" that he also should be named an inventor on the '067 and '823 patents. *Id., see also , Hess*, 106 F.3d at 980.

The clear and convincing evidence standard requires a plaintiff to present evidence "which produces in the mind of the trier of fact an abiding conviction that the truth of a factual *1725 contention is 'highly probable.'"*Price v. Symsek*, 988 F.2d

1187, 1191 [ 26 USPQ2d 1031] (Fed. Cir. 1993). Since the correction of inventorship standard requires "corroborated" evidence, the cases are clear that a purported co-inventor's testimony alone cannot rise to the level of clear and convincing proof. *Id.* at 1194.

The plaintiff's testimony must be corroborated due to "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier. . .."*Hess*, 106 F.3d at 980.The temptation to "reconstruct" the truth is especially strong where:

[T]he patent has been outstanding for a considerable time and the patented device has been successful. In that situation . . . there is an equally strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention. In these circumstances, it would be inappropriate to permit a lower standard than clear and convincing evidence.

*Id.*

In order to determine whether an alleged co-inventor's testimony has been corroborated, a "rule of reason" analysis is applied. *Price*, 988 F.2d at 1195;*Ethicon v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 [ 45 USPQ2d 1545] (Fed. Cir. 1998). The rule of reason analysis requires the court to make "an evaluation of all pertinent evidence . . . so that a sound determination of the credibility of the [alleged] inventor's story may be reached."*Id.* Such corroborating evidence may take a variety of forms, including contemporaneous documents prepared by a putative inventor, circumstantial evidence about the inventive process, and oral testimony by a person other than the named inventor. *Ethicon*, 135 F.3d at 1461.Reliable evidence "preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention." *Trovan v. Sokymat SA*, 299 F.3d 1292, 1302 [ 63 USPQ2d 1865] (Fed. Cir. 2002).

74 U.S.P.Q.2d 1716
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

In evaluating all the evidence received at the inventorship hearing, the court must "consider corroborating evidence in context, make necessary credibility determinations, and assign probative weight to the evidence to determine whether clear and convincing evidence supports a claim of co-inventorship."*Ethicon*, 135 F.3d at 1464.The court is required to consider "all of the evidence put forth;" there is no need for corroboration of every factual issue contested by the parties. *Id.* The evaluation of all the evidence is necessary "so that a sound determination of the credibility of the [alleged] inventor's story may be reached."*Trovan*, 299 F.3d at 1302.Inventorship can be shown by clear and convincing evidence even though no one piece of evidence in and of itself establishes prior conception. *Id.*

### ii. Overview of Frugoli's Purported

In 1990, Fougnies formed Cellular Express, having been in the cellular phone business during the late 1980s. While running his business, Fougnies noticed that a large number of customers-which he estimated at between 20-25 percent-had to be turned away because they did not meet the credit criteria established by the cellular carriers. As a result, he had a desire to tap the market of credit-challenged consumers who wanted to acquire cellular phones.

### a. Chip Phone

In attempting to enter this market, Fougnies considered and developed various ideas. In mid-1993 he contacted Harned, who at the time was working for another company, to help him develop what became known as the "chip phone." Harned, who had extensive electrical engineering and computer programming experience, designed a microprocessor chip which could be inserted into a particular cellular phone handset.

This chip could be programmed to allow the cellu-

lar phone to operate until the prepaid airtime had been exhausted, but then turn off when the time elapsed. Harned completed a prototype of the chip phone and delivered it to Fougnies in October of 1993. The system suffered from several problems, however, including the fact that it only worked on one cellular phone model, and it required a customer to visit a store in order to reprogram the chip when new airtime was purchased.

### b. Piggy Bank System

After a series of brainstorming sessions between Fougnies and Harned, a new system *1726 was conceived, whereby a prepaid user would make a phone call, which would then be redirected to a wireless switch over a private network to a prepaid wireless system. The prepaid wireless system would then validate the call. This improved system, referred to as the "piggy bank system," however, was also not optimal. For example, upon validation of the phone call, the user would receive a tone or signal telling him/her to enter the digits of the destination number in order for the call to be completed.

Fougnies and Harned ideally sought a concept they referred to as "full transparency." A fully transparent system would function the same as a normal post-paid cellular phone, without requiring the use of 1-800 numbers, or pin/pass codes. Since the piggy bank system was not fully transparent (due to the need to enter additional codes as prompted by the prepaid wireless system), the inventors continued to desire a better system.

Nevertheless, a diagram of the piggy-bank system was shown to representatives of cellular carrier Bell Atlantic on December 15, 1993 in the inventors' hopes of striking a deal for network access. After that meeting, Fougnies contacted AT&T in order to determine whether Cellular Express could purchase commercially available hardware to build the system depicted in the piggy bank diagram. There was

COPR. (C) 2012 The Bureau of National Affairs, Inc.

some debate (within Cellular Express) at this time as to whether a cellular carrier should build the piggy bank system, or whether Harned should construct the system. Recognizing the nontransparent nature of the piggy bank system, Fougnies and Harned continued to seek a fully transparent system during this time period.

c. The Fully Transparent System

Defendants contend that sometime in January of 1994, they conceived of the fully transparent system which is contained in the '067 and '823 patents. Under this system, for an "outbound" call, the destination number (called "DNIS"), as well as the caller's identifier (called "ANI"), are redirected over a private network to the prepaid wireless system. "Inbound" calls to the subscriber are also possible by sending the DNIS to the prepaid wireless system over the private network.

More specifically (according to figure 1 of the patent), with this system, a prepaid caller initiates a call by dialing the destination number and pressing the send key. That call is then sent to a cellular carrier's antenna tower. From the tower, the call is transmitted, via a T1 line to the cellular carrier's switch. At this stage, the cellular switch must determine where to send the call.

With a normal telephone call, the cellular switch would route the call to a local exchange carrier. Under the patented system, however, the switch actually recognizes the prepaid caller based on the caller's identification number (ANI). Based on the ANI, the switch recognizes that the call should not be routed to the local exchange carrier, but rather, routes the call to the prepaid cellular platform's "host computer".

The host computer then queries a remote server, which in turn queries a database, to determine whether there is a sufficient balance in the caller's account to complete the call. If there is a positive balance in the account, the call is completed by sending it to the local exchange carrier for it to be directed to the destination like any other telephone call. The call may continue until the subscriber's funds are depleted since the system allows for real time monitoring of airtime usage.

Defendants claim that, in the spring of 1994, Harned began implementing a commercial embodiment of the above-described, fully transparent system. At this time, Harned, who had previously been working with Fougnies in his evenings after work, joined Cellular Express full time. Recognizing that it could take significant time to develop an embodiment of the fully transparent system, however, Defendants decided to build the piggy bank system in order to get some kind of prepaid system into the marketplace. When this was completed in June of 1994, Harned returned to implementing a commercial embodiment of the fully transparent system.

The commercial embodiment of the fully transparent system required Harned to develop specialized computer software systems that would ultimately handle hundreds of transactions simultaneously and reliably. In addition, hardware components had to be selected and purchased. Further, the embodiment required the cooperation of cellular carriers since their cellular switches would have to be programed to recognize and route calls through Cellular Express' system.

By December of 1994, the inventors filed a patent application on the fully transparent system. *1727 At this time, their commercial embodiment of the invention became operational, and went live with the first subscribers in January of 1995. Also during this time, Cellular Express (which had changed its name to Cellexis), began advertising its new system. These ads, as discussed above, contained "patent pending" notices.

Between 1994 and 1996, Cellexis entered agreements with various carriers to provide service in ten metropolitan areas. As the systems were activated in these areas, they were commercially successful as thousands of subscribers signed up for service.

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                               Page 14
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

#### d. Frugoli's Claimed Contributions

As discussed above, Frugoli's initial contact with a Cellular Express employee, while shopping with a friend, resulted in an agreement between Frugoli's employer, QSC, and Cellular Express, to create new networking systems for the QSC stores, as well as to provide new administrative software for this networked system. Since Frugoli had extensive training and experience designing and implementing computer networks, he was asked to work on the Cellular Express project, soon thereafter, Frugoli was also asked to assist Harned in his work on the fully transparent prepaid wireless system.

The inventors discussed with Frugoli the need for the Cellular Express computer network to be configured so as not only to be able to serve the Cellular Express stores' administrative needs, but also to support the prepaid phone system. Frugoli claims that, at this time, he was told by the named inventors that they desired a fully transparent system, but that they had still not been able to create such a system. He claims that neither Foughies nor Harned had the technical expertise needed to devise a solution that attained full transparency. Rather, he asserts that his own telecommunications and computer networking experience was necessary to fill the void of the named inventors' inexperience and inability to create the fully transparent system.

Essentially, Frugoli claims that, while the named inventors had designed a non-transparent piggy bank system at the time he became involved with them, it was his ideas that bridged the gap between the piggy bank and total transparency. Indeed, he claims that at the time he became involved, Harned was attempting to implement a commercial embodiment of the piggy bank system. He posits that had the named inventors already conceived of the fully transparent system, Harned should have been investing his energies into implementing a commercial embodiment of the fully transparent system.

Frugoli claims that three contributions, made by himself, were necessary to achieve full transparency. First, he claims that the use of T1 lines to connect a cellular switch to a host computer was his idea. He argues that this idea was critical since it permitted the system to "get in front of a call" by automatically transferring the ANI and DNIS information-thus obviating the need for a caller to enter additional pin codes and/or 1-800 numbers.

Also of significant import, Frugoli claims to have contributed the idea of using networking technologies, such as LANs and WANs, which allowed the use of remotely located components in the prepaid system. As a result of this contribution, the host computer and the server could be located remotely from one another, allowing various host computers to be spread out among various geographic locations, and yet still communicate to one server and one database. This contribution resulted in added efficiency and reduced cost.

Finally, Frugoli's third claimed contribution, which even his own technical expert considered to be less important than the other two, was his idea that the subscriber database server itself should be constructed of a plurality of hard disk drives configured as a redundant array of independent drives (RAID technology). This contribution allowed "redundancy" to be built into the system-a complete necessity in any telecommunications system, since system downtime can be potentially disastrous.

While the evidence presented by the parties, both in support and in opposition to Fru-goli's alleged contributions will be fully discussed below, at this "overview" stage it should be noted that Defendants disagree that Frugoli contributed anything to the "conception" of the invention. While they agree that he was involved in helping Harned to complete a commercial embodiment of the system, they argue that he served only as a salesman of commercially available hardware, and that his only work on the invention was to assemble and install components he had ordered for the named inventors. In other words, as a *1728 QSC employee, Frugoli made hardware recommendations to the named inventors,

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                          Page 15
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

and helped them to physically reduce their system to practice.

### iii. Analysis of Evidentiary Support for Frugoli's Claimed Contributions

#### a. Testimony of Harned and Frugoli

The court notes, at the outset, that there is a direct conflict between the testimony of Harned and Frugoli as to Frugoli's purported contributions to the prepaid wireless system. The testimony of these two witnesses was unquestionably the most important evidence presented at the hearing. If Harned (the more skilled of the named inventors in the relevant technology) could not have created the system, it would appear more likely that Frugoli may have contributed to the conception as he claims. According to Harned's testimony, Fru-goli could not have helped conceive of the patented system in April of 1994 (when he became involved with Cellular Express) since the system was already fully conceived by January of 1994.

3 As a result of the importance of t his directly conflicting testimony, the court addresses this issue first. Put simply, this court was not persuaded that Harned could not have conceived of the fully transparent system prior to Frugoli's involvement. This conclusion is the result of considering the totality of the evidence at the hearing, as well as the demeanor of the witnesses while testifying. In the end, the court was left with the distinct impression that Harned was a credible witness, and that he very well could have conceived of the patented system without any input from Frugoli.

Harned's testimony exhibited a thorough understanding of the patented system. This court adjudges his testimony as a whole (particularly regarding his having conceived of the prepaid system pursuant to brainstorming sessions with Foughies-all prior to Frugoli's involvement) to have been credible. Harned not only has significant education

and training, he also testified as to his years of experience with computers and telecommunications related systems, as well as his keen interest in both of these technologies.

On the other hand, while Frugoli demonstrated an understanding of the relevant technologies, he did not persuade the court that he was the only player capable (as he testified) of contributing the ideas he claims to have made to the patented system. In addition, Frugoli presented contradictory and evasive answers on cross examination. Differences were noted between his deposition testimony and that of his hearing testimony. He appeared to be straining to not admit any facts which could damage his case. He was a patently uncooperative witness on cross examination. Taken as a whole, the court had many reasons to discount Frugoli's version of the events surrounding his purported inventorship.

For example, at the hearing, Frugoli sought to distance himself from testimony given at a deposition prior to having cut his deal with Verizon. At the deposition, Frugoli testified that a network administrator with the same experience as himself would have come up with the same solutions he did, and that any engineer would have come up with the same solutions. At the hearing, when questioned about whether any engineer would have come up with the same solutions, he responded that such an engineer would have to have the same experience as himself to come up with the same solutions. This testimony was calculated to change the deposition testimony which admits that an engineer-such as Harned-could have conceived the same solution Fru-goli claims.

At the hearing, Frugoli was also queried as to whether, if Defendants had worked with another network administrator, with Frugoli's same experience, that administrator would have come up with the same solutions. Frugoli responded by hedging his prior answer, indicating that he did not know if they would come up with the exact same solutions, and that he could not speak for anyone else. This testimony contradicted his deposition testimony on

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                                    Page 16
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

this very critical point.

Another example presented itself whenFrugoli was asked about his claim that Fougnies had asked him to sign an "assignment" of his rights in the invention in the summer of 1995. In his deposition, Frugoli claimed that Fougnies had given him the document. At the hearing, he testified for the first time that Gary Gunn had given him the document. Also, in an earlier deposition, Frugoli was asked extensively about the "assignment" (using that word), at which time he unhesitatingly explained the nature of the document. In fact, he explained that he asked an attorney friend of *1729 his to review the document, and was told not to sign it.

When asked at the hearing about the "assignment" he had allegedly been asked to sign (another document which has also apparently disappeared at this time), Frugoli feigned ignorance of the issue, explaining that he did not understand what counsel meant by the word "assignment." It was clear from the review of the deposition that Frugoli understood at that time what was meant by the word "assignment." His hearing testimony on this topic was, at best, evasive. Frugoli has attempted to persuade the court (to rebut the presumption of laches in this case) that he did not understand that he might have had inventive rights in the invention in 1995, and thus that he did not sue on those rights at that time. His pretended ignorance of being asked to sign an "assignment" of those rights was typical of his careful attempts to shade the facts in his favor at the hearing.

Other details of Frugoli's testimony regarding this "assignment" were sketchy. For example, he testified that he had an attorney friend review the document. In his deposition, he testified that the friend's name was "Joan," but that he did not know her last name. He testified that he thought she might presently be a judge somewhere in Arizona, but that he had no idea what kind of judge she was. In an earlier deposition, he testified that she lived in Tucson, Arizona, but in a later deposition testified that he did not know in which town (though still al-

legedly in the Tucson area) [FN3] she resided. In addition, it was demonstrated that, in his first deposition, Frugoli testified that he had this friend "look over" the document, but that in a later deposition he testified that he merely told her about it over the phone.

In light of the foregoing inconsistencies, this court is left with serious doubt as to whether any "assignment" was ever given to Frugoli (indeed, Fougnies testified that he never asked Frugoli to sign any such document at any time), and whether the mysterious "Joan" even exists. Frugoli claimed to be comfortable enough to call this person to seek legal advice, (and even referred to her as "dude"), but he did not know anything specific about where she lived or where she worked-he could not even identify her by her last name.

The foregoing testimony leads the court to seriously discount Frugoli's credibility, which is particularly troublesome in a case where he bears not only the burden of proof, but also an "elevated" clear and convincing evidence burden. As discussed above, a purported co-inventor's testimony must be corroborated; however, since Frugoli's own testimony is less credible than the directly conflicting testimony of Harned-testimony which did not suffer from the same testimonial flaws and inconsistencies as Frugoli's, it would be highly difficult for Frugoli to meet his high burden of proof. Nevertheless, the court will reviewFrugoli's corroborating evidence.

### b. Corroborating Evidence

Frugoli insists that at least six issues corroborate his conception of the patented invention. These include: (1) the named inventors' need for a person with his expertise, (2) the named inventors' expertise in the field, (3) the length of time the parties worked together, (4) the similarity of Frugoli's sketches and the patent figure, (5) expert testimony that only one in the inventor's field would have understood the contributions allegedly made; and (6)

74 U.S.P.Q.2d 1716                                                    Page 17
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

the named inventors' need to include Fru-goli in the October 1994 meeting with patent attorney Rosenbaum. The court will discuss each of these issues below.

### (1) Named Inventors' Need for Person of Frugoli's Expertise and (2) the Named Inventor's Own Expertise in the Field

4 This issue is discussed above: the court is not persuaded that Frugoli's expertise was necessary to the creation of the patented system. Frugoli certainly had expertise in networking technologies, as well as telecommunications systems; however, the court is not persuaded that Harned, an electrical engineer who also had significant expertise in computer-related technologies and telecommunications, needed input from Frugoli.

### (3) The Length of Time the Parties Worked Together

It is not disputed that the named inventors worked over a period of several months with Frugoli. These parties interacted regularly between *1730 April of 1994, when QSC began working with Cellular Express, and October of 1994, when the meeting with the patent attorney occurred (and even into the summer of 1995). It was also established at the hearing that much of the work was performed at Harned's home, since there was not sufficient space at Cellular Express' offices to actually build the patented system. The parties also performed some work at Frugoli's home during this period of time.

This length of time, however, does not necessarily lead to the conclusion that Frugoli conceived of anything. Indeed, the purpose of working at Harned's house was to actually build the system which Harned credibly testified had already been conceived. Harned testified that Frugoli simply aided in the implementation stage by selecting, ordering, and installing commercially available hard-

ware. In addition, another part of Frugoli's work with Cellular Express involved working on the stores' computer network design and implementation. It is not surprising that significant time was spent between Frugoli and the named inventors.

### (4) Similarity of Frugoli's Sketches and the Patent Figure

Frugoli places tremendous emphasis on the fact that he has produced a diagram, which he prepared, which represents the call-flow of the patented system precisely. This diagram, however, is not the smoking gun Frugoli claims it to be. Importantly, the document is dated in October of 1994-at a time when the invention, by all accounts, had long since been conceived. As a result, Frugoli has not presented any document which was created at the time the invention's conception allegedly occurred. Indeed, Frugoli has not presented any document which predates October of 1994 that attributes conception of the system to himself.

On the other hand, Defendants have presented evidence indicating that they had achieved total transparency before Frugoli became involved. After the piggy bank system had been conceived, an internal debate arose within Cellular Express as to whether the commercial embodiment of the system would be constructed by a cellular carrier, or by Harned. In December of 1993, Fougnies met with an AT&T representative in order to discuss the possibility of purchasing commercially available hardware for the implementation of the piggy bank system.

AT&T thereafter responded with a proposal which included a diagram of the piggy bank system. This proposal, however, was not completed until after the named inventors had conceived of the fully transparent system-some time after December of 1993. Upon receiving the AT&T proposal for the piggy bank system, Fougnies, who favored allowing Harned to construct the system as opposed to a cellular carrier, jotted in the middle of the propos-

74 U.S.P.Q.2d 1716                                                                                                Page 18
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

al's diagram:

THIS IS NOT TOTAL TRANSPARENCY

CAN THEY DO WHAT DAN CAN

This note on this diagram supports the named inventors' position that they had conceived of the fully transparent system well before Fru-goli drew his diagram in October of 1994, and even before the named inventors first met Frugoli.

The fact that Defendants have not presented a diagram of their system which predates their initial meeting with Frugoli is a strike against their defense, but it must be recalled that the burden of proof in this case lies with Frugoli. Defendants do not bear the burden to disprove Frugoli's allegations. Furthermore, as noted above in the discussion of laches, Frugoli's substantial delay in bringing suit has resulted in evidentiary prejudice which must be construed against him for purpose of meeting his substantial burden of proof. Both parties testified repeatedly about lost documents and witnesses that, had this case been brought six or seven years prior, could have been preserved.

When asked whether he could produce any documents prior to October of 1994 that corroborated his contributions to the prepaid system, Frugoli testified that very few of his documents from that time frame still existed, and that he believed additional documents once existed which would corroborate his story. He claims that there was "lots of" evidence, including status reports he generated at QSC, which would have corroborated his contributions.

In addition, Frugoli testified that a "silver bullets" memorandum existed, which discussed the solution originally sought by the named inventors. He has been unable to produce any such document. He claims that "weekly updates" were created while he worked at QSC, which also corroborate his inventive *1731 contributions. He has produced no such documents. Indeed, if Frugoli himself admits that

documents related to the conception of the system have been lost, the court can easily presume that the Defendants could also have presented documents in support of their position (as they too have testified).

Even though it is clear that documents have been lost, Defendants have still produced various documents which do corroborate their story. Frugoli has maintained that the named inventors needed his input to incorporate his inventive contributions into the system. Nevertheless, as noted above, the piggy bank diagram predates Frugoli's involvement with the named inventors. One of the elements contemplated on the piggy bank diagram was the use of T1 lines. While these lines were not contemplated to be used in precisely the same fashion as contemplated in the patented system, the fact that these lines were used in the piggy bank diagram corroborates Defendants' testimony that they were aware of T1s and were capable of incorporating them into the patented system–even if for a different use.

Likewise, as discussed above, Defendants have produced a diagram (Ex. 20) related to Cellular Express' discussions with AT&T (before Frugoli's involvement with Cellular Express), discussed above, which pertain to AT&T's proposal to build a commercial embodiment of the piggy bank system. This diagram contains references to elements thatFrugoli claims the named inventors were incapable of using without his help. For example, that diagram incorporates the use of T1 lines, as well as the use of ANI within a prepaid wireless system.

Another significant piece of evidence (Ex. 4) which predates the earliest document produced by Frugoli (October of 1994) is an August 17, 1994 letter from Fougnies to a representative of Bell Atlantic. In this letter, Fougnies discusses the various elements of the prepaid wireless system, including the transfer of both the ANI and DNIS information from a cellular switch to the prepaid phone system via a T1 line. This letter predates even the earliest document produced by Frugoli. Frugoli testified at the hearing that he actually helped Fougnies draft the August 17, 1994 letter; however, this testimony was dir-

COPR. (C) 2012 The Bureau of National Affairs, Inc.

ectly refuted by the testimony of Fougnies.

(5) Expert Testimony that only one in Frugoli's Field Could have Made the Alleged Contributions

Frugoli presented one "technical" expert witness. This witness, Dr. Charles Jackson, testified as to the importance of Frugoli's purported contributions to the prepaid system. As noted above, however, this court is not persuaded that Frugoli conceived of any element of the prepaid system. Jackson, who reviewed deposition transcripts of Harned's testimony, testified that he believed Harned to be relatively lacking in knowledge with regard to telecommunications engineering, as well as networking technologies.

While Jackson's testimony is damaging to the defense in this case, it is certainly not fatal. In order to find inventorship, the court must consider the evidence presented as a whole and be able to conclude, with an abiding conviction, that Frugoli's claims are "highly probable." Neither this testimony alone, nor in combination with any other evidence in Frugoli's favor, carries Frugoli's burden.

(6) The Named Inventors' Need to

Frugoli claims that his presence at the October 1994 meeting with David Rosenbaum was critical since he was the only person able to describe the system to patent counsel. While the court is persuaded that Frugoli attended at least one meeting with counsel, this evidence does not persuade the court thatFrugoli's presence was completely necessary. Frugoli himself established that various persons from Cellular Express were present at the meeting, including Larry Day, Gary Gunn, Fougnies and Harned-he has never claimed that Day or Gunn were inventors.

It is not surprising that, even if Frugoli simply

aided in the reduction to practice phase of the invention, he would be included in such a meeting. If he was heavily involved in the project by virtue of selecting, ordering and installing commercially available hardware for the commercial embodiment, his views could be helpful to patent counsel in determining whether the system was patentable. This issue does not establish that Frugoli made inventive contributions to the prepaid system.

*1732 c. Conclusion

Considering the totality of the evidence (including evidence not discussed above) both individually and collectively, the court is simply not persuaded-and certainly not to the level of clear and convincing evidence-as to the facts alleged by Frugoli. The court is not persuaded that the named inventors needed Frugoli's involvement to produce the patented system. Frugoli's testimony was seriously impeached, and that testimony, when considered together with the corroborating evidence he offered, has failed to persuade the court that Frugoli should be named as an inventor. Having reviewed all the evidence, this court is certainly not left with "an abiding conviction that the truth of [the factual assertions Plaintiff has made] is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993).

D. Whether Frugoli's Contributions were Legally Sufficient to Establish

Finally, the court will consider whether, assuming the truthfulness of Frugoli's factual assertions (i.e. that he did independently make the contributions to conception that he claims he made), he would be an inventor under the substantive standard governing inventorship.

i. Inventorship "Substantive" Standard of Review

COPR. (C) 2012 The Bureau of National Affairs, Inc.

74 U.S.P.Q.2d 1716                                                        Page 20
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

The substantive standard for establishing inventorship has been a subject of great contention in this lawsuit. The analysis begins at 35 U.S.C. § 116 ("Inventors"). That statute provides that if an invention is created by two or more persons jointly, they shall apply for the patent jointly. Further, the inventors may apply together "even though: (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent."*Id.*

As stated by the Federal Circuit in *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227 [ 32 USPQ2d 1915] (Fed. Cir. 1994), § 116"does not set forth the minimum quality or quantity of contribution required for joint inventorship."In *Acromed v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371 [ 59 USPQ2d 1130] (Fed. Cir. 2001), the Federal Circuit summarized the key inquiry in the inventorship analysis, stating:

Inventorship is a question of who actually invented the subject matter claimed in a patent. Conception is the touchstone of inventorship. Accordingly, each person claiming to be a joint inventor must have contributed to the conception of the invention.

*Id.* at 1379 (internal citations and quotation marks omitted); *see also , Sewall v. Walters*, 21 F.3d 411, 417 [ 30 USPQ2d 1356] (Fed. Cir. 1994); *Burroughs Wellcome*, 40 F.3d at 1227;*Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 [ 43 USPQ2d 1935] (Fed. Cir. 1997).

Conception for purposes of federal patent law is defined as the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."*Florida State Univ. v. American Bioscience, Inc.*, 333 F.3d 1330, 1338 [ 67 USPQ2d 1252] (Fed. Cir. 2003); *citing, Hybritech. Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 [ 231 USPQ 81] (Fed. Cir. 1986). An idea is sufficiently "definite and permanent" only when ordinarily skill would be necessary to reduce the invention to practice, without extensive research or experimentation. *Id.,Ethicon*, 135 F.3d at 1460.

a. Defendants' Position: Three Prongs

In order to qualify as an inventor, Defendants argue that three separate elements must be established. These elements are derived primarily from three Federal Circuit cases: *Acromed,Pannu*, and *Trovan. Acromed ,* citing *Pannu*, sets forth the first two elements, stating:

Beyond conception, a purported inventor must show that he made "a contribution to the claimed invention that is not insignificant FN4 in quality, when that contribution is measured against the dimension of the full invention, and [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art."

*Acromed v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371 [ 59 USPQ2d 1130] (Fed. Cir. *1733 2001), citing *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 [ 47 USPQ2d 1657] (Fed. Cir. 1998). The parties agree that the foregoing two factors must exist in order to establish inventorship.

Defendants claim (and their legal expert Mr. Mossinghoff testified to this end at the hearing) that a third inventorship prong is set forth by the Federal Circuit in *Trovan.*That Court observed that "the basic exercise of ordinary skill in the art, without an inventive act, does not make one a joint inventor."299 F.3d at 1302;*citing , Fina Oil and Chemical Co. v. Ewen*, 123 F.3d 1466, 1473 [ 43 USPQ2d 1935] (Fed. Cir. 1997). Defendants interpret this language to mean that if one merely exercises the ordinary skill expected of one skilled in a particular art, s/he cannot be an inventor.

Defendants argue that all three elements must be met by a co-inventor. In other words, if a party makes a (1) "not insignificant" contribution to the invention, but that contribution consists of (2) an

74 U.S.P.Q.2d 1716                                                                        Page 21
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

explanation of well-known concepts/the current state of the art, or (3) the exercise of ordinary skill expected of one skilled in the art, then that contribution is not sufficient for inventorship status.

### b. Frugoli's Position: Only Two Prongs

Frugoli contends that there are only two prongs-not three. He reads the foregoing quote from *Trovan* (which cites *Fina Oil*), differently from Defendants. He focuses on the phrase "without an inventive act" (i.e. the exercise of ordinary skill is insufficient "without an inventive act") to argue that one may be an inventor, even though s/he merely exercises ordinary skill in the art, as long as s/he also accomplishes an "inventive act" through the use of that ordinary skill.

In order to resolve this fundamental issue, a thorough review of the relevant authorities must be undertaken at this stage.

### c. Sewall v. Walters

The "third prong" dispute focuses on the quote from *Fina Oil* (cited by *Trovan*); however, *Fina Oil*[FN5] cites *Sewall v. Walters*, 21 F.3d 411 [ 30 USPQ2d 1356] (Fed. Cir. 1994), also an inventorship case, as precedent for this rule. In *Sewall*, an outside consultant for a company was retained to improve upon a CT scanner, which he accomplished through the conception of a "linear pointer memory means for storing a set of projection data memory points." *Id.* at 413.The consultant created detailed specifications for the system he created, which were then given to a company employee to reduce to practice. *Id.* at 414.The employee, Sewall, designed a "hardware structure" based entirely on the consultant's specifications. *Id.* The consultant's idea was thereafter patented without naming the employee.

When Sewall sued claiming that he was a joint inventor, the Court held that the hardware he had designed resulted from the effort of one of ordinary skill, and that he merely reduced the consultant's conception to practice. *Id.* at 416.As a result, Sewall did not perform an inventive act since he did not jointly conceive the system created by the consultant, but merely used ordinary skill to reduce it to practice according to the consultant's specifications.

Since the employee had not conceived of anything, he had not performed an "inventive act," and thus it is no wonder that *Fina Oil* would state that, "the basic exercise of the normal skill expected of one skilled in the art, without an inventive act, also does not make one a joint inventor."123 F.3d at 1473.The Federal Circuit is clear that where one does not contribute to conception, the mere aiding of the real inventor in reducing an idea to practice by the exercise of ordinary skill does not make one an inventor.*Id.; see also, Ethicon*, 135 F.3d at 1460.

### d. Acromed Corp. v. Sofamor Danek Group, Inc.

*Acromed,* another case which quotes *Sewall*, is instructive as well. There, the patent in suit, disclosed a plate-and-screw system for surgical implantation onto a patient's spinal column in order to correct a misshapen spine and thus alleviate pain caused by disc degeneration or fracture. 253 F.3d at 1374.The sole named inventor, Dr. Arthur Steffee, had recognized problems with prior devices used in such surgeries. *Id.*

*1734 For example, a hook and rod system straightened spines somewhat, but the rods had a tendency to slip, thus undercutting the effectiveness of the operation. *Id.* A later plate-and-screw device prevented slippage of long plates affixed to the spine (which effectively straightened the spine) by placing holes along the plate which could be matched with a hole tapped in a patient's vertebrae. *Id.* Since the holes were drilled in fixed locations along the plate, however, they were difficult to in-

74 U.S.P.Q.2d 1716          Page 22
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

stall and adapt to different patients since the holes were rarely spaced identically to pedicle distances between a patient's vertebrae. *Id.* at 1375.

Steffee improved upon the prior plate-and-screw devices by replacing the holes with elongated slots that ran along the length of the plate. *Id.* This solution fixed the problem of adjusting the plates to fit various patients' vertebrae, however, it created a potential for slippage since a screw could slide along the slot. *Id.* As a result, Steffee informed a hospital machinist, Mr. Janson, that he needed the plate designed such that a pin or nut could "sink in [to the slot] and stay[] right there."*Id.* Janson, therefore, used a drill press to place nests ("arcuate recesses") in the slots to eliminate the potential for slippage. *Id.* at 1380.

A defendant in a later infringement action argued that Steffee's patent on the device (which he had assigned to Acromed) was invalid for failing to name Janson as a co-inventor. *Id.* at 1377.The defendant theorized that Janson's cutting of the arcuate recesses was an inventive contribution to the patented system. *Id.* at 1379-80.The Court held, however, that Steffee had conceived of the need to place a pin or nut into the elongated slot which would "stay [] right there." *Id.* at 1380.In other words, the need for these recesses was conceived by Steffee. Janson's work of cutting the arcuate recesses "was simply the exercise of the normal skill expected of an ordinary" machinist.*Id., citing, Sewall,* 21 F.3d at 416.

Again, Janson, like Sewall, did not conceive anything-he did not perform any inventive act. He simply used ordinary skill to reduce Steffee's idea (of being able to insert a pin which would "stay[] right there") to practice.

e. Conclusion as to "Substantive

5 Since *Trovan* and *Fina Oil* both rely on *Sewall,* and since *Sewall* appears to support Plaintiff's reading of the rule, the court must conclude that only

two prongs must be met. Thus, the contribution must be "not insignificant" in light of the invention as a whole, and it must do more than merely explain well-known concepts or the current state of the art. *Supra. Sewall* merely holds that if one makes a contribution which amounts to an exercise of ordinary skill in the art, unless that contribution constitutes an "inventive act"-in other words, unless it contributes to the conception of the invention (as Sewall and Janson failed to do)-then s/he is not an inventor.

As a result, it appears that, as long as one *does* perform an inventive act, then s/he may be an inventor, as long as the contribution meets the two *Acromed-Pannu* prongs, even if the inventive act is a result of the exercise of ordinary skill. This appears to be the only conclusion supported by the foregoing caselaw. In both cases, the courts were explicit that Sewall and Janson did not conceive anything-they merely assisted in reducing an idea to practice using ordinary skill. Those cases do not state that the exercise of ordinary skill, by itself, can never amount to invention. Rather, they state that the exercise of ordinary skill, *without an inventive act,* cannot rise to the level of inventorship. *Supra.*

Indeed, this result is even further supported by reference to one treatise, which (though citing extensively to *Trovan,Fina Oil* and *Sewall*) describes the inventorship standard, stating:

Thus, the critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue. All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of an invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts or the current state of the art.

*Robert L. Harmon, Patents and the Federal Circuit*

§ 9.1(a) (p, 446) (Sixth Ed. 2003). While this treatise identifies three elements **1735** (since it includes the background element of "conception" as an element), it does not mention the need to establish that one's acts were beyond the ordinary skill of one skilled in the art. The only limitation on a conceived, significant contribution is that it must "do more than merely explain to the real inventors well-known concepts or the current state of the art. *Id.* This court's inquiry, therefore, is whether Frugoli contributed to the conception of the invention. If so, this court must consider whether that contribution meets the *Acromed-Pannu* standard.

### ii. Application of Inventorship Standard to Facts Presented

Even if Frugoli did suggest the use of T1's, LANs/ WANs or RAID technology within the patented system, the addition of these elements was not inventive. The court will consider each of these elements in turn. First, as noted above, Frugoli claims that it was his idea to use a T1 line to connect the cellular switch to a host computer within the prepaid system. Relatedly, he claims that this idea was important since it permitted the system to "get in front of the call" by automatically transferring the ANI and DNIS information to the prepaid system, allowing for full transparency by obviating the need for a caller to enter additional codes to complete the call.

The question at this stage is whether this "contribution," if it was Frugoli's, amounts to an "inventive act." As Defendants' expert witness, Gerald Mossinghoff, testified at the hearing, during the prosecution history of the patents at issue, the patent examiner considering the use of the T1 land line stated that:

Absent any teaching or criticality, communicating between two source [sic] by land-lines . . . is a matter of design choice as it is well established that communications between two source [sic] made

[sic] be carrier [sic] out by land lines . . .. Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made in order to provide the best communications media.

Ex. 576, at p. 115.

In addition to the patent examiner's comments that the use of the T1 land line was simply a matter of design choice, and would have been obvious to one of ordinary skill in the art, Frugoli's own deposition testimony agrees with this conclusion.

In his April 2002 deposition, Frugoli admitted that the use of T1s was not "rocket science." He admitted that a network administrator with his same experience would have come up with the same solution. He indicated that the "The Basics" book (which he had received at a Motorola seminar) would have explained what a T1 line could be used for. He further opined that T1s had been technology for "close to fifty years." He admits that T1s were readily available in the marketplace at the time.

The foregoing testimony admits the obvious nature of Frugoli's claimed contribution:if some other administrator with his experience had been hired by the named defendants, s/he would have created the exact same solution. This statement corroborates the conclusion of the patent examiner who concluded that this solution was "obvious."

Along these same lines, at the hearing, Fru-goli was queried as to whether "The Basics" book also explained the concepts of ANI and DNIS. He responded that this book did *not* explain those concepts. Nevertheless, it was thereafter pointed out that, in his April 2002 deposition, Frugoli admitted that, to understand ANI and DNIS, "all you need is a book," and that "The Basics book . . . explains ANI and DNIS pretty clearly in it."This testimony is not only in direct conflict with his hearing testimony, it indicates that a knowledge of ANI and DNIS were common to one skilled in the art in 1994.

In addition, expert witness Lawrence Harte testified

74 U.S.P.Q.2d 1716

2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716

(Cite as:74 U.S.P.Q.2d 1716)

as to the common nature of T1 lines at the time of the invention. He indicated that T1s were conceived in 1964, and widely deployed in the 1970s and 1980s. By 1994, the market for T1s in the United States was $7.9 billion dollars, or 7% of the total revenue of telecommunications in that year. He opined that T1s were well-known technology in telecommunications in 1994.

Put simply, the facts belie Frugoli's claim that his idea of using T1 lines to transfer ANI and DNIS information within the prepaid wireless system was an inventive contribution. Not only did he admit that another network administrator with his experience would have come up with this same solution, it was well-established that a knowledge of T1s, ANI and DNIS were very common in 1994. As a result, this court must concur with the statement by the patent examiner that the use of T1 land *1736 lines would be obvious to one in the art at the time.

While Frugoli may have conceived of the idea of using a T1 line, this court finds that this "conception" does not meet the *Acromed-Pannu* standard since it constituted nothing more than the explanation of well-known concepts or the current state of the art. The patent examiner found this contribution to be a matter of mere "design choice," since it is well-established that communications between two points may be carried out by the use of land lines. Not only does this observation further the conclusion that the use of T1s was a mere explanation of the current state of the art, it also leads to the conclusion that this contribution does not meet the "not insignificant in comparison to the invention as a whole" prong of the *Acromed-Pannu* standard. Finally, even if the *Sewall* standard is applied (which is not necessary), it is clear that Frugoli simply exercised the skill expected of one skilled in network administration by recommending T1 lines-and that he did not perform an inventive act.

Next, Frugoli claims to have contributed the idea of using networking technologies, such as LANs and WANs, which allowed the use of remotely located

components in the prepaid system. The court's analysis with regard to LANs and WANs, (as well as with regard to RAID, as discussed below) is very similar to its analysis regarding T1s. The patent examiner's observation with regard to T1s being a matter of design choice, and obvious to one of ordinary skill, was also applied to the "contribution" of using LANs and WANs. Ex. 576, p. 115. Likewise, the parties stipulated during expert Harte's testimony that these concepts were well-known in 1994. Harte testified that these concepts were multi-billion dollar industries at the time.

Frugoli also admitted with regard to LANs and WANs (as well as RAID) that this contribution was not "rocket science." In his April 2002 deposition, he testified that if one were to talk to the "Bell lab guys," they would have suggested the same solution. He admitted that the concept of LANs and WANs was a solution that "any engineer" would have come up with in connection with their use in the prepaid system.

The fact that these elements also were well-known at the time, that they would have been obvious to one of Frugoli's experience, and that they were simply a matter of "design choice," leads to the conclusion that this contribution-even if conceived by Frugoli-does not meet *Acromed-Pannu's* prongs. Fru-goli merely explained well-known concepts to the actual inventors for purposes of reducing their idea to practice. Again, he did nothing more than exercise the normal skill expected of one skilled in the art, without an inventive act.

Finally, Frugoli claims that it was his idea that the subscriber database server should be constructed of a plurality of hard disk drives configured as a redundant array of independent drives (RAID technology). With regard to this contribution, the patent examiner noted that:

Absent any teaching or criticality, using a redundant array of mass storage devices is a matter of design choice as it is well established that databases can be store [sic] in a variety of storage devices.

74 U.S.P.Q.2d 1716                                                                 Page 25
2004 WL 3372012 (D.Ariz.), 74 U.S.P.Q.2d 1716
(Cite as:74 U.S.P.Q.2d 1716)

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made in order to provide the best storage media.

Ex. 576, at p. 115.Again, the same phrases were used by the examiner to describe this concept as were used with regard to the other two concepts: they were a matter of "design choice," and would have been "obvious to one of ordinary skill."

Frugoli admitted that RAID was a "well known" concept in 1994. When asked at the hearing whether one with the same level of skill as a network administrator would have come up with the RAID solution, he responded in the negative. In his April 2002 deposition testimony, however, Frugoli admitted that, anyone with his same level of experience would have come up with a solution that was, if not identical, very similar. He also admitted that it was not a "complicated" solution. In addition, the parties also stipulated that RAID technology was well-known in 1994, and that it was a multi-billion dollar industry at the time.

The foregoing facts persuade the court that the conception of using RAID technology was also not inventive. The same results under *Acromed-Pannu* and *Sewall* apply to this contribution: it was simply the suggestion of a well-known concept, and the exercise of ordinary skill without any inventive act.

*1737 The court's conclusions with regard to Frugoli's claimed contributions are bolstered when one considers the fact that part of Fru-goli's job as a QSC employee was to sell computer hardware. Dr. Kirk Thompson, the owner of QSC, testified that it was Frugoli's job to recommend and sell hardware components to clients in connection with QSC's consulting services. Customers, such as Cellular Express, had an incentive to purchase hardware through QSC because QSC could offer financing for hardware products purchased through them.

As a result, since it is well-established that the components recommended by Frugoli were multi-billion dollar industries in 1994, it is also not surprising that network administrators, such as Frugoli, would recommend the off-the-shelf hardware components that Fru-goli claims to have contributed to the prepaid system. Even if he first thought of the idea of using the components he claims to have contributed, it is well-established that these contributions were simply a matter of design choice, and that another computer administrator of the same or similar skill and experience would have recommended the same or a similar solution. This conclusion thus removes any possibility that Frugoli could be considered an inventor even if he did contribute the concepts he claims to have conceived with regard to the fully-transparent system. Put simply, the clear and convincing evidence standard has not been met in this case.

IT IS ORDERED DENYING Plaintiff's claim for correction of inventorship.

FN1. The parties have used the names Cellular Express and Cellexis ("Cellexis International, Inc.") somewhat interchangeably throughout the litigation. It appears that Cellexis was the entity through which the patented system was exploited by the named inventors. Since this case involves events which transpired both prior to and after the creation of the patented system, for clarity, the court will generally refer to both of these entities as "Cellular Express."

FN2. Frugoli's training and experience will be detailed later in this order.

FN3. The court can take judicial notice that there are few "towns" in the Tucson area. Perhaps Frugoli was referring to the names of areas within the City of Tucson.

FN4. The parties debate in their prehearing memoranda whether the term "not insignificant" requires the contribution to be "significant." This, however, is a debate for another day since the present case does

not hinge on an interpretation of this term.

FN5. The *Fina Oil* case does not lend itself very well to the present analysis since that Court simply overturned the district court's determination of inventorship on summary judgment, concluding that genuine issues of fact existed as to the relative contributions of the parties seeking to establish inventorship. *Fina Oil*, 123 F.3d at 1466.

D.Ariz.
Frugoli v. Fougnies
2004 WL 3372012, 74 U.S.P.Q.2d 1716

END OF DOCUMENT

COPR. (C) 2012 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
INTEGRATED CARDS, L.L.C., Plaintiff/
Counter-defendant,
v.
McKILLIP INDUSTRIES, INC. d/b/a/ USA/
DOCUFINISH, Defendant/Counter-Plaintiff.

No. 06 C 2071.
Aug. 8, 2008.

Mark Warren Hetzler, Jon A. Birmingham, Fitch,
Even, Tabin & Flannery, Chicago, IL, for Plaintiff/
Counter-defendant.

Jacqueline A. Criswell, Michael Paul Chu, Brinks,
Hofer, Gilson & Lione, Panagiotis V. Albanis,
Tressler, Soderstrom, Maloney & Priess, LLP,
Chicago, IL, for Defendant/Counter-Plaintiff.

### MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, District Judge.

*1     Plaintiff/Counter-defendant   Integrated
Cards, L.L.C. ("Integrated") filed suit against De-
fendant/Counter-Plaintiff, McKillip Industries, Inc.
d/b/a/ USA/DOCUFINISH ("USA"), alleging pat-
ent infringement on U.S. Patent No. 5,462,488
("the '488 patent") entitled "Integrated card and
business form assembly and method for fabricating
same on label formation equipment." USA moved
for summary judgment on Integrated's claims on the
basis of laches and equitable estoppel. For the reas-
ons set forth below, USA's Motion for Summary
Judgment is denied and the matter will proceed to a
bench trial on the issues of laches and equitable es-
toppel.

### STATEMENT OF FACTS

Much like the Capulets and the Montagues, the
McKillip brothers have been embroiled in a bitter
family dispute for decades. Two brothers, both
alike in trade and ambition, and their two Illinois-
based integrated card companies, have now brought
their battle to the federal courthouse where the
Court assumes there will be a healthier outcome for
both parties.

In 1994, John J. McKillip ("John") invented a
product entitled "Integrated card and business form
assembly and method for fabricating same on label
formation equipment" and the '488 patent on the
product was issued on October 31, 1995. Pltf. Resp.
56.1 ¶ 2.[FN1] An integrated card consists of a base
document, like a letter, with an attached card which
can be pulled away from the document. Pltf. Resp.
56.1 ¶ 9.[FN2] Later that year, John assigned one
half of his interest in the '488 patent to Stanley
Stack, Jr. ("Stack"). Pltf. Resp. 56.1 ¶ 3. John and
Stack remained joint owners of the ' 488 patent un-
til September 29, 2005 when John assigned his in-
terest to Malessa Partners, LLC ("Malessa"). Pltf.
Resp. 56.1 ¶ 3. Stack and Malessa remained joint
owners of patent until October, 2005 when Stack
assigned his interest to Stack, LLC. Pltf. Resp. 56.1
¶ 4. Malessa and Stack LLC later assigned their in-
terests in the '488 patent to Integrated. Pltf. Resp.
56.1 ¶¶ 3-4.

> FN1. Citations to "Plaintiff's Responses to
> Defendant's 56.1 Statement" have been ab-
> breviated to "Pltf. Resp. 56.1" Citations to
> "Response of USA/DOCUFINISH to In-
> tegrated's Statement of Material Facts"
> have been abbreviated to "Def. Resp.
> 56.1."

> FN2. Lawyers will recognize these as the
> way they receive their annual atotrney re-
> gistration cards. Not every product called
> an "integrated card" has the same construc-
> tion. Id.

Steven McKillip ("Steven"), John's brother,
was the principal of United Stencil & Affixing Co.,

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

Inc.[FN3] which changed its name in 1998 or 1999 to USA/Docufinish, the defendant in this action. Pltf. Resp. 56.1 ¶ 6. USA has been operating for over twenty years and is in the business of providing products for segments of the printing industry, including integrated cards. Pltf. Resp. 56.1 ¶ 6. On April 12, 2006, Integrated filed suit against USA alleging that one of its integrated card products infringes upon the '488 patent. Pltf. Resp. 56.1 ¶ 8. It is undisputed that USA has sold the accused product continuously since at least 1995. Pltf. Resp. 56.1 ¶ 8. USA moves for summary judgment on the issue of laches and equitable estoppel.

> FN3. In 1987 John filed articles of incorporation under the name United Stencil & Affixing even though his brother Steve was already operating a company under the same name. Pltf. Resp. 56.1 ¶ 72.

### STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir.2001); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir.2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of*

*Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

### DISCUSSION

#### I. The Laches Defense

*2 Under 35 U.S.C. § 282, laches is an equitable defense that bars recovery by the plaintiff for any damages incurred before the initiation of the infringement suit. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992) (en banc). Laches requires proof that the patentee unreasonably and inexcusably delayed filing suit and that the delay resulted in material prejudice to the defendant. *Wanlass v. GE,* 148 F.3d 1334, 1337 (Fed.Cir.1998). A presumption of laches arises when more than six years has elapsed between the time the plaintiff knew or should have known of the alleged infringing activity and the time of filing suit. *Aukerman,* 960 F.2d at 1028. When the presumption is in effect, the court infers unreasonable delay and prejudice from the length of the delay, and the burden going forward with the evidence shifts to the plaintiff. *Id.* When the presumption does not arise, the party claiming laches bears the burden of proving that the delay was unreasonable and inexcusable, and that it materially prejudiced the party claiming laches. *Id.* The period of delay begins at the time the patentee had actual or constructive knowledge of the defendant's potentially infringing activities. *General Electric,* 148 F.3d at 1337.

The issue of laches is committed to the sound discretion of the court. *Aukerman,* 960 F.2d at 1032. Because the nature of the laches defense is fact-intensive, summary judgment often will be inappropriate, but may be granted under some circumstances. *Rockwell International Corp. v. SDL, Inc.,* 103 F.Supp.2d 1192, 1196 (N.D.Ca.2000) (denying summary judgment on laches defense);

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*see also Wanless v. Fedders Corp.,* 145 F.3d 1461, 1464 (Fed.Cir.1998).

Plaintiff filed the instant action April 12, 2006. Thus, to trigger the presumption, defendant must show the absence of genuine disputes as to whether plaintiff knew or should have known of the alleged infringement on or before April 12, 2000. *Rockwell,* 103 F.Supp.2d at 1196. The parties do not suggest a hard and fast rule regarding the level of knowledge requisite to trigger laches, nor does the equitable nature of laches generally warrant such mechanical rules. *Id.* at 1197; *see also Aukerman,* 960 F.2d at 1034. Integrated "must have had more than a mere suspicion but less than absolute assurance of defendant's alleged infringement in order to activate the laches clock." *Id.*

USA argues that Stack and John, co-owners of the '488 patent, have had actual knowledge of the accused product since March 1999 and 1996, respectively, and that Stack's knowledge should be attributed to John, and thus, Integrated. If USA is correct that Integrated knew or should have known of its alleged infringement more than six years before it filed the instant lawsuit, a presumption of laches arises. Integrated, of course, asserts that neither Stack nor John knew that the USA product infringed on the '488 patent until shortly before filing this lawsuit. For the reasons discussed below, Integrated has raised triable issues of material fact concerning when it knew or should have known about USA's alleged use of the '488 patent, and therefore the presumption does not apply and summary judgment is denied.

*John's actual or constructive knowledge of the alleged infringement*

*3 USA argues that John had sufficient knowledge of USA's product to allege infringement prior to April 2000 based on: (1) Stack's knowledge arising out of his ownership of Business Forms Sales; (2) John's conversations with Brian Wooley in 1996; (3) John's conversations with Chuck Casagrande in 1996; (4) John's work with AmeriPrint from 1997-1998; and (5) John's attendance at trade shows in October 1998.[FN4] USA further asserts that its use of the accused product was open and notorious in the industry. Integrated responds that neither Stack nor John had actual or constructive knowledge that the USA product infringed on the '488 patent until 2005. Resp. p. 2. It was only then that John became aware of possible infringement and began trying to obtain samples of integrated card products so that he could test them and determine whether they actually infringed on the '488 patent. Moreover, John denies that Wooley, Casagrande, and Schulty told him that USA was infringing on the '488 patent and denies that he attended the Baltimore tradeshow in 1998.

> FN4. USA argues that Gary St. Onge of Libman Business Forms made a sales call on John at his home on August 18, 2000. Incidentally, because Integrated filed its claim on April 12, 2006 the presumption arises only if it knew or should have known of the accused product before April 12, 2000. Nevertheless, it is undisputed that John didn't learn about USA products from St. Onge. Def. Resp. 56.1 ¶ 12.

Integrated has raised questions of fact regarding each of these alleged sources of John's knowledge. First, there are genuine issues of disputed fact regarding whether Stack knew that the '488 was being infringed. In 1993, John stated a company called Tri-Graphics and, together with partners Stack and Bob Van Hyfte ("Van Hyfte"), made integrated cards using the '488 patent. Pltf. Resp. 56.1 ¶ 14, 15. USA asserts that Stack and Van Hyfte knew of the existence of the accused product because Stack receive quotes from USA for integrated cards in June, 2001 and Van Hyfte purchased integrated cards from USA from 1997 through 1999. However, Stack denies requesting a specification, denies knowing that USA was in that business or that he was aware that they were allegedly using the potentially infringing integrated card product. Pltf. Resp. 56.1 ¶ 61. Moreover, Integrated denies that the product identified in the quotes automatically

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

imputes knowledge to Stack because the term "integrated card" can be used to describe a card having many different constructions and not the construction used in the '488 product. *Id.*

Regarding Van Hyfte, USA argues that Van Hyfte purchased integrated cards from 1997 to 1999 and, given his close relationship with Stack, must have told Stack about the potential infringement. However, there was no evidence that Van Hyfte discussed his purchases for his company Metro Graphx with Stack or John nor did USA prove that the purchase orders showing Metro Graphx's purchases from USA referenced the same type of integrated card as the '488 patent. Pltf. Resp. 56.1 ¶ 56.

Second, USA argues that Brian Wooley, a pressman for Tri-Graphics, told John that USA made integrated card products. Wooley worked for USA during the time in which it sold the alleged infringing integrated card. Pltf. Resp. 56.1 ¶ 17. However, whether Wooley told John that USA made integrated cards when Wooley was employed by Tri-Graphics is disputed. Pltf. Resp. 56.1 ¶ 20.

*4 Third, it is disputed whether in June or July, 1996, Chuck Casagrande ("Casagrande"), who owned Precision Coated Products ("Precision"), sent a quote to John at Tri-Graphics at John's request with three options for laminating integrated cards, including the light lift dry product used only to make integrated cards. Pltf. Resp. 56.1 ¶ 22, 23. Similarly, the parties dispute whether Casagrande made a sales call and sent several quotes to John at Tri-Graphics after John contacted Precision asking for laminates. Pltf. Resp. 56.1 ¶ 24. John denies that Casagrande showed him USA integrated cards during the sales visit. Pltf. Resp. 56.1 ¶ 25.

USA argues that John had notice of USA's use of the accused product in January 1998 because he showed John Schulty, President of AmeriPrint Corp., a business plan that discussed what others were doing in the integrated card industry. Whether the plan discusses the accused product is disputed and John maintains that it was drafted because he was pursuing patent protection for a piece of label-making equipment that was an improvement over a different kind of affixing equipment. Pltf. Resp. 56.1 ¶ 32. Though John promoted integrated cards and the named product "Americards" and also attended trade shows during this time period, there was no evidence that USA's accused product was displayed at the trade shows or that John was aware of every competitor in the industry during this time period. Pltf. Resp. 56.1 ¶ 27.

Additionally, USA argues that John Walter McKillip ("John W."), Vice President of Sales for USA, attended a trade show in Baltimore in October 1998 and worked at USA's booth with Janet Storjohann. According to John W. and Storjohann, John visited USA's both, introduced himself to John W. as his uncle, and took a sample pack of integrated cards. Whether John actually attended the trade show, however, is disputed. Pltf. Resp. 56.1 ¶ 63; Def. Resp. 56.1 ¶ 14-15.

USA also argues that its use of the accused product was open and notorious in the industry and that John, as an active figure in the industry since the 1960s, should have known of USA's open and notorious allegedly infringing activities by April, 2000. However, it is disputed whether John was an "active figure in the industry" or simply a "small" and "independent" businessman. Pltf. Resp. 56.1 ¶ 53-55, 77; Def. Resp. 56.1 ¶ 1, 4-5, 28. The existence of this dispute coupled with the fact that it is disputed whether the '488 integrated card is easily testable distinguishes this case from *Wanless* and *Hall. See Wanless,* 148 F.3d at 1339; (patentee's claims were barred by laches because the defendant's "notorious sale of easily testable products," air conditioners, gave the patentee the opportunity to discover the alleged infringement earlier); *see also Hall v. Aqua Queen Mfg.,* 93 F.3d 1548 (Fed.Cir.1996) (patent involved an easily testable product, a waterbed and Hall was a central and active figure in the waterbed industry); *see also IXYS Corp. v. Advanced Power Technology, Inc.,* 321

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

F.Supp.2d 1156, 1161 (N.D.2004) (denying summary judgment on laches where technology made it necessary to "actually slice the device open and examine its component structure under a microscope.").

*5 Finally, courts impose a duty on patentees to police their rights and a patentee is charged with such knowledge as it might have obtained on reasonable, diligent inquiry. *See General Electric*, 148 F.3d at 1338; *see also Rockwell*, 103 F.Supp. at 1199. "If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent." *Odetics, Inc. v. Storage Tech. Corp.*, 919 F.Supp. 911, 917-18 (E.D.Va.1996) (vacated on other grounds). While the evidence casts doubt on John's testimony that he diligently policed the ' 488 patent [FN5], the Court will not draw inferences against the non-movant nor make credibility determinations at the summary judgment stage. *See Wanless*, 145 F.3d at 1466-67 (district court reversed for drawing inferences about plaintiff's state of mind against the non-movant and for making impermissible credibility determinations at the summary judgment stage).

> FN5. For example, John attended an October 2002 trade show but chose to look at the girls at the trade show instead of looking at competitor's booths. Pltf. Resp. 56.1 ¶ 37. In general, John didn't look at competitor's booths when he attended industry trade shows. Pltf. Resp. 56.1 ¶ 37. While employed at American Stencil, John was not concerned with what competitors were doing because he "didn't care" and did not police the industry for products that may have infringed on any of his patents because he had "better things to do." Pltf. Resp. 56.1 ¶ 35. In 1993, American Stencil, John's company, sued USA for patent

infringement involving another product but made no efforts it the following years to monitor what USA was selling to its customers. Pltf. Resp. 56.1 ¶ 36. Yet, while John didn't "peek through windows to find out what someone else is doing," he attests that the '488 patent must be tested by taking a physical sample to determine infringement and that he is absolutely concerned with whether others infringe on his products. Def. Resp. 56.1 ¶ 6. In light of the existence of disputed facts, the Court will not draw inferences against the non-movant regarding John's credibility or his state of mind. However, whether John adequately policed his rights will certainly be considered at trial.

USA has failed to show the absence of genuine issues of material fact whether John knew or should have known of defendant's alleged infringement before April 12, 2000. USA suggests that plaintiff is simply not credible on the issue of his knowledge. The credibility of witnesses, however, cannot be resolved on summary judgment. *Abdullahi v. City of Madison*, 423 F.3d 762, 2005 U.S.App. LEXIS 19580, 2005 WL 2179827, at *9 (7th Cir.2005). Accordingly, the six-year presumption does not apply to the instant case.

Without the benefit of the six-year presumption, the burden remains on USA to establish the absence of a disputed issue of material fact whether plaintiff's delay was unreasonable and inexcusable, and whether defendant suffered either economic or evidentiary prejudice that would have been avoided had plaintiff filed suit earlier. *General Electric*, 148 F.3d at 1337; *Aukerman*, 960 F.2d at 1028. Here, Integrated has raised triable issues of material fact that it filed the instant action approximately one year after it learned that there may be infringements of the '488 patent and defendant does not argue that a one year delay is unreasonable or that it harmed USA. Def. Resp. 56.1 ¶ 5. In fact, USA asserts that it suffered prejudice as a result of investments re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

lated to integrated cards "since it started to sell [them]" and that it "reduced its efforts in selling the allegedly infringing card" since October 2005. Pltf. Resp. 56.1 ¶ 78, 82; Memorandum, p. 18.

Integrated also argues that the court should deny the motion for summary judgment because USA has failed to offer any evidence of either economic or evidentiary prejudice, as required to establish a laches defense. In particular, Integrated argues that USA fails to establish that its increased expenditures on the development and marketing of the accused product were related to the alleged delay and not a change in position or a business decision to capitalize on a market opportunity. *See Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1294 (Fed.Cir.1992) (nexus must be shown between the patentee's delay in filing suit and the expenditures; the alleged infringer must change his position "because of and as a result of the delay."). Integrated also asserts that USA fails to establish that as a result of missing evidence, it cannot put on a fair defense. "Conclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, is not sufficient." *Meyers v. Asics Corp.,* 974 F.2d 1304, 1308 (Fed.Cir.1992). Because the court denies summary judgment on laches, it need not resolve the prejudice issue at this stage. The court notes, however, that questions of disputed material fact regarding the prejudice element of the laches defense should be addressed during the bifurcated bench trial on laches, discussed below.

*6 Accordingly, without the benefit of the six-year presumption and with disputed facts about prejudice, defendant has failed to establish the required elements of the laches affirmative defense. *See Hemstreet v. Scan Optics, Inc.,* 1992 U.S. Dist. LEXIS 18393, 1992 WL 368059 (N.D.Ill.Dec.3, 1992) (denying summary judgment on laches because disputed issues regarding when the patentee knew or should have known of the infringement). Whether the defense of laches applies is a legal or

equitable question for the court. *Town of Munster, Ind. v. Sherwin-Williams Co., Inc.,* 27 F.3d 1268, 1269 (7th Cir.1994). Given the time and expense required to litigate a patent infringement claim, a bench trial on laches before proceeding to issues on infringement is in the interest of both the parties and the court. *See PSN Ill., Inc. v. Ivoclar Vivadent, Inc.,* 398 F.Supp.2d 902, 911 (N.D.Ill.2005); *citing Aero Products Int'l, Inc. v. Intex Recreation Corp.,* 2004 U.S. Dist. LEXIS 12899, 2004 WL 1557942, at * 1 (N.D.Ill. July 9, 2004) (jury trial held in patent case, but issue of whether defense of laches applies reserved for court's determination). The court will address laches, including: (1) if the six-year presumption applies [FN6]; and (2) if the presumption does not apply, whether Integrated's delay was unreasonable and inexcusable from the length of time that it knew or reasonably should have known of its claims against USA and whether USA has established prejudice. Additionally, the Court will address disputed issues regarding whether John, and thus, Integrated, was willfully or negligently oblivious to the activities of others in the industry, including USA. Pltf. Resp. 56.1 ¶ 35; Def. Resp. 56.1 ¶¶ 2, 17, 24, 40, 55, 77, 28, 30, 40; *see also Beam Laser Systems, Inc. v. Cox Comm., Inc.,* 144 F.Supp. 464, 470-72 (E.D.Va.2001); *General Electric,* 148 F.3d at 1336.

> FN6. The parties are further directed to address the issue of whether the '488 product is easily testable and as to all of the alleged instances when Stack or John were given notice of the alleged infringement, whether the actual infringing product, namely, the '488 product, was discussed or shown to them and not some other type of integrated card.

## II. Equitable Estoppel

USA's Motion for Summary Judgment on the basis of estoppel fails for the same reasons as its motion on the basis of laches. USA argues that Integrated should be equitably estopped from claiming that USA infringed the '488 patent. In order for

Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)
(Cite as: 2008 WL 3286981 (N.D.Ill.))

an equitable estoppel defense to bar a patent infringement claim, the alleged infringer must show that: (1) the patentee led the alleged infringer to reasonably infer that the patentee would not enforce its patent; (2) the alleged infringer relied on that conduct; and (3) the patentee suffered material injury as a consequence of that reliance. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992). Reliance by the other party as well as prejudice are required in order to estop the patentee from later suing. *Id.* at 1042-43. The issue of estoppel is committed to the sound discretion of the court. *Aukerman*, 960 F.2d at 1041.

Turning to the first element, USA does not argue that John or others made misleading statements that led it to infer that Integrated did not intend to enforce the '488 patent. Rather, USA argues that John, having either actual or constructive knowledge of the accused product, made a strategic decision to "do nothing" until October 2005 when John sent USA a cease and desist letter. During John's alleged affirmatively misleading 10-year period of silence, USA asserts that it further invested in the accused product. As such, USA's argument is premised upon the presumption that John had actual or constructive knowledge of the '488 prior to 2005 when it sent the cease and desist letter to USA. Because this Court has already concluded that there is a genuine issue of material fact regarding John's actual or contractive knowledge of the patent, USA's estoppel argument is denied. That said, a patentee's inaction can constitute "misleading conduct' when coupled with other factors. *Id.* at 1042. As with the laches issues, a bench trial on estoppel before proceeding to issues on infringement is in the interest of both the parties and the court. The court will address equitable estoppel, including: (1) Integrated's actual or constructive knowledge of the accused product; (2) assuming John knew or should have known of USA's potentially infringing conduct prior to October 2005, whether his inaction constituted misleading conduct; (3) whether USA reasonably relied on that conduct; and (4) whether USA suffered material in-

jury as a consequence of that reliance.

*7 Finally, USA argues that John in an "inherently incredible witness" and that the instant suit was filed for an improper purpose-namely, John's ancient grudge against his brother Steve. John and Steve's credibility will be judged at trial.

III. *Conclusion and Order*

For the reasons stated above, the court denies defendant's motion for summary judgment on laches.[FN7] A status hearing on this matter is set for August 20, 2008 at 9:00 a.m. The parties are directed to be prepared to discuss pretrial preparation for a bifurcated bench trial on laches and estoppel, and to set a trial date.

> FN7. USA's Motion to Strike Integrated Response to its Statement of Fact (Dk.90) is granted in part and denied in part consistent with this order. Integrated's Motion to Strike Exhibit SS is granted. (Dk.85). Exhibit SS contains twenty-six pages of attorney argument that should have been included in its Reply brief. *See Local Rule 7.1; see also Solaia Tech. LLC v. Arvin-Meritor, Inc.*, 361 F.Supp.2d 797, 817 (N.D.Ill.2005); *Rochlin v. Cincinnati Ins. Co.*, 2003 U.S. Dist. LEXIS 13759, *23-24, 2003 WL 21852341 (S.D.Ind. July 8, 2003).

So ordered.

N.D.Ill.,2008.
Integrated Cards, L.L.C. v. McKillip Industries, Inc.
Not Reported in F.Supp.2d, 2008 WL 3286981 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.)) ·

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Mark MOORE, Plaintiff,
v.
BROADCOM CORPORATION, et al, Defendant.

No. C06-05647 MJJ.
Feb. 14, 2008.

Timothy T. Huber, Law Offices of Timothy T.
Huber, El Dorado Hills, CA, for Plaintiff.

Thomas Joseph Wimbiscus, Joseph F. Harding,
Ronald H. Spuhler, Chicago, IL, Nathan Lane, III,
Squire Sanders & Dempsey, San Francisco, CA, for
Defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

MARTIN J. JENKINS, District Judge.

### INTRODUCTION

*1 Before the Court is Defendants Broadcom
Corporation ("Broadcom") and Paul Beard's
("Beard") (collectively, "Defendants") Motion for
Summary Judgment. (Docket No. 49.) Plaintiff
Mark Moore ("Moore" or "Plaintiff") opposes the
Motion. For the following reasons, the Court
GRANTS the Motion.

### FACTUAL BACKGROUND

This action presents a dispute over the ownership of a patent. The following facts are undisputed
unless noted.

### A. Defendants and the Patent at Issue

In 1996, Defendant Beard was employed by
Norand Technologies ("Norand"), a manufacturer
of bar code readers and scanners. (UF ¶ 10.) In
the Spring of 1997, Norand was acquired by Intermec,
Inc. ("Intermec"). (UF ¶ 11.)

On December 31, 1997, Intermec, while Beard
was employed there, filed a provisional application
for a patent. (UF ¶ 6.) Beard was the only inventor
named on the provisional application. (Id.) On
December 30, 1998, the provisional application was
converted to a non-provisional application. (UF ¶
7.) Again, Beard was the only inventor named on
the non-provisional application. (Id.) On January 9,
2001, the United States Patent Office issued the application as United States Patent No. 6,172,712 (the
" '712 patent"). Defendant Beard is the sole inventor or listed on the '712 patent. (UF ¶ 2.)

The '712 Patent is entitled "Television with
Hard Disk Drive." (UF ¶ 5.) The '712 patent claims
an apparatus comprised of a disk drive and a video
processing system that simultaneously (1) stores a
video feed to a computer-like hard drive or similar
storage device; and (2) plays back any part of the
stored video while the video feed continues to be
stored. (UF ¶ 9; Defs.' Mem. of P. & A. at 3.) The
most common use of this invention today is in personal video recorders, which allow a viewer to
pause and/or "rewind" a television show while the
hard drive continues to record the show. (Defs.'
Mem. of P. & A. at 3-4.) The viewer can then fast
forward through commercials when playing back
the show. (Id. at 4.)

In 1998, Beard left the employ of Intermec to
focus on his new position at Alation, a startup company that he and Plaintiff Moore started together.
(UF ¶ 35; Defs.' Mem. of P. & A. at 4.) On January
19, 1999 Beard executed, and recorded, an assignment conveying all rights to the invention claimed
in the ' 712 patent to Intermec IP Corporation, a
holding company for Intermec. (UF ¶ 12.) On February 6, 2001, Intermec IP assigned, and recorded,
all rights, title and interest in the '712 patent to its
parent company, Unova, Inc. (UF ¶ 14.) On February 6, 2003, Defendant Broadcom recorded an assignment with the United States Patent Office confirming its acquisition of the '712 patent. Defendant
Broadcom now owns all rights, title and interest in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

the '712 patent. (UF ¶ 1.)

### B. Plaintiff Moore

Moore began working as a software engineer at Compaq Computer in 1994. (UF ¶ 19.) When Compaq closed its San Bruno office in February 1997, several individuals, including Moore and Beard, formed their own company under the name "Not Limited," which was subsequently changed to "Alation." (UF ¶ 21-22; Harding Decl., Exh. C at 65:8-13.) Under these auspices, and pro se, Beard and Moore filed for more than three other patents. (UF ¶ 23-25.) In May 2000, Cypress Semiconductor Corp. acquired Alation. (UF ¶ 26.)

*2 "Pause Live TV," as the '712 Patent invention was referred to, was an idea discussed by Alation members at multiple meetings in 1997, but the company decided to pursue the creation of a wireless home network and not the Pause Live TV idea at that point. (Harding Decl., Exh. C at 106-110.) Defendant Beard then decided to pursue the patent with his current employer, Intermec. (*See id.* at 422:15-423:10.) Defendant Beard provided Moore with a copy of the provisional application around December 31, 1997, the date that the provisional application was filed. (UF ¶ 16.) Moore was aware of the contents of the provisional application on or about December 31, 1997, and was aware that he was not named as an inventor on the provisional application. (UF ¶ 17.) Moore had knowledge that the '712 patent issued on or about January 9, 2001, the date that the '712 patent issued.

### C. Procedural History

On September 14, 2006, Plaintiff filed the Complaint in this action seeking (1) to be declared a co-inventor on the '712 Patent; and (2) an award of damages for unjust enrichment. (*See* Complaint, Docket No. 1.) In this Motion, Defendants seek an order granting summary judgment on the basis of laches, estoppel, inventorship and statutes of limitation. (*See* Defs.' Mem. of P. & A. at 1.)

### LEGAL STANDARD
### A. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson,* 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *Id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

### B. Laches

*3 To invoke the laches defense Defendants have the burden of proving that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant", and that (2) "the delay operated to the prejudice or injury of the defendant."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc). The application of the equitable defense of laches is committed to the sound discretion of the district court. *Id.* A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties. *Id.*

"*Prima facie,* the underlying critical factors of laches are presumed upon proof that the [omitted inventor] delayed filing suit for more than six years after actual or constructive knowledge" of the claim.[FN1] *Id.* at 1035-36. Where the presumption applies, the two facts of unreasonable delay and material prejudice "*must* be inferred, absent rebuttal evidence." *Id.* at 1037 (emphasis in original). The presumption of laches shifts the burden of production (but not the burden of persuasion) to the plaintiff to offer proof either that the patentee's delay was reasonable, or that the defendant suffered no prejudice, or both. *Id.* at 1038. The plaintiff must provide evidence sufficient to put the existence of either the presumed fact of unreasonable delay, or the presumed fact of prejudice, into genuine dispute-i.e., sufficient to support a finding of the nonexistence of the presumed fact. *Id.* at 1037. If the plaintiff provides such evidence, raising a genuine issue respecting either unreasonable delay or prejudice, the presumption disappears entirely as to both factors and the accused infringer is put to its proof on the entirety of the laches defense. *Id.* at 1038; *see also Hemstreet v. Computer Entry Systems Corp.,* 972 F.2d 1290, 1293 (Fed.Cir.1992) ("the presumption of laches which arises after a defendant proves a six-year delay is a 'double-bursting bubble' which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to *either* delay or prejudice.") (emphasis in original).

> FN1. While *Aukerman* was decided in the context of a patent infringement case, the rules announced in *Aukerman* apply with equal force in the inventorship context. *See Advanced Cardiovascular Systems, Inc. v.*

*Scimed Life,* 988 F.2d 1157, 1163 (Fed.Cir.1993) (holding that the rebuttable presumption of laches described in *Aukerman* applies to claims of inventorship as well as patent infringement).

Ultimately, the establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case. *Aukerman,* 960 F.2d at 1036. Laches remains an equitable judgment of the trial court in light of all the circumstances. *Id .* If the decision on laches is made on summary judgment, there must be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered. *Id.* at 1039.

## ANALYSIS
### A. Presumption of Laches Applies

The Court first determines if the presumption of laches applies to the instant case. In infringement actions, the period of delay "is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit" but cannot begin prior to the issuance of the patent. *Aukerman,* 960 F.2d at 1032. However, in cases for correction of inventorship, the Circuit has held that "[w]hen applying the equitable doctrine of laches in order to bar a claim, the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter" and *not* from the date of the issuance of the patent. *See Advanced Cardiovascular Systems,* 988 F.2d at 1161-62.

*4 Here, Defendant Beard provided Moore with a copy of the provisional application around December 31, 1997, the date that the provisional application was filed. (UF ¶ 16.) Moore was aware of the contents of the provisional application on or about December 31, 1997, and was aware that he was not named as an inventor on the provisional application. (UF ¶ 17.) Thus, Defendants argue, more than eight years passed between the moment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

Plaintiff knew, or reasonably should have known, that Defendants had filed an application for a patent on the invention, and failed to name him, and the time Plaintiff filed suit.

Plaintiff, on the other hand, without citation to a single case, argues that the laches presumption does not apply to an action to correct inventorship and that the period of delay was less than the six years required to create the presumption of laches. ( *See* Plf.'s Opp. at 14.) As to Plaintiff's first contention, that the presumption of laches does not apply to inventorship claims, the Federal Circuit has held to the contrary. *See Advanced Cardiovascular Systems,* 988 F.2d at 1163 (holding that the laches presumption applies to an action to correct inventorship).

As to Plaintiff's second argument, the Circuit, in *Advanced Cardiovascular Systems,* clearly held that unlike infringement cases, the claimant's knowledge, rather than the date of the issuance of the patent, controls for establishing the period of delay. *Id.* at 1161-62. In that case, however, the period of delay at issue occurred after the issuance of the patent. The Circuit has not, therefore, explicitly ruled on whether the period of delay may begin prior to the issuance of a patent. For the following reasons the Court finds that the period of delay may begin prior to the issuance of a patent.

First, the rationale of *Advanced Cardiovascular Systems* counsels in favor of this finding. In *Advanced Cardiovascular Systems,* the Circuit reasoned that laches apply at any time that inventorship may be remedied, but should not apply before the omitted inventor has learned of the claim. *See id.* at 1162. The Circuit's rationale is "in harmony with the patent statute, for in accordance with 35 U.S.C. § 256 inventorship may be corrected at any time, whether by direct application to the commissioner or by the court." *Id.* (footnote omitted). The Court noted that "[w]ere laches measured constructively from the date of patent issuance, an erroneously omitted inventor could be barred from remedy before he or she learned of the existence of

the patent." *Id.* This, the Circuit held, is not in keeping with "either § 256 or the practice that allows challenges to patent validity throughout the patent life."

While not discussed in *Advanced Cardiovascular Systems,* pursuant to 35 U.S.C. § 116, correction of inventorship may be accomplished prior to the issuance of a patent by application to the commissioner. *See* 35 U.S.C. § 116; 37 C.F.R. § 1.48. In addition, an action to correct inventorship while the patent application is still pending, under 35 U.S.C. § 116, includes the requirement that such amendment must be diligently made. *See* 37 C.F.R. § 1.48; *Stark v. Advanced Magnetic, Inc.,* 29 F.3d 1570, 1574 (Fed.Cir.1994). The requirement of diligence supports a finding that delay is discouraged, and laches may apply, even at these early stages. Thus, the rationale of *Advanced Cardiovascular Systems,* that laches may apply at any time that inventorship may be remedied but should not apply before the omitted inventor has learned of the claim, applies in equal force to the time during which a patent application is pending, but before it is issued. *See id.* at 1162.

*5 Next, at least one other district court has found that in correction of inventorship actions "the time period for laches commences when [Plaintiff] knew, or reasonably should have known, that Defendants had filed an application for a patent on the system, and failed to name him." *Frugoli v. Fougnies,* 74 U.S.P.Q.2d 1716, 1719 (D.Ariz.2004). Finally, while *Advanced Cardiovascular Systems* involved a situation in which, unlike the instant case, an omitted inventor gained knowledge about the omission *after* the date of the patent, the language of the opinion is broad and counsels against delaying the beginning of the laches period until after the issuance of the patent. Thus, the Court finds that the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter. *See Advanced Cardiovascular Systems,* 988 F.2d at 1161-62.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

In the instant case, it is undisputed on this record that Moore knew that Beard filed a copy of the provisional application around December 31, 1997 and that Beard was listed as the sole inventor. (UF ¶¶ 16-17.) Moore also repeatedly testifies to his knowledge, from 1997 forward, of the provisional application, the facts surrounding its prosecution and his desires to acquire or license the '712 Patent. (See, e.g., Huber Decl., Exh. 1 at 412:21-414:7.) On this record, therefore, there are no triable issues of material fact as to the date Plaintiff knew, or should have known, of the facts underlying the inventorship claim. Instead, it is undisputed that Plaintiff knew, by December 31, 1997, of the filing of the application which resulted in the ' 712 Patent and knew at that time that it failed to name him as an inventor. Thus, more than eight years passed from when Plaintiff knew he was not named as an inventor and the filing of this action, thus establishing the requisite period of delay. Plaintiff's contentions to the contrary are unavailing.[FN2]

> FN2. Plaintiff states, in his responses to interrogatories, that it was not until 2004 that he learned that he could correct the '712 Patent to reflect the names of the true inventors. (See Harding Decl., Exh. G at 4:10-24.) Plaintiff does not raise this argument in the Opposition. Even if raised, however, this argument is not meritorious because Plaintiff's knowledge of the facts, not knowledge of the law, is the critical question and Plaintiff does not dispute that he was aware of the provisional application on the date it was filed. (See id. at 4:10-13.)

The Court therefore applies a presumption of laches with respect to Moore. Accordingly, unreasonable delay and material prejudice "must be inferred, absent rebuttal evidence." Aukerman, 960 F.2d at 1037 (emphasis in original). The burden of coming forward with "evidence sufficient to support a finding of the nonexistence of a presumed fact" is shifted to Moore. Id. at 1037. Moore can

meet his burden of production, and "burst" the presumption bubble, by introducing "evidence sufficient to raise a genuine dispute as to either delay or prejudice." Hemstreet, 972 F.2d at 1293.

At oral argument, Plaintiff's counsel conceded that if the Court applies the presumption of laches in this case, Plaintiff has no good argument as to why the Court should not grant the Motion. That said, the Court reviews the evidence presented as to both reasonableness and prejudice.

**B. Reasonableness of Moore's Delay**

To overcome the presumed fact of unreasonable delay, Moore "bears the burden only of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of [his] conduct." Aukerman, 960 F.2d at 1039. The Court must weigh any justification offered by the plaintiff. Id. at 1033. The Court, carefully considering all of the evidence submitted by Moore, finds that Moore has failed to meet this burden.

*6 Moore proffers one excuse as to his delay in filing suit. Moore contends that Beard omitted Moore as an inventor of the '712 Patent so that Norand/Intermec would pay for its prosecution. (Plf.'s Opp. at 15-16.) Without the omission of Moore as an inventor, the argument goes, Norand/Intermec would not have agreed to prosecute the patent because they did not receive an assignment from Moore, only from Beard. (See id.) Thus, Beard proceeded as the sole inventor with Norand/Intermec, with the hopes of one day buying back the '712 Patent. (See id.) In the meantime, Plaintiff asserts that Beard forcefully induced Moore to take no action and thereby not "make waves." (See id.)

The evidence in the record is as follows. Moore testified that Beard asked, and encouraged, Moore and other Alation colleagues to file the patent application with him, but that they did not have the resources to do so. (See, e.g., Huber Decl., Exh. 1 at 414:5-7.) Moore testified that Beard thought that Norand was a safe place to "park" the intellectual property, which Moore and Beard could then li-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

cense back or obtain from Norand at a later date. (
*See, e.g., id.* at 4:22:19-423:5.) In the meantime,
Moore lobbied Beard to get a license for the patent
so the two of them could compete with TiVo, but
Beard discouraged him from doing so at that time. (
*See, e.g., id.* at 413:10-19.) Beard also discouraged
Moore from contacting anyone at Norand/Intermec
regarding the patent. (*See, e.g., id.* at 186:14-16,
198:21-23.)

Viewing this evidence in a light most favorable
to Plaintiff, the "scheme" Moore asserts does not
create a genuine issue of fact as to the *reasonable-
ness* of Moore's delay. Instead, the evidence shows
that Moore and Beard together decided that Beard
should pursue the patent as the sole inventor with
Norand/Intermec. Then, after the application was
underway, Beard refused to pursue a license or pur-
chase of the '712 Patent with Moore, even though
Beard hoped to license, or purchase, the patent
from Norand/Intermec at a later date. The evidence
does not, however, show why Moore could not
have asserted his inventorship rights at an earlier
date. Instead, the "scheme" appears to have more to
do with the issue of licensing, or purchasing, the
patent and not the inventorship issue itself. Most
importantly, however, Plaintiff was a party to the
alleged scheme against Norand/Intermec and/or the
Patent Office and has not offered evidence that
raises a genuine factual issue as to why the delay
that resulted from his own scheme was reasonable.
On this record, therefore, Plaintiff has not raised a
genuine factual issue as to the reasonableness of his
delay.

## C. Material Prejudice
Material prejudice "may be either economic or
evidentiary." *Aukerman,* 960 F.2d at 1033. A show-
ing of *either* evidentiary or economic prejudice
constitutes material prejudice. *Id.* As with the ele-
ment of unreasonable delay, material prejudice is
presumed and Moore bears the burden of produc-
tion.

## 1. Economic Prejudice
*7 "Economic prejudice may arise where a de-

fendant will suffer the loss of monetary investments
or incur damages which likely would have been
prevented by earlier suit." *Aukerman,* 960 F.2d at
1033. Expenditures and investments must have a
"nexus" to the patentee's delay in filing suit. *Hem-
street,* 972 F.2d at 1294. "It is not enough that the
alleged infringer changed his position-i.e., invested
in production of the allegedly infringing device.
The change must be because of and as a result of
the delay, not simply a business decision to capital-
ize on a market opportunity ." *Id.* However, "there
is a difference between prejudice that results from
delay and prejudice that is due to reliance upon
delay." *Meyers v. Asics Corp.,* 974 F.2d 1304, 1308
n. 1 (Fed.Cir.1992). Defendants "need not show
that they relied on [the patentee's] delay to establish
laches. However, they must show that the prejudice
they suffered resulted from the delay." *Id.*

Because of the presumption, Moore bears the
burden of production and must come forward with
evidence sufficient to raise a genuine factual issue
as to whether economic prejudice exists. Plaintiff
does not submit any evidence on this point. Instead,
Plaintiff argues that Defendants' evidence does not
demonstrate that Broadcom actually spent any ma-
terial sums on the '712 Patent that it might not have
spent had it known of Moore's claims.[FN3] (Plf.'s
Opp. at 14.) Plaintiff has therefore failed to meet its
burden of production by failing to come forth with
sufficient evidence to negate the presumed fact of
economic prejudice.[FN4] *See Hall v. Aqua Queen
Mfg., Inc.,* 93 F.3d 1548, 1554 (Fed.Cir.1996)
(holding that under the presumption, "defendants
could have remained utterly mute on the issue of
prejudice and nonetheless prevailed").

> FN3. Plaintiff also requests a continuance
> of this hearing under Rule 56(f) if "the
> court puts any credence in Broadcom's
> claims of economic prejudice." (Plf.'s Opp.
> at 15.) Plaintiff, however, does not state
> what specific evidence he could obtain
> with a continuance which would prevent
> summary judgment. Defendants also object

Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)
(Cite as: 2008 WL 425932 (N.D.Cal.))

to this request in their "Responses to Moore's Objections to Evidence." At oral argument, Plaintiff's counsel went so far as to concede that if the Court applied the presumption of laches, the Motion should probably be granted. Thus, the Court perceives no justification for granting a continuance under Rule 56(f).

FN4. While Plaintiff fails entirely to meet the burden of production on this point, Defendants submit evidence that Moore's unreasonable delay has caused a "whirlwind" of economic prejudice including: (1) Intermec's reliance on Moore's silence while prosecuting the '712 Patent and Intermec's subsequent representations and warranties to Broadcom of full ownership; (2) Broadcom's reliance upon Intermec's warranties and Moore's silence when it paid $24 million for a multi-patent acquisition which included the '712 Patent; (3) Broadcom's bringing of a patent infringement lawsuit; and (4) Broadcom's licensing of the patent to various third parties. (See Brazeal Decl. ¶¶ 2-10.) Plaintiff raises evidentiary objections to these paragraphs of the Brazeal declaration based on Declarant's lack of personal knowledge, hearsay, and violations of the best evidence rule. Upon review, the Court finds that Plaintiff's evidentiary objections are not meritorious. Defendants' evidence, therefore, serves to further support the proposition that Defendants suffered economic prejudice.

**2. Evidentiary Prejudice**

Evidentiary prejudice may arise where the "defendant's ability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events" undermines the Court's ability to judge facts. *Aukerman*, 960 F.2d at 1033.

Defendants argue that they will suffer from evidentiary prejudice because Moore has no contemporaneous records of events, Moore repeatedly admitted his inability to recall details of the events asserted to have taken place years ago, other witnesses have expressed difficulty with remembering events from years ago and the dates and events in the record are inconsistent given the passage of time. (See Defs.' Mem. of P. & A. at 15.) Plaintiff argues that Defendants have failed to offer admissible evidence of evidentiary prejudice and that Moore, not Defendants, is actually prejudiced by the passage of time. (Plf.'s Opp. at 14.) Plaintiff, however, does not submit any evidence to rebut the presumption.

Plaintiff, therefore, has failed to meet its burden of production by failing to come forth with sufficient evidence to negate the presumed fact of evidentiary prejudice. *See Hall*, 93 F.3d at 1554.

**D. Weighing Of Factors In Exercise Of This Court's Discretion.**

*8 The Court considers "all pertinent facts and equities" based on undisputed facts, including the more than eight year delay, the presumed and unrebutted fact of unreasonable delay and the presumed and unrebutted fact of material prejudice. On this basis, the Court exercises its equitable discretion to grant Defendants' Motion for Laches on Plaintiff's inventorship claim. Plaintiff's unjust enrichment claim, and Defendants' Motion for Summary Judgment on that claim, is moot as it is premised entirely on the declaration of inventorship rights.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. The Clerk of the Court is directed to close the file.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Moore v. Broadcom Corp.
Not Reported in F.Supp.2d, 2008 WL 425932 (N.D.Cal.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.