**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MEMORYLINK CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 3301** |
| **v.** | ) | |
| | ) | |
| **MOTOROLA SOLUTIONS, INC. and** | ) | **Judge John J. Tharp, Jr.** |
| **MOTOROLA MOBILITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Memorylink Corporation ("Memorylink") asserts numerous claims against Motorola Solutions, Inc. and Motorola Mobility, Inc. (collectively, "Motorola") stemming from the parties' business relationship. At the close of fact discovery, Motorola moved for summary judgment on all of Memorylink's claims. For the reasons explained below, Motorola's motion for summary judgment is denied as to Memorylink's "Correction of Inventorship" claim relating to the '352 Patent (Count I), but Motorola's motion is granted with respect to all other claims.

**BACKGROUND**[1]

In June 1997, Peter Strandwitz, at that time the CEO of Plexus Corp. ("Plexus"), developed the idea of a handheld video camera that could wirelessly transmit video to another camera or monitor. Aware of the limits of his own video expertise, in August 1997 Strandwitz partnered with Bob Kniskern, a wireless video transmission expert who was at that time the president of Adaptive Micro-Ware, Inc. ("Adaptive"), to try to make his idea a reality. According

---

[1] In deciding a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Therefore, for the purposes of this opinion, the Court will resolve all disputed fact issues in favor of Memorylink.

to Memorylink, by October 1997, Strandwitz and Kniskern had firmly conceived of their invention: a handheld camera device (such as a cell phone or camcorder) that transmits and receives video signals by communicating wirelessly with a base station, utilizing video compression/decompression circuitry and control features to optimize bandwidth usage (hereafter, "the Device").

Strandwitz and Kniskern knew that they needed a radio board for the Device because it required wireless signal transmission. Kniskern identified several companies that supplied radio boards that might work with the invention; Motorola was one of these potential suppliers. In late 1997, Strandwitz contacted Motorola's Radio Research Laboratory about a possible relationship with respect to the Device because Motorola was developing 5 GHz wireless radio technology and because Motorola had a lot of radio expertise. Strandwitz believed that Motorola could also provide economic strength, market power, engineering and industry resources, and business opportunities that would benefit the Device. As of October 31, 1997, Strandwitz and Kniskern had engaged in written dialog with Motorola regarding the Device, and thereafter they worked with Motorola on its development. For example, on December 22, 1997, Kniskern sent a letter to Jan Wyckoff, a Motorola engineer, regarding Motorola's efforts to "support the R.F. link and maximum data throughput" of the Device.

Pursuant to its efforts to help develop the Device, Motorola entered into several contractual relationships with various entities related to Strandwitz and Kniskern. On December 26, 1997, Motorola entered into a non-disclosure agreement ("NDA") with Adaptive[2] that restricted the parties' abilities to share information that they learned through their joint

---

[2] Kniskern signed the NDA on behalf of Adaptive.

enterprise. Next, on January 13, 1998, Motorola agreed to a Memorandum of Understanding ("MOU") with Plexus regarding the Device.[3] The MOU states that "[t]he parties intend to continue the development of a preliminary specification for the Device and to continue discussions about the role each of them would have in the development of the Device if it is mutually decided to proceed with the project." The NDA and MOU both contained provisions explicitly stating that they were non-transferrable without Motorola's prior written consent.

In late December 1997, Strandwitz and Kniskern met with Motorola employees including Wyckoff and Gary Schultz, a Motorola engineer, to discuss the project. The parties agreed that Strandwitz and Kniskern would provide a demonstration of the Device on January 20, 1998. At the meeting, Motorola gave Strandwitz and Kniskern basic information about the radio board that it provided for purposes of the demonstration. On January 20, Strandwitz and Kniskern demonstrated the Device as planned. The demonstration involved a one-way wireless link from a portable camera device located inside a child's lunchbox to a receiver attached to a video monitor. The demonstration was a success. Memorylink contends that Motorola's only contribution to the January 20, 1998 demonstration was the old, generic radio board that it had provided.

After the January 20, 1998 demonstration, the parties determined that the technology would be better demonstrated using a camcorder. Strandwitz went to an electronics store with Schulz and Wyckoff (both of Motorola), and Schulz bought Sharp camcorders for use in the next demonstration. The next day, Strandwitz sent a letter to Tom Waltz, Motorola's Director of

---

[3] Strandwitz signed the MOU on behalf of Plexus.

Strategy and Business Development, regarding jointly patenting the Device. The letter stated, in part:

> Pursuant to the meeting yesterday, I am writing this letter to confirm that it now appears to make good sense to investigate patent protection on various elements of the Device. As we have moved forward conceptually and with the demonstration unit, there is a growing belief that there are patentable elements relative to the Device. We agree that any patents would be jointly owned by Motorola and our team's "funding entity", and that it would make good sense to have Motorola head up the patent investigation.

Ex. 37 to Motorola's Statement of Facts. The letter also included a "Draft for Discussion Only" document stating that any patents and other intellectual property rights that the parties jointly developed would be jointly owned by Motorola and Memorylink. *Id.*

The "funding entity" referred to in Strandwitz's letter was Memorylink, a company created by Strandwitz and Kniskern to serve as a funding and coordinating entity to create wireless video products and technology. Strandwitz was the original investor in Memorylink, and served as CEO and Chairman of the Memorylink board. Kniskern became the President of Memorylink, and was a board member. Memorylink was incorporated on January 28, 1998, and Strandwitz immediately followed up with another letter to Waltz informing him that Memorylink had officially been incorporated and stating that:

> The Memorylink arrangement should simplify matters moving forward. As you and I discussed, any patents relating to the Device would be jointly owned by Motorola and Memorylink.

Ex. 13 to Motorola's Statement of Facts. Strandwitz copied Kniskern on his January 28, 1998 letter.

Over the next month, the parties developed three new circuit boards for use in the Device. Motorola developed a radio board and a control logic board and Memorylink developed a video compression board. Each of these components was necessary to transmit wireless video and each

was installed in the Sharp camcorders. The Motorola control logic board implemented a control feedback mechanism that interfaced between the video compression engine and the radio. Memorylink claims that Kniskern and Strandwitz had conceived of this feedback mechanism and that they understood that it would be part of the Device before they met with Motorola. On February 25, 1998, Strandwitz and Kniskern demonstrated the wireless video system using the Sharp camcorder at Motorola's offices.

Thereafter, the parties intensified their efforts to patent the Device. On April 13, 1998, Hugh Dunlop, a member of Motorola's in-house legal department,[4] sent Strandwitz a letter proposing "that Motorola and MemoryLink enter into an agreement under which one or more joint patent applications are filed." Ex. 42 to Motorola's Statement of Facts. Dunlop's letter also said "[i]t is my understanding from Gary Schultz and Jan Wyckoff that the inventors for these ideas are yourself, Gary, Jan, and Bob Kniskern. Please let me know if you or Bob disagree with this determination of inventorship." *Id.* Strandwitz and Kniskern reviewed Dunlop's letter and did not disagree with his determination of inventorship.[5] On April 21, 1998, Strandwitz and Kniskern met with Schultz and Wyckoff, and each individual signed an invention disclosure form that listed Strandwitz, Kniskern, Wyckoff, and Schulz as joint inventors of the Device. Ex. 44 to Motorola's Statement of Facts. Later, on June 22, 1998, Motorola submitted the patent application for the Device (which became the '352 Patent). The patent application listed

---

[4] Memorylink asserts that Dunlop also served as counsel for Strandwitz, Kniskern, and Memorylink with respect to their intellectual property claims.

[5] Memorylink claims that Strandwitz and Kniskern did not disagree with Dunlop because Dunlop "was their lawyer," because neither Strandwitz nor Kniskern "had a proper understanding of what 'inventorship' was in order to be properly named on a patent," and because "Strandwitz was informed that Motorola's employees needed to be on the patent." Memorylink Resp. to Motorola Statement of Fact ¶ 48.

Strandwitz, Kniskern, Wyckoff, and Schultz as inventors. Motorola prepared, paid the fees for, and prosecuted the '352 patent.

Each of the inventors listed on the '352 Patent entered into a contract to assign their intellectual property rights jointly to Motorola and Memorylink. The assignment agreement states:

> For and in consideration of the sum of One Dollar to us in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, we [Strandwitz, Kniskern, Schulz, and Wyckoff] have sold, assigned and transferred, and do hereby sell, assign and transfer unto [Motorola and Memorylink] . . . the entire right, title and interest [to the '352 Patent].

Ex. 48 to Motorola's Statement of Facts. Kniskern and Strandwitz signed the assignment on June 12 and 13, 1998, respectively, and Schulz and Wyckoff signed it on June 22, 1998.

On June 24, 1998, two days after applying for the '352 Patent, Motorola demonstrated the Device, using wireless camcorders, for Sony. Strandwitz and Kniskern did not attend the Sony demonstration and did not know that it would be occurring, but they were aware that Motorola intended to perform a demonstration for Sony because Motorola had asked them to modify Sony camcorders for the demonstration. Motorola did not require Sony to sign a non-disclosure agreement prior to the demonstration, but Motorola claims that it "diluted" the demonstration so as not to reveal the underlying technology or other confidential information.

Also on June 24, 1998, Motorola filed a second patent application (which was later granted as the '938 Patent) without informing Memorylink and without Memorylink's knowledge or agreement. The '938 Patent depicts two video camcorders with the ability to transmit video via removable modems placed in the camcorders' storage modules. Motorola listed only Schulz and Wyckoff as the "inventors" of the '938 Patent.

The U.S. Patent and Trademark Office later granted the patent applications and issued the '352 Patent on February 18, 2003 and the '938 Patent on June 3, 2003. Memorylink alleges that on November 29, 2007, it for the first time learned from its attorneys that Schulz and Wyckoff were not proper co-inventors, and should not have been listed as such on the '352 Patent. Shortly thereafter, Memorylink learned for the first time of the existence of the '938 Patent.

Memorylink filed its original complaint, which listed twenty separate claims against Motorola, on June 9, 2008. Memorylink later filed two amended complaints revising certain counts and adding an additional six counts for a total of twenty-six counts. This case originally proceeded in this district before Judge Hibbler, who dismissed many of Memorylink's claims on Motorola's motion to dismiss. In their reassignment status report, the parties provided the following helpful chart detailing which claims remain and which have been dismissed.

| Count | Claim | '352 Patent | '938 Patent |
|-------|-------|-------------|-------------|
| I | Correction of Inventorship | ✓ | N/A |
| II | Assignment of '352 Patent is Invalid due to Fraud | Dismissed | N/A |
| III | Assignment of '352 Patent is Void for Lack of Consideration | ✓ | N/A |
| IV | Infringement of '352 Patent | ✓ | N/A |
| V | Correction of Inventorship | N/A | ✓ |
| VI | Breach of Non-Disclosure Agreements | ✓* | |
| VII | Breach of Fiduciary Duty | Dismissed | ✓ |
| VIII | Common Law Fraud | Dismissed | ✓ |
| IX | Promissory Fraud | Dismissed | Dismissed |
| X | Negligent Misrepresentation | Dismissed | Dismissed |
| XI | Conversion | Dismissed | ✓ |
| XII | Tortious Interference | Dismissed | ✓ |
| XIII-XV | Various claims | Dismissed | N/A |
| XVII-XX | Amended as Counts XXIII-XXVI | Dismissed | Dismissed |
| XXI | Breach of Contract | ✓* | |
| XXII | Promissory Fraud (Amended from Count IX) | N/A | ✓ |
| XXIII | Conversion of '938 Patent (In the Alternative) | N/A | ✓ |
| XXIV | Common Law Fraud regarding '938 Patent (In the Alternative) | N/A | ✓ |
| XXV | Conversion of '938 Patent (In the Alternative) | N/A | ✓ |
| XXVI | Common Law Fraud regarding '938 Patent (In the Alternative) | N/A | ✓ |

* Counts VI and XXI are not patent-specific

The parties have taken extensive discovery, and Motorola now moves for summary judgment in its favor on all of Memorylink's remaining claims.

## DISCUSSION

### I. Consideration Supported Assignment of the '352 Patent.

The parties first dispute whether adequate consideration supported Strandwitz and Kniskern's transfer of their intellectual property rights to Motorola and Memorylink. The assignment agreement contains a form recitation of consideration, stating that Strandwitz and Kniskern assigned their intellectual property rights "[f]or and in consideration of the sum of One Dollar to us in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged." Memorylink now challenges that recitation, however, claiming that the "other good and valuable consideration" that they were to have received was Schulz and Wyckoff's reciprocal grant of their ownership of the '352 Patent to Memorylink. According to Memorylink, Schulz and Wyckoff were not true inventors of the '352 Patent, and therefore they had no ownership interest to grant. Thus, Memorylink argues, Strandwitz and Kniskern did not actually receive *anything* in exchange for giving up their rights to the '352 Patent.

Motorola, on the other hand, argues that Memorylink is bound by the contractual acknowledgments of the adequacy of consideration and that, in any event, undisputed evidence shows that Strandwitz and Kniskern received legally valid consideration in exchange for the assignment of their rights. Motorola claims that Strandwitz and Kniskern received at least the following in exchange for their assignment of rights: continued employment benefits from

Memorylink, Plexus, and Adaptive;[6] patent prosecution resources; technical and engineering support; and business opportunities.

Motorola, as the party relying on the assignment agreement, bears the burden of proving adequate consideration. *Serpe v. Williams*, 776 F. Supp. 1285, 1288 (N.D. Ill. 1991).[7] Consideration is the "bargained for exchange of promises or performances, and may consist of a promise, an act, or a forbearance." *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 11324 ¶ 23, 976 N.E.2d 344, 352 (quoting *McInerney v. Charter Golf, Inc.*, 176 Ill.2d 482, 487, 680 N.E.2d 1347, 1350 (Ill. 1997)). "Any act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." *Id.* Courts should "not inquire into the adequacy of consideration to support a contract." *Id.* ¶ 24.

### A. Parol Evidence

Curiously, in view of Motorola's argument that the adequacy of consideration for the assignment is acknowledged on the face of those documents, Memorylink argues that the Court should *not* consider parol evidence in deciding whether Strandwitz and Kniskern received consideration in exchange for the assignment of their intellectual property rights. Resp. Br. (Dkt.

---

[6] Motorola correctly asserts that Strandwitz and Kniskern could have received valid consideration from an entity other than Motorola itself. *See* Restatement (Second) of Contracts § 71(4) (consideration "may be given by the promisee or some other person"). Memorylink does not dispute that valid consideration could have come from an entity other than Motorola.

[7] The assignment contract does not contain a choice of law provision, but both Memorylink and Motorola invoke Illinois law. Motorola MSJ Br. (Dkt. 314) at 15 (Motorola invoking Illinois law); Memorylink Resp. Br. (Dkt. 329) at 5-6 (Memorylink invoking Illinois contract law). And Judge Hibbler previously applied Illinois law to Memorylink's claim that the assignment lacked consideration. *Memorylink Corp. v. Motorola, Inc.*, No. 08 C 3301, 2009 WL 464338, *6 n. 1 (N.D. Ill. Feb. 23, 2009). To determine what state's substantive law applies to the assignment agreement, we employ a "most significant contacts" test. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). Because neither party has given any reason to doubt that Illinois has the most significant contacts with the assignment, and because both parties invoke Illinois law, the Court will apply Illinois substantive law to interpret the assignment.

329) at 16-17. If the Court confines itself to the four corners of the assignment agreement, it must find that Strandwitz and Kniskern *did* receive consideration. The agreement itself unambiguously says that they received "consideration in the sum of One Dollar . . . in hand paid, and other good and valuable consideration." Memorylink argues that the consideration for the assignment was the exchange of patent rights, but there is no such statement in the assignment itself, so absent parol evidence that argument must be rejected. Moreover, Memorylink's argument that parol evidence must be excluded undercuts its position that the assignment was invalid due to a failure of consideration as that is a ground that is ordinarily invoked to *permit* the introduction of parol evidence. *See O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 845, 591 N.E.2d 1384, 1390 (1st Dist. 1992). Curious though its argument may be, Memorylink has eschewed reliance on parol evidence and on that basis alone its argument that there was inadequate consideration to support the assignment must be rejected. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions.").

### B. Schulz and Wyckoff Transferred Their Interest in the '352 Patent.

Even if Memorylink had not disavowed any reliance on parol evidence, and putting aside the question of whether Strandwitz and Kniskern actually received the $1 consideration payment recited in the contract,[8] there is no question that they received other valid, and much more substantial, consideration. In fact, Strandwitz and Kniskern received exactly the consideration that they acknowledge they bargained for: Schulz and Wyckoff's agreement to assign their

---

[8] Strandwitz and Kniskern's declarations state that neither of them received any portion of the "One Dollar" recited in the assignment, nor other consideration. If the Court were to accept parol evidence on this issue, there would be a disputed question of fact as to whether Strandwitz and Kniskern received consideration of $1 as described in the assignment agreement.

intellectual property rights to Memorylink. Memorylink now argues that Schulz and Wyckoff were not properly listed as inventors of the '352 Patent, and therefore that they had no valid intellectual property rights to assign. But the fact remains that Schulz and Wyckoff did assign whatever rights they possessed, and that assignment is valid consideration *even if* it turns out that they should not have been listed as inventors of the '352 Patent. At the time of their assignment, Schulz and Wyckoff at the very least had some basis to claim ownership of the '352 Patent, and their agreement to assign away any ownership claims, however uncertain, constituted consideration. Further, Strandwitz and Kniskern were in a good position to know whether Schulz and Wyckoff had a colorable claim to be co-inventors of the '352 Patent—they knew exactly what Schulz and Wyckoff had and had not done in developing the Device. They apparently believed that the Schulz and Wyckoff did have valuable inventorship claims. Whether Strandwitz and Kniskern were mistaken about the strength of those claims is, for this reason, beside the point.

Consideration does not fail merely because the property transferred from one party to another, though it originally appeared to be valuable, turns out to be worthless. *See Fed. Deposit Ins. Corp. v. Lauterbach*, 626 F.2d 1327, 1339 (7th Cir. 1980) (applying Wisconsin law); *Lindy Lu LLC v. Illinois Cent. R.R. Co.*, 2013 IL App (3d) 120337 at ¶¶ 23-24, 984 N.E.2d 1171, 1176 ("The purchaser of a quitclaim deed may not recover the money he paid or allege a failure of consideration . . . even if the grantor has not title to the property."); *see also* 3 R. Lord, Williston on Contracts § 7:21 (4th ed. 2013) ("most courts, even today, would follow the rule that surrender of a paper, though it turns out factually to be valueless, can serve as consideration for a promise, so long as there is some possibility, though dubious or completely uncertain, that it might have at least some value"). That Schulz and Wyckoff's claim to ownership of the '352

Patent was uncertain—and might eventually be found to be meritless—does not void the contract for lack of consideration. *See Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476, 616 N.E.2d 1095, 1097 (N.Y. 1993) ("The fact that the sellers may not have had a property right in what they sold does not, by itself, render the contract void for lack of consideration.").

At a minimum, Schulz and Wyckoff's ownership of the intellectual property is analogous to a disputed claim that may prove invalid.[9] The Restatement makes clear that the surrender of a claim "which proves to be invalid" is not consideration unless "(a) the claim . . . is in fact doubtful because of uncertainty as to the facts or the law, or (b) the . . . surrendering party believes that the claim or defense may fairly be determined to be valid." Restatement (Second) of Contracts § 74(1). In other words, Schulz and Wyckoff's assignment constituted valid consideration unless the Court finds that their claim to inventorship of the '352 patent was clearly invalid *and* that they did not believe that their inventorship claim might be valid. The Court cannot make either finding.

First, that Schulz and Wyckoff's inventorship claim "is in fact doubtful" is apparent from the fact that the issue is still being litigated 15 years after the parties filed the patent application. Memorylink admits that Schulz and Wyckoff provided some contribution to the '352 Patent, but it disputes whether that contribution was significant enough to result in inventorship. Schulz and Wyckoff, then, had at least an arguable claim to intellectual property rights at the time of the assignment. Second, there is significant evidence that Schulz and Wyckoff believed (and still believe) that they were properly co-inventors of the '352 Patent. They have each testified that they considered themselves to be inventors of the patent, Schulz Dep. at 250 (explaining that the

---

[9] At the time of the assignment, of course, no one disputed Schulz and Wyckoff's ownership of the '352 Patent rights.

group decided that Schulz and Wyckoff were among the inventors of the '352 Patent); Wyckoff

Dep. at 191 (describing parts of '352 Patent that he invented), and Memorylink has presented no

evidence that Schulz and Wyckoff did not consider themselves to be inventors of the '352 Patent.

Therefore, because Schulz and Wyckoff's claim to ownership of the '352 Patent intellectual

property rights was (at least) doubtful and they believed that their claim might be valid, their

assignment of these rights was valid consideration for Strandwitz and Kniskern's

contemporaneous assignment to Motorola.

### C. Strandwitz and Kniskern Received Patent Prosecution Resources.

Strandwitz and Kniskern also bargained for and received patent prosecution resources in

exchange for their assignment of the '352 Patent to Motorola. There is no dispute that Motorola

drafted the '352 Patent specification and claims, paid all fees associated with the patent filing,

and continued to prosecute the patent application after it was filed. The provision of patent

prosecution resources can constitute consideration for the assignment of patent rights. *See

Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11 C 820, 2012 WL 3288487, *6-7 (D.

Minn. Aug. 10, 2012). Memorylink argues that Strandwitz and Kniskern did not bargain for

Motorola's patent prosecution resources, but the undisputed evidence shows that they did. On

January 21, 1998, Strandwitz sent a letter to Waltz of Motorola to discuss patenting their project

that stated:

> We agree that any patents would be jointly owned by Motorola and our team's
> "funding entity" [Memorylink], and that it would make good sense to have
> Motorola head up the patent investigation.

Ex. 37 to Motorola's Statement of Facts. In other words, Strandwitz offered to give joint patent

ownership to Motorola, and asked for Motorola to prosecute the patent. That is classic

"bargained for" consideration, and it provides an independent basis for rejecting Memorylink's

argument that the assignment fails for lack of consideration.

Because the undisputed facts reveal that Strandwitz and Kniskern received consideration

for their agreement to assign their ownership of the '352 Patent to Motorola and Memorylink,

Motorola's motion for summary judgment is granted as to Count III. That means that Motorola

has been a joint owner of the '352 Patent at all relevant times. As Judge Hibbler stated earlier in

this litigation, "[i]t is axiomatic that a joint owner of a patent cannot be liable for infringement."

*Memorylink Corp. v. Motorola, Inc.*, 2009 WL 464338 at *9; *see also* 35 U.S.C. § 262.

Therefore, Motorola is also entitled to summary judgment on Count IV, Memorylink's claim that

Motorola infringed the '352 Patent.

## II.     The Claim for Correction of Inventorship of the '352 Patent Survives Because Motorola Has Not Shown Prejudice from Memorylink's Delay.

Motorola next moves for summary judgment as to Count I of the complaint, arguing that

Memorylink's claim for correction of inventorship is barred by laches and equitable estoppel. As

a practical matter, because the Court has already ruled in Motorola's favor on the '352 Patent

infringement claim, Memorylink may have no economic incentive to maintain this claim.

However, the claim is not moot because 35 U.S.C. § 256, under which Memorylink brings its

claim, applies broadly whenever a party seeks to correct inventorship for its own benefit or to

serve "the public interest of assuring correct inventorship designations on patents." *Chou v. Univ.*

*of Chicago*, 254 F.3d 1347, 1358 (Fed. Cir. 2001). Because correcting the inventorship of the

patent constitutes a remedy of its own, the claim is not moot, and the Court will consider it.

A rebuttable presumption of laches applies to a correction of inventorship claim where a

plaintiff delays filing suit for more than six years after knowledge of the facts underlying its

14

claim. *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008). "[T]he laches period for a § 256 correction of inventorship claim begins to run when the . . . inventor knew or should have known of the issuance of the patent, regardless of whether the . . . inventor knew or should have known of the [allegedly incorrect] inventorship while the patent application was pending before the PTO." *Hor v. Chu*, 699 F.3d 1331, 1336-37 (Fed. Cir. 2012) (internal quotation marks omitted).[10] The '352 Patent was issued on February 18, 2003, and Memorylink filed suit on June 9, 2008, a delay of nearly five and a half years. Though Memorylink's delay was significant, it does not meet the six year requirement for the presumption of laches to apply.

Even without the presumption of laches, Motorola may still argue that laches applies. Dismissal of a claim on the ground of laches is appropriate only where there is "(1) unreasonable and unexcused delay in bringing the claim, and (2) material prejudice to the defendant as a result of the delay." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). Here, Memorylink waited over five years from when its correction of inventorship claim arose until filing its complaint. Memorylink claims that its delay was reasonable because Motorola and its inside counsel, Dunlop, deliberately misled it into believing that Schulz and Wyckoff were properly named as inventors. Judge Hibbler previously examined and rejected this argument:

> The notion that Memorylink had no suspicions of fraud seem[s] highly suspect given Memorylink's dogged insistence that Motorola's engineers contributed nothing to the patent. In this case, Motorola's purported fraud would be relatively easy to unearth. An individual does not need a law degree to understand that those

---

[10] The *Hor* opinion was issued after the parties filed their summary judgment briefs, and it settles the legal question the parties' disputed in their briefs as to whether the laches period began in 1998 when Strandwitz and Kniskern knew that Schulz and Wyckoff were named as inventors of the '352 Patent or when the patent was issued in 2003.

who contribute nothing to an invention are not "required" to be listed as "co-inventors" [on the patent].

*Memorylink Corp. v. Motorola, Inc.*, 2009 WL 464338 at *5. Memorylink's excuse for its delay boils down to its own ignorance of the law of inventorship. But "ignorance of one's legal rights is not a reasonable excuse in a laches case." *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 55 (D.D.C. 2008); *see also Jones v. United States*, 6 Cl. Ct. 531, 532-33 (Cl. Ct. 1984) (rejecting laches defense based on ignorance of the law). Memorylink's delay in pressing its claim is unreasonable and unexcused.

However, Motorola fails to establish the prejudice required to rely on laches. Prejudice can be evidentiary or economic. Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992). Motorola argues that in their depositions, Strandwitz, Kniskern, and Wyckoff could not remember specific details about what had happened at the time of the invention, nearly fifteen years earlier. But the details that the witnesses cannot remember do not appear to be crucial to deciding inventorship. For example, Strandwitz cannot remember who attended the meeting at which Memorylink and Motorola decided to add Schulz and Wyckoff to the '352 Patent, but that detail is completely irrelevant to the question whether Schulz and Wyckoff were properly named as inventors. Similarly, Kniskern does not recall whether he worked with Schulz and Wyckoff in preparing the patent application itself, nor does he recall when Motorola first sent him information about the radio boards it planned to supply. Wyckoff does not remember the date on which he conceived of the Device covered in the '352 Patent, when Motorola sent the

radio board specifications, or what was said at the time that the parties decided that Schulz and Wyckoff would be named as inventors.[11] None of those details are directly material to the inventorship question. And the documents that Motorola has identified as missing—such as a signed copy of the Joint Patent Filing Agreement[12]—also do not appear to directly impact the inventorship question. Though time has surely dulled the witnesses' memories, Motorola has not established that it will be unable "to present a full and fair defense" to Memorylink's inventorship claim, nor that it has suffered material evidentiary prejudice by reason of the delay. *Aukerman*, 960 F.2d at 1033.

Nor has Motorola established economic prejudice. It claims that its legal department incurred patent prosecution costs because of Memorylink's delay, but most of Motorola's patent prosecution costs were likely incurred prior to the inception of Memorylink's claim, which did not occur until after the USPTO issued the '352 Patent. And because Motorola is a joint owner of the patent due to the inventors' assignment, it incurred patent prosecution costs not because of Memorylink's delay, but rather in order to protect its own economic interests. Therefore, Motorola cannot establish prejudice from Memorylink's delay, and its argument that Memorylink's correction of invention claim is barred by laches fails.

Motorola's equitable estoppel defense fails for the same reason as its laches claim: lack of prejudice. *See DSM Desotech, Inc. v. 3D Sys. Corp.*, 900 F.Supp.2d 783, 792 (N.D. Ill. 2012)

---

[11] Wyckoff also testified that he could not "remember all of the details" of what he did to design the Device, but he was able to give a thorough description of his contributions. Wyckoff Dep. at 207-08.

[12] An unsigned copy of this agreement has been located and produced.

("The element of material prejudice for laches is the same as for equitable estoppel."). Therefore, Motorola's motion for summary judgment is denied as to Count I.

### III. Summary Judgment is Appropriate on Memorylink's Correction of Inventorship of the '938 Patent.

Memorylink's remaining claims all relate to the second patent, known as the '938 Patent, which listed Schulz and Wyckoff as inventors. Memorylink first claims that, pursuant to 35 U.S.C. § 256, inventorship should be corrected to show that Strandwitz and Kniskern were the true inventors of the patent. After all reasonable inferences are drawn in its favor, Memorylink bears the burden of showing by clear and convincing evidence that Strandwitz and Kniskern were inventors of the '938 Patent. *Stern v. Trustees of Columbia Univ. in the City of New York*, 434 F.3d 1375, 1377 (Fed. Cir. 2006). But it presents no evidence to show that Strandwitz and Kniskern invented the actual technology described in the '938 Patent, instead merely arguing that they came up with the idea of using a camcorder to wirelessly transmit and receive video. Further, Strandwitz and Kniskern both admit that they did not invent the technology described in the '938 Patent.

The '938 Patent describes the invention as a "self-contained camera device and method for capturing and communicating images via a modem." The modem discussed in the '938 Patent was to be the "same shape and size as a magnetic cassette tape" such that it can be inserted and removed from the tape deck of a standard camcorder. The patent repeatedly emphasizes that data would be transmitted by modem.

When Motorola questioned Strandwitz and Kniskern about whether they had invented a device that would transmit data wirelessly by use of a modem shaped like a cassette tape, they denied inventing such a device, and even questioned why a modem would be used in that

manner. *See* Strandwitz Dep. at 232 ("I don't know why you would do that with a modem"); 236 ("I wouldn't . . . be able to say I thought of coming up with a modem to fit in a drive like that"); 237 ("I guess I don't consider that an invention very much."); Kniskern Dep. at 299 (Q: "Did you have discussions with anyone in the 1997, 1998 time frame of the concept of a removable modem that can be inserted into a camera's tape slot?" A: "No."). That the supposed inventors themselves admit that they did not conceive of a device that would work like the '938 Patent is fatal to Memorylink's claim.

Memorylink protests, however, that Strandwitz and Kniskern conceived of converting standard camcorders to allow them to transmit and receive signals. They would presumably argue that the '938 Patent falls within that general class of devices. But that does not mean that they invented the device actually described in the '938 Patent—and Strandwitz and Kniskern admit that they did not. At best, Strandwitz and Kniskern might conceivably have had a potential claim that the '938 Patent should be invalidated because it is an obvious or non-novel application of their pre-existing idea that cameras could wirelessly transmit data. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149-50 (1989) (describing requirement in patent law that "an innovation not be anticipated by the prior art in the field" and stating that an invention "will not qualify for federal patent protection if its contours are so traced by the existing technology in the field that the improvement is the work of the skillful mechanic, not that of the inventor") (internal quotation marks omitted). But Memorylink has not advanced a claim to invalidate the '938 Patent.[13]

---

[13] And in any case, it is far from clear that such a claim would have any merit.

Because Strandwitz and Kniskern admit that they were not inventors of the '938 Patent, summary judgment is granted to Motorola on Count V.

**IV.     Memorylink's State Law Claims Relating to the '938 Patent Also Fail.**

Counts VII, VIII, XI, XXII, XXIII, XXIV, XXV, and XXVI of Memorylink's complaint are all state law claims that depend on a finding that Memorylink is the owner of the '938 Patent. Because the Court has already determined that Strandwitz and Kniskern did not invent the '938 Patent, Memorylink therefore has no ownership interest in the '938 Patent. Accordingly, summary judgment is appropriate on each of these counts. Since Strandwitz and Kniskern were not inventors of the '938 Patent, Motorola did not fraudulently obtain their idea (Counts VIII, XXII, XXIV, XXVI) nor breach any fiduciary duty in obtaining the idea (Count VII), and Memorylink cannot maintain a claim that Motorola converted the idea (Counts XI, XXIII, XXV).

**V.      Motorola is Entitled to Summary Judgment on Memorylink's Breach of Contract Claims.**

Memorylink's breach of contract claims also fail to survive summary judgment. First, Memorylink alleges that Motorola breached the NDA by sharing certain confidential information with Sony in 1998. However, Memorylink is not a party to the NDA. Rather, on December 26, 1997, Motorola entered into the NDA with Adaptive, and the terms of the NDA explicitly state that it "may not be assigned by either party without the prior written consent of the other." Memorylink argues that "the parties ratified, by their conduct," an assignment of the NDA to Memorylink because Motorola would not have shared its radio technology with Memorylink or allowed Memorylink to keep the radio board unless it understood that the NDA prevented Memorylink from disclosing that technology. But that argument is woefully inadequate to

establish that the NDA was assigned, especially because the NDA requires all assignments to be in writing. The mere fact that Motorola sent certain technology to Memorylink cannot establish that Motorola acquiesced to an assignment of the NDA through a course of conduct consistent with acceptance. If merely sending sensitive technology to an outside party was sufficient to establish confidentiality obligations then Motorola would have no need of non-disclosure agreements at all. Further, Memorylink admitted in its statement of additional facts that there was no non-disclosure agreement between itself and Motorola. Dkt. 330 ¶ 52. Because Memorylink has failed to present evidence showing that it was a party to the NDA, Motorola's motion for summary judgment is granted as to Count VI.

Finally, Memorylink alleges that Motorola violated the MOU by obtaining intellectual property rights to the technology covered by the '352 Patent and the '938 Patent. Memorylink claims that Motorola violated the portion of the MOU that states that '[e]ach party will retain all rights to its own concepts and technology, including the right to transfer or license its own concepts and technology." Dkt. 1-4 ¶ 5. But, as explained above, Strandwitz and Kniskern assigned their intellectual property rights in the '352 Patent to Motorola (along with Memorylink), and Memorylink has presented no evidence to show that it developed the idea for the technology covered by the '938 Patent. Therefore, it is clear that Motorola did not violate the MOU, and it is entitled to summary judgment on Count XXI.

* * *

For the reasons set forth above, Motorola's motion for summary judgment is granted on all claims except for Count I.

21

Entered: August 15, 2013

_____
John J. Tharp, Jr.
United States District Judge